IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOSEPH C. GARCIA, | § | |
| | § | No.:3:06-CV-2185 |
| Petitioner, | § | |
| | § | |
| vs. | § | **CAPITAL CASE** |
| | § | |
| NATHANIAL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Institutional | § | |
| Division, | § | |
| | § | |
| Respondent. | § | |

*Amended*

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

**JOSEPH C. GARCIA** (hereinafter also referred to as Petitioner, Applicant, or **GARCIA**) petitions pursuant to 28 U.S.C. § 2241 & 28 U.S.C.§ 2254 for a writ of habeas corpus because he is confined by the State of Texas under a sentence of death, in violation of the laws and Constitution of the United States.

**JOSEPH C. GARCIA** has never sought federal habeas corpus relief for these convictions and sentences before. This is his first appearance in federal district court for any purpose.

# TABLE OF CONTENTS

**INTRODUCTION**

1. **BASIS OF CONFINEMENT**……………………………………………………………1

2. **OVERVIEW OF PROCEDURAL HISTORY**……………………………………………1

3. **STANDARD OF REVIEW**……………………………………………………………..2

4. **EXHAUSTION AND PROCEDURAL DEFAULT**………………………………………..6

   a.    Cause and Prejudice: State Habeas Counsel Acted Outside the Course of the Representation When Filing Mr. Garcia's Initial State Habeas Petition.…………………………………………………………………6

      (1)   Langlois violated the first habeas rule:  he failed to allege facts which would entitle Garcia to relief.  ………………………………………12

      (2)   Langlois violated the second habeas rule: habeas is not a vehicle to litigate direct appeal claims. …………………………………… …14

      (3)   Langlois failed to bring any claims of ineffective assistance of appellate counsel, though the Court of Criminal Appeals pointed out appellate counsel's deficiencies in a written opinion. ………………15

      (4)   The result was that Langlois filed another direct appeal, a pleading he was neither authorized nor court-appointed to file. …………………16

      (5)   Under *Coleman*, Langlois's actions were external to Garcia, and, "cause" under the procedural default doctrine ………………………17

      (6)   Under *Coleman*, the legal basis for several claims were not reasonably available to Garcia due to Langlois's unauthorized actions, constituting "cause." …………………………………………..17

      (7)   Furthermore, state appellate counsel's failure to bring many claims on direct appeal – thereby denying Garcia effective assistance of counsel on direct appeal – constitutes "cause" for any default of those claims……………………………………………………………20

(8)   Finally, interference by state officials in denying Garcia's request to order Langlois to file additional claims also constitutes "cause." …..21

(9)   As to prejudice, Garcia was generally denied constitutional protections of meaningful access to the courts, and his property and liberty interests were denied. ……………………………………………….22

## GROUNDS FOR RELIEF

1.   **VIOLATION OF DUE PROCESS – IMPROPER ALLOCATION OF BURDENS OF PROOF IN JURY INSTRUCTIONS.** …………………………………………………………………24

2.   **VIOLATION OF DUE PROCESS – FAILURE TO DEFINE VAGUE TERMS IN "SPECIAL ISSUES" INSTRUCTION TO THE JURY** …………………………………………………28

3.   **VIOLATION OF DUE PROCESS AND JURY TRIAL GUARANTEES BY REQUIREMENT OF 10 "NO" VOTES ON SPECIAL ISSUE #3** ……………………………………………….33

4.   **VIOLATION OF DUE PROCESS FOR FAILURE OF THE TEXAS COURT OF CRIMINAL APPEALS TO ENGAGE IN PROPORTIONALITY REVIEW IN DEATH PENALTY CASES** …38

5.   **DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL – TRIAL COUNSELS' FAILURE TO OBJECT AND PRESERVE MULTIPLE ERRORS** …………………………..40

   A.   The Standard for Ineffective Assistance of Counsel………………………40

   B.   Trial Counsel Failed to Properly Object to the Trial Court's Grant of the State's General Objection to Venireperson David Chmurzynski …………43

   C.   Trial Counsel Failed to Object to Jury Selection Process in Violation of Texas Statutes, Which Violated Garcia's Sixth Amendment Rights…………………………………………………………………………………52

   D.   Trial Counsel Failed to Object to the Prosecutor's Misstatements of Law in Closing Argument that the Verdict on Guilt Did Not Need to Be Unanimous……………………………………………………………………………61

   E.   Trial Counsel Failed to Object to the State's Mischaracterization of Evidence and Improper Argument at Closing……………………………..66

   F.   Trial Counsel Failed to Request an Anti-Parties Charge at the Punishment Phase of Trial…………………………………………………………………………68

G.  Trial Counsel was Ineffective for Failing to Object to Improper Party
    Conspiracy and Inferred Intent Instructions at the Guilt/Innocence
    Phase……………………………………………………………………..71

H.  Trial Counsel was Ineffective for Failing to Investigate Possible Mitigation
    Evidence……………………………………………………………………77

**6. DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL – APPELLATE
COUNSEL'S FAILURE TO RAISE MULTIPLE GROUNDS OF ERROR**……………………83

A.  Right to Effective Assistance of Appellate Counsel……………………84

B.  Standard for Effective Assistance of Counsel …………………………85

C.  Appellate Counsel Failed to Properly Raise the Trial Court's Improper
    Grant of the State's General Objection to Venireperson David
    Chmurzynski. …………………………………………………………..86

D.  Appellate Counsel Failed to Properly Allege that Jury Selection was
    Conducted in Violation of Texas Statutes……………………………..87

E.  Appellate Counsel Failed to Properly Brief Issue Regarding Erroneous
    Admission of Extraneous Offense Evidence…………………………..89

F.  Appellate Counsel Failed to Raise Points of Error on Jury Instructions
    Regarding Intent at Guilt or Innocence Phase of Trial…………………93

G.  Appellate Counsel Failed to Raise as Error the State's Mischaracterization
    of Evidence and Improper Argument at Closing. ………………………98

H.  Appellate Counsel Failed to Raise the Denial of a Motion to Suppress
    Evidence Obtained Under Invalid Search and Arrest Warrants………100

**7. DENIAL OF EFFECTIVE ASSISTANCE OF STATE HABEAS COUNSEL –
HABEAS COUNSELS' FAILURE TO RAISE MULTIPLE ERRORS** ………………………116

A.  Original State Habeas Counsel Denied Garcia the Competent and Effective
    Assistance of Counsel Guaranteed to Him by the Sixth and Fourteenth
    Amendments to the United States Constitution. ………………………116

## <u>CONCLUSION</u>

## <u>INDEX OF EXHIBITS</u>

Exhibit A:    Texas Court of Criminal Appeals Opinion on direct appeal in *Garcia v. State*, No. AP-74692 dated February 16, 2005 (not designated for publication).

Exhibit B:    Texas Court of Criminal Appeals Order on subsequent application for writ of habeas corpus in *Ex Parte Garcia*, No. WR-64,582-02 (Tex. Crim. App. March 5, 2008)(not designated for publication).

Exhibit C:    Subsequent Application for Post-Conviction Writ of Habeas Corpus in *Ex Parte Joseph C. Garcia*, filed in the state trial court and Court of Criminal Appeals on November 12, 2007.

Exhibit D:    Texas Court of Criminal Appeals Opinion on initial application for writ of habeas corpus in *Ex Parte Garcia*, No. WR-64,582-01, dated February 16, 2005.

Exhibit E:    Copy of Richard Langlois's current Texas state bar profile.

Exhibit F:    Correspondence between Garcia and Langlois.

Exhibit G:    Motion to Order State Court Appointed Lawyer to Submit Non-Frivolous Issue for the Record, filed in the 283rd Judicial District Court of Dallas County, Texas on July 11, 2005.

Exhibit H:    Excerpts from Application for Post-Conviction Writ of Habeas Corpus in *Ex Parte Joseph C. Garcia*, filed in the state trial court and Court of Criminal Appeals on December 14, 2004.

Exhibit I:    Correspondence between Fry and Garcia.

Exhibit J:    Mitigation Assessment and Investigation Report, along with exhibits thereto, prepared by Toni Knox, LCSW.

Exhibit K:    Record excerpt of Jury Charge at Guilt/Innocence and Punishment (CR2:282-303).

Exhibit L:    Table of Grounds and Claims.

## INTRODUCTION

### 1.   BASIS OF CONFINEMENT.

**JOSEPH C. GARCIA**, inmate number #999-441, is confined by the Texas Department of Criminal Justice, Correctional Institutions Division, Nathaniel Quarterman, Director, TDCJ-ID.   Petitioner is being denied his liberty and also faces execution under an unconstitutional conviction for capital murder and the concomitant sentence of death.

### 2.   OVERVIEW OF PROCEDURAL HISTORY.

Mr. Garcia was tried and convicted of capital murder, and sentenced to death, in the 283rd Judicial District Court in Dallas County, TX.   On direct appeal, Mr. Garcia was represented by appointed counsel William "Matt" Fry.[1]   In an unpublished opinion, the Texas Court of Criminal Appeals affirmed his conviction and sentence on February 16, 2005.[2]   Mr. Garcia was initially represented in state habeas proceedings by appointed counsel Richard Langlois.[3]   The Texas Court of Criminal Appeals denied Mr. Garcia's application for writ of habeas corpus on November 15, 2006.[4]   No petition for writ of certiorari was filed in the Supreme Court.   In subsequent state proceedings, Mr. Garcia

---

[1] *See, e.g.,* CR2:412-413, Motion for New Trial, filed by Mr. Fry on Garcia's behalf on Feb. 28, 2003.

[2] *Garcia v. State*, No. AP-74692 (Tex. Crim. App., February 16, 2005) (opinion attached hereto as Exhibit A).

[3] *See, Ex Parte Garcia*, WR-6458201, Nov. 15, 2006, Application for Post-Conviction Writ of Habeas Corpus, filed by Mr. Langlois on Garcia's behalf on Dec. 14, 2004 (excerpts attached hereto as Exhibit H).

[4] *See* Exibit D *Ex Parte Garcia,* No. WR-64582-01, Nov. 15, 2006 (Tex. Crim. App. 2006)(not designated for publication).

was represented on a *pro bono* basis by undersigned counsel.  A subsequent application for writ of habeas corpus was filed due to Langlois's failure to bring several claims in Garcia's initial state habeas application.  Mr. Garcia's subsequent application for writ of habeas corpus, filed in the Texas Court of Criminal Appeals, was denied on March 5th, 2008.[5]  Those claims that Langlois did not file in the initial state habeas petition have now been fully presented to the Texas Court of Criminal Appeals.[6]

On November 13, 2007, Garcia filed in this Court a Preliminary or Skeletal Petition for Writ of Habeas Corpus and a Motion to Stay and Abate Proceedings.  This Court administratively dismissed Mr. Garica's petition, allowing him to move to re-open and file the instant Amended Petition within 30 days of a ruling on his subsequent state habeas petition by the Texas Court of Criminal Appeals.[7]  As the Texas Court of Criminal Appeals issued its ruling on Mr. Garcia's subsequent state habeas petition on March 5, 2008, this amended petition is timely filed.

### 3.    STANDARD OF REVIEW.

Title 28, section 2254(d) of the United States Code provides:

An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to

---

[5] *See* Exhibit B, *Ex Parte Joseph C. Garcia*, No. WR-64,582-02 (Tex. Crim. App. March 5, 2008)(not designated for publication).

[6] *See* Exhibit C, Subsequent Application for Post-Conviction Writ of Habeas Corpus in *Ex Parte Joseph C. Garcia*, filed in the state trial court on November 12, 2007; and Exhibit B, Texas Court of Criminal Appeals Opinion dated March 5, 2008.

[7] *See* Order Granting Agreed Motion to Stay and Abate and Administratively Closing Case dated December 4, 2007.

any claim that was ***adjudicated on the merits*** in State court proceedings unless the adjudication of the claim –

>   (1)   resulted in a decision that was ***contrary to, or involved an unreasonable application of***, clearly established Federal law, as determined by the Supreme Court of the United States; or

>   (2)   resulted in a decision that was based on an ***unreasonable determination of the facts*** in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis supplied).

The threshold question the Court must answer under 28 U.S.C. § 2254(d) is whether the claim was adjudicated on the merits in State court proceedings. "An 'adjudication on the merits' occurs when the state court resolves the case on substantive grounds, rather than procedural grounds."[8]

When the state court adjudicates the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under the contrary to, or unreasonable application prong of § 2254(d)(1).[9] "The 'contrary to' and the 'unreasonable application' clauses in § 2254(d) have independent meaning.[10] A federal habeas court may issue a writ under the "contrary to" clause "if the state court applies a rule different from the governing law set forth in the [Supreme Court's] cases, or if it decides a case differently

---

[8] *Valdez v. Cockrell*, 274 F.3d 941, 946-947 (5th Cir. 2001), *citing Mercadel v. Cain*, 179 F.3d 271, 273 (5th Cir.1999) (holding that whether an adjudication on the merits has occurred is whether the state court disposed of the case on substantive or procedural grounds).

[9] *Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001).

[10] *Id.*

than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts."[11] Under the "unreasonable application" clause, a federal habeas court may grant a habeas writ if "the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case."[12]

When the state court adjudicates the claim on the merits, questions of fact are reviewed under § 2254(d)(2).[13]  "Under [28 U.S.C. § 2254](d)(2), a state court decision may be overturned on factual grounds if its determinations of fact are "objectively unreasonable in the light of the evidence presented in the state-court proceeding".[14]  A determination of a factual issue made by a State court shall be presumed to be correct,[15] but that presumption of correctness can be rebuttable by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).  Title 28, U.S.C., § 2254(e)2 prescribes the circumstances under which a district court can conduct a hearing.

"Notwithstanding AEDPA's requiring substantial deference for state court determinations . . . "deference does not imply abandonment or abdication of judicial review."[16]  So long as a hearing is not barred under 28 U.S.C. § 2254(e)2, a district court may conduct a hearing on whether the presumption of correctness is rebutted by clear and

---

[11] *Bell*, 122 S.Ct. at 1850.

[12] *Haynes v. Cain*, 298 F.3d 375, 379 (5th Cir. 2002).

[13] *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

[14] *Guidry v. Dretke*,  397 F.3d 306, 316-317 (5th Cir. 2005) (*citing  Miller-El,* 537 U.S. 322, 340 (2003)).

[15] According to the *Valdez* court, "the presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."  *Valdez v. Cockrell*, 274 F.3d at n.11.

[16] *Guidry*, 397 F.3d at 326 (quoting *Miller El*, 537 U.S. at 340 (2005).

convincing evidence and to aid its determination under 2254(d)(2).[17]   Under § 2254(e)2, the district court may not conduct a hearing if the petitioner "failed to develop the factual basis" for his claim in state court.[18]

> However, a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel. *Michael Williams,* 529 U.S. at 432, 120 S.Ct. 1479; *see also Dowthitt v. Johnson,* 230 F.3d 733, 758 (5th Cir.2000). Restated, if a petitioner develops a factual basis for a claim in state court (or sufficiently attempts to do so), subpart (e)(2) does *not* bar an evidentiary hearing in district court whenever the petitioner developed the facts in state court or sufficiently attempted to do so.[19]

Where there is <u>no</u> adjudication on the merits, the court is to review the claim *de novo*.[20]  In the case at bar, for those grounds that the Texas state courts did not adjudicate Mr. Garcia's claim on the merits, this Court is compelled to review the habeas petition and grant relief based on the federal court's independent consideration of the merits of the claim, subject to judicially-established principles of federal habeas review.

---

[17] *Id.*
[18] 28 U.S.C. § 2254(e)2.
[19] *Guidry* at 323.
[20] *See  Fisher v. Texas,* 169 F.3d 295, 300 (5th Cir.1999) (finding that where a state habeas court decided the habeas applicant's claim on procedural grounds, there had not been an "adjudication on the merits").

**4.    EXHAUSTION AND PROCEDURAL DEFAULT.**

Respondent will likely argue that one or more of Mr. Garcia's claims are procedurally defaulted.[21]   However, based on the reasons articulated below, Mr. Garcia can demonstrate cause and prejudice to excuse any default, and/or alternatively, that he is excused from the exhaustion requirement of 28 U.S.C. § 2254 (b)(1)(ii) altogether.

**a.  Cause and Prejudice: State Habeas Counsel Acted Outside the Course of the Representation When Filing Mr. Garcia's Initial State Habeas Petition.**

Although Mr. Garcia is aware that the Fifth Circuit has rejected a cause-and-prejudice argument to excuse unexhaustion and procedural default due to ineffective assistance of state habeas counsel, he preserves it here for further appellate review.[22]

Furthermore, Garcia contends here that the cause and prejudice requirements are fulfilled because Langlois's actions in filing his initial writ cannot be imputed to Garcia – meeting the cause prong of the analysis.  (The prejudice prong of the analysis is addressed in sections below presenting Garcia's various grounds for relief herein).

A petitioner is not liable for attorney errors committed when the attorney functions outside 'the course of the representation' or does not act 'in furtherance of the litigation.' As articulated by Professor Liebman:

---

[21] *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Martinez v. Johnson*, 255 F.3d 229, 237-241 (5th Cir. 2001); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).

[22] *Martinez v. Johnson*, 255 F.3d 229, 238 n.10 (5th Cir. 1991)[22] ("failure to provide 'competent' counsel for a state habeas petition does not fall under the general catch-all exception provided in 28 U.S.C. § 2254(b)(1)(B)(ii).").

Although as indicated above, the Court has not yet supplied an "exhaustive catalog of ... objective impediments to compliance with a procedural rule," the Court, or in some cases the lower courts, have concluded that the following situations satisfy the "cause" requirement:

> Petitioner's counsel was responsible for the default and counsel's actions (or omissions) in this regard may properly be "imputed to the State" because:
>
> \*\*\*
>
> Petitioner's counsel was responsible for the default, but petitioner cannot be required to "bear the risk of attorney error that result[ed] [in the] procedural default" because counsel was not acting as "petitioner's agent" with regard to the default.[23]

The cause and prejudice analysis is premised on agency law, which formed a critical part of the analysis by the United States Supreme Court in *Coleman v. Thompson*.[24]   In *Coleman*, the Supreme Court rejected counsel's ineffectiveness as "cause" stating that "[i]n a case such as this, where the alleged attorney error is inadvertence in failing to file a timely notice, such a rule would be contrary to well-settled principles of agency law.[25]

Conversely the principle, implicitly if not explicitly, stated in *Coleman* is:

---

[23] *Randy Hertz & James Liebman*, 2 FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE 1197, 1208, 1213 (4th ed. 2001).

[24]   501 U.S. 722, 731-32, 745-750, 754 (1991); *but see Martinez v. Johnson*, 255 F.3d 229, 239-240 (5th Cir. 2001) (holding  "This court is foreclosed by precedent from considering whether an exception exists under the *Coleman* rule.") and *compare Ex parte Graves*, 70 S.W.3d 103, 124 (Tex. Crim. App. 2002) (Price, J., dissenting, Holcomb, J. joined) ("To the extent that the Fifth Circuit Court of Appeals holds that the question no longer remains open, that Court is mistaken. And to the extent that the majority fails to address this open question, it is also wrong.").

[25] *Coleman v. Thompson*, 501 U.S. at 752-57; *See also*, RESTATEMENT (SECOND) OF AGENCY § 242 (1958) (master is subject to liability for harm caused by negligent conduct of servant within the scope of employment).

[Except in specific circumstances], [a] master is not subject to liability for the torts of his servants acting outside the scope of their employment.[26]

"Agency is the … relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and *subject to his control*, and consent by the other so to act."[27]  "For an agency relationship to exist, there must be a meeting of the minds between the parties to establish the relationship and there must be some act constituting the appointment of the agent. The consent, however, may be express or implied; **the intention of the parties may be ascertained by their conduct.** Indeed, even though a written agreement is labeled an 'agency' agreement, that designation is not controlling, and **the legal effect of the relation must be determined from** the **provisions of the contract** and **the facts of the relationship."**[28]

"**[T]he law does not presume an agency relationship**, and the person alleging such a relationship has the burden of proving it."[29]  "[E]ven though one acts for and in behalf of another, if he is not under that other person's control, the relation of agency does not exist."[30] "Essential to an agency relationship is the principal's right to assign the

---

[26] RESTATEMENT (SECOND) OF AGENCY § 219(2) (1958).
[27] <u>RESTATEMENT (SECOND) OF AGENCY § 1 (1958)</u> (emphasis added).
[28] 3 Tex. Jur. 3d Agency 1 (internal footnotes omitted).
[29] *Alvarado v. State*, 853 S.W.2d 17, 22-23 (Tex. Crim. App. 1993) (citing *Buchoz v. Klein*, 184 S.W.2d 271, 286 (Tex. 1994)).  Because agency is based on state law, Texas law applies.  *See Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 364 (5th Cir. 2000).  Even under federal law, an agency relationship may not be presumed.  *Rainey v. Town of Warren*, 80 F. Supp.2d 5 (D.R.I. 2000).
[30] *Walker v. Federal Kemper Life Assur. Co.*, 828 S.W.2d 442, 452 (Tex.App.—San Antonio 1992).

agent's task and to control the means and details of the process by which the agent will accomplish the task."[31]

Langlois was thrust upon Garcia by the State of Texas when he was appointed to represent Garcia. Thus, there was no physical, documented contract between the parties. In such a case, where an attorney is appointed and he and his client have not come to an agreement as to the scope of the attorney's duties prior to the representation, the implied terms of the contract would seem to naturally include – at a minimum – that Langlois fulfill his duties under state statute and standards promulgated by the state bar.[32] Langlois's knowledge of his obligations to Garcia under § 11.071 are apparent in Langlois's own filings. Before ever writing to Garcia, Langlois filed a Motion for Extension of Time to file the original petition, stating the following:

> [C]ounsel must conduct an independent investigation of possible claims not raised on direct appeal. This requires counsel to travel to death row to visit applicant and interview applicant and [sic] consider all unchallenged claims on direct appeal. It also requires counsel to review the standard of effective assistance of trial counsel. . . .

and

---

[31] *Webster v. Lipsey*, 787 S.W.2d 631, 635 (Tex.App.—Houston [14th Dist.] 1990, writ denied).

[32] In this vein*, see* Exhibit D, a copy of Langlois's current Texas state bar profile, noting that Langlois is certified by the Texas Board of Legal Specialization in Criminal Law. The exhibit also contains a pamphlet downloaded from the Texas Board of Legal Specialization website entitled "What is a Criminal Law Board Certified Attorney?" The pamphlet notes the procedures and requirements for a lawyer to become board certified, and notes that to become certified, a lawyer "must also have extensive knowledge of state and federal constitutional law, evidence, procedure and penal laws involved in the trial of these matters." Texas courts have found that capital defendants are only entitled to "competent" counsel in state habeas proceedings (*Ex parte Graves*, 70 .W.3d 103 (Tex. Crim.. App. 2002). Leaving aside for the moment what "compentence" in this realm entails, surely the state court – in appointing Langlois – and Garcia would be entitled to rely on Langlois's general abilities as he reports them to the state bar.

> Counsel must also present all claims to avoid the procedural-default doctrine which precludes federal habeas review when the last reasoned state-court [sic] opinion addressing a claim explicitly rejects it on a state procedural ground. [33]

Analysis of contract terms certainly do not establish an agency relationship in this case.

As to the facts of the relationship and a meeting of the minds, the clear answer is that no meeting of the minds ever occurred between Garcia and Langlois, and Langois brazenly acted outside Garcia's control.  Garcia first contacted Langlois on March 10, 2004, stating he was aware that Langlois had been appointed and noting that Garcia had not received any letter from Langlois "informing me [Garcia] of your [Langlois's] new duties."[34]  No answer was received from Langlois.  Garcia wrote again on November 12, 2004, stating that Garcia "really need to see you and hear from you [Langlois] . . . This is my second attempt to contact you and I haven't heard anything from you since you've been appointed."[35]

Langlois finally wrote to Garcia on November 13, 2004, stating that he planned to file Garcia's state habeas petition before December 11, 2004, and that Langlois would "attempt to visit you [Garcia] this month to go over my efforts on your behalf."[36] Langlois did not visit Garcia, instead sending him a letter with a copy of the writ that

---

[33] Motion for 90 Day Extention to File Original Writ of Habeas Corpus with Finding for Good Cause; filed in the 283rd District Court of Dallas County, Texas, on August 23, 2004.

[34] *See* Exhibit F, correspondence between Garcia and Langlois, (Letter dated March 10, 2004). As this correspondence is submitted here only in the context of whether an agency relationship existed, portions of the correspondence having to do with Garcia's underlying conviction have been redacted.

[35] *See* Exhibit F, correspondence between Garcia and Langlois, (Letter dated November 12, 2004).

[36] Exhibit F (Letter dated November 13, 2004).

Langlois filed. [37]  Langlois noted in this letter that if he "failed to raise any issue, those issues generally are not available for federal review."  Obviously, Langlois did not bother to discuss with Garcia the issues – either raised or not raised - in the initial state habeas petition before filing it.

From there, the relationship went further downhill.  Garcia went so far as to file a motion with the trial court on July 11, 2005, requesting that Langlois be ordered to submit one particular issue for review, and complaining of Langlois's representation.[38]  The motion was summarily denied the next day.[39]

Viewing the parties' relationship, then, the Court is faced with an appointed lawyer who failed to communicate even that he represented his client for months after he was appointed.  After Garcia wrote to Langlois twice, both times questioning what Langlois was doing and requesting that he come and talk to Garcia, Langlois finally deigned to write to him – some eight months after receiving Garcia's first letter.  Langlois then mislead Garcia by telling him that he would come and speak with Garcia about issues to be raised in the petition.  Without ever having a discussion with Garcia about issues that were or were not raised, Langlois filed the petition.  Later, when Garcia asked the state court's help in making Langlois raise a particular issue, the court refused.

---

[37] Exhibit F (Letter dated December 11, 2004).  The writ was actually file stamped on December 14, 2004.

[38] *See* Exhibit G, Motion to Order State Court Appointed Lawyer to Submit Non-Frivolous Issue for the Record, filed in the 283rd Judicial District Court of Dallas County, Texas on July 11, 2005.

[39] *Id.* at page 2.

AMENDED PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN CUSTODY

In this situation, there is no justification for holding Garcia liable for Langlois's errors when Langlois – under the *Coleman* Court's agency law analysis – acted outside the course of the representation.   Under these circumstances, Langlois's actions must be deemed "something external to the petitioner, something that cannot be fairly attributable to him and therefore a basis for finding 'cause' under the procedural default doctrine."[40]

### (1)   Langlois violated the first habeas rule:  he failed to allege facts which would entitle Garcia to relief.

The first rule of habeas corpus is that the petitioner has the burden of alleging facts which entitle him to relief.[41]   As appointed counsel, Langlois's duty to investigate was clearly stated in Texas statutes:   Langlois was charged with "investigat[ing] expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus."[42]   Additionally, Langlois's burden of allegation and proof had been clearly stated in state case law.   More than fifteen years prior to Mr. Garcia's state habeas proceeding, Texas law was clear that "[i]n a post conviction collateral attack, the burden is on the applicant to allege and prove facts which, if true, entitle him to relief."[43]

Rather than rising to his duty and burden, Langlois filed an apparently boilerplate state habeas petition, complete with boilerplate arguments obviously cut-and-pasted into a

---

[40] *Hertz & Liebman*, at 1213, n.39.

[41] JOHN G. JASUTA, *Post Conviction Remedies Pursuant to Article 11.071*, STATE BAR OF TEXAS, TEXAS CRIMINAL APPELLATE MANUAL J-11 (1996).

[42] Tex. Code Crim. Proc., Art. 11.071 § 3.

[43] *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985).

form, with mismatched fonts and spacing.[44]  Langlois, having never met with Mr. Garcia, failed to file *any* extra-record grounds for relief.  Langlois also appears to have failed to undertake *any* adequate, independent fact investigation, despite his clear duty to do so under then-existing Texas case law, State Bar guidelines, and ABA guidelines.[45]  Furthermore, despite requesting an extension of time in which to file Proposed Findings of Fact and Conclusions of Law on behalf of Mr. Garcia, Langlois apparently never filed any (there is no indication of any in the record), and merely left the state court to consider the extensive Proposed Findings of Fact and Conclusions of Law filed by the state.

Indeed, the state court's ultimate Findings of Fact and Conclusions of Law were those which it adopted, ***verbatim***, from the State's proposals.  As a result, the Findings of Fact and Conclusion of Law continuously recite that the state habeas claims are record-based claims, with no extrinsic record support.  For example:

> Grounds 1-6:  ("The Court notes that habeas corpus is not a substitute for appeal. . . . The Court finds that applicant's claim . . . could have been, but was not, raised on direct appeal. . . Accordingly, the Court concludes that applicant's first ground for relief is procedurally barred and should not be addressed.  The Court further notes that an applicant is barred from challenging the effectiveness of trial counsel for the first time of [sic] habeas review when he has failed to utilize the habeas process to develop additional evidence to support his claim. . . . The Court finds that applicant has not submitted any new evidence, derived from the habeas process, to substantiate his allegation . . . that he was denied his federal constitutional

---

[44]  *See, e.g.,* Exhibit G, Application for Post-Conviction Writ of Habeas Corpus in *Ex Parte Joseph C. Garcia*, filed in the state trial court and Court of Criminal Appeals on December 14, 2004, at pp. 118-119.

[45]  ABA Guidelines 11.9.3 (1989) admonish that post-conviction counsel "should consider conducting a full investigation of the case, relating to both the guilt/innocence and sentencing phases."

right to effective assistance of [trial] counsel.  Instead, applicant relies
exclusively on information contained in the trial record, which was
available to him on direct appeal. . . . The Court finds that applicant's
ineffective-assistance claims could have been, but were not, raised on direct
appeal.")[46]

### (2) Langlois violated the second habeas rule: habeas is not a vehicle to litigate direct appeal claims.

Mr. Langlois violated the second habeas rule, when most of the claims he asserted

could have been raised on direct appeal.  A habeas proceeding is not a vehicle to litigate

matters which should and could have been raised on direct appeal.[47]  The Findings of Fact

and Conclusions of Law repeatedly reject the state habeas claims on the basis that they

could have been raised on direct appeal.[48]  Alternatively, the trial court found that each

ground was without merit, since no extra-record evidence was presented in support of

those claims.[49]

---

[46] See [CR3:358-360], Court's Findings of Fact and Conclusions of Law.

[47] *Ex parte Ramos*, 977 S.W.2d 616 (Tex. Crim. App. 1998); *Ex parte Gardner*, 959 S.W.2d 189 (Tex. Crim. App. 1998).

[48] *See, e.g.,* CR3:359-367, Findings of Fact and Conclusions of Law (assessing Garcia's claims that his federal and state constitutional rights were denied by trial counsels' failure to request a jury instruction on the lesser-included offense of felony murder).  One repeated finding made by the court was that Garcia failed to properly present and argue his state constitutional claims by not, pursuant to Texas case law, urge that the Texas constitution afforded greater protection than the federal constitution.  This latter finding led to findings that Garcia's state constitutional claims were also procedurally defaulted.  CR3:368.

[49] *See, e.g.,* CR3:399-400, Findings of Fact and Conclusions of Law (assessing Garcia's claims that he was denied effective assistance of trial counsel when trial counsel failed to object to the jury charge  that contained disjunctive means of committing capital murder.  The court found that "the trial record [was] silent as to why counsel did not object to the charge [and] applicant [did not provide the court] with any extrinsic evidence of counsel's reasoning."  *Id.* at 400.

> **(3)** **Langlois failed to bring any claims of ineffective assistance of appellate counsel, though the Court of Criminal Appeals pointed out appellate counsel's deficiencies in a written opinion.**

Langlois compounded these errors further – by failing to raise *any* ineffective assistance of appellate counsel claims in his initial writ – though the Texas Court of Criminal Appeals could not have been more clear that such claims existed when it noted several deficiencies of state appellate counsel in the court's opinion on appeal:

> With the single exception of setting out what is required to preserve error on these points, appellant has not cited to any authority. However, we will, in the interest of justice, review the record and address the points on their merits. A review of the record shows that the points are otherwise preserved for review."[50]

Later in the opinion, the court noted on another ground of error:

> In his eighth point of error, appellant complains that the trial court erred in admitting evidence during the guilt phase concerning two extraneous offenses: (1) appellant's escaping from prison, and (2) the escapees' taking of numerous firearms during the escape. Appellant asserts that the admission of this evidence violated Texas Rules of Evidence 401, 402, 403, and 404(b). He also asserts that the trial court should have granted his request for a limiting instruction once the evidence was admitted.
>
> With regard to appellant's claims that the admission of the evidence was more prejudicial than probative or that he was entitled to a limiting instruction regarding the evidence, he has wholly failed to present anything more than conclusory statements. He has inadequately briefed these complaints, and we will not address them. Tex. R. App. P. 38.1(h). Point of error eight is overruled."[51]

---

[50] Exhibit A, *Garcia v. State*, AP-74,692 (Tex. Crim. App., February 16, 2005).

[51] Exhibit A, *Garcia v. State*, AP-74,692 (Tex. Crim. App., February 16, 2005).

Apparently the Court of Criminal Appeals felt no need to review the record on this point "in the interests of justice."  And neither did Langlois, since there is nothing in the original writ concerning the deficiencies of appellate counsel.  Because the original writ was filed before the CCA ruled on the original appeal, Langlois had not divined what the court would determine to be adequate presentation of appellate error.  Had he waited[52] or been able to wait until the CCA rendered its decision on February 16, 2005, Langlois would have at least had the option to include a ground that Mr. Garcia had been denied his right to have an effective counsel on direct appeal.

> **(4)    The result was that Langlois filed another direct appeal, a pleading he was neither authorized nor court-appointed to file.**

The result of the failure to do an independent and adequate postconviction investigation, and support the state habeas claims with extrinsic extra-record evidence resulted in the filing of another, but unauthorized direct appeal in a capital habeas proceeding.[53]  Rather than filing a "document worthy of the title 'writ application,'" Langlois filed another direct appeal, a document which he was not authorized or court-appointed to file.[54]

---

[52] Although the statute requires the filing of the writ no later than 180 days from the date of appointment or not later than the 45th day after the state's original brief on direct appeal is filed, see art. 11.071, §4(a), the writ lawyer requested an extension.  The state's appellate brief was filed on July 28, 2004.  That would have made the writ due on September 11, 2004.  On August 17, 2004, Langlois requested a 90-day extension to file the writ with the trial court, moving the deadline to file the writ to December 11, 2004, a Saturday.  The writ was filed on Tuesday, December 14, 2004.

[53] *Compare Ex Part Kerr*, 64 S.W.3d 414, 416 (Tex. Crim. App. 2002).

[54] *Ex Parte Kerr*, 64 S.W.3d at 416.

> **(5)     Under *Coleman*, Langlois's actions were external to Garcia, and, "cause" under the procedural default doctrine.**

Tex. Code Crim. Proc. 11.071, § 2(a) allows a defendant to make an election to either act *pro se* or to have a state habeas attorney represent him. Garcia's election to seek counsel came with a realistic expectation that his state habeas attorney would act in accord with the mandates set down for filing an initial writ application.

To the extent that this court finds that each of the claims raised in this amended federal habeas petition is unexhausted and/or procedurally defaulted, then there is a *prima facie* showing that Langlois did not file "an initial writ application" seeking "relief from a judgment imposing a penalty of death."[55] Garcia was deprived of his "one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute" – not only in state habeas, but in federal proceedings, as well.

> **(6)     Under *Coleman*, the legal basis for several claims were not reasonably available to Garcia due to Langlois's unauthorized actions, constituting "cause."**

Langlois's unauthorized actions in *not* filing meritorious claims cannot be attributed to Garcia. Though Texas law recognizes that "the relationship of attorney and client is one of agency,"[56] and that "under this rule, the omissions, as well as the commissions, of an attorney are to be regarded as the acts of the client whom he

---

[55] *Ex parte Kerr*, 64 S.W.3d at 419 (quoting Tex. Code Crim. Proc. 11. 071, § 1).
[56] *Texas Emp. Ins. Ass'n v. Wermske*, 349 S.W.2d 90, 93 (Tex. 1961).

represents; and his neglect is equivalent to the neglect of the client himself,"[57] Mr. Langlois's failings cannot be attributed to Mr. Garcia when no true agency relationship existed.

Courts have certainly recognized the near impossibility of a capital defendant, unlearned in the law, being able to properly assert claims absent the assistance of a lawyer.  For instance, although discussing the right to counsel in a criminal trial, Justice Black, in *Gideon v. Wainright,*[58] concisely stated the reason why counsel is needed "at every sep in the proceedings against him:"

> From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law.  This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.  A defendant's need for a lawyer is nowhere better stated than in the moving words of Mr. Justice Sutherland in *Powell v. Alabama*:
>
>> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel, he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be

---

[57] *Id.*

[58] 372 U.S. 335 (1963).

not guilty, he faces the danger of conviction because he does not know how to establish his innocence.[59]

Technical claims based on decades of case law interpreting the Constitution, as well as technical standards for alleging and making showings on such claims, surely come within the realm of items that a petitioner must depend on habeas counsel for knowledge of. When counsel, however, fails to act as a petitioner's agent and fails to communicate with his client, such claims are basically foreclosed from the petitioner. In this case, for instance, many of Garcia's claims of ineffective assistance of trial counsel were not available to him on the date that his initial state habeas application was filed, since Langlois apparently failed to recognize them, and certainly failed to communicate with Garcia about those claims. The factual bases for those claims were thus not ascertainable by Mr. Garcia through the exercise of reasonable diligence on or before the date of his initial filing.

Mr. Garcia's claim of ineffective assistance of counsel on appeal (for counsel's failure to properly present claims that admission of certain evidence at trial was more prejudicial than probative, and that he was entitled to a limiting instruction on the evidence) could not have been evident to Garcia. The factual basis for that claim was not available on the date that Garcia's initial petition was filed by Langlois (December 14,

---

[59] *Id.* at 344-45 (citing *Powell v. Alabama*, 287 U.S. at 68-69). The issue is similar to issues faced by immigrants relying upon counsel regarding immigration proceedings. Failures of immigration counsel have been found to constitute ineffective assistance in those proceedings and "exceptional circumstances" that require a reversal of a removal order. *See Aris v. Mukasey*, ___ F.3d ___, 2008 WL 441800 at *3-5 (2nd Cir. 2008).

2004), as it was not apparent until the Court of Criminal Appeals issued its opinion in Mr.

Garcia's state appeal on February 16, 2005.[60]   Under *Coleman*, because the factual and/or

legal bases for these claims were not reasonably available to Garcia when his initial

petition was filed, the "cause" requirement is met.[61]

> **(7)**   **Furthermore, state appellate counsel's failure to
> bring many claims on direct appeal – thereby
> denying Garcia effective assistance of counsel on
> direct appeal – constitutes "cause" for any default
> of those claims.**

In addition to Langlois's failures, Garcia's appointed counsel on appeal, William

"Matt" Fry, failed to raise myriad grounds on direct appeal.[62]   As a result, the trial court's

Findings of Fact and Conclusions of Law (adopted verbatim from the state's proposed

findings and conclusions) noted over and over again that Garcia's state writ claims were

defaulted, because they could have, but were not, raised on direct appeal.[63]   Additionally,

the Texas Court of Criminal Appeals held that some claims that *were* actually raised on

direct appeal were briefed so poorly that the court would not consider them.[64]

---

[60] *See* Exhibit A, *State v. Garcia*, AP-74,692 (Tex. Crim. App., February 16, 2005)("With regard
to appellant's claims that the admission of evidence was more prejudicial than probative or that
he was entitled to a limiting instruction regarding the evidence, he has wholly failed to present
anything more than conclusory statements.  He has inadequately briefed these complaints, and
we will not address them.")..
[61] *Coleman*, 501 U.S. at 753 (quoted in *Martinez v. Johnson*, 255 F.3d at 240).
[62] *See, e.g.,* Findings of Fact and Conclusions of Law; *Garcia v. State*, AP-74,692 (Tex. Crim.
App., February 16, 2005).
[63] *Id.*
[64] *See* Exhibit A, *State v. Garcia*, AP-74,692 (Tex. Crim. App., February 16, 2005)("With regard
to appellant's claims that the admission of evidence was more prejudicial than probative or that
he was entitled to a limiting instruction regarding the evidence, he has wholly failed to present

Much like Langlois's actions with regard to his client, Fry never once met with Garcia before his appeal was filed.  He wrote Garcia a total of three times – on April 1, 2003, December 19, 2003, and finally on January 27, 2004.[65]  The last letter in January 2004 informed Garcia that the appeal brief had been filed.  Had Fry ever met with his client to discuss several claims that were on the record (raised here) or briefed all claims actually brought sufficiently, there is a reasonable probability that the Texas Court of Criminal Appeals would have found error and remanded the case.  To find that appellate counsel (while failing to engage in such basic contact with his client, failing to raise several obvious record-based claims, and failing to brief issues sufficiently so that the appellate court would actually consider them) acted as a true agent of Garcia would defy logic and common sense.   Appellate counsel's shortcomings, amounting to ineffectiveness under *Strickland*, denied Garcia any reasonable ability to bring many meritorious claims.

> **(8)    Finally, interference by state officials in denying Garcia's request to order Langlois to file additional claims also constitutes "cause."**

It was clear to state actors in 2005 that Langlois was not acting as Garcia's agent when Garcia filed his motion with the trial court, asking the trial judge to order Langlois

---

anything more than conclusory statements.  He has inadequately briefed these complaints, and we will not address them.").

[65] See Exhibit I, correspondence between Fry and Garcia.

to assert a meritorious claim on his behalf.[66]   In essence, Garcia's motion was a plea to the court to force Langlois to actually act as an agent would – under Garcia's direction and subject to his control.   Rather than providing any relief to Garcia, however, the trial court summarily denied the motion.   A state official thus assisted, enabled or perhaps even encouraged, Langlois's unauthorized actions to continue.   Under *Coleman*, such "interference by officials" also constitutes "cause" under the procedural default analysis.[67]

> **(9)     As to prejudice, Garcia was generally denied constitutional protections of meaningful access to the courts, and his property and liberty interests were denied.[68]**

While Langlois functioned outside the course of the representation and did not act in furtherance of the litigation, Garcia was denied his constitutional right of access to the courts, which applies regardless of the existence of a constitutional right to counsel in state habeas proceedings.   It is well-established that a prisoner has a right under the First and Fourteenth Amendments to meaningful access to the courts.[69]   This deprivation –

---

[66] *See* Exhibit F, Motion to Order State Court Appointed Lawyer to Submit Non-Frivolous Issue for the Record, filed in the 283rd Judicial District Court of Dallas County, Texas on July 11, 2005.

[67] *Coleman*, 501 U.S. at 753 (quoted in *Martinez v. Johnson*, 255 F.3d at 240) ("For example, a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials . . . made compliance ***impracticable,*** would constitute cause under the standard.") (emphasis added).

[68] Additional specific examples of prejudice are addressed with regard to each of Garcia's grounds of error below.

[69] *Crowder v. Sinyard*, 884 F.2d 804, 811 (5th Cir. 1989) *(overruled on other grounds); Horton v. California*, 496 U.S. 128 (1990).   *See also* U.S. CONST. Art. 1, Sec. 9. ("The privilege of the writ of habeas corpus shall not be suspended . . .").

which is an independent constitutional violation – constitutes cause *and* prejudice.[70]  This

right is violated when a state actor blocks access to the courts in a manner that hinders the

ability to pursue a legal claim.

Mr. Garcia was also denied his procedural due process rights under the Due

Process Clause of the Fourteenth Amendment:

> Procedural due process rules are meant to protect persons not from the
> deprivation, but from the mistaken or unjustified deprivation of life, liberty,
> or property. . . .   Such rules "minimize substantively unfair or mistaken
> deprivations of" life, liberty, or property by enabling persons to contest the
> basis upon which a State proposes to deprive them of protected interests.[71]

Furthermore, Mr. Garcia was denied his constitutionally-protected property and

liberty interests[72]  under TEX. CODE CRIM. PROC. art. 11.071, which the Texas Court of

Criminal Appeals expressly recognized in *Ex Parte Graves*.   Finally, Garcia was denied

constitutional protections as discussed below, amounting to actual prejudice.

---

[70] *See Martinez v. Johnson*, 255 F.3d at 240-241 (citing controlling precedent in the Fifth Circuit
holding that "error committed in a post-conviction application, where there is no constitutional
right to counsel, cannot constitute cause," but also citing controlling precedent holding that such
ineffectiveness of state habeas counsel *"will* constitute cause [ ] if it is an independent
constitutional violation.")(internal citations omitted).  In this case, while Garcia absolutely argues
that state habeas counsel was ineffective, the larger issue in his case is Texas's *ineffective system*
that fails to protect the rights of capital defendants.  Garcia's appointed appellate counsel was
ineffective.  His errors were not raised by appointed state habeas counsel.  Nor did habeas
counsel bring other obvious claims, or any extra record claims, on review.  Under the Texas
system of appointing counsel to indigent capital defendants, when the appeal and writ run on
parallel tracks, at the same time; when the lawyers who are appointed are, at times, "appalingly
inept," (*see Ruiz v. Quarterman,* 504 F.3d 523, 530-31 (5th Cir. 2007)), something is horribly
awry.  The state, who appoints counsel, forces them to work on parallel tracks (yet does not force
them to talk to each other or even their client while so doing), should not gain a procedural
default benefit due to its own broken system.  Such results merely elevate form over substance –
to the severe detriment of Texas capital defendants.
[71]   *Carey v. Piphus*, 435 U.S. 247, 259-60 (1978).
[72]   *Goss v. Lopez*, 95 S. Ct. 729, 735 (1975).

## GROUNDS FOR RELIEF[73]

### 1.   VIOLATION OF DUE PROCESS – IMPROPER ALLOCATION OF BURDENS OF PROOF IN JURY INSTRUCTIONS.[74]

#### a. Factual Background

The current "mitigation" special issue in Texas, and the one applied in this case

was as follows:

> Do you find, taking into consideration all of the evidence,
> including the circumstances of the offense, the defendant's
> character and background, and the personal moral culpability
> of the defendant, that there is a sufficient mitigating
> circumstance or circumstances to warrant that a sentence of
> life imprisonment rather than a death sentence be imposed?

(CR 2:303).

Consistent with current Texas law, the jury charge did not impose any burden of

proof as to mitigation on either the State or Appellant.  Appellant objected at trial on the

basis that the court's charge failed to place the burden of proof as to the above special

issue upon the State.  Appellant's objection was overruled. (RR.44, 44-45).

---

[73] Twelve of the federal constitutional claims presented in Garcia's initial state habeas application are presented here.  (Several of the claims presented in Garcia's initial state habeas application have been grouped together in this Petition).  Additionally, seven federal constitutional claims presented in Garcia's subsequent state habeas application are presented here.  A table of claims presented in Garcia's state petitions, his Skeletal Petition in this Court, and the instant Amended Petition is attached hereto as Exhibit L – Table of Grounds and Claims).

[74] Claims 7, 9, and 43 presented in Garcia's initial state habeas application; Grounds Two and Three cited in Petitioner's Skeleton Brief filed in this Court.

### b. Argument

Mr. Garcia recognizes at the outset that this issue is currently foreclosed in the Fifth Circuit.[75] The claim is raised and argued here to preserve it for a potential further review.

The United States Supreme Court declared that Arizona's capital sentencing scheme violated the Sixth Amendment's jury trial guarantee because Arizona trial judges determined whether aggravating factors existed which justified imposition of the death penalty.[76] Applying the holdings from its previous decisions in *Jones v. United States*,[77] and in *Apprendi v. New Jersey*,[78] the Supreme Court held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."[79] "If a State makes an increase in a defendant's authorized punishment contingent on the finding of fact, that fact–no matter how the state labels it–must be found by a jury beyond a reasonable doubt."[80] Therefore, that which has the effect of increasing punishment beyond a maximum statutory sentence must be considered the functional

---

[75]*See Rowell v. Dretke,* 398 F.3d 370 (5th Cir. 2005).
[76] *See Ring v. Arizona,* 536 U.S. 584 (2002).
[77] 526 U.S. 227(1999).
[78] 530 U.S. 466 (2000).
[79] *Jones*, 526 U.S. at 243 n. 6.
[80] *Apprendi*, 530 U.S. at 482-83.

equivalent of an element of an offense greater than the one covered by the jury's guilty verdict.[81]

*Apprendi* involved a New Jersey "hate crime" statue that provided for a lengthier prison term if the trial judge found, by a preponderance of the evidence, that a defendant committed a crime with a biased purpose. The Supreme Court held that the Due Process Clause required that such a factual determination be made by a jury on the basis of proof beyond a reasonable doubt.[82]  The Court based its holding in the fact that if a "sentencing factor" serves to increase a sentence beyond the maximum sentence otherwise statutorily authorized, "it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense."[83]

*Apprendi*'s "element's rule" was extended to capital prosecutions in *Ring v. Arizona*.[84]  In *Ring*, the Supreme Court held that, under *Apprendi*, "[b]ecause Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires that they be found by a jury."[85]

A distinction must be drawn between the "elements" of a crime and factors that simply influence a criminal sentence.  For example, a finding that only increases a mandatory *minimum* penalty is not an element of a separate offense, and therefore need

---

[81] *Id.,* 530 U.S. at 495.
[82] *Id.,* 530 U.S. at 490.
[83] *Id.* at 494 n. 19.
[84] 536 U.S. 584 (2002).
[85] 536 U.S. 584, 605 (quoting *Apprendi*, 530 U.S. at 494).

not be proven beyond a reasonable doubt.[86]   But facts "setting the outer limits of a sentence, and of the judicial power to impose it, are the elements of the crime for the purposes of the constitutional analysis."[87]

In the instant case, the jury's guilty verdict would have resulted in a life sentence unless and until the State proved beyond a reasonable doubt that answers to the first two special issues were "yes." This additional requirement of proving the first two special issues, once satisfied, would have acted to convert a life sentence to that of death. The State's failure to convince the jury that the first two special issues should be answered "yes," or failure of jurors to unanimously agree, would have resulted in imposition of the life sentence applicable once finding a guilt occurred.   In that respect, the special issues are factors which are virtually indistinguishable from the aggravating circumstances found to be "the functional equivalent of an element of a greater offense."[88]

The Texas special issues constitute death-eligibility factors which are the functional equivalents of elements, and must therefore be proven to a jury beyond a reasonable doubt. Because the mitigation special issue fails to require that the State prove lack of sufficient mitigation beyond a reasonable doubt, the Texas death penalty scheme violates the Due Process Clause of the United States Constitution.[89]

---

[86] *Harris v. United States,* 536 U.S. at 557 (discussing *McMillan v. Pennsylvania*, 477 U.S. 79 (1986)).

[87] *Id.,* 536 U.S. at 567.

[88] *Ring*, 536 U.S. at 609 , quoting *Apprendi*, 530 U.S. at 494 n. (holding that death-eligibility factors "operate as 'the functional equivalent of an element of a greater offense.'")

[89] U.S. CONST., amend XIV.

The Court of Criminal Appeals rejection of this claim was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Apprendi*, *Jones*, and *Ring*. Adopting state-prepared findings of fact, the state District Court and the Court of Criminal Appeals stated that "article 37.071 requires the State to prove beyond a reasonable doubt – and the jury to find – every fact legally necessary for imposition of the death penalty. . . .the mitigation special issue exists to give the jury an opportunity to reduce the defendant's sentence to life imprisonment."[90] This is an unreasonable application of *Apprendi,* for the jury's no vote on mitigation effectively increased the statutory maximum from life imprisonment to death. The trial court's imposition of the death sentence should be reversed.

## 2. VIOLATION OF DUE PROCESS – FAILURE TO DEFINE VAGUE TERMS IN "SPECIAL ISSUES" INSTRUCTION TO THE JURY.[91]

### a. Factual Background

In the punishment phase, the jury was instructed pursuant to Article 37.071 of the Texas Code of Criminal Procedure as follows:

<u>Special Issue No. 1</u>

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Joseph Garcia, would commit criminal acts of violence that would constitute a continuing threat to society?

---

[90] CR3:375; Finding Number 66.

[91] Claims 11, 13, 39, 41 and 42 presented in Garcia's initial state habeas application; Grounds Four, Nine, Ten and Elevan cited in Petitioner's Skeleton Brief filed in this Court.

Special Issue No. 2

Do you find from the evidence beyond a reasonable doubt that the defendant, Joseph Garcia, actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?

Special Issue No. 3

Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is sufficient mitigating circumstance or circumstances  to warrant that a sentence of life imprisonment rather than a death sentence be imposed?  (RR 56:75-76).

### b. Argument

Mr. Garcia acknowledges that this claim (that the terms used in the special instructions given to Texas juries in death penalty cases are unconstitutionally vague) has been rejected by the Fifth Circuit.[92]  He wishes to preserve this error for further review in the event relief is not otherwise granted herein.

---

[92] *See Anderson v. Quarterman,* slip copy, 2006 WL 3147544 (5th Cir. 2006) (not designated for publication) *(citing James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.1993) (holding that the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society" "have a common-sense core of meaning that criminal juries should be capable of understanding") (internal quotations omitted)); *see also  Hughes v. Johnson,* 191 F.3d 607, 615 (5th Cir. 1999); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996).

The jury received no instructions concerning the meaning of the crucial terms in the special issues, specifically, the terms "probability," "criminal acts of violence," or "continuing threat to society." This failure to define the operative words and phrases violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of the death penalty.[93]   Because the trial court failed to charge the jury in a constitutionally adequate manner so that its determinations are rationally reviewable, there was no rational process justifying the imposition of the death sentence upon Mr. Garcia in comparison to other cases in which other defendants received a life sentence. This failure to properly instruct the jury violated Garcia's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Texas special issues applied in this case function as aggravating circumstances. An aggravating circumstance is any finding by a capital sentencer which "circumscribe[s]] the class of persons eligible for the death penalty."[94]   An affirmative finding to the first special issue and a negative response to the second comprise a finding on an aggravating circumstance as defined by the Supreme Court in *Zant.* When an aggravating circumstance is vague, however, it fails to serve its constitutionally mandated narrowing function. A sentence of death may not be imposed using a vague aggravating factor unless the state court cures such vagueness by applying a valid limiting construction, thereby

---

[93] *See Godfrey v. Georgia,* 466 U.S. 420 (1980).
[94] *Zant v. Stephens,* 462 U.S. 862. 878 (1983).

providing the sentencer specific and detailed guidance concerning its scope.[95]  Because the Texas special issues contain terms that are unconstitutionally vague, the special issues are unconstitutional as applied to Garcia.[96] His death sentence must therefore be vacated.

In Texas, the Court of Criminal Appeals has held that the special issues perform the function of narrowing the class of death eligible defendants, and thereby comprise aggravating circumstances under the Constitution: "[T]he function of Article 31.071 [is] to further narrow the class of death-eligible offenders to less than all those who have been found guilty of (capital murder) as defined under §19.03 (capital murder statute)." *Smith v. State,* 779 S.W.2d 417, 419 (Tex. Crim. App.1988); *Roney v. State,* 632 S.W.2d 598, 603 (Tex. Crim. App. 1982) (the facts of crime alone do not provide death-eligibility, otherwise every murder in the course of robbery would warrant a capital sentence).  The Texas special issues cannot suffice as a framework for the imposition of the death penalty if the special issues themselves contain crucial terms that are undefined and inherently vague.

The Texas Court of Criminal Appeals has refused to apply any limiting construction to the unconstitutionally vague terms in the special issues special issues must channel sentencing discretion by adequately informing juries "what they must find to impose the death penalty."[97]  Texas allows its capital juries virtually unfettered discretion

---

[95] *Maryland v. Cartwright,* 486 U.S. 356 (1988).
[96] *See Walton v. Arizona,* 497 U.S. 639, 110 S.Ct,. 3047, 111 L.Ed.2d 511 (1990); *Lewis v. Jeffers,* 497 U.S. 766 (1990).
[97] *Maryland v. Cartwright,* 486 U.S. at 362.

in construing the statutory aggravating circumstances without the aid of specific definitions of crucial terms contained in the special issues.[98]   Yet that function is articulated through the use of the special issue questions, which employ broad terms that result in capital sentencing determinations lacking standards.   Such a result runs directly counter to the Eighth Amendment's requirement that there be a rational process for juries and appellate courts to decide who lives and who dies.

In the first special issue, the word "probability" has no common or uniform meaning.   Jurors in the instant case were left to apply any possible interpretations of the word – did each juror define probability as about fifty percent?   Or a "substantial likelihood?"   Or perhaps "any chance at all?"   The jurors were also denied any definition for the phrases "criminal acts of violence" or "continuing threat to society."   How did each juror define those terms?

The various words and phrases in the special issues, viewed individually or as a whole, did not provide the jury any uniform guidance in how to apply terms crucial to the decision to impose the ultimate sentence.   In *Jurek v. Texas*,[99] a plurality of the Supreme Court noted that "[t]he Texas Court of Criminal Appeals has yet to define precisely the meanings of such terms as "criminal acts of violence," and "a continuing threat to society."[100]   Such failure has rendered the first special issue unconstitutional.

---

[98] *Roney v. State* 632 S.W.2d at 603.
[99] 428 U.S. 262, 272 (1976).
[100] *Id.* at 272.

In its decision on Garcia's direct appeal, the Court of Criminal Appeals rejected this claim.[101]  It offered no reasoning and simply reaffirmed its holdings in *Escamilla v. State*.[102]  The Court of Criminal Appeals rejection of this claim was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Maryland v. Cartwright*.  Appellant's death sentence should be modified to life.

### 3.   VIOLATION OF DUE PROCESS AND JURY TRIAL GUARANTEES BY REQUIREMENT OF 10 "NO" VOTES ON SPECIAL ISSUE #3.[103]

#### a.  Factual Background

In Texas, all twelve jurors must answer the first special issue (future dangerousness) affirmatively before the trial court may impose the death penalty.  A life sentence, on the other hand, requires that at least ten jurors answer the special issue negatively.[104]  Unanimity must also exist for the jury to enter a negative finding on the mitigation issue, while ten of twelve jurors must vote to grant leniency.[105]  The trial court instructed the jury accordingly. (RR44:48-49).  The failure of a capital jury to garner the requisite number of votes either way results in a life sentence.[106]  The trial court, counsel,

---

[101] *See* Exhibit A, pp. 9-10, Opinion of the Texas Court of Criminal Appeals on direct appeal (No. AP-74,692, *Garcia v. Texas*, February 16, 2005).

[102] 143 S.W.3d 814, 828 (Tex. Crim. App. 2004), *cert. denied* 544 U.S. 950, 125 S.Ct. 1697.

[103] Claim 46 (erroneously numbered 45) presented in Garcia's initial state habeas application; Grounds One and Seven cited in Petitioner's Skeleton Brief filed in this Court.

[104] TEX. CODE CRIM. PROC. ANN., Art. 37.071 §2(d)(2).

[105] *Id*., §2(f)(2).

[106] *Id.* §2(g).

and the parties may not disclose to the jury that their failure to unanimously agree on an answer to either special issue results in a life sentence.[107]

### b. Argument

Mr. Garcia acknowledges that this claim is currently foreclosed in the Fifth Circuit.[108]  He wishes to preserve this error for further review in the event relief is not otherwise granted herein.

Article 37.071 of the Texas code of Criminal Procedure creates the potential for considerable confusion among reasonable jurors.[109]  The rule generates the danger that jurors otherwise pre-disposed to hold out for a life sentence will conform to a "majority rules" mentality.  A juror may reasonably believe that his vote in favor of a life sentence is worthless unless nine others join him.  If a majority of other jurors are firmly voting "yes," holdouts may feel an obligation to join them since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict.[110]

---

[107] *Id.*, §2(a).

[108] In *Miller v. Johnson,* 200 F.3d 274, 288-289 (5th Cir. 2000), the court held that *Mills v. Maryland,* 486 U.S. 367 (1988) was not applicable to the capital sentencing scheme in Texas. The court concluded that "[u]nder the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance." *Miller*, 200 F.3d at 288-289 (*citing Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994)).

[109] The Supreme Court has held that, in judging the constitutionality of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme. *See, e.g., California v. Brown*, 479 U.S. 538, 541 (1987); *Francis v. Franklin*, 471 U.S. 307, 315-316 (1985).

[110] *See Mills v. Maryland*, 486 U.S. 367, 383 (1988) ("[C]ommon sense suggests that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation unless they are expressly instructed to do so.")(citations omitted).

Support for this argument comes in the Supreme Court cases criticizing the trial court practice of inquiring into the numerical division of deadlocked juries prior to sending the jury back for further deliberations.[111]   In such cases, the Supreme Court has held that "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear "in some degree, serious although not measurable, an improper influence upon the jury."[112]

Put another way, the Texas 12/10 Rule is an impermissible "dynamite charge" which has been recognized as a possible violation of the Eighth Amendment to the Constitution in the capital sentencing context.[113] Article 37.071's 12/10 Rule injects arbitrariness into the proceedings and creates the potential for unreliable sentencing determinations – a constitutional violation of the highest order in the capital sentencing context.  For example, the Louisiana Supreme Court found that an instruction creating a risk of speculation violated the Constitution, stating:

> In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality. . . . . Instead, the members of the sentencing body were left free to speculate as to what the outcome would be in the event there was no unanimity. Under these circumstances, individual jurors could rationally surmise that in the event of a disagreement a new sentencing hearing, and perhaps a new trial before another jury would be required.[114]

---

[111] *See, e.g., Lowenfeld v. Phelps*, 484 U.S. 231, 239-240 (1988) and *Brasfield v. United States*, 272 U.S. 448, 450 (1926).

[112] *Lowenfield*, 484 U.S. at 239, *citing Brasfield*, 272 U.S. at 450.

[113] *See Lowenfeld*, 484 U.S. at 240-241.

[114] *State v. Williams*, 392 So.2d 619, 631 (La. 1980) (on rehearing).

The 12/10 Rule also violates the Eighth Amendment principle in that it is unconstitutional to instruct capital sentencing jurors in a manner leaving reasonable jurors to believe that their individual vote for a life sentence is worthless unless some threshold number of jurors agree that particular mitigating factors exist.[115]   That is, a constitutional violation exists if a reasonable juror could interpret the charge to mean that there must be a meeting of the minds among some threshold number of jurors as to whether the mitigating evidence offered by the defendant warrants either a negative answer to the first special issue, or an affirmative response to the second, thus resulting in the imposition of a life sentence.[116]   Unless jurors are informed of the result of a deadlock in such a situation, the risk that one or more jurors will give in to a "majority rules" mentality is too great under the Eighth Amendment.

Under *Mills*, a constitutional violation would occur under the Texas scheme if reasonable juror, instructed pursuant to Art. 37.071, were led to believe that their votes in favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them.   In a case involving a similar sentencing scheme, the the Seventh Circuit found a *Mills* violation:

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death .... [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded

---

[115] *Mills v. Maryland*, 486 U.S. 367 (1988).  Again, Garcia acknowledges that the Fifth Circuit has rejected attempts to extend the application of *Mills* to the Texas capital sentencing scheme.

[116]*Mills*, 486 U.S. at 373-375. In *Mills*, the threshold number was twelve, while in Texas it is ten.

from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.[117]

In *Kubat,* reasonable jurors could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life. Texas jurors are erroneously led to believe that, even if they want to vote for life, a mistrial, or possibly a death sentence, rather than a life sentence (the constitutionally required result) will result unless nine other jurors join them in their vote. This feature of article 37.071 creates the potential for considerable confusion among reasonable jurors. Because "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevented the consideration of constitutionally relevant mitigating evidence," Garcia was sentenced to death in an unconstitutional manner.[118]

In its decision rejecting this claim on direct appeal, the Court of Criminal Appeals offered no reasoning and simply reaffirmed its holdings in *Escamilla v. State*.[119] The state court's decision was contrary to and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States in *Mills*. For this reason, the judgment of the trial court should be reversed and the cause remanded for a new punishment hearing.

---

[117] *Kubat v. Thieret*, 867 F.2d 351, 369-373 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989).
[118] *Boyde v. California*, 494 U.S. 370, 380 (1990).
[119] 143 S.W.3d at 828.

4.   **VIOLATION OF DUE PROCESS FOR FAILURE OF THE TEXAS COURT OF CRIMINAL APPEALS TO ENGAGE IN PROPORTIONALITY REVIEW IN DEATH PENALTY CASES.**[120]

### a. Factual Background

In Texas, all twelve jurors must answer the first special issue (future dangerousness) affirmatively before the trial court may impose the death penalty. A life sentence, on the other hand, requires that at least ten jurors answer the special issue negatively.[121] Unanimity must also exist for the jury to enter a negative finding on the mitigation issue, while ten of twelve jurors must vote to grant leniency.[122] The trial court instructed the jury accordingly. (RR44:48-49). The failure of a capital jury to garner the requisite number of votes either way results in a life sentence.[123] The trial court, counsel, and the parties may not disclose to the jury that their failure to unanimously agree on an answer to either special issue results in a life sentence.[124]

### b. Argument

Mr. Garcia acknowledges that this claim is currently foreclosed.[125] He wishes to preserve this error for further review in the event relief is not otherwise granted herein. Garcia urges that the Texas Court of Criminal Appeals, based on statutory language of the

---

[120] Claim 40 (erroneously numbered 39) presented in Garcia's initial state habeas application; Ground Eight cited in Petitioner's Skeleton Brief filed in this Court.

[121] TEX. CODE CRIM. PROC. ANN., Art. 37.071 §2(d)(2).

[122] *Id.*, §2(f)(2).

[123] *Id.* §2(g).

[124] *Id.*, §2(a).

[125] *Pulley v. Harris,* 465 U.S. 37, 104 S. Ct. 871, 79 L.Ed. 2d 29 (1984).

*Penry*[126] special issue, at least upon request, should engage in some type of meaningful proportionality review of death penalty verdicts to consider the "death worthiness" of a particular defendant in view of the totality of mitigating and aggravating evidence in a given case. Under the former capital sentencing scheme, the Texas Court of Criminal Appeals refused to do so.[127]   The review should consider whether Garcia's death sentence is "excessive" or "disproportionate" as compared to "sentences imposed in similar capital cases" in Texas, at least post-*Furman*.  Garcia recognizes that the United States Supreme Court holds that the Eighth Amendment does not require a "comparative proportionality review."[128]   In *Hughes supra*, the Court of Criminal Appeals likewise rejected such an argument.

In spite of the above United States Supreme Court and Texas decisions, Garcia urges that his Fourteenth Amendment Due Process right requires such an appellate review. That due process requires that courts engage in a proportionality review in civil cases,[129] while not in death penalty cases, is extraordinarily ironic. "It is inconceivable that a punitive verdict of death is not entitled to the same due process as applies to dollar-amount verdicts."[130]   Garcia contends that due process requires proportionality review in

---

[126] *Penry v. Lynaugh*, 492 U.S. 302, S.Ct. 2934, 106 L.Ed.2d 256 (1989).

[127] *Hughes v. State*, 897 S.W. 2d. 285, 294 (Tex. Crim. App. 1994).

[128] *Pulley v. Harris*, 465 U.S. 37, 104 S. Ct. 871, 79 L.Ed. 2d 29 (1984).

[129] *See, e.g. Honda Motor Co., Ltd v. Oberg*, 512 U.S. 415, 114 S. Ct. 2331, 129 L. Ed. 2d 336 (1994).

[130] *State v. Pinnell*, 877 P. 2d 635, 310 Ore. 438 (1994): *See State v. Cunningham*, 880 P. 2d 431, 320 Ore. 47, 74-82 (1994) (Fadeley, Jr. dissenting).

death penalty cases to determine whether a particular death sentence is "excessive" or "disproportionate" and urges that his sentence of death is excessive and disproportionate.

5.   **DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL – TRIAL COUNSELS' FAILURE TO OBJECT AND PRESERVE MULTIPLE ERRORS .[131]**

### A.  The Standard for Ineffective Assistance of Counsel

It is well established that a defendant is entitled to the effective assistance of counsel as required by the Sixth and Fourteenth Amendments to the Constitution.[132] Effective assistance is denied if, "counsel's representation fell below an objective standard of reasonableness," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[133]   To establish deficient performance, Garcia must show that his trial counsel's representation "fell below an objective standard of reasonableness."[134]   The court applies a highly deferential standard to the examination of counsel's performance, making every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.[135]   To satisfy the prejudice requirement, the record must demonstrate that, "there is a reasonable probability that, but for counsel's unprofessional

---

[131] Claim II presented in Garcia's successor state habeas application; Grounds Fifteen through Twenty cited in Petitioner's Skeleton Brief filed in this Court.

[132] *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

[133] *Strickland v. Washington*, 466 U.S. 668 (1984).  The *Strickland* standard applies to retained as well as appointed counsel.  *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

[134] *Strickland*, 466 U.S. at 688.

[135] *See Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

errors, the result of the proceeding would have been different."[136]   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[137]   That is, "a criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[138]   This in not an outcome-determinative test.[139]   The question is not whether a defendant would have more likely than not received a different verdict but for counsel's performance, but whether, "he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."[140]

It has been held that, even if an attorney's manner of conducting a trial was trial strategy, it can be so ill-chosen as to render a trial fundamentally unfair.[141]   Courts have found ineffective assistance  of counsel when when the attorney permitted the eliciting of inadmissible and incriminating hearsay;[142]   when the attorney passed over admission of prejudicial and clearly inadmissible evidence has no strategic value;[143]   and when the

---

[136] *Strickland*, 466 U.S. at 694.

[137] *Id.; see also Nealy v. Cabana,* 764 F.2d 1173, 1178 (5th Cir. 1985).

[138] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687).

[139] *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

[140] *Kyles v. Whitley*, 514 U.S. 419, 454, 115 S.Ct. 419, 131 L.Ed. 2d 490 (1995).  Although *Kyles* involves the determination of prejudice following the State's suppression of evidence favorable to the defense (*Brady* error) (*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963)) the standard for prejudice employed in such cases is adopted from, and is identical to, that in *Strickland*.  *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed. 2d 481 (1985).  In both circumstances, to demonstrate prejudice, a petitioner must show that "there is a reasonable probability that . . . the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-434 (quoting *Bagley*, 473 U.S. at 682).

[141] *United States v. Rusmisel*, 716 F.2d 301, 310 (5th Cir. 1983).

[142] *Baldwin v. State*, 668 S.W.2d 762, 764 (Tex. App. - Houston [14[th] Dist.] 1984, no pet.)

[143] *Lyons v. McCotter*, 770 F.2d 529 (5th Cir. 1985).

attorney failed to object to four inadmissible extraneous offenses.[144]   Indeed, supposed

tactical decisions that give no advantage to a defendant are not reasonable and courts do

not engage in presumption of reasonableness under these circumstances.[145]   And a single

error of counsel may support a claim of ineffective assistance if the error was of such

magnitude that it rendered the trial fundamentally unfair.[146]

Although *Strickland* requires a showing of prejudice, it does not require the

defendant to show that his counsel's deficient performance, *more likely than not*, altered

the outcome of the case.[147]   The result at trial "can be rendered unreliable, and hence the

proceeding itself unfair, even if the error of counsel cannot be shown by a preponderance

of the evidence to have determined the outcome."[148]   Thus, the *Strickland* requirement that

a defendant must show a "reasonable probability" that the outcome of trial would have

been different absent error of counsel does not mean that Garcia must show a better than

50-50 chance.   *Strickland* merely imparts the idea that "showing some conceivable effect

---

[144] *Strickland v. State*, 747 S.W.2d 59, 60-61 (Tex. App. - Texarkana 1988, no pet.); s*ee also Mares v. State*, 52 S.W.3d 886 (Tex. App. - San Antonio, pet. ref'd) (holding failure to make objection in such a case cannot be considered reasonable trial strategy); *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999).

[145] *Proffitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir. 1987).

[146] *See Nelson v. Estelle*, 642 F.2d 903, 907 (5th Cir. 1981); *Tress v. Maggio*, 731 F.2d 288, 292-94 (5th Cir. 1984) (failure to seek severance); *Summit v. Blackburn*, 795 F.2d 1237, 1244-45 (5th Cir. 1986) (failure to object to proving corpus delecti solely by defendant's confession); *Cooke v. State*, 735 S.W.2d 928, 930 (Tex. App. - Houston [14[th] Dist.] 1987, pet. ref'd) (failure to object to tainted identification after illegal arrest and to proffer of bolstering testimony when entire strategy was mistaken identity); *Sanders v. State*, 715 S.W.2d 771, 776 (Tex. App. - Tyler 1986, no pet.) (failure to raise involuntariness of confession).

[147] *Strickland*, 466 U.S. at 693.

[148] *Id*. at 694.

on the outcome of the proceeding" would not suffice to overturn a conviction.[149] Instead, according to *Strickland*, a "reasonable probability" means a reasonable chance that counsel's mistake could have affected the outcome of the case, based upon concrete and identifiable facts and circumstances reflected in the record.

Trial counsel in Garcia's case was ineffective due to failures to object to several items, to preserve items for error, and to conduct a meaningful mitigation investigation. Those failings are as follows:

### B. Trial Counsel Failed to Properly Object to the Trial Court's Grant of the State's General Objection to Venireperson David Chmurzynski.[150]

Garcia's right to effective assistance of counsel at trial, under the Sixth and Fourteenth Amendments to the United States Constitution was denied when counsel failed to properly object to the trial court's granting the State's general objection to venireperson David Chmurzynski.

### 1. Factual Background

On November 25, 2002, prospective juror Chmurzynski was called for individual voir dire. (RR13:238-249). The trial court conducted a preliminary questioning, basically informing the prospective juror that this was a capital case, the State was seeking the death penalty, then asking him if there was anything occurring in his life experience that would prevent him from being a fair juror in this case. (RR13:238-239). The prosecution then

---

[149] *Id.* at 693.

[150] Claim III(B) in Garcia's Sucessor State Habeas Petition; Ground Fifteen cited in Petitioner's Skeletal Petition.

began asking questions.    The prosecutor first asked if jury service would be a financial

hardship.   (RR13:241-242).    The venireperson said service would not be a problem.

(RR13:242).  He was then asked about what he remembered about pre-trial publicity and

if the publicity caused him to have an opinion.  The venireperson gave a brief recollection

of the basic facts of the case (as did almost every venireperson called), and said he did not

have an opinion.  (RR13:243)  The following then occurred:

> Q. Okay. We asked you a little bit about the death penalty in your questionnaire.
> You gave yourself an 8 a on a scale of 1 to 10 on page 4. And a couple of
> questions further down we asked you if you believe in an eye for an eye and you
> said yes. And honestly that means different things to different people.
>
> A. Uh-huh.
>
> Q. What does that mean to you when you said an eye for an eye on No. 8 out of
> 10?
>
> A. In some cases that it would be appropriate, taking of another life.
>
> Q. Nothing automatic. Just in some cases?
>
> A. In some cases.
>
> Q. Okay. We asked you if you thought the death a penalty was ever misused and
> you said yes in cases of mental incapacity. If you could explain your thoughts
> there.  Same  thing on page 4?
>
> A. Uh-huh. I don't think that I believe that someone who is possibly retarded
> should be subjected to that.
>
> Q. Okay.
>
> A. May not be responsible for their own actions in that sense?
>
> Q. Okay. Have you come down on jury summons before? Have you ever been on a
> jury?

A. I've been called once and it was not a capital ~ case and I was never interviewed or anything, just released.

Q. Okay. Rehabilitation, we asked about on page 10, second question from the bottom. Do you think that prison rehabilitates people and you said, sometimes a good person can make a mistake and learn from it and a bad person will not be affected. What were you thinking there?

A.     Really, just what it says. I don't -- I would like to believe that someone can make a mistake and learn from it, pay their price and go forward. And then there's probably people who are just not going to learn and not going to change.

Q. As best you can tell, have you always been in favor of the death penalty? Just something you have kind of evolved into thinking or something --

A. No, probably not something that I really thought about until this experience.

Q. Sometimes people come in and said, well, there was that one case or that one situation that made me really think, now, before maybe I wasn't. We have other people who say, I guess as long as I thought about it, I've been in favor of it and some people say, I really haven't given it much thought.

Why are you favor of it in some cases? What is your thought as to why we have it available?

A. Because I believe in the sanctity of taking a life, the sanctity of a life, and I believe that taking a life is probably the ultimate crime or ultimate evil.

Q.     Okay

A.     Especially if it is done in maliciously and willfully and that's it.

Q.     Okay.  I know it's probably not something that comes up much, but I appreciate since you filled out the questionnaire and you have thought about it a little bit.  We bring people down and  talk to them about the capital murder and death penalty.

And in this particular case we like to kind of  be up front in that, as you know,  you may recall this is a case where we're seeking the death penalty. That's our goal. That's what we feel the evidence, number one, will show in this case that the defendant is guilty of capital murder, intentionally murdering a person in the course of a robbery or another way is alleged to have happened is the person who was murdered was an Irving police officer by the name of Aubrey Hawkins.  We have to prove that beyond a reasonable doubt and if we do so, we go to punishment

questions that would be asked and answered in punishment by the jury yes or no. Depending on how a jury answers those questions, could be a life sentence or a death sentence.

You follow me there? That's kind of the procedure people get life or people get death.

A.      The jury decides.

Q.      The jury makes that decision.  I bring that up because people have come down and been honest enough with us and have told us, as best I can tell, I'm in favor of the death penalty.  There's people out there who in my mind do something so bad they should get it,, but they are not sure they can sit over here and do it.  For whatever reason, they  Didn't want it on their conscience.  They didn't want to got through it when all the publicity takes place later on with  executions.  You know in Texas they are carried out more  than any other state?

A.      Yes.

Q.      The details are reported a lot. I think there was one last week reported the person basically at the end   of two minutes he was in midsentence and they reported, you might  have heard that report, he gasped three times for air in the middle of a sentence.  People come down and tell us, you know that's maybe not a situation that's right for  them .  And we respect that. That's why we ask the question.  And I liken it to washing windows on a skyscraper.  I know that needs to be done, but me personally, you can't get me up there.  That's just something that I can't do.

A.      Right

Q.      Have you thought about that? Serving on a case like that to make that decision

A.      I have.

Q.      And what are your thoughts about whether you can participate.

A.      I think it would be a difficult thing for me to do.

* * *

THE COURT: Let the record reflect we're in the presence of Mr. Garcia, out of the presence of Mr. Chmurzynski.  State?

Mr. D'Amore (prosecutor):  We would challenge, Judge, based on his answer.

THE COURT: It will be granted.

Mr. Lucas(defense counsel):   The defense will remain silent

THE COURT: You may.  It will be granted.

* * *

THE COURT:  For the record, the Court, sitting higher than the jurors, I have had an opportunity to view the jurors.  This juror was extremely nervous. His hands were quivering.  In response to the question whether or not he could assess the death penalty, his voice broke. (R. 13, pp. 244-249).

## 2.  Argument

The trial court's grant of the State's general objection to Venireperson

Chmurzynski, based on the following exchange, was improper.

THE COURT: Let the record reflect we're in the presence of Mr. Garcia, out of the presence of Mr. Chmurzynski.  State?

Mr. D'Amore (prosecutor):   We would challenge, Judge, based on his answer.

THE COURT: It will be granted.

Mr. Lucas(defense counsel):   The defense will remain silent

THE COURT: You may.  It will be granted.

* * *

THE COURT:  For the record, the Court, sitting higher than the jurors, I have had an opportunity to view the jurors.  This juror was extremely nervous. His hands were quivering.  In response to the question whether or not he could assess the death penalty, his voice broke. (R. 13, pp244-249)

A juror is not biased merely because he has reservations about the use of the death penalty or does not endorse its use in all cases.[151]   A juror cannot be excluded for cause simply because:

      1.    "They voiced general objections to the death penalty

      2.    [T] voiced … conscience … scruples against its infliction."

      3.    [T]hey voiced … religious scruples against its infliction."[152]

The striking of one juror because of a Witherspoon error can result in a new trial for the appellant.[153]   The improper exclusion of a single venireperson under *Wainwright v. Witt*[154] is reversible error and is not subject to the harmless error rule.[155]

In *Russeau v. State*,[156] the Texas Court of Criminal Appeals stated:

> Prospective jurors who can set aside their beliefs against capital punishment and honestly answer the special issues are not properly challengeable for cause. *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). Prospective jurors are challengeable for cause if their views about the death penalty would prevent or substantially impair the performance of their duties in accordance with their instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).

> We afford the trial court considerable deference, because it is in the best position to evaluate a prospective juror's demeanor and responses. *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998). We will reverse a trial court's ruling on a challenge for cause only if a clear abuse of discretion is evident. *Ibid*. When a prospective juror's answers are vacillating, unclear, or contradictory, we accord deference to the trial court's decision. We will not second-guess the trial court

---

[151] *Witherspoon v. Illinois*, 391 U.S. 510, 520-23 (1968); *Morgan v. Illinois*, 504 U.S. 719, 732 (1992).

[152] Witherspoon, supra; See also Lockhart v. McCree, 476 U.S. 162, 179-80 (1986).

[153] *Davis v. Georgia*, 429 U.S. 122 (1976).

[154] 469 U.S. 412 (1985).

[155] *Gray v. Mississippi*, 481 U.S. 648, 666 (1987); *Ex parte Williams*, 748 S.W. 2w 461, 464 (Tex. Crim. App. 1988).

[156] 171 S.W.3d 871 (Tex. Crim. App. 2005), cert. denied, 126 S.Ct. 2982 (2006).

when the prospective jurors are persistently uncertain about their ability to follow the law.

The court affirmed the point because the record showed that the prospective juror vacillated on whether she could actually assess a death sentence.[157]

But in *Simpson v. State*,[158] the Texas Court of Criminal Appeals stated:

In Perillo [*Perillo v. State*, 656 S.W.2d 78 (Tex. Crim. App. 1983)], also a death penalty case, this Court squarely addressed whether the trial court erred in refusing to allow defense counsel the opportunity to question a venire member, and, if so, whether it was reversible error. *Perillo*, 656 S.W.2d at 69. After noting that under Article 35.17 both parties are expressly entitled, on demand, to examine venire members individually, we held that excusing a venire member without allowing defense counsel an opportunity to question him was error. But whether such error was harmful, and thus reversible, depended upon whether the prospective juror was shown to be disqualified under *Witherspoon v. Illinois*, 391 U.S. 510 (1968). In other words,

> Excusing a prospective juror without giving counsel for the defendant an opportunity to question the juror should not ever occur unless the record affirmatively and unequivocally reflects that the prospective juror would, regardless of the evidence, automatically vote for a verdict that would prohibit the assessment of the death penalty. *Id*. at 81.

Because the prospective juror at issue in *Perillo* was a vacillating juror rather than one absolutely disqualified under *Witherspoon*, we held defense counsel should have been given an opportunity to examine him. *Id*. at 82.  By failing to give defense counsel such an opportunity, we held the trial court committed reversible error. *Ibid.*

In *Howard v. State*, 941 S.W.2d 102 (Tex. Crim. App. 1996), we modified the holding in *Perillo*. We explained that, in prior cases, we had held that it was error for the trial court to refuse a defendant's request to question venire members before they were excused for cause. *Id*. at 113.  We noted that, in those cases, we would find the error harmless if, at the time the venire member was excused, the venire

---

[157] *See also Blue v. State*, 125 S.W.3d 491 (Tex. Crim. App., 2003) (where there was much vacillation by the prospective juror, leading to a denial of the Witherspoon claim).
[158] 119 S.W.3d 262, 265 (Tex. Crim. App. 2003).

member made it absolutely clear that her views on the death penalty would prevent or substantially impair her ability to comply with her oath. *Ibid.*

In *Howard*, we were persuaded that our earlier approach was incorrect, and we modified it. We held that, if after inquiry by the trial court, it is clear that the venire member is conclusively biased against a phase of law upon which the State is entitled to rely during the guilt or punishment phases and that these views would prevent or substantially impair the venire member's ability to perform her duties, it was not error for the trial court to deny the defendant an opportunity to question venire members before granting the State's challenge for cause. *Ibid.*

Today, we once again modify the standard for determining error when the trial court denies a defendant's request to question individually a venire member in a capital case. First, Article 35.17, Section 2, is the basis for the appellant's objection that he was not provided an opportunity to question the venire member about her views on the death penalty. That section provides that:

In a capital felony case in which the State seeks the death penalty, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court.

Tex. Code Crim. Proc. art. 35.17, § 2. Although the trial court has a great deal of discretion in placing reasonable restrictions on the exercise of voir dire examination, *Boyd v. State*, 811 S.W.2d 105, 115 (Tex. Crim. App. 1991), the statute is clear. The trial court, upon demand of either party, is required to permit that party to individually question a venire member on the principles already discussed by the trial court. As a result, a trial court that denies a party's request has erred.

The notion of "reversible error" in terms of error that is not subject to a harm analysis has been greatly impacted by our decision in *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997), when we recognized that "[e]xcept for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis." Both *Perillo* and *Howard* predate our decision in *Cain*. *Perillo* essentially held that when defense counsel was denied an opportunity to question a venire member who was vacillating under Witherspoon, there was per se reversible error.

In light of *Cain*, such error is now subject to a harm analysis. And, because the appellant's complaint is that he was not afforded an opportunity to question the venire member under Article 35.17, we review the record for harm under the nonconstitutional standard provided in Rule 44.2(b). Under Rule 44.2(b), we disregard all nonconstitutional errors that do not affect the appellant's substantial rights. We have held that a substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001).[159]

Garcia contends that his trial counsel should have objected, pursuant to *Witherspoon*, that Mr. Chmurzyski was not disqualified. His statement that it would be difficult to give the death penalty is not the type of equivocation that eliminates one for cause from the jury panel. Further, there was no proper objection by the prosecution, nor was there an opportunity for the defendant to even examine the prospective juror.

A single error of counsel may support a claim of ineffective assistance if the error was of such magnitude that it rendered the trial fundamentally unfair.[160] And again, the striking of one juror because of a Witherspoon error can result in a new trial for the appellant.[161] Likewise, the improper exclusion of a single venireperson under *Wainwright* is reversible error and is not subject to the harmless error rule.[162]

### 3. Prejudice

It is plain that the failure of trial counsel to properly object to the exclusion of Mr. Chmurzyski was a denial of the effective assistance of counsel. Counsels' failure to conduct any examination of the venireperson also deprived Mr. Garcia of his rights to

---

[159] *Simpson*, 119 S.W.3d at 265-267.

[160] *See, e.g., Nelson v. Estelle*, 642 F.2d 903, 907 (5th Cir. 1981).

[161] *Davis v. Georgia*, 429 U.S. 122 (1976).

[162] *Gray v. Mississippi*, 481 U.S. 648, 666 (1987); *Ex parte Williams*, 748 S.W. 2w 461, 464 (Tex. Crim. App. 1988).

secure a fair and impartial jury that was not selected using death prone procedures.  Mr. Garcia's effective representation at trial required more from his trial counsel than remaining silent when constitutional error was being committed.  But for these violations of the Mr. Garcia's constitutional rights to effective assistance of counsel, no rational jury would have found him guilty of capital murder, nor by clear and convincing evidence would have a jury answered the special issues in the state's favor.

### C.  Trial Counsel Failed to Object to Jury Selection Process in Violation of Texas Statutes, Which Violated Garcia's Sixth Amendment Rights.[163]

Mr. Garcia was deprived of his right to have a jury selected as required by the Texas statutes in capital cases – which, in turn, gave the state an unfair advantage in picking a jury, which, in turn, violated Garcia's Sixth Amendment right to a jury trial. This issue was not raised by trial counsel.  Mr. Garcia contends that but for these violations of his constitutional rights to effective assistance of counsel, no rational jury would have found him guilty of capital murder, nor by clear and convincing evidence would have a jury answered the special issues in the state's favor.

### 1.  Factual Background

The Texas Legislature has prescribed strict procedures for the selection of juries in our state.  In a capital proceeding, such as the instant case, the legislature has provided for

---

[163] Claim III(C) in Garcia's Sucessor State Habeas Petition; Ground Sixteen cited in Petitioner's Skeletal Petition.

the summoning of a "special venire."[164]   A copy of the names of veniremembers summoned must be served upon the defendant two days prior to trial.[165]   When the venire has been assembled, voir dire may be commenced.[166]   A veniremember may be challenged for cause if the veniremember fails to meet the qualifications discussed, *supra*, or for reasons specified in Tex. Code Crim. Proc., Arts. 35.16, and 35.21.   Either party may peremptorily challenge a veniremember for any reason.[167]   In a capital case, each party holds fifteen peremptory challenges.[168]   In a capital case during voir dire, a veniremember is passed first to the State for acceptance or challenge and then to the defendant.[169]   The first twelve veniremembers not challenged, either for cause or peremptorily, constitute the jury.[170]

In the present case after Mr. Garcia had exercised his fifteenth peremptory challenge, the procedure for selecting the jury changed.   Before that time, a prospective juror would be examined by the trial court on preliminary matters.   Then the prosecution would conduct individual voir dire.   The venireperson would then be passed to the defense for individual voir dire.   The state then would state whether there was a challenge for cause, the trial court would rule, the defense would state whether there was a challenge for cause and the trial court would rule.   Then the venireperson would be submitted to the

---

[164] Tex.Code Crim. Proc., Art. 34.01
[165] Tex. Code Crim. Proc., Art. 34.04.
[166] Tex. Code Crim. Proc., Art. 35.17.
[167] Tex. Code Crim. Proc., Art. 35.14.
[168] Tex. Code Crim. Proc., Art. 35.15.
[169] Tex. Code Crim. Proc., Art. 35.13.
[170] Tex. Code Crim. Proc., Art. 35.26.

State for a peremptory challenge.  If the State accepted the venireperson, then the defense would exercise its right to use a peremptory challenge.  The procedure was as is required by the Code of Criminal Procedure.[171]

After Mr. Garcia used his 15 peremptory challenges, the procedure changed. After the venireperson was questioned by the trial court the prosecutor and defense counsel, he was then submitted to the prosecution for cause, then the defense for cause.  If the trial court denied the challenges for cause, the State then was permitted to withhold making its peremptory challenge until a pool of venirepersons were accumulated.  The Defendant then was permitted to again make objections to having used peremptory challenges after challenges for cause were denied and ask for additional challenges.  When the objections were denied, the state then stated whether it was accepting the venireperson or using a peremptory challenge.

The following occurred after Mr. Garcia had exercised his 15 peremptory challenges on January 9, 2003. (RR36:170):

> THE COURT:  Ms. Tucker, please come forward.  Be seated, ladies and gentlemen. Please be seated, Ms. Tucker.  Ms. Tucker, from your responses and your conduct here this morning, you are a qualified juror in this case.  You are not yet an actual juror. (RR37:125).
>
> ***
>
> THE COURT:  Ms. Hutchinson, if you will, please come forward and have a seat for a moment.  Be seated, ladies and gentlemen.  Ms. Hutchinson, you have qualified as a juror in this case.  Now, whether or not you are actually going to sit on the jury or not is yet to be determined.  I think you understand that, right?  (R.R37:180).
>
> ***

---

[171] Tex. Code Crim. Proc., Arts. 35.13, 35.17, 35.20.

THE COURT:  Here you go, Ms. Rees.  Please be seated, folks.  Ms. Rees.  Ms. Rees, you have been accepted as a qualified juror in this case.  Again, what I said at the outset.  You have yet to be selected as a juror.  But you are a qualified juror.  That decision is going to comprise the jury should be made at least by the middle or the latter part of this week.  You will be notified either way by the Court coordinator or the Court bailiff.  (RR38:88).

\*\*\*

THE COURT:  All right.  Ask Ms. Donoski to return, please.  Ms. Donoski, the attorneys believe that you are a qualified juror and so do I, the Court.  We're very fortunate to have someone like you who is willing to participate in your judicial system.

Again, if you remember from my brief early remarks, the fact that you are qualified does not necessarily mean that you are going to be a trial juror.  That decision will be made probably. (RR41:125).

\*\*\*

THE COURT:  It will be denied.  Please come forward, Mr. Diffee.  Here you go, sir.  Be seated, ladies and gentlemen.  Mr. Diffee, you are a qualified juror in this case.  If you recall my very opening conversation with you, that doesn't necessarily mean that you are going to actually serve on the trial jury.  That decision should be made in the next day or two.  When that decision is made, you will immediately be notified by Brian by phone.  (RR42:75).

On the last day of jury selection, January 21, 2003, the following occurred:

MR. LOLLAR:  I believe, Your Honor, that then brings us to juror No. 3170, who was spoken to on -- 3170 who was spoken to on January 10.  Juror No. 3170 was Robin Tucker.  We feel, after having spoken to the juror and after the State had the opportunity to speak to the juror, that she is totally unacceptable to the defense.  We would say in her questionnaire she clearly indicates that she would favor a death penalty, if the murder was planned and if she specifically says that a murder, the intentional taking of a life without justification while in the course of a robbery would be done -- would be one that would be done with malice and intent and that would justify in her mind the position of the death penalty.  She says she's a nine on a scale of one to ten, being in favor of the death penalty.

She indicates that the issue that would be most important to her in whether the person would get death or life in a capital murder case, if it had been proven to her that the murder was commited with malice and intent, which necessarily it would be for the juror to have found a defendant guilty of capital murder.

We feel for these reasons that she is unacceptable to the defendant and we would seek to ask the Court's permission for a 17th peremptory challenge.  We understand that this is not authorized, per se, by the statute, but we also understand it's within the discretion of the Trial Court we would think that the juror would be acceptable to the State.  And we'll get their announcement at this time.

**MR. D'AMORE:  That's correct, Judge.  We accept Ms. Tucker 3170.  The State will accept.**

THE COURT:  Any other?

MR. LOLLAR:  Put on the record, we have identified for the record certain jurors that we have been forced as the defense hearing the case to strike using our peremptory challenges.  And these strikes were made after we had requested that the Court, that the Court excuse the juror for cause.

And I would like to identify for the record certain jurors that we have had to use our 16 peremptory challenges on.  No. 144 was actually the first juror we spoke to Ama Helfenbein, we had to use the peremptory challenge No. 1 because the Court wouldn't excuse her for cause when she cannot assess five years for murder and when she would not require the State prove the defendant should have anticipated a murder.  So we did object to her.  Ask that the Court excuse her for cause and the Court declined, and we had to use peremptory challenge.

On another the 19th juror we spoke to Larry Carroll, 1134, we had to use our fifth peremptory challenge on him.  He said that he would automatically vote yes on Special Issue No. 1, if he found the defendant guilty.  And he also said that he would automatically vote yes on Special Issue No. 2, if the defendant was present and in on the robbery in any capacity.

We had to use peremptory challenge No. 6 on Greg Babineaux, B-A-B-I-N-E-A-U-X, No. 1526.  We had to use our challenge on him.  He indicated he could not presume the defendant innocent.  He indicated that the manner and means of death would not matter to him, that he would find the defendant guilty, even if the State failed to prove each and every allegation in the indictment beyond a reasonable doubt.  He indicated that venue of the offense wouldn't matter to him.  It would not be required that the State prove Dallas County.  If they prove it at all, that would be sufficient.

He indicated that he would not be able to consider the entire penalty range for murder.  He indicated that he would tend to believe police officers' testimony more than any other witness.  He was wrong on Special Issue No. 1, 2, and 3.  He indicated that there would be nothing that would cause him to change the death sentence back to a life sentence under Special Issue No. 3, that there would be no mitigating circumstances.  And if he would believe that the mere presence of the defendant at the scene of an offense would make him guilty and he would require the testimony of the defendant himself before he would consider finding the defendant not guilty of the offense.

We did request to excuse him for cause, Mr. Babineaux.  Court declined and we had to use peremptory challenge No. 6 on him.

The Court will recall juror No. 2899, Lillian Lyles.  We had to use peremptory challenge No. 9 on her.  The juror said that the case before her that she already knew the facts about

this case qualified for the death penalty.  She said she would automatically answer No.
2 yes, if a gun was used during the commission of the offense by any of the parties.
Nothing could mitigate for Special Issue No. 3, if Special Issue No. 1 and 2 were answered
yes.

The Court will recall juror No. 2955, Karen Henderson we had to use our tenth
peremptory challenge on her.  She had formed an opinion of the defendant's guilt through
the news media that she was aware of.  She said that she could not guarantee she could put
that out of her mind.  We asked that she be excused for cause and the Court denied and we
used peremptory challenge No. 10 on her.

No. 2973 we had to use our 11th challenge on Kenneth Harington.  That juror, the Court
will recall, while he said everything right during the testimony, that he was also the one
who, through his civic organization in the City of Irving where he resided, had raised
$158,000 for the educational fund for the son of the deceased in this case.  We had to use a
peremptory challenge on him.  We asked that he be excused for cause.  Denied.

And we had to use juror 3101 Barbara Patton.  We had to use a peremptory challenge on
her.  She would not presume the answer to Special Issue No. 1 no, if they had found
someone guilty of capital murder.  And she would -- further would be inclined to answer it
yes and wouldn't be able to presume the answer to be no.

We have identified those jurors for the record, Your Honor.  Also the Court will recall
Mr. Lucien, No. 3143, Ms. Salmon, No. 3129.  We had to use peremptory challenges on
those jurors as well.

And we believe that the record will reflect that the jurors in the totality of their voir dire
showed they could not be fair to this defendant and in this case.  We asked that the Court
in its discretion give us an additional 17th peremptory challenge.  We ask this for the
reasons that we have just stated on the record.

We feel that by the use of our peremptory challenges when the Court should have granted
our challenges for cause, we have been forced to use peremptory challenges on jurors who
were unqualified, as the record will reflect.  We feel that the Court in its discretion should
allow us an additional peremptory challenge.

We feel denial of the Court to do that would violate the defendant's rights under the Sixth
Amendment of the United States Constitution, right to an impartial juror.  We feel the
denial of our request for peremptory would deny the defendant his Fifth Amendment
rights to due process of rights and his Fourteenth Amendment rights to due process of law
under the protection of the laws under the United States Constitution.

And we would further ask that the Court in its discretion allow us peremptory challenges
under the Texas State Constitution, Section 10, right to impartial juror, Section 13, due
course of law, and Section 19, due course of law of the land.

THE COURT:  The request will be denied.

MR. LOLLAR:   I take it that juror 3170 is seated as juror No. 11 over our objection?

THE COURT:  Robin Tucker is seated, subject to being sworn.

MR. LOLLAR:  That brings us to juror No. 3171, Susan Hutchison.

**MR. D'AMORE:  For the record, since it's back to us on the next jury, we accept Ms. Hutchison.**

MR. LOLLAR:  Without reciting again all of the reasons that we feel we're entitled to another peremptory challenge, I would reurge those that have just been recited into the record in regard to Ms. Tucker.

And we state in the record Ms. Hutchison is unacceptable to the defendant and had -- if we were granted another peremptory challenge, that we would use it to strike juror No. 3171, Susan Hutchison.  She feels in her questionnaire and also in her voir dire to the Court, we believe that the Court misstated the law on the range of murder and in that regard to a 17-year-old girl who has never been in trouble before, it would be five years probation and she couldn't go along with that.

We feel the mere presence -- she indicated to the Court the mere presence at the scene of the offense would make a person guilty of the offense.  She had problems with the presumption of innocence, particularly in this case.

And so for those reasons we would state to the Court that she's totally unacceptable to the defense and had we -- we feel that the record will reflect that the State misrepresented the punishment range in a murder case and that was done over the objection of the defendant. We feel the record will reflect that.

So the bottom line, Your Honor, is that Ms. Hutchison is totally unacceptable to the defendant and we would use a peremptory challenge on her, if the Court would grant us an extra peremptory challenge in her case.  And for grounds therefor, I reurge the motion that I just made in regard to Ms. Tucker No. 3170.

THE COURT:  Request will be denied.

MR. LOLLAR:  The record will reflect that the Court recalls the objections that I just made in regard to Ms. Tucker and that's what you considered in denying our request?

**THE COURT:  The record will so reflect.  Susan Hutchison is a seated juror No. 12 subject to being sworn.**

MR. LOLLAR:  Please note our exception to the Court's ruling.

THE COURT:  It will be noted.

MR. LOLLAR:  I believe the Court now has before it certain numbers of jurors who, again, we had --

MR. D'AMORE:  I think that the record should reflect that there are some people who were taken out of order for scheduling for the prospective jurors sake.  And their schedules, Judge, I think there is a list you have some we agreed on because we were out of order and some we talked to.  If you can go through that list, we can tell you.

THE COURT:  Alternate juror No. 3230, Ralph Moser.

MR. D'AMORE:  Both the State and the defense will agree to excuse Mr. Moser.

MR. LOLLAR:  That's correct.

THE COURT:  No. 3267 James Nix.

MR. D'AMORE:  State and defense have agreed to excuse Mr. Nix.

MR. LOLLAR:  That's correct.

THE COURT:  Juror 3278, Vicki Donosky.

**MR. D'AMORE:   We actually talked to her, Judge, and I believe we accept Ms. Donosky at this time.**  I believe the Court held her qualified and the State accepts her at this time.

MR. LOLLAR:  We accept Ms. Donosky as the first alternate.

THE COURT:  Vicki Donosky will be the first alternate.  Debra Gambordella.

MR. D'AMORE:  The State and the defense have agreed to excuse 3287.

THE COURT:  No. 3297, Lacy McIntosh.

MR. D'AMORE:  State and defense have agreed to excuse 3297.

THE COURT:   No. 3298, Charles Cernosek.

MR. D'AMORE:  State and defense have agreed to excuse 3298.

MR. LOLLAR:  That's correct.

THE COURT:  No. 3299 Stephen Smith.

MR. D'AMORE:  State and defense have agreed to excuse 3299.

MR. LOLLAR:  That's correct.

**THE COURT:  No. 3304, Jason Diffee.**

**MR. D'AMORE:  That's the juror that we talked to just a few minutes ago today. The State agrees to 3304.**

MR. LOLLAR:  We resubmit the challenges for cause made to co-counsel.

THE COURT:  The record shall reflect the challenges.  Again, the prior ruling stands.

MR. LOLLAR:  We accept Mr. Diffee as the second alternate.

THE COURT:  Subject to the challenges?

MR. LOLLAR:  Yes.

THE COURT:  No. 3304, Jason Diffee, will be the No. 2 alternate and this was done in open court with all the attorneys present and also in the presence of Mr. Garcia.  Anything further, gentlemen?  (RR42:75-87).

## 2. Argument

The above procedure was completely contrary to the requirements of Articles 35.13, 35.17 and 35.20 of the Code of Criminal Procedure.  Present counsel has not been able to find any case in which the present procedure was used.  In *Elliott v. State*,[172] an appellant argued that the statutes permitted an accused in a non-capital case to use the procedure, in effect giving the defense knowledge of the state's peremptory strikes.  The Texas Court of Criminal Appeals stated that the above statutes were only applicable to capital cases.

As noted above, the Texas Legislature prescribed strict procedures for the selection of juries in capital cases.  That structure was meant to permit the citizen accused to get the fairest possible jury.  In effect the state was permitted to see what was coming before having to exercise its peremptory challenges.  Anyone who has picked a jury knows what

---

[172] 412 S.W.2d 320 (Tex. Crim. App. 1967).

an advantage this gave the prosecution.  Before exercising a peremptory, the state got to examine every other person called.  They knew what the effect of exercising their peremptory challenges would cause on the remaining venirepersons.

### 3.  Prejudice

Trial counsel provided ineffective assistance of counsel by not objecting to the procedure being used.  It gave the prosecution a method to more intelligently use its peremptory strikes, in effect selecting a jury that is more death penalty prone, a practice prohibited by *Witherspoon v. Illinois*.[173]  As noted above, the Legislature has prescribed strict procedures for the selection of juries in capital cases.  That structure was meant to permit the citizen accused to get the fairest possible jury.  In effect the state was permitted to see what was coming before having to exercise its peremptory challenges.  Trial counsels' failure to object falls below the minimum standard of effective assistance as provided in *Strickland* and its progeny.  It also gave the state a significant advantage that harmed Mr. Garcia.

### D.  Trial Counsel Failed to Object to the Prosecutor's Misstatements of Law in Closing Argument that the Verdict on Guilt Did Not Need to Be Unanimous.[174]

Mr. Garcia was entitled under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution to a unanimous guilty verdict.  In *Ngo v. State*,[175] the Texas

---

[173] *See Morgan v. Illinois*, 504 U.S. 719, 732 (1992)  (The State is not empowered to empanel a pro-death jury).

[174] Claim III(D) in Garcia's Sucessor State Habeas Petition; Ground Seventeen cited in Petitioner's Skeletal Petition.

[175] 175 S.W.3d 738 (Tex.Crim.App., Mar. 16, 2005).

Court of Criminal Appeals acknowledged that when the state charges different criminal acts regardless of whether these acts constitute violations of the same or different offenses or statutory provisions, the jury must be instructed that it cannot return a guilty verdict unless it unanimously agrees upon the commission of any of these criminal acts.[176]   At Garcia's trial, the prosecutor's misstatements of law in closing arguments deprived Garcia of these rights, and trial counsels' failure to object to the misstatements denied Garcia effective assistance of counsel.

## 1.  Factual Background

The court charged the jury on three types of criminal liability: principal, party, and conspirator.  In final argument, the prosecution made the following statements:

> The next thing I want to talk about, the ways that you can find Joseph Garcia guilty of capital murder because he is.  The evidence has shown you.  We talked about, first of all, there are two separate ways that capital murder was committed here.  You have seen the evidence.  Aubrey Hawkins in the course of committing -- excuse me, in the official dispatch of his duties as a police officer with the City of Irving in full police uniform in a squad car rolls up on them in the back of Oshman's and they kill him.
>
> Now, as it says in the charge, you can infer intent through words, actions, circumstances, surrounding the commission of the offense.  Clearly here, folks, you have the absolute right as jurors to convict Joseph Garcia as a principle for capital murder.
>
> Now, I'm not going to sit here and tell you that Aubrey Hawkins can come in here and tell you that's who killed him.  Obviously, that can't happen.  They've killed the only eyewitness to his murder.
>
> But inferring from the facts and evidence that has been presented to you, you know that Joseph Garcia was at the Oshman's.  You know he was participating in that

---

[176] *Id.* at 744-45; *see also Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999).

robbery.   You know from Wesley Ferris that at the time of the walkie-talkie communication, hurry up, hurry up, let's go, we've got company, you know that Joseph Garcia and Michael Rodriguez leave the breakroom of the Oshman's.

And you know, you have seen the diagram that the breakroom is way in the back, in the far bottom right-hand corner of State Exhibit 43, that it does not take one to two minutes to travel that short distance to the back loading dock.   You know that to be the case.

That puts Joseph Garcia in the back loading dock area of Oshman's at the time that Aubrey Hawkins is ambushed and murdered.   You know from John Lindley that he was armed with a weapon.

Based on the autopsy results of Aubrey Hawkins, we cannot tell you which gun fired some of these shots.   We can't tell you.   And you have every right to infer that Joseph Garcia fired some of those shots.   You have every right to do that under the law and the evidence as it is presented before you.   That enough would be sufficient to find him guilty of capital murder.

But it doesn't stop there.   There are actually six different ways, total, because you have not only him acting as a principle for the murder of Aubrey Hawkins as a police officer in the line of duty, you have him acting as a party, aiding, attempting to aid, the others.   You have him as a co-conspirator.   Clearly, as Mr. Lucas said in his opening, they are not disputing that.   He was there and an active participant in that robbery.

You also can find him guilty as a co-conspirator.   Remember how we talked about it in jury selection, if they are there to commit one felony, aggravated robbery, and another felony is committed, capital murder, he can be found guilty, even if he didn't intend it, as long as one or more of the others did.   All you have to do is look at the mannequin.   Was that intent to kill?   Could there be any more evidence of intent to kill than that mannequin?   Clearly he's guilty under both of these theories.

You also have him as a principle.   In the course of committing that robbery of the Oshman's, the robbery of Wesley Ferris, did they kill Aubrey Hawkins?   There's no question about that.   Again, you have enough evidence to put him outside in the back of that loading dock area at the time those shots are fired.   He can be found guilty as a principle.

He can be found guilty as a party for aiding and attempting to aid the others to commit the offense of robbery, and should he have anticipated -- excuse me, aiding and attempting to aid those others to commit the offense of capital murder, again, you have sufficient evidence to have him out there committing that offense.

And then finally the conspiracy parties.  Should he have anticipated this?  Folks, not only did all of them fall under the category of should have anticipated, it's quite clear from the evidence that they did, in fact, anticipate that.  The evidence is overwhelming on that.

You have six different ways to find him guilty of capital murder.  **And you all do not have to agree on which one it is.**  You can have three of you, you can actually break it down, since there would be twelve of you, you can have two on each of the six and that's a unanimous verdict.  And it can be broken down any way, any numbers, in any of that different category of those six ways to find him guilty of capital murder.

**All of those are appropriate and you are not in disagreement if you cannot agree on which one, as long as you do agree on one of them.**  It's that simple. (RR50:8-11).

## 2.  Argument

A unanimous jury verdict ensures that the jury agrees on the factual elements underlying an offense - it is more than mere agreement on a violation of a statute.[177]

While courts have distinguished the submission of jury charges between multiple offenses from submission of multiple manner and means of a single offense, the submission in Mr. Garcia's trial was equivalent to a submission of two offenses because two distinct ways of committing the capital murder of Officer Hawkins existed.  The first manner and means was pursuant to § 19.03(a)(1), the murder of a peace officer, which did not require an intentional murder pursuant to § 19.02 (b)(1).  That is, the murder may have been committed with the lesser mens rea of knowingly causing the death.  The second manner and means was pursuant to § 19.03(a)(2), which specifically requires a mens rea of intentionally causing the death pursuant to § 19.01(b)(1).  Courts have recently

---

[177] *United States v. Holley*, 942 F.2d 916 (5th Cir. 1991) (citing *McKoy v. North Carolina*, 494 U.S. 433, 108 L.Ed. 2d 369, 110 S. Ct. 1227 (1990) (Blackmun, J., concurring)).

recognized that capital murder is a result of conduct offense that also includes nature of circumstances and/or nature of conduct elements depending upon the underlying conduct that elevates the intentional murder to capital murder.[178]   Thus, the aggravating "nature of circumstances and/or nature of conduct elements" are elements of the offense of capital murder.[179]   The jury instructions in Garcia's case, coupled with the prosecutor's misstatement of law – allowing the jury to *not* agree on which of Garcia's acts constituted capital murder – deprived him of his right to a unanimous verdict.

### 3. Prejudice

The jury instructions allowed more than one of Mr. Garcia's acts to constitute capital murder.   First, the jury was allowed to find him guilty on a theory that he shot Officer Hawkins himself.   Secondly, a parties theory was submitted allowing conviction for acting as a party or as a conspirator.   These two theories contained different criminal acts: first, that he was a shooter; and second, that he was involved in a different way but was not a shooter.   The jury was allowed, without any objection from the defense, to find Mr. Garcia guilty without unanimous agreement on the act of which he was guilty.   Based upon the above circumstances, error exists.

The failure of defense counsel to object to the jury instructions and the prosecutor's argument satisfies the *Strickland* test.   The law in the jury instructions was

---

[178] *Patrick v. State*, 906 S.W.2d 481, 491 (Tex.Crim.App. 1995), (citing *Hughes v. State*, 897 S.W.2d 285 (Tex.Crim.App. 1994)).

[179] *Rodriguez v. State*, 146 S.W.3d 674 (Tex. Crim. App. 2004); *Reyes v. State*, 84 S.W.3d 633, 636 (Tex.Crim.App.  2002).

incorrect, and the prosecution relied upon it in pursuit of a guilty verdict.  Under these

circumstances, confidence in the outcome of this case is directly undermined.

### E.  Trial Counsel Failed to Object to the State's Mischaracterization of Evidence and Improper Argument at Closing.[180]

Compounding the error created by counsels' failure to object to the state's

misstatement of the law at closing arguments during the guilt/innocence phase, counsel

further failed to object to an egregious misstatement of facts – one which characterized

Mr. Garcia as having made a threat to kill someone, when in fact, no witness ever testified

that Mr. Garcia made any such statement during the robbery.

### 1.  Factual Background

In its closing arguments, the state took a statement made by Rivas, a co-defendant,

and instead attributed that statement to Mr. Garcia:

> **Recall Joseph Garcia's threats inside?  "If _we_ kill one of you, _we're_ going to kill all of you."  Is that anticipation?  Is that knowledge?  Is that intent?  Of course it is.**  (R:50:15-16) (emphasis added).

This was a blatant mischaracterization of testimony.  The actual testimony about who

made that statement was given by Wes Ferris, the Oshman's manager:

> **Q. What did you see <u>Mr. Rivas</u> do then?**
>
> **A. He had his gun pointing in the air.  Then he dropped it and pointed it directly at my chest and said, "Don't try it, Wes.  If you do, _I'll_ have to shoot you.  If _I_ shoot you, _I'll_ shoot everybody."**  (R45:63) (emphasis added).

---

[180] Claim III(E) in Garcia's Sucessor State Habeas Petition; Ground Eighteen cited in Petitioner's Skeletal Petition.

Failure of defense counsel to object to this blatant mischaracterization certainly satisfies the *Strickland* test.   Additionally, counsel failed to object to the following argument made by the state in closing:

> ***They*** did whatever ***they*** had to do to escape from Oshman's, just like ***they*** did whatever ***they*** had to do to escape from the Connally Unit.  It was planned.  It was anticipated.  You can infer ***they*** knew what ***they*** were doing from the scanners, from the frequency codes, and the savage number and brutality of how Officer Hawkins died tells you there is a probability of future danger. (RR56:79)(emphasis added).

## 2. Argument

The prosecutor's misstatement alleging that Garcia told an Oshman's employee that Garcia would shoot him was clearly a statement going to a central issue in the case – whether Garcia possessed the requisite intent to be convicted of capital murder.  By attributing Rivas's statements -- that would easily evidence intent – to Garcia, the prosecutor basically told the jury that the state had met one of the elements it had to prove. The prosecutor then compounded his misstatement later in his closing argument by lumping all of the co-defendants into one unit that seemingly had some shared central intent.  Any reasonable attorney would have objected to a prosecutor who put another person's vitriolic threats into his client's mouth.  And any reasonable attorney would have objected to a prosecutor insisting that his client engaged in some kind of group think – when a basic element at issue was his client's individual intent.  The failure to object to these statements thus satisfies the *Strickland* test.

### 3.  Prejudice

Counsels' failure to object to this mischaracterization of testimony and improper argument deprived Garcia of effective assistance of counsel.   Allowing the state to magically assert that statements going to show intent – particularly coupled with the state's mischaracterization of law during closing, error in the jury charge regarding what could be considered to show intent, the improper argument that the jury could find Mr. Garcia guilty based on the acts of others (quoted above), and the multiple theories on which the state urged the jury to convict Mr. Garcia – surely created error sufficient to undermine confidence in the verdict and death penalty assessed in this case.

### F.   Trial Counsel Failed to Request an Anti-Parties Charge at the Punishment Phase of Trial.[181]

At the guilt/innocence phase of trial, both a parties charge and a conspiracy charge were given.  While it is appropriate to consider party liability in assessing guilt, the death penalty may only be imposed for individualized conduct.[182]  As stated by the Texas Court of Criminal Appeals:

> The law of parties may not be applied to the special issues. *Martinez v. State,* 899 S.W.2d 655, 657 (Tex.Crim.App. 1994) (citing *Green v. State,* 682 S.W.2d 271, 287 (Tex.Crim.App. 1984). While the law of parties can support a conviction for capital murder, the death penalty may be imposed only by examination of the mitigating and aggravating circumstances concerning the individual defendant.

---

[181] Claim III(F) in Garcia's Sucessor State Habeas Petition; Ground Nineteen cited in Petitioner's Skeletal Petition.

[182] "The law of parties cannot be applied to the punishment phase of a capital murder trial." *Green v. State,* 682 S.W.2d 271 (Tex. Crim. App. 1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985); *Johnson v. State,* 853 S.W.2d 527, 536 (Tex.Crim.App. 1992).

*Green,* 682 S.W.2d at 287 (applying *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)).[183]

Therefore, an anti-parties charge focusing on the conduct of the accused alone is appropriate. For example, a charge instructing the jury "[to] confine yourselves, in answering the following issues, to the conduct and acts of the defendant *standing alone* is appropriate."[184]

## 1.  Factual Background

In this case, Mr. Garcia was convicted on a charge that allowed conspirator liability.  The punishment charge specifically instructed the jury to consider all of the evidence from the guilt or innocence stage of trial:

> You shall consider all evidence admitted during the guilt or innocence stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.  (CR2:297).

No anti-parties instruction was requested at the punishment phase, and no such instruction was contained in the punishment charge.  (CR2:296-303).

At the punishment phase, trial counsel was obliged to ensure that the jury understood its obligation to consider only if Mr. Garcia, standing alone, anticipated death as set out in Special Issue Number Two. The failure to request the charge enhanced the possibility that the jury convicted Mr. Garcia because other members of the group

---

[183] *Varga v. State,* 2003 WL 21466926, 11 (Tex.Crim.App. 2003) (not designated for publication).
[184] *Martinez v. State,* 899 S.W.2d 655, 657 (Tex.Crim.App. 1994) (emphasis supplied).

anticipated death.   In fact, the prosecution made that very argument without objection, thus enhancing the harm created by the omission:

> **They** did whatever **they** had to do to escape from Oshman's, just like **they** did whatever **they** had to do to escape from the Connally Unit.  It was planned.  It was anticipated.  You can infer **they** knew what **they** were doing from the scanners, from the frequency codes, and the savage number and brutality of how Officer Hawkins died tells you there is a probability of future danger.   (RR56:79) (emphasis added).

## 2.  Argument

The reason for the need for the anti-parties charge is clear from Texas court precedent:

> The point of the anti-parties charge is to direct the jury's focus to the conduct or mental state of the defendant *as opposed to that of a co-defendant or accomplice*. Whether or not the defendant knew or was aware of the impact the victim's death would have on others does not have any tendency to make it more or less probable that the defendant himself, rather than an accomplice or co-defendant, 'actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.'[185]

> When parties liability is argued at the guilt/innocence phase of trial, an anti-parties charge is required at the punishment phase.  Under Texas law, an accused is entitled to an anti-parties charge, that is, an instruction that the law of parties may not be considered by the jury in assessing punishment or in answering the special issues in a capital case if the accused requests such an instruction. *McCoy v. Lynaugh,* 714 F.Supp. 241, 251 (S.D.Tex.), *aff'd,* 874 F.2d 954 (5th Cir.1988). . . (citing *Nichols v. State,* 754 S.W.2d 185 (Tex.Crim.App. 1988)). . . . An accused is entitled to such an instruction upon request; absent a request, there is no obligation upon the court to so charge. *Nichols,* 754 S.W.2d at 199.[186]

> [I]n cases where a law of parties charge was given during the guilt/innocence phase of a capital case a prophylactic instruction should be given, if requested,

---

[185] *Solomon v. State,* 49 S.W.3d 356, 371 (Tex. Crim. App. 2001)(Meyes, J., dissenting) (emphasis in original) (paraphrasing Tex. Code Crim. Proc. art. 37.071, § 2(b)(2)).

[186] *Chambers v. Cockrell,* 2003 WL 22017036 at * 22 (N.D.Tex. 2003) (not designated for publication).  *See also  Marquez v. State,* 725 S.W.2d 217, 225 (Tex .Crim. App. 1987).

which would instruct the jury to limit its consideration of punishment evidence to conduct shown to have been committed by the defendant.

The charge is of critical importance when conspiracy liability is alleged because that charge does not require a specific intent to kill as does the regular parties charge.[187]

### 3. Prejudice

Trial counsels' failure to request and obtain an anti-parties charge at punishment allowed the jury to assess the death penalty for Garcia – based on the acts of others. The absence of this instruction which has been clearly contemplated and discussed in Texas case law, coupled with the prosecutor's arguments that grouped Garcia's alleged acts in with others' acts, allowed the jury to consider Garcia's likelihood of future dangerousness based on the acts of others. This failure to obtain a proper charge clearly played a major role in the death sentence being assessed. Thus, both prongs of *Strickland* are established.

### G. Trial Counsel was Ineffective for Failing to Object to Improper Party Conspiracy and Inferred Intent Instructions at the Guilt/Innocence Phase.[188]

### 1. Factual Background

In this case, Mr. Garcia was convicted on a charge that allowed conspirator liability. The jury charge instructed the jury that it could find Garcia guilty of capital murder in any of six different ways, and that his alleged intent to commit capital murder could be inferred from acts and circumstances of others.

---

[187] *Prytash v. State,* 3 S.W.3d 522, 549 n.4 (Tex. Crim. App. 1999).

[188] Claims 15, 17, 19 and 21 in Garcia's Initial State Habeas Petition; Grounds Five, Six and Thirteen cited in Petitioner's Skeletal Petition.

The indictment returned by a Dallas Grand Jury alleged the offense of capital murder in two separate paragraphs pursuant to §19.03(a)(1) "murder of a peace office in paragraph I" and §19.03.03(a)(2) "intentionally committing murder in the course of robbery in paragraph II." (CR1:2).  Within the jury charge, the trial court instructed the jury that "intent may be inferred from the surrounding facts and circumstances including but not limited to acts done and words spoken." (CR1:286).  The charge also contained an instruction that allowed the jury to consider criminal responsibility for conduct of another under a conspiracy theory pursuant to §7.02(b), Texas Penal Code.  The instruction provided stated:

> "If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, then all conspirators are guilty of the felony actually committed, thought having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. Murder and robbery are felony offenses." (CR2:287)

The application paragraphs permitted the jury to find applicant guilty of capital murder under six multiple manner and means and multiple means of culpability, individually and as a party:

## APPLICATION OF THE LAW AND FACTS

### CAPITAL MURDER

Now bearing in mind the foregoing instructions,

(1) If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, the defendant, Joseph C. Garcia, intentionally or knowingly caused the death of Aubrey Hawkins, an individual, by shooting Aubrey Hawkins with a firearm, a deadly weapon, and that Aubrey Hawkins was a peace officer, namely: a City of Irving police officer,

acting in the lawful discharge of an official duty, and the defendant knew Aubrey Hawkins to be a peace officer, then you will find the defendant, Joseph C. Garcia, guilty of capital murder:

OR

(2)      If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, George Rivas, Donald Keith Newbury, Michael Anthony Rodriguez, Randy Halprin, Patrick Murphy, or Larry Harper, hereinafter referred to as "the others," or any combination of the others, knowing Aubrey Hawkins was a peace officer, did intentionally or knowingly cause the death of Aubrey Hawkins, an individual and a peace officer, namely a City of Irving police officer, acting in the lawful discharge of an official duty, by shooting him with a firearm, a deadly weapon, and if you further find from the evidence beyond a reasonable doubt that the defendant, Joseph C. Garcia, acting as a party, as that term is here in before defined, did, with the intent to promote or assist the commission of the offense of murder, solicit, encourage, direct, aid, or attempt to aid the others, or any one or combination of the others, in intentionally or knowingly causing the death of Aubrey Hawkins, then you will find the defendant. Joseph C. Garcia, guilty of capital murder:

OR

(3)      If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, the defendant, Joseph C. Garcia, entered into a conspiracy with one or more of the following persons: George Rivas, Donald Keith Newbury, Michael Anthony Rodriguez, Randy Halprin, Patrick Murphy, or Larry Harper, hereinafter referred to as "the others," to commit the felony offense of robbery, and that in the attempt to carry out the conspiracy, if any, one or more of the others, knowing Aubrey Hawkins was a peace officer, did intentionally or knowingly cause the death of Aubrey Hawkins, an individual and a peace officer, namely a City of Irving police officer, acting in the lawful discharge of an official duty, by shooting him with a firearm, a deadly weapon, and if you further find that intentionally or knowingly causing the death of Aubrey Hawkins was committed in furtherance of the unlawful purpose to commit robbery and should have been anticipated as a result of carrying out the conspiracy to commit robbery, whether or not the defendant, Joseph C. Garcia, had the intent to cause the death of Aubrey Hawkins, then you will find the defendant, Joseph C. Garcia, guilty of capital murder;

OR

(4)      If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, the defendant, Joseph C.

Garcia, intentionally caused the death of Aubrey Hawkins, an individual, by shooting Aubrey Hawkins with a firearm, a deadly weapon, while in the course of committing or attempting to commit teh offense of robbery of Wesley Ferris, then you find the defendant, Joseph Garcia, guilty of capital murder;

OR

(5)     If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, George Rivas, Donald Keith Newbury, Michael Anthony Rodriguez, Randy Halprin, Patrick Murphy, or Larry Harper, hereinafter referred to as "the others," or any combination of the others, did intentionally cause the death of Aubrey Hawkins, an individual, by shooting him with a firearm, a deadly weapon, while in the course of committing or attempting to commit the offense of robbery of Wesley Ferris, and if you further find from the evidence beyond a reasonable doubt that the defendant, Joseph C. Garcia, acting as a party, as that term is here in before defined, did, with the intent to promote or assist the commission of the offense of murder, solicit, encourage, direct, aid, or attempt to aid the others, or any one or combination of the others, in intentionally causing the death of Aubrey Hawkins, in the course of the commission or attempted commission of the offense of robbery of Wesley Ferris, then you will find the defendant, Joseph C. Garcia, guilty of capital murder;

OR

(6)     If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, the defendant, Joseph C. Garcia, entered into a conspiracy with one of more of the following persons: George Rivas, Donald Keith Newbury, Michael Anthony Rodriguez, Randy Halprin, Patrick Murphy, or Larry Harper, hereinafter referred to as "the others," to commit the felony offense of robbery of Wesley Ferris, and that in the attempt to carry out this conspiracy, if any, one or more of the others did intentionally cause the death of Aubrey Hawkins by shooting Aubrey Hawkins with a firearm, a deadly weapon, and if you further find that intentionally causing the death of Aubrey Hawkins was committed in furtherance of the unlawful purpose to commit the robbery of Wesley Ferris, and that intentionally causing the death of Aubrey Hawkins was an offense that should have been anticipated as a result of carrying out the conspiracy to commit robbery, whether or not the defendant had the intent to cause the death of Aubrey Hawkins, then you will find the defendant Joseph C. Garcia, guilty of capital murder.[189]

---

[189] *See* Exhibit K, Record excerpt of Jury Charge at Guilt/Innocence and Punishment, (CR2:289-292).

## 2.  Argument

Garcia was entitled under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as article 1, §§10, 13, and 19 and article 5, § 13 of the Texas Constitution to a unanimous guilty verdict.  In *Ngo v. State*,[190] the Court held that when the State charges different criminal acts regardless of whether these acts constitute violations of the same or different offenses or statutory provisions, the jury must be instructed that it cannot return a guilty verdict unless it unanimously agrees upon the commission of any of these criminal acts.[191]

A unanimous jury verdict ensures that the jury agrees on the factual elements underlying an offense - it is more than mere agreement on a violation of a statute.[192] While the courts have distinguished the submission of jury charges between multiple offenses from submission of multiple manner and means of a single offense, the submission in Garcia's trial was equivalent to a submission of two offenses because two distinct ways of committing the capital murder of Hawkins existed.  The first manner and means, charged pursuant to Texas Code of Criminal Procedure § 19.03(a)(1), was  murder of a peace officer, which does not require an intentional murder pursuant to § 19.02 (b)(1). That is, the murder could have been committed with the lesser mens rea of knowingly causing the death.   The second manner and means was instructed pursuant to §

---

[190] 175 S.W.3d 738 (Tex.Crim.App. 2005).
[191] *Id.*; *See also Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999).
[192] *United States v. Holley*, 942 F.2d 916 (5th Cir. 1991) (citing *McKoy v. North Carolina*, 494 U.S. 433, 108 L.Ed. 2d 369, 110 S. Ct. 1227 (1990) (Blackmun, J., concurring)).

19.03(a)(2), which specifically required a mens rea of intentionally causing a death pursuant to § 19.01(b)(1).  Courts have recently recognized that capital murder is a result of conduct offense that also includes nature of circumstances and/or nature of conduct elements depending upon the underlying conduct that elevates the intentional murder to capital murder.[193]  Thus, under case law, the aggravating "nature of circumstances and/or nature of conduct elements" are elements of the offense of capital murder.[194]

Another way to consider the question is that first, the jury instructions allowed more than one of Garcia's acts to constitute capital murder.  First, the jury was allowed to find him guilty on a theory that he shot Officer Hawkins himself.  Secondly, a parties theory was submitted allowing conviction for acting as a party or as a conspirator.  These two theories contained different criminal acts: First, that he was a shooter, and secondly that he was involved in a different way but was not a shooter.  Due to the party conspiracy instructions and the way the charge was structured, the jury ultimately had six separate ways of convicting Garcia of capital murder.[195]  The jury was allowed, without any objection from the defense, to find Garcia guilty without unanimous agreement on the act of which he was guilty.

---

[193] *Patrick v. State*, 906 S.W.2d 481, 491 (Tex.Crim.App. 1995), (citing *Hughes v. State*, 897 S.W.2d 285 (Tex.Crim.App. 1994)).

[194] *Rodriguez v. State*, 146 S.W.3d 674 (Tex. Crim. App.  2004); *Reyes v. State*, 84 S.W.3d 633, 636 (Tex.Crim.App.  2002).

[195] *See* Exhibit K, (CR2:289-292).  The instructions literally listed six different ways in which the jury could find Garcia guilty of capital murder, all instructed in the disjunctive.

Third, the inclusion of the inferred intent instruction, which stated: "Intent may be inferred from the surrounding facts and circumstances, including but not limited to acts done and words spoken,"[196] allowed the jury to reach a verdict that, based on the disjunctive choices the jury was instructed on, and the additional instruction that Garcia's intent could be inferred from the acts of others, was not unanimous. Based upon the above circumstances, error exists.

### 3. Prejudice

The failure of defense counsel to object to the jury instructions and the prosecutor's argument satisfies the *Strickland* test. The law in the jury instructions was incorrect, and the prosecution relied upon it in pursuit of a guilty verdict. Under these circumstances, confidence in the outcome of this case is directly undermined.

### H. Trial Counsel was Ineffective for Failing to Investigate Possible Mitigation Evidence.[197]

Trial counsel failed to employ a penalty phase investigator or mitigation expert, an essential member of any capital trial team and a requirement under Guideline 3.1(A)(1) of the State Bar Guidelines, adopted in 2006. Those guidelines states: "The defense teams should consist of no fewer than two attorneys qualified in accordance with Guideline 4.1, an investigator, and a mitigation specialist.[198] This failure to obtain such mitigation experts resulted in the jury *not* being presented a large portion of evidence regarding

---

[196] (CR2:286).

[197] Claim III(G) in Garcia's Sucessor State Habeas Petition; Ground Twenty cited in Petitioner's Skeletal Petition.

[198] *State Bar of Texas, Guidelines and Standards for Texas Capital Counsel.*

mitigating factors.  Counsel further failed to *explain* exactly what constituted "mitigating factors" to the jury.  Had these issues been properly explained, and a mitigation expert employed to present the abundance of mitigating evidence from Garcia's life, there is a substantial likelihood that at least one juror would have voted to spare Garcia the death penalty.

### 1.  Factual Background

Brad Lollar, one of Garcia's trial attorneys, was tasked with conducting mitigation interviews and obtaining pertinent records on behalf of Garcia's defense.  In do doing, Lollar obtained documents regarding Garcia's childhood from CPS and conducted family interviews.  Testimony from Garcia's ex-wife, former mother-in-law, and a close family friend was presented at punishment.  Additionally, Dr. Gilda Gessner was retained as a future dangerousness expert and testified in that regard at the punishment phase of trial.  Finally, a psychiatrist, Dr. Judy Stonedale was retained to "assess" Garcia to determine whether he suffered from any mental health issues or specific psychiatric illness.

To be sure, these mitigation efforts were more than that historically undertaken in any number of capital cases in Texas.  However well-intentioned these efforts were, it is important to review what Garcia's defense *did not* do in terms of preparing mitigation evidence.

Toni Knox, a licensed clinical social worker, has reviewed the mitigation investigation done on Garcia's behalf for purposes of this petition.  Ms. Knox's Mitigation Assessment and Investigation Report, along with exhibits thereto, is attached hereto as

Exhibit J.  Ms. Knox concludes that the mitigation investigation performed was deficient in several respects, and that mitigation was not properly presented to the jury – in terms of both educating the jury about what "mitigating circumstances" were, as well as presenting effective and abundant evidence pertaining to Garcia's childhood.  Highlights of what was not done by counsel on Garcia's behalf are as follows:

- No thorough mitigation investigation was conducted by a dedicated and trained mitigation specialist.  Such an investigation would have included a complete psychosocial history, a family history time line, and a genogram.[199]

- No "front-loading" of mitigation issues was conducted.  This would have included educating jurors – starting at voir dire and continuing through the trial at both phases – about mitigating evidence and possible themes.[200]

- Jury venirepersons were not effectively questioned regarding their ability to consider mitigation evidence.[201]

- No consulting mental health expert was involved to guide Garcia's counsel in effectively presenting mitigation evidence and obtaining other experts.[202]

- No experts – other than those used to address "future dangerousness" were utilized.  Additional experts (such as a mitigation specialist) could have addressed Garcia's nightmarish childhood involving frequent abandonment and exposure to drugs and violence, and the long-term effects of being raised by dysfunctional and substance-abusing family members.[203]

- No neuropsychological testing was performed to rule out biological brain problems, particularly those which may have been related to Garcia's mother's significant substance abuse;[204]

- No clear mitigation strategy or presentation of mitigation evidence was compiled.[205]

---

[199] Exhibit J, Affidavit of Toni Knox, p. 3.
[200] *Id.* at pp. 3, 12-14.
[201] *Id.* at pp. 6-9.
[202] *Id.*
[203] *Id.* at pp. 3, 10-12.
[204] Exhibit J, Affidavit of Toni Knox, p. 11.
[205] *Id.* at pp. 14-15.

- The jury was not presented with abundant evidence regarding Garcia's history of childhood abandonment, sexual abuse, exposure to frequent violence, exposure to drug use, poverty, lack of a stable environment, and criminality and drug use in Garcia's immediate family.[206]

Ms. Knox concludes that while evidence at the punishment phase was extremely important in Garcia's case, such evidence was not explored sufficiently, presented effectively, or presented in line with any kind of strategy or theme.[207]

Ms. Knox, a qualified mitigation specialist, completed a detailed psychosocial history, life timeline, and genogram of Garcia's life and family for purposes of this petition, resulting in evidence that was not, but could easily have been, presented by trial counsel.  This mitigating evidence includes:

- Garcia's childhood was a "nightmare."  His mother was from an extremely dysfunctional family.  She perpetuated this history with her own children.  Garcia never met his biological father.  His mother abandoned her first three children to their biological father, but kept Garcia with her (his biological father was a serviceman with whom his mother had a brief affair) when she moved from San Antonio, Texas, to New York, New York.[208]

- While living in New York, Garcia's mother became a drug addict.  Garcia was continually abandoned by her.  He was sexually abused and witnessed several violent events, including a murder, at a very young age.[209]

- Garcia's closest relationship when he was young was with his sister, who died at age nine from cancer.  The sister had previously been abandoned at the hospital by Garcia's mother after she was admitted for a treatment, discharged, and not picked up by the mother for 2 ½ weeks.[210]

---

[206] Exhibit J, Affidavit of Toni Knox at pp. 14-18.

[207] *Id*. at pp. 19-21.

[208] Exhibit J, Affidavit of Toni Knox, at pp. 19-20 and Attachment A, Psychosocial History, pp. 2-6.

[209] *Id.* at p. 20 and Attachment A, Psychosocial History, p. 7.

[210] *Id.* at Attachment A, Psychosocial History, p. 8

- Garcia and the sister were subsequently abandoned at the mother's friends house, and then taken away from the mother by CPS.  Garcia's sister was ultimately sent back to New York to her father (where she died).  Garcia was released to his mother by CPS, who then lost track of Garcia for a period of time because CPS could not find his mother to check on his welfare.[211]

- While Garcia and his sister were still living with their mother, and while the sister was being treated for cancer (she was paralyzed on one side of her body, in a wheelchair, and had only limited use of the other side of her body), Garcia often cared for his sister and her needs because the mother was rarely home.[212]

- Many of Garcia's family members were addicted to drugs and alcohol.  His mother was a heroin addict and was incarcerated when Garcia was a teenager.  Garcia was raised at various homeless shelters and residential treatment centers, because none of his family members were willing to take him in while his mother was incarcerated.[213]

Detailed facts about Garcia's childhood, family, and traumatic experiences are found in several attachments to Ms. Knox's Affidavit.

## 2.  Argument

Trial counsel defending a death penalty case as an "obligation to conduct a thorough investigation of the defendant's background"[214] that should "comprise efforts to discovery *all reasonably available* mitigating evidence to rebut any aggravating evidence that may be introduced by the prosecutor."[215]

While trial counsel did present mitigating evidence regarding Mr. Garcia's background, childhood and family to the jury, the evidence was compiled by attorneys

---

[211] *Id.* at Attachment A, Psychosocial History, pp. 8-9.
[212] *Id at* Attachment A, Psychosocial History, pp. 7-8.
[213] Exhibit J, Affidavit of Toni Knox, at p. 20 and Attachment A, Psychosocial History, pp. 10-12.
[214] *Williams v. Taylor*, 529 U.S. 362, 296 (2000) (citing ABA Standards for Criminal Justice 4-4.1, commentary pp. 4-55 (2d ed. 1980))
[215] *Wiggins v. Smith*, 539 U.S. 510 (2003)(quoting Guidelines 11.4.1(C), p. 93 (1989)(emphasis added by Supreme Court).

lacking the distinct qualifications, clinical skills and forensic skills of a mitigation specialist. Several methods and pieces of social history that are typically used by mitigation specialists were not utilized or compiled by Garcia's trial counsel. The benefit of such skills in assessing what types of mitigation evidence to both look for and present is obvious by the subsequently-adopted Texas State Bar standards for capital counsel.

As a result of counsel's failure to properly conduct a meaningful mitigation investigation, Garcia's jury was never properly education on what types of issues they would consider as mitigating circumstances. The jury was not presented any cohesive theme of mitigation that discussed the detailed information that was available about Garcia's nightmarish childhood. No such evidence was front-loaded during voir dire or the guilt/innocence phase of the trial. At the punishment phase, counsel merely presented disjointed evidence regarding Garcia's future dangerousness – much of which, on review of the trial transcript, appeared to benefit the State rather than Garcia.

### 3. Prejudice

The failure to properly conduct a thorough investigation of Garcia's background and history – though such evidence was clearly available prior to trial – resulted in critical evidence not being presented to Garcia's jury. The failure to retain trained mitigation experts to help investigate and present mitigation evidence resulted in a jury lacking not only substantive information, but an informed and organized context in which to view that information. There is a substantial likelihood that had the jury been educated on mitigating circumstances, had it been presented a cohesive theme of such circumstances

applied to Garcia's life, and had it been presented with numerous details of Garcia's history that comprised mitigating circumstances, the death penalty would not have been assessed.  Trial counsels' mitigation investigation and presentation fell far short of the standard of effectiveness outlined in *Strickland.*

### 6.   DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL – APPELLATE COUNSEL'S FAILURE TO RAISE MULTIPLE GROUNDS OF ERROR ON APPEAL.[216]

Just as Garcia's trial counsel failed to object and preserve error on certain points, Garcia's appointed appellate counsel, William "Matt" Fry, failed to argue obvious and meritorious grounds for appeal.  This failure was pointed out time and time again by the trial court and the Texas Court of Criminal Appeals with regard to Garcia's initial state habeas application.[217]

---

[216] Claim IV presented in Garcia's successor state habeas application; Grounds Twenty One through Twenty Six cited in Petitioner's Skeleton Brief filed in this Court.  Though Garcia was deprived of effective assistance of appellate counsel as to *every* claim brought in both of his state habeas petitions (because none of those claims were raised on direct appeal), Garcia acknowledges that no ineffective assistance of appellate counsel claims were raised in his initial state habeas petition.

[217] *See* Court's Findings of Fact and Conclusions of Law in *Ex Parte Joseph C. Garcia*, W01-00325 (CR2:358-483).  The trial court's findings, (which were themselves adopted wholesale from the State's proposed findings of fact and conclusions of law), adopted by the Court of Criminal Appeals, noted that as to most of Garcia's claims raised in his initial state habeas petition, such claims were not raised in on appeal and were thus procedurally barred (though the court went on to alternatively deny each of Garcia's claims on the merits).  *See, e.g. Id.* at pp. 359-360.

## A.  Right to Effective Assistance of Appellate Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel, both at trial and on appeal.[218]  In *Ward v. State*,[219] the Texas Court of Criminal Appeals acknowledged that defendants in Texas have been afforded a statutory right of appellate review of their convictions, and that defendants are entitled to effective assistance of counsel on appeal:

> A state is not required by the Federal Constitution to provide appellate courts or a right to appellate review. *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891, 898 (1956); *McKane v. Durston*, 153 U.S. 684, 687-688, 14 S.Ct. 913, 914-915, 38 L.Ed. 867, 868 (1894). Nonetheless, Texas has granted criminal defendants a statutory right of appellate review. Article 44.02, V.A.C.C.P. (1966). When a State elects to act in a field where its action has significant discretionary elements, it must act consistent with the dictates of the Texas and Federal Constitutions. *Evitts v. Lucey*, 469 U.S. 387, 401, 105 S.Ct. 830, 839, 83 L.Ed.2d 821, 833 (1985).

> In *Evitts v. Lucey,* 469 U.S. 387, 395-96, 105 S.Ct. 830, 836, 83 L.Ed.2d 821, 829-30 (1985), the Supreme Court held that there is a constitutional guarantee of effective assistance of counsel on appeal in every criminal prosecution, whether counsel is appointed or retained. In Evitts, defendant's retained counsel filed notice of appeal, brief and record. Counsel failed to submit a statement of facts required by the Kentucky Rules of Appellate Procedure. The Kentucky Court of Appeals dismissed the defendant's appeal for failure to file a statement of facts. The Supreme Court ultimately affirmed the granting of a writ of habeas corpus on the ground that the appellant had been denied effective assistance of counsel. The Supreme Court held:

>> In bringing an appeal as of right from his conviction, a criminal defendant is attempting to demonstrate that the conviction, and the consequent drastic loss of liberty, is unlawful. To prosecute the appeal, a criminal appellant must face an adversary proceeding that--like a trial--is governed by intricate rules that to a layperson would be hopelessly forbidding.  An unrepresented appellant--like an unrepresented defendant at trial--is unable to protect the vital

---

[218] *Strickland v. Washington,* 466 U.S. 668 (1984); *Evitts v. Lucey,* 469 U.S. 387, 396 (1985).
[219] 740 S.W.2d 794 (Tex.Crim.App. 1987).

interests at stake. To be sure, respondent did have nominal representation when he brought this appeal. But nominal representation on an appeal as of right--like nominal representation at trial--does not suffice to render the proceedings constitutionally adequate; a party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all. *Id.,* 105 S.Ct. at 836.[220]

Garcia was thus entitled to effective assistance of appellate counsel.

## B.  Standard for Effective Assistance of Counsel

To be sure, Garcia had *nominal* representation when he brought this appeal. But nominal representation on an appeal does not suffice to render the proceedings constitutionally adequate; a party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all.[221]   Thus, Garcia's appellate counsel's performance is to be judged by the same objective standard of reasonableness set forth in *Strickland v. Washington.*[222]   Effective assistance is denied if, "counsel's representation fell below an objective standard of reasonableness," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[223]

---

[220] *Ward*, 740 S.W.2d at 800.

[221] *Strickland v. Washington*, 466 U.S. at 686.

[222] *Id.*

[223] *Id.*

**C. Appellate Counsel Failed to Properly Raise the Trial Court's Improper Grant of the State's General Objection to Venireperson David Chmurzynski.[224]**

Garcia's right to effective assistance of counsel on appeal, under the Sixth and Fourteenth Amendments to the United States Constitution was denied when appellate counsel failed to properly raise this ground of error on appeal.

### 1. Factual Background

The factual background regarding this claim is set forth in Section 5(B) (page 43) above.

### 2. Argument

The legal standards pertinent to the State's objection to Venireperson Chmurzynski are also set forth above. As to Garcia's appellate counsel, whether counsel's performance was deficient is a mixed question of law and fact, and accordingly, this Court will make an independent determination of whether counsel's representation passed constitutional muster.[225] In the instant case, appellate counsel's lack of adequate argument and briefing eliminated the possibility that constitutional errors at trial would be reviewed on direct appeal, as well as in state habeas proceedings. But for counsel's inadequate briefing of some points – and failure to raise obvious other ones – there is a reasonable certainty that the claims would have been reviewed by the Court of Criminal Appeals.

---

[224] Claim IV(B) in Garcia's successor state habeas application; Ground Twenty One cited in Petitioner's Skeletal Petition.

[225] *Gray v. Lynn,* 6 F.3d 265, 268 (5th Cir.1993) (quoting *Ricalday v. Procunier,* 736 F.2d 203, 206 (5th Cir.1984)).

### 3.  Prejudice

Because the striking of one juror due to a *Witherspoon* error can result in a new trial for the appellant, appellate counsel's failure to raise this issue on direct appeal was certainly deficient.[226]   Likewise, the improper exclusion of a single venireperson under *Wainwright* is reversible error and is not subject to the harmless error rule.[227]   Garcia was thus prejudiced by appellate counsel's failure, because had he raised this issue on appeal, there is a reasonable probability that Garcia's case would have been remanded for a new trial.

### D.  Appellate Counsel Failed to Properly Allege that Jury Selection was Conducted in Violation of Texas Statutes. [228]

Garcia's right to effective assistance of counsel on appeal, under the Sixth and Fourteenth Amendments to the United States Constitution was denied when appellate counsel failed to properly raise this ground of error on appeal.

### 1.  Factual Background

The factual background regarding this claim is set forth in Section 5(C) (page 52) above.

---

[226] *Davis v. Georgia*, 429 U.S. 122 (1976).
[227] *Gray v. Mississippi*, 481 U.S. 648, 666 (1987); *Ex parte Williams*, 748 S.W. 2w 461, 464 (Tex. Crim. App. 1988).
[228] Ground IV(C) in Garcia's successor state habeas application; Ground Twenty Two cited in his Skeletal Petition.

## 2. Argument

The legal standards pertinent to the method of jury selection – and the unfair advantage given to the State as the result of how the jury selection proceeded – is also set forth above.  Mr. Garcia's contention is that the defect affected his substantial rights as required by the jury selection statutes and his right to a jury trial, as provided in the Sixth amendment to the United States Constitution.  Appellate counsel should have raised this issue on appeal in two ways.  The first would have been as both statutory and constitutional error for failing to follow the state statutory structure that resulted in giving the state a chance to better use its peremptory challenges to get a death prone jury, a practice condemned in *Witherspoon v. Illinois*,[229] and *Morgan v. Illinois*,[230] cited above.  The second issue on appeal should have raised the ineffectiveness of counsel for failing to object to the procedure used.

## 3. Prejudice

Had appellate counsel raised these grounds on direct appeal, they would have been reviewed by the Court of Criminal Appeals.  Due to the unconstitutional method of jury selection that gave the state an improper advantage in obtaining a more death-prone jury, there is a reasonable likelihood that had these claims been reviewed, Garcia's case would have been remanded for new trial.

---

[229] 391 U.S. 510 (1968).
[230] 504 U.S. 719, 732 (1992).

### E.  Appellate Counsel Failed to Properly Brief Issue Regarding Erroneous Admission of Extraneous Offense Evidence. [231]

Garcia's right to effective assistance of counsel on appeal, under the Sixth and Fourteenth Amendments to the United States Constitution was denied when appellate counsel failed to properly raise this ground of error on appeal.

### 1.  Factual Background

In its Opinion dated February 16, 2005, the Court of Criminal Appeals stated:

> With regard to appellant's claims that the admission of the evidence [on appellant's escape from prison and the escapees' taking numerous firearms during the escape] was more prejudicial than probative or that he was entitled to a limiting instruction regarding the evidence, he has wholly failed to present anything more than conclusory statements.  He has inadequately briefed these complaints, and we will not address them. [232]

At trial, Mr. Garcia's counsel properly preserved this issue by filing a written objection to the introduction of extraneous offenses during the guilt/innocence phase. (CR1:101-04).  The motion was discussed during pretrial hearings, but no ruling was made at the time.  (R22:16-30).  Counsel objected to the evidence again prior to opening statements, and the trial court overruled the objection.  (R45:3-8).  The court ultimately ruled that the evidence of the escape and firearms taken during it were contextual, and allowed the evidence to be admitted (subject to the defense's running objection), and denied a request for a limiting instruction.  (R48:6).  The court stated:

---

[231] Ground IV(D) in Garcia's successor state habeas application; Ground Twenty Three in his Skeletal Petition.

[232] *Garcia v. State*, No. AP-74,692 (Tex. Crim. App., February 16, 2005).

The nature of the dispute in this case is regarding the weapons that were used during the robbery and the parties conducting the robbery and murder in Irving, Texas.  (R48:4).

I've heard arguments from both sides.  The Court has made the appropriate balancing test.  I find that the escape from the penitentiary some 11 days prior to the 24th of December is contextural [sic], will not overburden the jury, and the limited purpose of admitting the testimony from Mr. Garcia [a witness, not Joseph C. Garcia, the defendant] *to prove up the ownership of the weapons and the parties involved in obtaining that property.*  (RR48:5).

No limiting instruction was contained in the court's charge to the jury.  (CR2:282-95).

## 2.  Argument

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.[233]  If the defendant so requests at the guilt/innocence phase of trial, the trial court must instruct the jury not to consider extraneous offense evidence admitted for a limited purpose unless it believes beyond a reasonable doubt that the defendant committed the extraneous offense.[234]

Same transaction contextual evidence is therefore admissible without a limiting instruction, but only to the extent that it is necessary to the jury's understanding of the

---

[233] Tex.R. Evid. 404(b).

[234] *See George v. State*, 890 S.W.2d 73, 76 (Tex. Crim. App. 1994); *Rodriguez v. State*, 137 S.W.3d 228, 230-31 (Tex.App.-Houston [1st Dist.] 2004, no pet.).

offense, and only when the offense would make little or no sense without also bringing in the same transaction evidence.[235]   Stated alternatively, same transaction contextual evidence is admissible when several offenses are so intermixed or connected as to form a single, indivisible criminal transaction, such that in narrating the one, it is impracticable to avoid describing the other.[236]

Because the trial court ruled that evidence of the escape was contextual evidence, the state was allowed to refer to the escape in both opening and closing arguments (and it did), and provide evidence of the large number of firearms that were taken in the escape and later recovered in Colorado.  From the very beginning of the case, then, the state was able to paint Mr. Garcia in the light of being a convict who escaped from prison and along with others went on a crime spree.  However, as trial counsel noted, the escape occurred eleven days before events at Oshman's in Irving on December 24, 2000.  The act of the Oshman's robbery itself and the subsequent killing of Officer Hawkins were definite events, happening in close temporal and physical proximity.   The escape from the Connally Unit many days before and many miles away was not.  It was not "impractical" to explain the robbery and Officer Hawkins's death without referring to the escape.  Surely the jury would have been able to understand the robbery and killing without hearing evidence about the escape.   But because the trial court ruled that the escape

---

[235] *McDonald v. State*, 179 S.W.3d 571, 577 (Tex. Crim. App. 2005); *Castaldo v. State*, 78 S.W.3d 345, 352 (Tex. Crim. App. 2002); Wesbrook v. State, 29 S.W.3d 103, 114-15 (Tex. Crim. App. 2000); *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993).
[236] *McDonald*, 179 S.W.3d at 577; *Rogers v. State*, 853 S.W.2d 29, 33-34 (Tex. Crim. App. 1993).

evidence was contextual, the jury, without a limiting instruction, was allowed to consider evidence of the escape for whatever purpose it deemed fit – not only to show the ownership of the weapons, as the trial judge opined.  The jury could have easily concluded that since Mr. Garcia escaped from prison and was merely present at the robbery and subsequent killing of Officer Hawkins (without, in fact, any direct evidence to show that Mr. Garcia was present during the shooting of Officer Hawkins), he must have been guilty of capital murder.   This is precisely the danger that evidentiary rules and limiting instructions exist to protect against.

### 3.  Prejudice

Because the Court of Criminal Appeals refused to consider this point on appeal, having found that appellate counsel failed to offer more than conclusory statements about the evidence and lack of limiting instruction, Garcia was denied effective assistance of counsel.  While appellate counsel did address the balancing test necessary under Rule 403 of the Texas Rules of Evidence, he failed to argue that the escape evidence prejudiced Mr. Garcia by painting him as a criminal generally.   Counsel's deficient performance fell below an objective standard of reasonableness in that counsel on appeal, armed with the record on appeal, should have been able to offer argument in support of this claim rising above mere conclusory statements.   Mr. Garcia was prejudiced by appellate counsel's failure in that he was unable to obtain review of this viable claim.   Had the Court of Criminal Appeals reviewed this claim, there is a reasonable likelihood that it would have remanded Garcia's case for a new trial.

### F.  Appellate Counsel Failed to Raise Points of Error on Jury Instructions Regarding Intent at Guilt or Innocence Phase of Trial.[237]

Garcia's right to effective assistance of counsel on appeal, under the Sixth and Fourteenth Amendments to the United States Constitution was denied when appellate counsel failed to properly raise this ground of error on appeal.

### 1.  Factual Background

At trial, counsel objected to the trial court's substitution of its own language regarding intent being inferred from surrounding circumstances for the pertinent statutory language:

> Your Honor, we would once again renew our objection to the statement that intent can be inferred.  That's hardly the burden of proof in this or any other case.  We think that by giving that instruction that the Court greatly lowers the State's burden of proof and we would object to it.  We would also request a definition of reasonable doubt.
>
> Going back to the Court's ruling, there is a statutory definition of intentional which we think suffices over some layman's language that's been included in this which we think lowers the burden of proof.  We would continue our objection.  (RR50:4).

The court responded:

> Answering the first question on the issue of common sense on the intent may be inferred by surrounding circumstances, the request to remove the language is denied.  (RR50:3-4).

The court's charge to the jury at the guilt or innocence phase of trial included language from § 6.03(a) and (b) of the Texas Penal Code.  In addition to this language, the court charged:

---

[237] Claim IV(E) in Garcia's successor state habeas application; Ground Twenty Four in his Skeletal Petition.

Intent may be inferred from the surrounding facts and circumstances including but not limited to acts done and words spoken.  (CR2:286)

In this case, the jury was also instructed that it could consider conduct of other participants in the robbery under a conspiracy theory:

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  Mere presence alone will not constitute one a party to an offense.

"Conspiracy" means an agreement between two or more persons, with intent that a felony be committed, that they, or one or more of them, engage in conduct that would constitute the offense.  An agreement constituting a conspiracy may be inferred from acts of the parties.

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, then all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.  Murder and robbery are felony offenses.

(CR2:287).  The jury was also instructed that one theory of conviction for capital murder was:

 . . . If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, [the other Texas Seven members], hereinafter referred to as 'the others,' or any combination of the others, knowing Aubrey Hawkins was a peace officer, did intentionally or knowingly cause the death of Aubrey Hawkins, an individual and peace officer, namely a City of Irving police officer, acting in the lawful discharge of an official duty, by shooting him with a firearm, a deadly weapon, and if you further find from the evidence beyond a reasonable doubt that the defendant, Joseph C. Garcia, acting as a party, as that term is here in [sic] before defined, did, with the intent to promote or assist the commission of the offense of murder, solicit, encourage, direct, aid, or attempt to aid the others, or any one or combination of the others, in intentionally or

knowingly causing the death of Aubrey Hawkins, then you will find the defendant, Joseph C. Garcia, guilty of capital murder.

(CR2:289).

## 2. Argument

Intentional murder is a "result of conduct" offense.[238]  As such, "what matters is that the conduct (whatever it may be) is done with the required culpability to effect the *result* the Legislature has specified."[239]  Murder is an offense which requires that the culpable mental state accompany the result of the conduct, rather than the nature of the conduct.  Thus, a murder charge which defines "intentionally" or "knowingly" as they relate to the *nature* of the conduct is in error.[240]  While courts have held that instruction stating that intent can be inferred from *a defendant's* acts or words spoken have been held proper,[241] the wording in the court's charge in Mr. Garcia's case was misleading.

When reviewing charge errors, an appellate court must undertake a two-step review: first, the court must determine whether error actually exists in the charge, and second, the court must determine whether sufficient harm resulted from the error to require reversal.[242]  The standard to determine whether sufficient harm resulted from the

---

[238] *Martinez v. State*, 763 S.W.2d 413, 319 (Tex. Crim. App. 1988).

[239] *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985).

[240] *Wallace v. State*, 763 S.W.2d 628, 629 (Tex. App. – San Antonio 1989)(*cited in Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994).

[241] *See Brown v. State*, 92 S.W.3d 655, 662 (Tex. App. – Dallas, 2002) and cases discussed therein).

[242] *Abdnor v. State,* 871 S.W.2d 726, 731-32 (Tex.Crim.App.1994); *Fulenwider v. State*, 176 S.W.3d 290, 298 (Tex.App.-Houston [1st Dist.] 2004, pet. ref'd).

charging error to require reversal depends upon whether appellant objected at trial.[243] Where there has been a timely objection made at trial, an appellate court will search only for "some harm."[244]

The first part of the intent instruction given in Mr. Garcia's case properly tracked the language of the statute, noting that intent with respect to results of conduct means that a person knows that his conduct is reasonably certain to cause the result.  However, the additional comment on what the jury could infer to find intent, namely, that "intent may be inferred from the surrounding facts and circumstances including but not limited to acts done and words spoken" – without stating that intent could be so inferred only from *Mr. Garcia's* acts and words - was misleading in that on its face, it allowed the jury to infer Mr. Garcia's intent from the acts and words of others.

The state further compounded the harm caused by the instruction when it misstated by its argument at closing, which took a statement made by Rivas, and instead attributed that statement to Mr. Garcia:

> **Recall Joseph Garcia's threats inside?  "If *we* kill one of you, *we're* going to kill all of you."  Is that anticipation?  Is that knowledge?  Is that intent?  Of course it is.**  (R:50:15-16) (emphasis added).

This was a blatant mischaracterization of testimony.  The actual testimony about who made that statement was given by Wes Ferris, the Oshman's manager:

> **Q. What did you see <u>Mr. Rivas</u> do then?**

---

[243] *Abdnor*, 871 S.W.2d at 732; *Fulenwider*, 176 S.W.3d at 298.

[244] *Id.*

**A. He [RIVAS] had his gun pointing in the air.   Then he dropped it and pointed it directly at my chest and said, "Don't try it, Wes.  If you do, I'll have to shoot you.  If I shoot you, I'll shoot everybody."**  (R45:63) (emphasis added).

Obviously the statement that the prosecutor used to urge a finding of Mr. Garcia's intent was not made by Mr. Garcia, nor was it made as a group effort (Rivas said that *he* would shoot people, not that *the group* would shoot people, as mischaracterized by the prosecutor).

### 3.  Prejudice

The harm to Mr. Garcia in not having this issue raised or reviewed is this: taken in combination with the other instructions, and the prosecutor's closing arguments that Mr. Garcia could be properly found guilty on any of six theories, the instruction on inferred intent, without explanation as to what acts and words the jury could consider in determining Mr. Garcia's intent, could have allowed the jury to convict Mr. Garcia based solely on some inferred intent that was based on acts or statements by another participant. This claim – that the jury was allowed to convict Mr. Garcia under a burden of proof less than that guaranteed to him under federal and state constitutions – was obvious and should have been presented on appeal.  Mr. Garcia was thus prejudiced by appellate counsel's failure to raise this point by not being able to obtain review (with the appellate court reviewing under a standard of determining whether "some harm" occurred) of non-statutory language in this instruction which effectively lowered the burden of proof as to intent.  Had the issue been raised, there is a reasonable probability that the Court of Criminal Appeals, utilizing the "some harm" analysis to be applied when the issue was

preserved at the trial court level, would have remanded Garcia's case for a new trial.

### G. Appellate Counsel Failed to Raise as Error the State's Mischaracterization of Evidence and Improper Argument at Closing. [245]

Garcia's right to effective assistance of counsel on appeal, under the Sixth and Fourteenth Amendments to the United States Constitution was denied when appellate counsel failed to properly raise this ground of error on appeal.

### 1.  Factual Background

Compounding the error created by the state's misstatement of the law at closing arguments during the guilt/innocence phase, was an egregious misstatement of facts – one which characterized Mr. Garcia as having made a threat to kill someone, when in fact, no witness ever testified that Mr. Garcia made any such statement during the robbery.

In its closing arguments, the state took a statement made by Rivas, and instead attributed that statement to Mr. Garcia:

> **Recall Joseph Garcia's threats inside?  "If *we* kill one of you, *we're* going to kill all of you."  Is that anticipation?  Is that knowledge?  Is that intent?  Of course it is.**  (R:50:15-16) (emphasis added).

This was a blatant mischaracterization of testimony.  The actual testimony about who made that statement was given by Wes Ferris, the Oshman's manager:

> **Q. What did you see <u>Mr. Rivas</u> do then?**
>
> **A. He [RIVAS] had his gun pointing in the air.  Then he dropped it and pointed it directly at my chest and said, "Don't try it, Wes.  If you do, *I'll* have**

---

[245] Claim IV(F) in Garcia's successor state habeas application; Ground Twenty Five cited in his Skeletal Petition.

**to shoot you.  If *I* shoot you, *I'll* shoot everybody.''**  (R45:63) (emphasis added).

This factual misstatement was amplified by further improper arguments relating to intent and accountability in the state's closing argument:

> ***They*** did whatever ***they*** had to do to escape from Oshman's, just like ***they*** did whatever ***they*** had to do to escape from the Connally Unit.  It was planned.  It was anticipated.  You can infer ***they*** knew what ***they*** were doing from the scanners, from the frequency codes, and the savage number and brutality of how Officer Hawkins died tells you there is a probability of future danger. (RR56:79)(emphasis added).

## 2.  Argument

Any reasonable appellate attorney who read the record and saw that his client was characterized as making a threat that he did not actually make would have certainly raised the issue on appeal.   Trial counsel's error in not objecting to the prosecutor's misstatements was obvious.  The failure to raise this ground on appeal – even if it would have been viewed under a plain error standard due to trial counsels' failure to object -- satisfies the *Strickland* test.

## 3.  Prejudice

The harm to Mr. Garcia is that the jury's verdict could quite clearly have been based on the state's assertion that Mr. Garcia made statements showing a common intent, or showing his particular intent, to shoot someone – when in fact, no such statements were ever presented in evidence.  The *Strickland* standard was met by this dereliction as well.

### H. Appellate Counsel Failed to Raise the Denial of a Motion to Suppress Evidence Obtained Under Invalid Search and Arrest Warrants. [246]

Garcia's right to effective assistance of counsel on appeal, under the Sixth and Fourteenth Amendments to the United States Constitution was denied when appellate counsel failed to properly raise this ground of error on appeal.

### 1. Factual Background

Much discussion was had regarding trial counsel's objections to Mr. Garcia's warrantless arrest. In support of the arrest, the state offered several federal and state warrants (Exhibits 866 – 869), as well as the search warrant for the RV (Exhibit 288).[247] Counsel noted that Mr. Garcia was arrested by Colorado Sheriff's deputies who lacked a warrant or exigent circumstances, in violation of the Texas Code of Criminal Procedure, §§ 14.04 and 14.06. Trial counsel also objected to the introduction of evidence seized in Colorado without a valid search warrant.[248] (RR:49:3-8). The validity of the warrants had been an issue in the three trials of other Texas Seven defendants that preceded Mr. Garcia's trial.

---

[246] Claim IV(G) in Garcia's successor state habeas application; Ground Twenty Six cited in his Skeletal Petition.

[247] The Reporter's Record in this case includes a notation that Exhibit 288 is a copy of the search warrant. This comports with record cites from the trials of the other defendants – Exhibit 288 in those trials is the search warrant. However, in the record in this case, it appears that a photo of Exhibit 288A has been included in two places – behind tab 288A, and behind tab 288. A copy of the search warrant is not present in the reporter's record in this case, and should the court require a supplemental record excerpt, counsel will supply one.

[248] Some items introduced by the state were seized incident to arrest of others. If the arrests, however, were made without a warrant or exigent circumstances, the searches incident to those arrests are also faulty as being "fruit of the poisoned tree." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920).

At trial, the Sheriff from Teller County, Colorado, testified that at the time of Mr. Garcia's arrest, he had not checked on any warrants and did not verify that any valid arrest warrants existed until *after* he arrested Mr. Garcia:

Q.      The warrants that you just referred to were arrest warrants; is that correct?

A.      That is correct.

Q.      And the search.  The subsequent search which was done of the RV in which actually one of them came out of that was taken into custody, the search of that vehicle was not done pursuant to these arrest warrants?

A.      No, sir, it was not.

Q.      Very good.  I think that's all the questions that we have -- do you know which authority issued the arrest warrants?

A.      I do not remember, sir.

Q.      Did you have actual warrants in hand when the arrests were made?

A.      No, sir.

Q.      Did they commit a felony in your presence?

A.      In my presence?

Q.      Yes, sir.

A.      No, sir.

Q.      Did they commit any type of breach of the  peace in your presence?

A.      No, sir.

Q.      So the authority that you relied upon in arresting the individuals that you arrested was pursuant to the arrest warrants that you heard about from the State of Texas?

A.      Yes, sir.

Q.        But you had not seen those?

A.        I had not seen the physical paperwork, no, sir.

Q.        Did you know whether or not those were for felonies or misdemeanors?

A.        Felonies, sir.

Q.        And what were the felonies alleged?

A.        Escape from the institution and I believe various other crimes, assault, possession of firearms.  They listed various charges based on the escape from the institution.

Q.        As far as you knew were there any federal charges alleged?

A.        I believe that there may have been federal charges as a result of them being fugitives from the State of Texas.

Q.        You did not arrest them pursuant to any federal authorities?

A.        No, sir.

Q.        How long was it before you actually got the arrest warrants themselves or copies of them?

A.        It was sometime later in the day of the 22nd.  The exact time, I don't remember, sir.

Q.        Was there a conscious decision made by you or anyone else that you know of to make the arrests of the individuals before the arrest warrants arrived to you?

A.        We were hoping we would get the arrest warrants, but the opportunity and conditions that presented themselves dictated otherwise.

Q.        So it was a conscious decision to proceed with the arrests before you got the arrest warrants in hand?

A.        Yes, sir.

Q.        And was that decision made by you?

A.        It was made by myself in conjunction with the federal agent in charge.

Q.        And what was that person's name?

A.        Mark Mershon, M-E-R-S-H-O-N.

Q.        And so it's clear, then, these individuals were not arrested by Texas authorities?

A.        They were not.

Q.        Did the individuals at the time of their arrest appear to be in flight from the scene?

A.        That opportunity was not given to them, sir.

Q.        Did the persons who were arrested appear to be in the process of destroying any type of evidence?

A.        I was not present, so I can't answer that.

Q.        In other words, I guess what I'm asking is the arrest was made without any evidence that they were fleeing from the scene and without any evidence that they were destroying evidence?

A.        Again, I was not at the scene.  They did not have the opportunity to flee, based on the tactical effort that was made.

Q.        And I guess what -- to make myself more clear, they were not arrested because they were fleeing or because they were destroying evidence. They were arrested, as you have said, under the authority of what you heard were the arrest warrants from Texas?

A.        They were arrested as fugitives from the state of Texas.  (RR48:70-

73).

The trial court, taking it upon itself to question the Sheriff, asked whether the

Sheriff was informed of the nationwide "be on the lookout for" notice regarding the case.

On this basis, the court noted:

The record is clear as to the questions I asked him as to the bolo and the nationwide broadcast of the circumstances surrounding this case. He definitely knew these people were wanted and there were warrants outstanding. As to the actual physical documents, no, we all agree he didn't have that in hand; no, he didn't have the actual number of the document. (RR49:8).

Trial counsel went on to note that an alert is not a warrant or probable cause, that there were several defects with the warrant issued by the City of Irving (based on non-compliance with Articles 15.02, 15.03 and 15.04 of the Texas Code of Criminal Procedure); with the warrant from Karnes County, Texas (based on non-compliance with Articles 15.01, 15.02, 15.03, 15.04, and 15.05 of the Texas Code of Criminal Procedure); with the warrant from the Western District of Texas (for failure to specifically identify the person sought and violations of 18 USC § 922(j)); and with the warrant from the Northern District of Texas (based on allegations of interstate flight to avoid prosecution, without having any supporting facts in the supporting Affidavit that Mr. Garcia engaged in interstate flight). (RR49:8-17, 21-22). These objections were all overruled. (*Id.*). Counsel also objected to the search warrant for the Jeep Cherokee and Ford van, based on a lack of particularity in the warrant and for non-compliance with Articles 18.01 and 18.02 of the Texas Code of Criminal Procedure. (RR49:18). Counsel also objected to the search warrant as stale. (RR49:22).

The court ultimately ruled that:

. . . under Colorado law under Colorado Revised Statute 16-3-102-C, which closely mirrors the Texas Code of Criminal Procedures, Section 14.04, but it's broader than 14.04, permits an officer to make a warrantless arrest if he believes a criminal offense has, in fact, been committed and the officer has reasonable grounds for believing that the person being arrested has committed the offense.

> Very broad statute and I have previously ruled that even if all these warrants were
> defective and all of them were bad and they had nothing else to go on, that that
> Colorado Statute would prevail.  (RR49:24).

Counsel responded with additional objections to admission of the items seized under

Article 38.23 of the Code of Criminal Procedure and under the Fourth, Fifth, Sixth, Eighth

and Fourteenth Amendments of the United States Constitution, and Article 1, Sections 9,

10, 13 and 19 of the Texas Constitution.  (RR49:24-25).  Finally, trial counsel pointed out

that the trial court had sua sponte invoked Colorado law as a basis for the arrests and

searches incident to arrests, without any invocation of the law by the State.  (RR49:25).

## 2.  Argument

The Court's reliance on Colorado law to justify the arrest was misplaced, both

under conflicts of law principles and under case law construing the full faith and credit

clause.  Conflicts of laws principles have been reviewed by the Court of Criminal Appeals

several times in recent years, and the results reached by the court would dictate that

Colorado law was an inappropriate basis on which to give effect to the arrest and

search.[249]

In *Davis v. State,*[250] the Texas Court of Criminal Appeals addressed the issue of

conflict of laws where the defendant was impeached as a witness with a prior conviction

from federal court where he had been sentenced to probation and successfully completed

---

[249] The following argument and authorities regarding the validity of the warrants under both
Colorado and Texas law, are taken from briefing on the issue filed by both Rogriguez and
Halperin, other Texas Seven defendants, who raised similar objections at trial and on subsequent
review.

[250] 645, S.W.2d 288 (Tex.Cr.App. 1983).

the probation. The court overruled the point because the offense was considered a final conviction in federal court. The court considered it well settled that "the admissibility and effect of offered evidence which does not affect a substantial right are to be determined by the forum in which such evidence is sought to be introduced."[251] Thus, the Texas state courts were not bound be federal law in deciding the issue.

In *Davidson v. State,*[252] the Court of Criminal Appeals was confronted with a defendant who had fled to Canada while he was being investigated for indecency with a child. Upon his return to the United States, he was arrested and interrogated by Customs agents who took his oral statement but failed to either electronically record it or reduce it to writing for the defendant's signature. Despite the defense objections that the statements violated Art. 38.22, V.A.C.C.P., the trial court ruled that the statement was entitled to be admitted under the Full Faith and Credit Clause of the U.S. Constitution.

Art. IV, Sec. 1 of the United States Constitution requires that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." In *Davidson*, the issue was whether the statements were admissible at the Texas trial simply because they would be admissible in a Montana courtroom under Montana law. While the constitutional clause would seem to demand such a result, the Court of Criminal Appeals, quoting from *Alaska Packers Ass'n v Indus. Accident*

---

[251] 645 S.W.2d at 291.

[252] 25 S.W.3d 183 (Tex.Cr.App. 2000).

*Commision of California*,[253] found the clause more flexible:

> A rigid and literal enforcement of the full faith and credit clause, without regard to the statute of the forum, would lead to the absurd result, that whenever the conflict arises, the statute of each state must be enforced in the courts of the other, but cannot be in its own.

The Court of Criminal Appeals considered it a basic tenet of conflict of laws jurisprudence, that the law of the forum in which the judicial proceeding is held should determine the admissibility of evidence. *Davidson*.[254] The court stated:

> Considerations of efficiency and convenience require that questions relating to the admissibility of evidence, whether oral or otherwise, should usually be determined by the local law of the forum. The trial judge must make most evidentiary decisions with dispatch if the trial is to proceed with reasonable celerity. The judge should therefore, as a general rule, apply the local law of his own state.[255]

Because Art. 38.22 was considered a procedural rule dealing with an evidentiary matter, Texas law applied and the case was remanded for a harm analysis.

In *Gonzales v. State*,[256] the Court of Criminal Appeals reiterated the *Davidson* rule and held that the law of the forum state controlled on questions on the admissibility of evidence. The only exceptions were privileged communications, parol evidence, and the statute of frauds. The court defined a substantive right as a "right to the equal enjoyment of fundamental rights, privileges, and immunites" while a procedural right was a "right that helps in the protection or enforcement of a substantive right."[257] Procedural rights are

---

[253] 294 U.S. 532, 547 (1935).
[254] 25 S.W.3d at 185.
[255] *Id.* at 186.
[256] 45 S.W.3d 101 (Tex.Cr.App. 2001),
[257] *Gonzales*, 45 S.W.3d at 106, n. 8.

governed by the law of the forum while substantive rights are governed by the law of the forum with the most significant contacts.[258]

In *Vega v. State*,[259] the Court of Criminal Appeals confronted a violation of Title 3 of the Family Code when the defendant was arrested in Illinois, rather than Texas. The defendant argued that Title 3 was a procedural right while the State argued that it was substantive in nature. This Court noted several factors to consider in deciding which state had the most significant relationship to the case, including (1) where the unlawful conduct occurred; (2) the place where the relationship between the parties is the strongest; (3) the number and nature of contacts that the non-forum state has with the parties and with the transaction involved; (4) the relative materiality of the evidence that is sought to be excluded; and (5) the fairness to the parties. Colorado adopts the same standards.[260]

Vega sought to suppress a confession taken in violation of Texas law. Because Vega was a Texas resident charged with an offense committed in Texas and because Illinois' only contact with Vega was limited to one occasion in which a highly material statement was obtained, all of the factors except fairness militated in favor of applying

---

[258] *Id.*; *see also Nonn v. State*, 41 S.W.3d 677 (Tex.Cr.App. 2001) (quoting from *Davidson v. State, supra*).

[259] 84 S.W.3d 613 (Tex.Cr.App. 2002),.

[260] *People v. Thompson*, 950 P.2d 608, 611 (Colo. App. 1997) ("In determining whether a sufficient reason exists to apply Oregon law and exclude the wife's testimony, the factors to be considered include: (1) the number and nature of the contacts that the state of the forum has with the parties and with the transaction involved; (2) the relative materiality of the evidence sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties.").

Texas law.  As a result, the Court did not decide whether Title 3 was substantive or procedural.[261]

Similarly, even under the Full Faith and Credit Clause of the Constitution, Texas law should be applied rather than Colorado law.  In the *Alaska Packers* case, *supra*, the Court determined that the choice of law issue should be resolved by applying the law of the State having the greater interest.   In *Allstate Insurance v. Hague*,[262] a plurality of the Supreme Court decided that the appropriate standard was whether there existed significant contact or a significant aggregation of contacts in the forum state.   Finally, in *Phillips Petroleum v Shutts*,[263] a majority of the Court adopted the *Allstate* standard.   By constitutional standards, Texas has the significant aggregation of contacts to Mr. Garcia.  At the time of his arrest, was a Texas resident. The offense occurred in Texas.  It was and is the State of Texas that had an immediate interest in enforcing its penal laws. The witnesses lived in Texas.   Colorado's only contact with this case was that its officers arrested Mr. Garcia and housed him in one of its jails briefly.  Thus, the trial court should have applied Texas law, as was clear to Mr. Garcia's trial lawyers.

The warrants were also invalid under Texas law.  The United States and Texas Constitutions protect against unreasonable seizures and prohibit warrants lacking probable

---

[261] "Because the conflict of laws scheme of both states militate for the application of Texas substantive law, the question of which directives in Title 3 are substantive and which procedural is not relevant here." *Vega*, 84 S.W.3d at 618.
[262] 449 U.S. 302 (1981).
[263] 472 U.S. 797 (1985).

cause.[264]   Arrests generally must be supported by the same level of probable cause, with or without a warrant.[265]   A detached and neutral magistrate must find probable cause before a warrant for an arrest may be issued.[266]

An affidavit must provide the magistrate with sufficient factual information to support an independent judgment that probable cause exists to believe that the accused has committed an offense.[267]   Thus, the magistrate's action cannot be a mere ratification of the bare conclusions of others.[268]   In determining the sufficiency of an affidavit supporting an "arrest" warrant, a reviewing court is limited to the "four corners" of the affidavit.[269]   Affidavits are viewed in a common sense rather than hypertechnical manner.[270]   A presumption is indulged in favor of the regularity of the proceedings in a lower court unless the record presents affirmative evidence to the contrary.[271]

In *Green v. State*,[272] the court addressed a similar problem to the case at bar:

> The actual basis for the complaint's conclusion is omitted from the complaint. The complaint contains no allegations that the complainant spoke with personal knowledge of the matters contained (there) in and (does) not indicate any source for the complaint's belief, nor set up sufficient information to support an independent judgment that probable cause existed.[273]

---

[264] *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9.

[265] *See Whitely v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564-66 (1971).

[266] *Coolidge v. New Hampshire*, 403 U.S. 443, 449 (1971).

[267] *McFarland v. State*, 928 S.W.2d 482, 509 (Tex.Cr.App. 1996).

[268] *Illinois v. Gates*, 462 U.S. 213, 239 (1983).

[269] *Id.* at 510.

[270] *Id.*

[271] *Garza v. State*, 896 S.W.2d 192, 197 (Tex.Cr.App. 1995).

[272] 615 S.W.2d 700 (Tex.Cr.App. 1980), quoting from *Knox v. State*, 586 S.W.2d 504 (Tex.Cr.App. 1979).

[273] *Id.* at 706.

Thus, it was clear to the Court that the "magistrate here certainly could not 'judge for himself the persuasiveness of the fact relied on . . . to show probable cause."[274]  The *Green* court then reached the same conclusion on the warrant affidavit before it.[275]

Appellate review of an affidavit in support of any warrant, however, is not de novo.  Rather, great deference is given to the magistrate's determination of probable cause.[276]  Probable cause is determined from the four corners of the affidavit and the reasonable inferences drawn therefrom.[277]  The magistrate's task in evaluating an affidavit is to make a practical common sense decision whether, given the totality of the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place.[278]

### Territorial Limit of the Texas Arrest Warrant

The Irving warrant introduced as Exhibit 867 had force and effect only to the Texas border.  The warrant was not submitted to a Colorado magistrate for consideration and issuance of a Colorado warrant, as is required by Art. 51.13 of the Code of Criminal Procedure.  A Texas arrest warrant runs only to the borders of the State.[279]  The Code of

---

[274] *Id.* at 706.

[275] *See also Miller v. State*, 736 S.W.2d 643 (Tex.Cr.App. 1987).

[276] *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

[277] *Cassias v. State*, 719 S.W.2d 585, 587-88 (Tex.Cr.App. 1986).

[278] *Hennessy v. State*, 660 S.W.2d 87, 89 (Tex.Cr.App. 1983).

[279] *See* Art. 15.06, V.A.C.C..P.; *O'Hara v. State*, 837 S.W.2d 139 (Tex.Cr.App. 1992) ("Art. 15.06 plainly states that any peace officer to whom a warrant is directed or has been transferred may execute the warrant in any county in the state" (emphasis added)).  The predecessor statute, Art. 223, CODE CRIM. PROC.  had a similar geographic limiation. "A warrant of arrest, . . . shall extend to any part of the State; . . . " *See Loyd v. State*, 143 Tex.Crim. 516 (1942); *Barnes v.*

Criminal Procedure has a provision for enforcing a Texas warrant outside the borders of the State.[280]   Colorado has the same provision.[281]   Because it cannot be presumed that the Legislature intended to do a useless thing,[282] it is clear that the Texas legislature intended to enact the sole means by which a Texas warrant might be enforced in another state or at least recognized the territorial limit of its warrants.

### *Colorado law*

Even if the trial court could have relied on Colorado law, it was unavailing.  The trial court concluded that the Colorado authorities could arrest Mr. Garcia under Colorado statute, 16-3-102, Colorado Statutes.  That rule, however, has a more restrictive standard than the trial court applied.  In Colorado, a suspect may be arrested if the office has: (1) an arrest warrant; (2) an offense is committed within his presence or (3) he has probable cause to believe that an offense was committed and that the person to be arrested committed that offense.  In Colorado, the concept of reasonable suspicion is equated with probable cause.[283]

---

*State*, 390 S.W.2d 266 (Tex.Cr.App. 1964) (Under the provisions of Art. 223, V.A.C.C.P. the warrant of arrest issued by the magistrate in Lubbock County authorized an arrest in any county of this state." (emphasis added).

[280] Art. 51.13, Sec. 13, V.A.C.C.P.

[281] *See* C.R.S. §§ 16-19-101 to 16-19-133.

[282] *See Love v. State*, 687 S.W.2d 469, 476 (Tex.App. Houston 1, 1985) *citing Hunter v Fort Worth Capital Corp.*, 620 S.W.2d 547, 551 (Tex. 1981).

[283] *See People v Theret*, 685 P.2d 193 (Colo. 1984); *People v Hamilton*, 666 P.2d 152 (Colo. 1983); *People v Roybal*, 655 P.2d 410 (Colo. 1982); *People v Eichelberger*, 620 P.2d 1067 (Colo. 1980) ("Section 16-3-102(1) ( c) C.R.S. 1973 provides that a peace officer may make a warrantless arrest under certain circumstances when he has probable cause to believe that an offense has been committed by the person to be arrested."); *People v McCall*, 43 Colo. App. 117 (Colo. App. 1979).

In *People v Rueda*,[284] the Colorado Supreme Court held that where an arresting officer does not directly observe the criminal activity he may rely on information from a trustworthy informant to establish probable cause. Conversely, where the warrant fails to establish probable cause, the arrest fails as well.[285]

### *The Federal Warrant*

While the Colorado authorities could have relied on a valid warrant issued by a federal magistrate to establish probable cause, such reliance failed if the federal warrant itself lacked probable cause.[286]

The federal arrest warrant charged Mr. Garcia with flight to avoid criminal prosecution for the offense of capital murder. The affidavit recited that the affiant had reviewed the charging documents. To establish the flight element of the offense, the affidavit recited the following:

> 4.   That on December 27, 2000, Affiant received information from Texas Department of Criminal Justice Investigator Bruce Tony, that his investigation determined that (the Texas 7) have fled the jurisdiction of the state of Texas and are currently in Mexico.

---

[284] 649 P.2d 1106 (Colo. 1982).

[285] *See also People v Mitchell*, 678 P.2d 990 (Colo. 1984) ( police officers not entitled to rely on a police bulletin which stated that a warrant existed for the defendant's arrest when that warrant itself was lacking in probable cause. "We do not, of course, question that the . . . police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." 678 P.2d at 997, quoting from *Whitely v Warden supra* at p. 568.).

[286] *People v Mitchell*, 678 P. 2d at 997.

5. That this belief is baed on information Investigator Tony received from a confidential source with whom HALPRIN and NEWBURY stayed the night, on December 26, 2000. During the evening, HALPRIN admitted involvement in the Oshman Store robbery and shooting in Irving, Texas on Christmas evening. The source stated that HALPRIN indicated that the group was going to Mexico by way of El Paso, Texas. The source advised HALPRIN that they should reconsider their plans and go to Mexico by way of Arizona as there were more locations where the group could cross the border undetected. The source further suggested they go to a location called Puerto Penasco, which is a small retirement town in Mexico. (RR64:Exhibit 866).

The same legal authorities set forth above apply with regard to the federal warrant. Nothing in the federal warrant links Mr. Garcia to "the group" mentioned by Mr. Halprin. Further, and more importantly, there is nothing in the affidavit's recitations to suggest that the confidential information mentioned is at all trustworthy. While *Illinois v. Gates* relaxed the standards by which the recitations can be made, it did not abolish them. To the contrary, *Gates* merely held that the arresting officer might supplement an informant's tip with other information in his warrant affidavit; reliance on confidential information must still be shown to be trustworthy. Thus, the federal warrant failed to amount to independent probable cause for the Teller County authorities.

### *Fruits of the Illegal Arrest*

When Mr. Garcia was arrested by the Teller County authorities, his vehicle contained firearms and other evidence that was presented at trial. Because the seizure of this evidence was pursuant to an illegal arrest discussed above, its legality also fails. Because the trial court erred in failing to suppress the fruits of that search, the point certainly should have been raised on appeal.

### 3.  Prejudice

Failure of appellate counsel to raise points so well preserved at trial, and so clearly an important and viable on appeal, boggles the mind.  Reasonably competent counsel would certainly have raised the claim that the trial court improperly relied on the law of a different jurisdiction when it found that fruits of a potentially illegal arrest and search could be used at trial, and that under Texas law, the arrest was illegal as well.  Mr. Garcia's appellate counsel instead chose to lodge 20 pages of argument on appeal (barely longer than the discussion on the trial record regarding the warrants) completely devoid of this issue.  Certainly, the failure to submit this issue on review prejudiced Mr. Garcia, who did not have the benefit of appellate review of the denial of his constitutional protections.  Had appellate counsel raised this issue, there is a reasonable probability that the Court of Criminal Appeals would have, according to settled law, found the arrest and search unconstitutional.

**7.    DENIAL OF EFFECTIVE ASSISTANCE OF STATE HABEAS COUNSEL –
HABEAS COUNSELS' FAILURE TO RAISE MULTIPLE ERRORS .[287]**

### A. Original State Habeas Counsel Denied Garcia the Competent and Effective Assistance of Counsel Guaranteed to Him by the Sixth and Fourteenth Amendments to the United States Constitution.

#### 1.  Factual Background

### State Habeas Counsel Failed to Raise Several Obvious Constitutional Claims

Mr. Garcia incorporates the grounds of error raised above with regard to ineffectiveness at trial and on appeal (listed specifically below), and asserts that he was denied effective assistance of state habeas counsel when state habeas counsel did not raise any of the errors that trial and appellate counsel should have raised.  State writ counsel was charged with "investigat[ing] expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus."[288]   State habeas counsel was certainly not "competent" under 11.071 § 2(a) in the sense that several blatantly obvious grounds of error raised herein were not raised in Mr. Garcia's original state habeas petition.  Those grounds of error are:

1. Trial counsels' ineffectiveness for failing to properly object to the trial court's granting the state's general objection to venireperson David Chmurzynski;

2. Trial counsels' ineffectiveness for failing to object to the jury selection process conducted in violation of Texas statutes;

---

[287] Claim VI presented in Garcia's successor state habeas application; Grounds Twenty Seven through Thirty Seven cited in Petitioner's Skeleton Brief filed in this Court.

[288] Tex. Code Crim. Proc., Art. 11.071 § 3.

3. Trial counsels' ineffectiveness for failure to object to misstatements of law in the prosecutor's closing argument that a verdict on guilt need not be unanimous;

4. Trial counsels' ineffectiveness for failure to object to misstatements of testimony and misstatements of law in the prosecutor's closing argument;

5. Trial counsels' ineffectiveness for failure to request an anti-parties charge at punishment;

6. Appellate counsel's ineffectiveness for failing to allege that venireperson Chmurzynski was improperly excluded;

7. Appellate counsel's ineffectiveness for failing to allege that the jury selection process was conducted in violation of Texas statutes;

8. Appellate counsel's ineffectiveness for failing to properly brief an issue properly preserved at trial regarding the erroneous admission of evidence;

9. Appellate counsel's ineffectiveness for failing to raise points of error on jury instructions given on the definition of intent;

10. Appellate counsel's ineffectiveness for failing to raise error based on the state's misstatement of evidence and misstatements of law during closing arguments; and

11. Appellate counsel's ineffectiveness for failing to raise the denial of a motion to suppress evidence obtained under invalid search and arrest warrants.

State habeas counsel's failure to raise these obvious grounds has harmed Mr. Garcia by not providing him an avenue for meaningful review of his constitutional claims. Since habeas review exists (as discussed below) for the exact purpose of providing meaningful review to such claims, harm in this case is evident.

### *State Habeas Counsel Failed to Conduct Independent Mitigation Evidence Investigation and Review.*

State habeas counsel, in dereliction of his duties set forth by 11.071 § 3 of the Texas Code of Criminal Procedure, wholly failed to conduct any independent mitigation investigation. Though §3 authorized state habeas counsel to incur expenses without

approval for investigation and expert services, he apparently lacked any desire to do so. State writ counsel failed to employ any investigator or mitigation expert, even while possessing adequate information from the record that no investigator or mitigation expert had been employed by trial counsel.  While state writ counsel was the only person who could conduct an extra-record review to determine whether trial counsel missed any possible mitigation grounds or evidence, no independent review occurred.  Had counsel engaged the services of a qualified mitigation expert to conduct proper review, the mitigation evidence presented at punishment would have been substantially stronger. There is a reasonable probability that this evidence would have been sufficient to undermine confidence in the outcome – that the death penalty would have been assessed.

An important part of the state writ lawyer's job was to determine whether trial counsel met counsels' "obligation to conduct a thorough investigation of the defendant's background,"[289]  including whether trial counsel made "efforts to discover *all reasonably available* mitigating evidence to rebut any aggravating evidence that may be introduced by the prosecutor."[290]

While trial counsel did present mitigating evidence regarding Mr. Garcia's background, childhood and family to the jury, the evidence was compiled by attorneys lacking the distinct qualifications, clinical skills and forensic skills of a mitigation

---

[289] *Williams v. Taylor*, 529 U.S. 362, 296 (2000) (citing ABA Standards for Criminal Justice 4-4.1, commentary pp. 4-55 (2d ed. 1980)).
[290] *Wiggins v. Smith*, 539 U.S. 510 (2003)(quoting Guidelines 11.4.1(C), p. 93 (1989)(emphasis added by Supreme Court).

specialist.  The state writ lawyer knew this.  Rather than employing such an expert to conduct an adequate extra-record review, however, he merely filed what basically amounted to a cookie-cutter version of the state appeal, citing only record claims.  This failure mocks the very reason for employing a system allowing for extra-record review.

### *State Habeas Counsel Failed to Allege that Cumulative Error Denied Due Process.*

State writ counsel failed to include an allegation that the cumulative error in Mr. Garcia's trial fatally infected the fairness of the trial itself.  Indeed, because state writ counsel failed to include so many grounds of error in the original petition, the cumulative effect of all errors that state writ counsel should have raised would have been lost in any regard.

Every defendant is afforded due process of law pursuant to the Fifth and Fourteenth Amendments of the United States Constitution.  The cumulative error doctrine provides relief when the constitutional errors committed in the state trial court so "fatally infected the trial" that they violated the trial's "fundamental fairness."[291]  The cumulative error doctrine has been recognized by the Court of Criminal Appeals.[292]  To show that the cumulative effect of several errors fatally infected a trial's fundamental fairness, the errors must first be cumulatively presented for review.  Mr. Garcia's state habeas lawyer's failure to present the eleven grounds of error noted above, in addition to the grounds he actually did present, possibly foreclosed any reasonable ability to make a claim for

---

[291] *See, e.g., Derden v. McNeel*, 978 F.2d 1453, 1457 (5th Cir.1992).

[292] *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (recognizing that the cumulative effect of errors may be found harmful).

cumulative error.  Or perhaps this ground was not one of the boilerplate grounds residing in state counsel's brief bank.  In any regard, a cumulative error claim on the basis of the eleven grounds above and the grounds raised in the original petition would have been obvious to a reasonably competent lawyer, and one should have been raised on behalf of Mr. Garcia.

### 2.  Argument

### *Governing Law Concerning Effective Assistance of State Writ Counsel*

In *Ex parte Graves*,[293] the Texas Court of Criminal Appeals basically held that Texas death row inmates are only entitled to the appointment of competent counsel on the first writ, not effective counsel as defined by *Strickland* and its progeny.  That decision is contrary to Garcia's Sixth and Fourteenth Amendment rights.

The United States Supreme Court has never *directly* addressed the issue of whether death row inmates are constitutionally entitled to receive the effective assistance of counsel during state writ proceedings when a state appoints counsel for state habeas review.  *See* Eric M. Freedman, *Giarratano is a Scarecrow: The Right to Counsel in State Capital Post-Conviction Proceedings*.[294]  Without the assistance of capable or competent counsel during state writ proceedings, state death row inmates cannot fairly or fully present viable federal claims after the AEDPA's regime of heightened emphasis on state proceedings.  Because many of the means of overturning state convictions can only be

---

[293] 70 .W.3d, 103 (Tex. Crim.. App. 2002).
[294] 91 Cornell L. Rev. 1079 (2006).

raised during state writ proceedings, it is not acceptable to conclude that state appellate challenges adequately protect capital defendants.   Because the punishment of capital defendants is quite literally irreversible, they require – legally and morally – more protection than allowing ineffective state counsel set the standard for further review. Under such a regime, federal review may be reduced to a review of tragic state court ineffectiveness, with no opportunity for correction.

To the extent that the state may rely on the Texas Court of Criminal Appeals' holding in *Ex Parte Graves*, Mr. Garcia urges this Court to appreciate that the Supreme Court has left open the question regarding a capital defendant's right to effective appointed counsel where "state collateral review is the first place that a state criminal defendant can present a particular challenge to his conviction."[295]   The *Graves* dissent continues that **"[t]o the extent that the Fifth Circuit Court of Appeals holds that question no longer remains open, that Court is mistaken.**   And to the extent that the [*Graves*] majority fails to address this open question, it is also wrong."[296]

The *Graves* dissent also noted that:

> **If the defendant's habeas counsel performs deficiently, a meritorious claim may not be adequately raised or investigated.   If the attorney appointed on his first writ is incompetent, then a defendant, who was deprived of effective assistance of counsel at trial, has no means to enforce his constitutional right to [the] affective [sic] assistance of counsel at trial.**[297]

---

[295] *Id.* at 124, (*citing Coleman v. Thompson*, 501 U.S. at 755).
[296] *Id.*
[297] *Id.* at 124-5.

After being appointed state writ counsel, Mr. Garcia became dependent on counsel to protect his later rights to challenge his conviction under the "Great Writ."[298]  Though the Constitution provides that the writ of habeas corpus shall not be suspended,[299] where capital convicts receive ineffective assistance of counsel from state-appointed attorneys, the Great Writ is basically foreclosed to them due to the failings of their attorneys.  Mr. Garcia urges this Court to uphold the meaning of the Constitution.

The role of habeas corpus in preserving constitutional rights is vital.  During the last decade, the majority of death penalty cases that have been overturned as invalid or unconstitutional were overturned in habeas proceedings, not on direct appeal.[300]  But without ensuring that capital convicts receive competent counsel, their rights and abilities to bring a large number of constitutional challenges becomes non-existent.  Mr. Garcia thus asks this Court to find that he was deprived of his Constitutional right to counsel, due process of law, fundamental fairness, and equal protection under the law.

Further, the analysis of the right to effective assistance of counsel on appeal is equally applicable when considering the reason to require effective assistance of counsel on a writ.   In *Ward v. State*,[301]  the Texas Court of Criminal Appeals stated:

> A state is not required by the Federal Constitution to provide appellate courts or a right to appellate review. *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891, 898 (1956); *McKane v. Durston*, 153 U.S. 684, 687-688, 14 S.Ct. 913,

---

[298] *See* U.S. CONST., Art. I, § 9.

[299] *Id.*

[300] *See, e.g., Rompilla v. Bears*, 545 U.S. 374 (2005)*; Miller-El v. Cockrell,*, 537 U.S. 322 (2003)*; Miller-El v. Dretke,* 545 U.S. 231 (2005)*; Panetti v. Quarterman*, 127 S.Ct. 2842 (2007).

[301] 740 S.W.2d 794 (Tex. Crim. App. 1987).

914-915, 38 L.Ed. 867, 868 (1894).   Nonetheless, Texas has granted criminal defendants a statutory right of appellate review.  Article 44.02, V.A.C.C.P. (1966). When a State elects to act in a field where its action has significant discretionary elements, it must act consistent with the dictates of the Texas and Federal Constitutions. *Evitts v. Lucey*, 469 U.S. 387, 401, 105 S.Ct. 830, 839, 83 L.Ed.2d 821, 833 (1985).

In *Evitts v. Lucey*, 469 U.S. 387, 395-96, 105 S.Ct. 830, 836, 83 L.Ed.2d 821, 829-30 (1985), the Supreme Court held that there is a constitutional guarantee of effective assistance of counsel on appeal in every criminal prosecution, whether counsel is appointed or retained. In Evitts, defendant's retained counsel filed notice of appeal, brief and record. Counsel failed to submit a statement of facts required by the Kentucky Rules of Appellate Procedure. The Kentucky Court of Appeals dismissed the defendant's appeal for failure to file a statement of facts. The Supreme Court ultimately affirmed the granting of a writ of habeas corpus on the ground that the appellant had been denied effective assistance of counsel. The Supreme Court held:

> In bringing an appeal as of right from his conviction, a criminal defendant is attempting to demonstrate that the conviction, and the consequent drastic loss of liberty, is unlawful. To prosecute the appeal, a criminal appellant must face an adversary proceeding that--like a trial--is governed by intricate rules that to a layperson would be hopelessly forbidding.  An unrepresented appellant--like an unrepresented defendant at trial--is unable to protect the vital interests at stake.  To be sure, respondent did have nominal representation when he brought this appeal.  But nominal representation on an appeal as of right--like nominal representation at trial--does not suffice to render the proceedings constitutionally adequate; a party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all. *Id.*., 105 S.Ct. at 836.[302]

Clearly, under current federal law and the AEDPA regime, when state writ counsel fails in his duties to a capital defendant, that defendant is, quite literally, marked for death with no meaningful opportunity for review of any errors affecting his fundamental rights.

---

[302] *Ward*, 740 S.W.2d  at 800.

### 3. Prejudice

Complaints will certainly continue alleging the failure of the Texas system of appointing counsel to indigent capital defendants in general, and its failure to appoint competent and effective counsel for state habeas review.  The reason these complaints will continue to come in is that many writ lawyers in Texas are simply not rendering competent and effective representation.  As noted herein, the writ lawyer in this case missed numerous issues that should have been raised.  Present counsel knows that the writ lawyers on original submission can not be expected to be perfect, but the penalty for mistakes by a writ lawyer is fatal to the applicant.

Appeal and writ practice in capital cases can best be described as a legal minefield. One misstep, and -- oops, we're sorry, but you must die because your counsel forgot, missed, didn't think it was important, hadn't stayed current on emerging law, his cookie cutter grounds didn't fit the situation, his computer quit working, or any number of reasons that caused the writ to be incomplete.

The opinion by Judge Cochran in *Ex parte Kerr*,[303] describes the purpose a writ of habeas corpus, and the problems existing when a "real" writ is not filed:

> The purpose of a writ of habeas corpus is to obtain a speedy and effective adjudication of a person's right to liberation from illegal restraint.  *See Blackledge v. Allison*, 431 U.S. 63, 71 (1977) ("the very purpose of the writ of habeas corpus [is] to safeguard a person's freedom from detention in violation of constitutional guarantees"); *Ex parte Ramzy*, 424 S.W.2d 220, 223 (Tex.1968) ("the purpose of

---

[303] 64 S.W.3d 414 (Tex. Crim App. 2002).

the writ of habeas corpus is to obtain a speedy adjudication of a person's right to liberation from illegal restraint"); 39 Am Jur 2d, Habeas Corpus § 1 ("[t]he purpose of the writ of habeas corpus ... is not to determine the guilt or innocence of a prisoner; the primary, if not the only, object of the writ is to determine the legality of the restraint under which a person is held").[304]

Earlier in the opinion, Judge Cochran had summarized some of the legislative history surrounding

article 11.071 of the Texas Code of Crim. Proc.:

> The Habeas Corpus Reform Act of 1995 was enacted to implement more efficiently the Texas Constitutional mandate that "[t]he Legislature shall enact laws to render the remedy [of habeas corpus] speedy and effectual." As Senator Montford explained in laying out the bill to the Senate Criminal Justice Committee, the Habeas Corpus Reform Act made three major changes to Texas law: 1) it adopts a unitary system for death penalty habeas review in which direct appeals and habeas review proceeded along parallel paths at roughly the same time; 2) "it adopts the abuse of the writ doctrine currently used in federal court which limits an inmate to a one-time application for a writ of habeas corpus except, and I want to emphasize, except in exceptional circumstances"; and 3) it provides for the appointment and payment of counsel to represent all those convicted of capital murder and sentenced to death in their habeas petitions. Representative Pete Gallego, in presenting the same habeas bill to the Texas House of Representatives stated:
>
>> And we tell individuals that everything you can possibly raise the first time, we expect you to raise it initially, one bite of the apple, one shot. ... What we're attempting to do here is to say "raise everything at one time." You get one bite of the apple. If you have to stick the kitchen sink in there, put it all in there, and we will go through those claims one at a time and make a decision. But none of this "every week you file a new petition" which is currently basically what happens. ... The idea is this: you're going to be able to fund counsel in these instances and we are going to give you one very well-represented run at a habeas corpus proceeding. And unless you meet a very fine-tuned exception, you're not going to be able to come back time after time after time.
>
> **Of course, this entire statute is built upon the premise that a death row inmate does have one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute.**[305]

---

[304] *Kerr*, 64 S.W.3d at 419.

[305] *Kerr,* 64 S.W.3d 414, at 418-419 (footnotes omitted).

The current practice in Texas is ***not*** giving capital applicants a full and fair opportunity to determine the legality of their restraint. It is not full and it is not fair. It may be fast, but it is not due process of law, as envisioned by the Fifth and Fourteenth Amendments to the United States Constitution.

The Texas Court of Criminal Appeals has noted that:

> The United States Supreme Court has held that there is no federal constitutional right to an attorney during a post-conviction collateral attack. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); 107 S.Ct. 1990, 1993, 95 L. Ed. 2d 539, 545-46 (1987); *In re Beasley*, 107 S.W.3d 696, 697 (Tex. App.- Austin 2003, no pet. h. ). Nor is there such a right under the Texas Constitution. *In re Beasley*, 107 S.W.3d at 697 (citing *Ex parte Mines*, 26 S.W.3d 910, 913 (Tex. Crim. App. 2000)). This Court recognizes that a mere legislative decision to provide counsel in a post-conviction proceeding does not "turn a legislative act of grace into a constitutional right.[306]

The above analysis appears to make the Texas Legislature the sole determiner of what due process of law is permitted in death penalty review. The Texas court system cannot sit on the side line and fail to recognize, under the mantra of "abuse of the writ," that the current system is not working, unless working is defined as efficiently effecting death sentences. But that is what the Court of Criminal Appeals appears to do. Which is exactly why capital defendants will continue to claim in federal courts that the entire system of capital postconviction proceedings, as administered in Texas, fails to comport with the guarantees provided them by the federal Constitution.

---

[306] *Ex parte Graves*, 70 S.W.3d 103, 110 (Tex. Crim. App. 2002); see *Morris v. State*, 110 S.W.3d 100, 103 (Tex. App.- Eastland 2003).

As noted above, the appeal lawyer in this case was, at best, incapable of writing an appeal brief that adequately identified and presented grounds of error, much less argue those grounds with any degree of effectiveness. And the original writ lawyer failed to recognize the appellate lawyer's deficiencies and missed several issues. The lawyers charged with fully and fairly presenting the applicant's "one bite of the apple" did not "stick" the "legal kitchen sink" in either the direct appeal or the original writ, yet, according to current law, Mr. Garcia will never be able to litigate these issues that contest the legality of his sentence. It is abysmally difficult to determine how allowing death sentences to be carried out under our system that contemplates (at least in theory) such notions as due process, fundamental fairness, equal protection under the law, meet with any kind of constitutional muster after cookie-cutter appeals and habeas briefs are filed, convictions are rubber-stamped, and death row inmates such as Mr. Garcia are then foreclosed from presenting valid constitutional claims.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Garcia asks that the Court:

1. Issue a writ of habeas corpus, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2. Grant him one or more hearings, (*see* separately filed motion accompanying this petition), at which he may present any evidence in support of his claims, and allow him a

reasonable period of time subsequent to any hearing this court determines to brief the issues of fact and of law raised by this Petition or such hearing;

3. Direct that under Habeas Corpus Rule 7, the record in this case be expanded to include the additional materials relevant to the determination of the merits of the petition, which are found in exhibits filed with this Petition; and

4. Grant any other relief which the Court deems just.

Respectfully Submitted,

 /s/ Camille M. Knight
CAMILLE M. KNIGHT
State Bar No. 24027124
2828 Routh Street, Suite 850
Dallas, Texas 75201
214.520.3900 telephone
214.764.0022 facsimile


 /s/  Ronald L. Goranson
RONALD L. GORANSON
State Bar No. 08193000
2828 Routh Street, Suite 850
Dallas, Texas 75201
214.651.1122 telephone
214.954.0226 facsimile

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on Laura Berins, Texas Attorney General's Office, via electronic filing in accordance with the local rules of court on this date.  I further certify that a copy has been sent to Ms. Berins via electronic mail to: Laura.Berins@oag.state.tx.us on this date.  A paper copy of the foregoing has been sent via United States mail to Joseph C. Garcia on this date as well.

 /s/ Camille M. Knight
CAMILLE M. KNIGHT

<u>**A**FFIDAVIT</u>

State of Texas                  )
                                )
County of Dallas                )

ON THIS DAY BEFORE ME, the undersigned official, personally appeared Camille M. Knight, a person known to me, and, after being sworn upon her oath, stated:

My name is Camille M. Knight.  I am an attorney licensed by the State of Texas and in this Court.  I am the attorney of record for Petitioner, appointed by this Court along with Ronald L. Goranson, my co-counsel.  Because of the time limitations imposed on filing this petition for writ of habeas corpus, I am unable to transmit this petition to Petitioner for his signature before filing.  I have read the foregoing Petition for Writ of Habeas Corpus and said petition is true and correct from my investigation of this case, knowledge and belief.


 /s/ Camille M. Knight
CAMILLE M. KNIGHT


SUBSCRIBED AND SWORN TO BEFORE ME this _____th day of April, 2008.


_____
Notary Public in and for the State of Texas