# ❧CA Scanning Cover Sheet



2238388

CaseNumber:  **WR-64,582-01**

EventDate:  04/24/2006

Style 1:  Garcia, Joseph C.

Style 2:

Event code:  11.071 WRIT RECD

EventID: 2238388

Applicant first name:  Joseph C.

Applicant last name:  Garcia

Offense:  19.03

Offense code:  Capital Murder

Trial court case number:  W01-00325-T(A)

Trial court name:  283rd District Court

Trial court number:  320570283

County:  Dallas

Trial court ID:  329

Event map code:  FILING

Event description:  Art. 11.071 - Application for Counsel

Event description code:  11.071

Remarks:

---

☐ *Document Scanned*                                    ☐ *Created or*
                                                         ☐ *Appended*

_____            _____
*Scanned by*          *date*            *Image ID*

*Comment*

_____

_____

_____

---

**EX PARTE:**

<u>JOSEPH C. GARCIA</u>

(Applicant)

**WRIT NO.** <u>W01-00325-T(A) - Volume</u> 1

**IN THE** <u>283rd JUDICIAL</u> **DISTRICT**

**COURT** _____, **DALLAS COUNTY, TEXAS**

---

## POST CONVICTION WRIT OF HABEAS CORPUS
## (ARTICLE 11.07, V.A.C.C.P.)

---

RECEIVED IN
COURT OF CRIMINAL APPEALS

APR 2 4 2006

Louise Pearson, Clerk

<u>ATTORNEY FOR APPLICANT:</u>

<u>Richard E. Langlois</u>

<u>217 Arden Grove</u>

<u>San Antonio, Texas  78215</u>

<u>Tel. 210/225-0341</u>

<u>ATTORNEY FOR STATE:</u>

HONORABLE BILL HILL

FRANK CROWLEY COURTHOUSE

DALLAS, TEXAS 75207-4313

**JIM HAMLIN**
**DISTRICT CLERK**
**FRANK CROWLEY COURTHOUSE**
**133 NORTH INDUSTRIAL**
**DALLAS, TEXAS 75207-4313**

Scanned Aug 29, 2011

APPLICANT <u>JOSEPH C. GARCIA</u>          APPLICATION NOS.  <u>64,582-01</u>

11.071 APPLICATION FOR WRIT OF HABEAS CORPUS      <u>XXX</u>


APPLICATION FOR WRIT OF HABEAS CORPUS DENIED WITH WRITTEN ORDER.

_Per Curiam_ _____   11/15/06
JUDGE                                                DATE

EX PARTE:                           WRIT NO. W01-00325-T(A)

JOSEPH C. GARCIA                    283rd JUDICIAL DISTRICT COURT

                                    DALLAS COUNTY, TEXAS

---

# I N D E X

---

CLERK'S COVER SHEET                                      VOL. 1-01

APPLICATION FOR POST-CONVICTION WRIT OF                  VOL. 1-02
HABEAS CORPUS TEXAS CODE CRIMINAL PROCEDURE
ART. 11.071

TRIAL DOCKET - WRIT                                      VOL. 1-128

STATE'S ORIGINAL ANSWER TO APPLICATION FOR              VOL. 1-129
WRIT OF HABEAS CORPUS IN DEATH PENALTY CASE

CLERK'S CERTIFICATION                                    VOL. 1-231A

No. W01-00325-T(A)

Ex Parte:                                        Application for Writ of Habeas Corpus

JOSEPH C. GARCIA                     283rd Judicial District Court

                                                      Dallas County, Texas

# CLERK'S COVER SHEET

APPLICANT'S NAME: **Joseph C. Garcia**

OFFENSE: **CAPITAL MURDER POLICE OFFICER**
(As described on the Judgment)

SENTENCE: **Death TDCJ; Fine: none; Court Costs: $242.25**
(As described on the Judgment)

TRIAL DATE: **February 13, 2003**
(Date upon which sentence was imposed)

JUDGE'S NAME: **Judge Cunningham**
(Judge Presiding at Trial)

APPEAL: **Yes (AP-74,692)**
(If Applicable)

REPORTER: **Unknown**
(If Applicable)

HEARING HELD: **Unknown**
(Pertaining to the Application for Writ)

FINDINGS & CONCLUSIONS FILED: **Yes**
(Pertaining to the Application for Writ)

RECOMMENDATION: **Deny**
(Trial Court's recommendation regarding Application)

JUDGE'S NAME: **Judge Becky Gregory**
(If different from Trial Judge)

AP-74,692

**IN THE TEXAS COURT OF CRIMINAL APPEALS**

**AND**

**IN THE DISTRICT COURT OF DALLAS COUNTY, TEXAS**
**283RD JUDICIAL DISTRICT**
**NO. FO1-00325-T-W1**



FILED
DEC 14 2004
JIM HAMLIN
DIST. CLERK, DALLAS CO., TEXAS
DEPUTY

**EX PARTE**
**JOSEPH C. GARCIA**
**APPLICANT**

**DEATH PENALTY CASE**
**APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS**
**TEXAS CODE CRIMINAL PROCEDURE ART.11.071**

**I.**
**ILLEGAL CONFINEMENT AND RESTRAINT**

Applicant, Joseph C. Garcia, pursuant to 11.071 of the Texas Code of Criminal Procedure, moves this Court to issue a Writ of Habeas Corpus for his release from confinement where he is being denied his liberty under an illegal and unconstitutional conviction and sentence of death imposed on February 13, 2003. (CR:Vol.2;pp308-10) Applicant is illegally restrained of his liberty by Doug Dretke, Director of the Texas Department of Criminal Justice – Criminal Institutional Division. This Application is being filed in the court of conviction, the 283rd Judicial District of Dallas County,

## AP-74,692

## IN THE TEXAS COURT OF CRIMINAL APPEALS

## AND

## IN THE DISTRICT COURT OF DALLAS COUNTY, TEXAS
### 283RD JUDICIAL DISTRICT
### NO. FO1-00325-T-W1



FILED
DEC 14 2007
JIM HAMLIN
DIST. CLERK DALLAS CO., TEXAS
DEPUTY

### EX PARTE
### JOSEPH C. GARCIA
### APPLICANT

## DEATH PENALTY CASE
## APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS
## TEXAS CODE CRIMINAL PROCEDURE ART.11.071

### I.
### ILLEGAL CONFINEMENT AND RESTRAINT

Applicant, Joseph C. Garcia, pursuant to 11.071 of the Texas Code of Criminal Procedure, moves this Court to issue a Writ of Habeas Corpus for his release from confinement where he is being denied his liberty under an illegal and unconstitutional conviction and sentence of death imposed on February 13, 2003. (CR:Vol.2;pp308-10) Applicant is illegally restrained of his liberty by Doug Dretke, Director of the Texas Department of Criminal Justice - Criminal Institutional Division. This Application is being filed in the court of conviction, the 283rd Judicial District of Dallas County,

Page 1 of 126

Texas, with the request that the writ be made returnable to the Texas Court of Criminal Appeals.

## II.
## JURISDICTION

The Court has jurisdiction of the subject matter of the Application for Writ of Habeas Corpus by virtue of Article 11.071. et. seq., Vernon's Ann. Tx. CrimC.Proc.(2003)

## III.
## HISTORY OF PRIOR PROCEEDINGS

Applicant was charged before a Dallas County Grand Jury by a true bill of indictment for capital murder pursuant to V.T.A.C. Penal §§19.03((a)(1)&(2). (CR:Vol.1,p-2)   Applicant entered a plea of not guilty before a jury and was convicted of Capital Murder in the 290th Judicial District Court of Dallas County, Texas, in Cause No. F01-0035. At the conclusion of the punishment phase, the jury answered the special issues in a manner that resulted in a sentence of death.[1]   Applicant was sentenced to death by the court on February 13, 2003. (CR:Vol.2,pp308-10)

Applicant's death sentence was automatically appealed directly to the Texas Court of Criminal Appeals.   Tex. R. App.

---

[1]See V.A.T.S. CRIM. PROC. ART.37.07 Sec.2(b).

25.2(a) and Tex. R. App. 71.1; Texas Code of Criminal Procedure Art. 37.071, § 2(h).

The Texas Court of Criminal Appeals has not yet rendered an opinion on the direct appeal, therefore, a petition for writ of certiorari has not been filed in the Supreme Court of the United States.

Applicant files this original application for a writ of habeas corpus.

## IV.
## STATEMENT OF FACTS

Applicant, along with six other inmates, escaped from a Texas prison unit and made their way to Dallas. Along the way, they committed several aggravated robberies to obtain money and property to assist them in their escape. After arriving in the Dallas area, they robbed an Oshman's Super Center located in Irving, Texas, on Christmas Eve, 2000. Irving police officer Aubrey Hawkins responded to a call related to the robbery and shortly after arriving at the Oshman's, Hawkins was shot numerous times and died as a result of his injuries. Applicant and his co-defendants then made their way to Colorado where they resided in a recreational vehicle park outside of Colorado Springs. Residents of the trailer park later recognized and reported Applicant and the

Page 3 of 126

others to local police after the group was featured on the national television show "America's Most Wanted." Soon thereafter, law enforcement officers were able to capture Applicant and five other escapees. The seventh escapee fatally shot himself after being surrounded by police.

## CLAIM 1:
### FEDERAL CLAIM
APPLICANT WAS DENIED DUE PROCESS AND THE RIGHT TO A FAIR AND IMPARTIAL JURY TRIAL IN VIOLATION OF THE FIFTH, SIXTH, SEVENTH, EIGHT, AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN TRIAL COUNSEL FAILED TO REQUEST THE TRIAL COURT TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF FELONY MURDER, A NON CAPITAL OFFENSE.

## CLAIM 2:
### STATE CLAIM
APPLICANT WAS DENIED DUE PROCESS AND THE RIGHT TO A FAIR AND IMPARTIAL JURY TRIAL IN VIOLATION OF ARTICLE 10, SECTIONS 3, 3A, 10, 13, 15 AND 19 OF THE TEXAS CONSTITUTION WHEN TRIAL COUNSEL FAILED TO REQUEST THE COURT TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF FELONY MURDER, A NON CAPITAL OFFENSE.

## CLAIM 3:
### STATE CLAIM
APPLICANT WAS DENIED DUE PROCESS AND THE RIGHT TO A FAIR AND IMPARTIAL JURY TRIAL IN VIOLATION OF ARTICLES 1.05, 1.141, 36.14 AND 36.15 WHEN TRIAL COUNSEL FAILED TO REQUEST THE TRIAL COURT TO REQUEST THE JURY ON THE LESSER INCLUDED OFFENSE OF FELONY MURDER, A NON CAPITAL OFFENSE.

## CLAIM 4:
### FEDERAL CLAIM
APPLICANT WAS DENIED THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, SEVENTH, EIGHT, AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN TRIAL COUNSEL FAILED TO REQUEST THE TRIAL COURT TO INSTRUCT

THE JURY ON THE LESSER INCLUDED OFFENSE OF FELONY MURDER, A
NON CAPITAL OFFENSE.

## CLAIM 5:
### STATE CLAIM

APPLICANT WAS DENIED THE RIGHT TO THE EFFECTIVE ASSISTANCE OF
COUNSEL IN VIOLATION OF ARTICLE 10, SECTIONS 3, 3A, 10, 13, 15
AND 19 OF THE TEXAS CONSTITUTION WHEN TRIAL COUNSEL FAILED TO
REQUEST THE COURT TO INSTRUCT THE JURY ON THE LESSER INCLUDED
OFFENSE OF FELONY MURDER, A NON CAPITAL OFFENSE.

## CLAIM 6:
### STATE CLAIM

APPLICANT WAS DENIED THE RIGHT TO THE EFFECTIVE ASSISTANCE OF
COUNSEL TO A FAIR AND IMPARTIAL JURY TRIAL IN VIOLATION OF
ARTICLES 1.05, 1.051, 1.141, 26.04, 25.052, 36.14 AND 36.15
WHEN TRIAL COUNSEL FAILED TO REQUEST THE TRIAL COURT TO
REQUEST THE JURY ON THE LESSER INCLUDED OFFENSE OF FELONY
MURDER, A NON CAPITAL OFFENSE.

## STATEMENT OF FACTS

Applicant was charged pursuant to § 19.03(a)(1) & (2)
Tex. Penal Code by indictment in the first paragraph with
capital murder by knowingly and intentionally causing the
death of Aubrey Hawkins, a City of Irving peace officer acting
in the lawful discharge of an official duty, applicant knowing
that Hawkins was a peace officer.

The second paragraph of the indictment charged applicant
with intentionally causing the death of Aubrey Hawkins, by
shooting the deceased with a firearm while the defendant was
in the course of committing and attempting to commit the

Page 5 of 126

007

offense of robbery of Wesley Ferris (CR:Vol.I;p-2)

## ARGUMENT AND AUTHORITIES

### Ineffective Assistance of Counsel

Claims of the ineffective assistance counsel under the United States Constitution and Texas Constitution utilize the same standards and there are not greater protection under one or the other; consequently, both Federal and State issues will be addressed together.

The United States Supreme Court and the Texas Court of Criminal Appeals have promulgated a two-prong test to determine whether representation was so inadequate that it violated a defendant's *Sixth Amendment* right to counsel. *See Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); Hernandez v. State, 726 S.W.2d 53, 54-55 (Tex. Crim. App. 1986); Munoz v. State, 24 S.W.3d 427, 433 (Tex. App.-Corpus Christi 2000, no pet.).* To prevail on a claim of ineffective assistance of counsel, appellant must prove by a preponderance of the evidence that: (1) counsel's performance fell below the standard of prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington, 466 U.S. 668, 687, 695,*

Page 6 of 126

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 13 of 236   PageID 1551

80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). A reasonable probability is one sufficient to undermine confidence in the outcome of the proceeding. Allegations of ineffective assistance of counsel must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.

The applicant bears the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). A defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.-Houston [1st Dist.] 1996, no pet.). Assertions of ineffective assistance of counsel must be firmly founded in the record. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective, and an appellate court will not find ineffectiveness based on speculation. *Id. at 836; Henderson v. State*, 29 S.W.3d 616, 624 (Tex. App.-Houston [1st Dist.] 2000, pet. ref'd).

Counsel's failure to request an instruction on a lesser

Case 3:06-cv-02185-M  Document 107  Filed 07/06/15  Page 14 of 236  PageID 1552

included offense, or object to the lack thereof, waives any complaint on appeal. *See Kinnamon v. State, 791 S.W.2d 84, 96 (Tex. Crim. App. 1990), overruled on other grounds by Cook v. State, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994); Mohammed v. State, 127 S.W.3d 163, 169 (Tex. App.-Houston [1st Dist.] 2004, pet. ref'd); see also Posey v. State, 966 S.W.2d 57, 62 (Tex. Crim. App. 1992)* (trial court has no duty to sua sponte instruct on an unrequested defensive issue).

At the charge conference in the present case, applicant's attorneys did not object to the court's charge for failure to include the lesser included offense of felony murder nor did they ask for a charge on any lesser included offenses other than aggravated robbery. Accordingly, appellant waived error on direct appeal, if any, on this issue.

### Charge Error

Whether a lesser offense instruction must be given is determined by a two-part test: "first, the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense." *Rousseau v. State*, 855 S.W.2d 666, 673

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 15 of 236   PageID 1553

(Tex. Crim. App. 1993); accord *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000); *Wolfe v. State*, 917 S.W.2d 270, 278 (Tex. Crim. App. 1996).

Here, the first part of the test is satisfied because the offense of felony murder is included within the proof necessary to establish capital murder. See Tex. Code Crim. Proc. Ann. art 37.09 (West 1981); *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999).; *Rousseau*, 855 S.W.2d at 673. It must be determined whether the evidence in the record would allow the jury rationally to find that, if guilty, appellant was guilty only of the lesser offense of felony murder.

The distinguishing element between felony murder and capital murder is intent. See *Fuentes*, 991 S.W.2d at 272; *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993). Capital murder requires the intent to kill while felony murder requires only the intent to commit the underlying felony. *Adanandus,* 866 S.W.2d at 230; *Rousseau*, 855 S.W.2d at 673; *Creel v. State*, 754 S.W.2d 205, 211 (Tex. Crim. App. 1988). The factor that must be decided is if there is evidence in the record that would support a rational jury finding that applicant had only the intent to rob the victims at Oshman's Sporting Store and not the intent to kill Hawkins, a peace

officer was shot outside the store by co-defendants.

Only some evidence must exist in the record that would permit a jury rationally to find that if applicant was guilty, he was guilty only of the lesser offense of felony murder. *Arevalo v. State*, 943 S.W.2d 887, 890 (Tex. Crim. App. 1997); *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993). Such evidence must be directly germane to a lesser included offense before an instruction is warranted. *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994). "The trial court's determination whether there is some evidence of a lesser included offense is distinct from the jury's ultimate determination whether applicant was guilty only of the lesser offense. Id. at 672 (citing *Lugo v. State*, 667 S.W.2d 144, 146 (Tex. Crim. App. 1984)). It does not matter, whether such evidence is produced by the State or the applicant, and whether it is weak, strong, unimpeached, or contradicted. Once such evidence is before the jury, It is then the jury's duty to determine whether the evidence is credible and supports the lesser included offense. Hampton v. State, 66 S>W>3d 430 (Tex.App.-Houston[1st Dist.] 2001).

### STATE AND FEDERAL CONSTITUTIONAL CLAIMS PRESENTED

A trial court must submit a charge setting forth the "law

applicable to the case." V.A.T.C. CRIM. PROC. Art. 36.14 (Vernon Supp. 2002). A constitutional error results when it directly offends the United States or Texas constitution, without regard to any statute or rule that might also apply. Lesser-included offense instructions have constitutional underpinnings in capital cases. Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The Federal rule is that a lesser included offense instruction should be given if the evidence would permit a jury rationally to find a defendant guilty of the lesser offense and acquit him of the greater. *Hopper v. Evans*, 456 U.S. 605, 612, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367, 373 (1982). "Due process requires that such an instruction be given only when the evidence warrants such an instruction. Thus the jury's discretion will be channeled so that it may convict a defendant of any crime fairly supported by the evidence.

The Constitution requires that the jury be instructed on any and all lesser included offenses "If the jury could rationally acquit on the capital crime and convict for the noncapital crime." *Cordova v. Lynaught*, 838 F.2d 764 (5th Cir.), *cert.denied*, 108 S..Ct. 2832 (1988). In *Cordova,* the Fifth Circuit Court of Appeals reversed a Texas capital

Page 11 of 125

013

murder conviction because of the failure to include a requested jury charge instruction on the lesser included offense of murder where the evidence would have permitted the jury rationally to find that defendant guilty of the lesser offense and acquit him of the greater. It further held that due process and the Eighth Amendment of the United States Constitution "require that, in a capital case, the jury must be allowed to consider a lesser included noncapital offense if the jury could rationally acquit on the capital crime and convict for the noncapital crime." *Cordova*, 838 F.2d at 767.

## CLAIM 7:
### FEDERAL CLAIM

**THE SENTENCING PROCEDURE MANDATED IN ART. 37.071(e) TEX. CODE CRIM. PROC. DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL JURY AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS OF THE FIFTH, SIXTH, EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT IS A SENTENCING FACTOR WHICH FAILS TO REQUIRE THE STATE TO NEGATE JURY FINDINGS WITH A BURDEN OF PROOF BEYOND A REASONABLE DOUBT.**

## CLAIMS 8:
### STATE CLAIM

**THE SENTENCING PROCEDURE MANDATED IN ART. 37.071(e) TEX. CODE CRIM. PROC. DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL JURY AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF ARTICLE I, SECTIONS 10, 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE IT IS A SENTENCING FACTOR WHICH FAILS TO REQUIRE THE STATE TO NEGATE JURY FINDINGS WITH A BURDEN OF PROOF BEYOND A REASONABLE DOUBT.**

## CLAIM 9:

Page 12 of 126

014

**FEDERAL CLAIM**

**APPLICANT WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO A GRAND JURY DETERMINATION AND AN INDICTMENT THAT CHARGES THE "SPECIAL ISSUE ELEMENTS" OF THE DEATH PENALTY, AND FACTS RELIED UPON TO SUPPORT THE CHARGE THAT APPLICANT IS "GUILTY" OF THE SPECIAL ISSUES IN VIOLATION OF THE FIFTH, SIXTH, EIGHT, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**CLAIM 10:**
**STATE CLAIM**

**APPLICANT WAS DENIED HIS STATE CONSTITUTIONAL RIGHT TO A GRAND JURY DETERMINATION AND AN INDICTMENT THAT CHARGES THE "SPECIAL ISSUE ELEMENTS" OF THE DEATH PENALTY, AND FACTS RELIED UPON TO SUPPORT THE CHARGE THAT APPLICANT IS "GUILTY" OF THE SPECIAL ISSUES IN VIOLATION OF ARTICLE I, SECTIONS 3, 10, 19, 13 OF THE TEXAS CONSTITUTION.**

**ARGUMENT AND AUTHORITIES**

In Texas, the punishment of a defendant's trial is determined by procedures established by the legislature pursuant to Art. 37.071, Tex.C.Crim.Proc. (2001). The trial court must submits a jury charge instructing the jury to determine two or three special issues. The first special issue requires the jury to determine if there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[2].(CR:Vol2:296-304)

---

[2] (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

Page 13 of 126

If the jury was charged at the guilt or innocence stage permitting the jury to find the defendant guilty as a party, the court shall submit special issue number two which requires the jury to determine whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased by intended to kill the deceased or another or anticipated that a human life would be taken[3].

The burden of proof on the State for special issues one and two are  statutory defined as a "beyond a reasonable doubt standard"[4].

In the case where the jury answers "yes" to both special issues submitted under Subsection(b) and the verdict is unanimous, the jury is to be instructed to answer the "mitigation" special issue which is referred to as the "nullification instruction[5]" which allows the jury to negated their findings upon an affirmative finding of future

---

[3] (2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

[4] ©)  The state must prove each issue submitted under Subsection (b) of this article beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted under Subsection (b) of this Article.

[5]See: *Penry v. Johnson*, 532 U.S. 782 (2001)(Penry II)

dangerousness and\or intent to cause the death of the deceased by finding there exists sufficient mitigating evidence which allows imposition of a life sentence in lieu of a death sentence[6].

The basic premises are twofold: The first is that Applicant has the constitutional rights to have a grand jury consider and allege in the indictment all specific facts legally essential to his conviction and death sentence, and then to have a trial jury determine beyond a reasonable doubt, all such facts (including facts supporting a negative answer to the mitigation special issue) legally essential to his sentence. In support of his assertion of these rights, Defendant cites the recent Supreme Court decisions in *Jones v* U.S. 526 U.S. 227 (1999), *Apprendi v. New Jersey, 530* U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Blakely v. Washington, U.S. , 124* S.Ct. 2531 (2004). The Eighth Amendment protection against the arbitrary imposition

---

[6] (e)(1)  The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:
> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Page 15 of 126

Case 3:06-cv-02185-M  Document 107  Filed 07/06/15  Page 22 of 236  PageID 1560

of the death penalty provides further support for the application of the *Apprendi/Ring/Blakely* due process and Sixth Amendment holdings to Defendant's case.

The United States Supreme Court has held in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that any fact other than a prior conviction that increases the maximum penalty for a crime must be charged in an indictment, then submitted to a jury and proven beyond a reasonable doubt. The decision in *Ring v. Arizona,* supra, was premised upon the Sixth Amendment right to trial by jury; the Court held the *jury,* rather than the trial court, must decide the facts justifying the state's death penalty, and in *Blakely v. Washington,* supra, the Supreme Court clarified what it meant by the term "maximum penalty."

The "maximum penalty" for *Apprendi/Ring/Blakely* purposes, under Texas death penalty law, is the life sentence is authorized up to and until the jury returns a unanimous negative answer on the sufficiency of mitigation. That finding is legally essential to the imposition of death in Texas. This "maximum penalty" concept is crucial to both of Applicant's claims, that:

1.

Page 16 of 126

018

## INDICTMENT MUST ALLEGE STATUTORY SPECIAL ISSUES AND SUPPORTING FACTS.

Applicant was entitled to a Grand Jury determination and an indictment that charges the "special issue elements" of the death penalty, and the facts relied upon to support the charge that Defendant is "guilty" of the special issues; as a matter of Sixth Amendment Right to Jury Trial and Fourteenth Amendment Due Process, as a matter of Eighth Amendment fairness in a capital case and as a matter of Fourteenth Amendment Equal Protection.

In addition to this federal Fourteenth Amendment due process and Sixth Amendment right to jury trial basis for requiring written a charge and a jury finding upon proof beyond a reasonable doubt of facts used to increase Applicant's maximum penalty, the Texas Constitution affords a parallel right to the right to trial by jury and to "due course of law" and also guarantees that, "No person shall be held to answer for a criminal offense unless on an indictment of a grand jury, " TEX CONST. Art. I, Secs. 10 and 19.; 'EX. CONST. Art. 1, Sec. 3.

## 2.
## STATE HAS BURDEN OF NEGATING MITIGATION BEYOND A REASONABLE DOUBT

019

Applicant was entitled to place upon the State the burden of proving beyond a reasonable doubt a negative answer to the mitigation special issue as a matter of Sixth Amendment Right to Jury Trial and Fourteenth Amendment Due Process, and as a matter of Eighth Amendment fairness in a capital case.

The Indictment is Constitutionally Deficient under the Sixth Amendment Right to Jury Trial, Fourteenth Amendment Due Process, Eighth Amendment fairness in a capital case/ Parallel Texas Rights and Texas Constitutional Right to Grand Jury Indictment.

1.) <u>Violation of Constitutional Rights to jury Trial and to Due Process of Law</u>:

Applicant's indictment (Appendix: Exhibit 1) for the crime of capital murder does not contain any Grand Jury charge alleging a probability Applicant would commit future acts of violence that would constitute a continuing threat to society, nor does it reflect a Grand Jury charge that mitigating circumstances are insufficient to warrant a sentence of life imprisonment, rather than the death sentence. Those statutory facts are the statutory elements required to impose the sentence of death; they have a unique status as the only facts upon which Applicant could have been held to answer for the crime with his life.

Page 18 of 126

The trial Court could sentence Applicant to death only if a jury returned a unanimous answer to each of three special issues: first, the jury must find unanimously, beyond a reasonable doubt, that there is a probability Applicant would commit criminal acts of violence that would constitute a continuing threat to society; second, that the jury find unanimously that Applicant caused the death of Aubrey Hawkins or that he did not actually cause the death of Aubrey Hawkins but intended to kill the deceased or another or anticipated that a human life would be taken; and third, the Court could not have sentenced Applicant to death unless the jury further found **unanimously** that there was not a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment, rather than a death sentence, be imposed. Tex. Crim. Proc. Art. 37.071 *(2)* (b) (1) c) , (d) 2) , (e) , *(f) (2)* , *(g)* .

Under the arguments submitted above, and the Supreme Court cases cited, the lack of indictment on the Texas "death facts," the special Issues and the supporting facts, Defendant has suffered violations of his Sixth, Fourteenth and Eighth Amendment rights, and his parallel state constitutional rights, so that this Court should set aside Applicant' death penalty as constitutionally deficient.

Page 19 of 126

## 2.) <u>Violation of Texas Constitutional Right to Grand Jury Indictment</u>

Art. I, Sec. 3 of the Texas Constitution guarantees that no person shall be held to answer for a criminal offense except by indictment returned by a Grand Jury. The State of Texas, now trying to kill this Applicant, has denied him that right to due process and the consequent notice and opportunity to prepare that it implies, by failing to present evidence to the Grand Jury so that it could decide if there were facts supporting the State's seeking the death penalty. It is the prosecutor's uncontrolled discretion, rather than the Grand jury's indictment, upon which Applicant is being held to answer for a criminal offense in this case.

## 3.) <u>Violation of Equal Protection</u>

The Grand Jury does not participate in the decision to seek the death penalty, and the prosecution does not present to the Grand Jury any of the factors the elected District Attorney is gathering, evaluating and using to make the unreviewed decision to seek death. Members of the Grand jury are not asked to screen the information for factual accuracy,

or weigh its significance according to its source, or according to their own perceptions of the propriety of seeking death in a particular case. The prosecution has complete discretion in selecting the particular facts used to prove the special issue answers so as to impose the death penalty. Those facts are legally essential to imposition of the death penalty, yet are not included in the indictment; even the special issues are not charged in the indictment, because the Grand Jury hears no evidence and makes no finding that the Defendant will be a continuing threat, or that the aggravating circumstances will require a negative answer to the mitigation issue. In the absence of a written charge - from the Grand Jury - the prosecutor's discretion is so broad as to offend the federal and state constitutional guarantees of equal protection under the law. The equal protection guarantees are intended to avoid the vagaries and unfairness (the arbitrariness and capriciousness) that may attend application of the law to similarly situated citizens in a system of elected prosecutors.

By interposing a Grand jury composed of citizens of the community, and the presentation of facts and the return of an indictment on the decision to seek death, the State would at

least dilute the unequal treatment that exists under the present system: that capital defendants who are similarly situated are tried differently in different counties (or even within the same county) based upon considerations that do not properly single one out for death. This procedure denies those charged with capital offenses the equal protection under the law as a defendant charged with capital murder under the same fact situation might face a death prosecution if he were prosecuted in Dallas County, but face a non-death capital prosecution in another county. See generally, *Bush v. Gore, 531 U.S. 98,* 121 S. Ct. *525, 148 L.* Ed2d *388* (2000).

The decisions in *Apprendi, Ring* and *Blakely* support the proposition that even though unfettered discretion has been afforded previously to the prosecution, it is now a constitutional prerequisite that in order to seek the death penalty, the State must use the Grand Jury process in the punishment decision: there must be the return of an indictment alleging the existence of legally essential "death facts" in terms of the Texas special issues, as well as non-statutory aggravating facts upon which it has based its charge that the special issues will be answered for death. Without the indictment on the punishment facts, the Texas system violates

the constitutional guarantees of equal protection of the laws. U.S. CONST. Amend. 14; TEX. CONST. Art. I, Sec. 3.

### Constitutionally Necessary to Place Upon the State the Burden of Proving Negative Answer on Mitigation Special Issue

The law in Texas currently places no burden of proof upon the State, to any degree, to prove the negative answer on the mitigation special issue, the prerequisite for imposing the death penalty. See, e.g., *Hankies v. State,* 132 S.W.3d 380, 386 (Tex.Crim. App. 2004)

One question is central to resolution of Applicant's claims regarding application of the *Apprenrii/Ring/Blakely* principle to the Texas death penalty: What is the "maximurn statutory punishment" in the Texas scheme for purposes of an *Apprendi-as-affected-by-Ring-as-affected-by-Blakely* analysis? The Court of Criminal Appeals has said in at least 12 recent capital cases that the maximum statutory punishment is death, and a negative finding on mitigation does not have the effect of increasing a defendant's punishrent beyond that maximum; it has only the potential to reduce the sentence already authorized by the jury's finding that he is a continuing threat. See, e.g., *Hankies,* supra; Blue v. State*,* 125 S.W.3d

Scanned Aug 29, 2011

491 (Tex.Crim.App. 2004).

The decision in *Blakely v. Washington, U. S. , 124 S.Ct. 2531 (2004) certainly contradicts the Texas court's reasoning. In that case, the defendant entered a guilty plea in state court and was convicted of second-degree kidnapping. Under the applicable Washington statute, the maximum punishment was ten years (120 months) confinement. However, under the state's sentencing reform act, the defendant's offense carried a "standard range" of 49 to 53 months. The judge was permitted to assess a sentence outside the statutory standard range (and within the statutory maximum) only upon making certain fact findings. After conducting a hearing, the trial judge made findings of fact and determined Blakely had acted with "deliberate cruelty." Based on that finding, he assessed Blakely's punishment at 90 months confinement, within the statutory maximum but well above the standard range.

When the defendant appealed his sentence on *Apprenrii* grounds, claiming he was denied his constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence, the State responded that *Apprendi* did not apply because the relevant "statutory maximum" was 120 months, not 53 months, pointing out that no

Page 24 of 126

"exceptional sentence" delivered under the sentencing guidelines was permitted to exceed that maximum. Writing for a majority of the Court, Justice Scalia explained the significance of the "statutory maximum:"

"Our precedents make clear, however, that the `statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant ... In other words, the relevant statutory maximum is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose <u>without</u> any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts `which the law makes essential to the punishment', ... and the judge exceeds his proper authority." *Blakely v. Washington,* supra, 124 S.Ct. at 2534-2535.

Under Texas law, <u>the jury's negative answer to the mitigation special issue is legally essential to imposition of the death penalty.</u> The affirmative answer to the statutory aggravating issue or issues will not alone authorize the death sentence. Tex. Code Crim. Proc. Art. 37.071, Sec. 2(g), (Life sentence shall be imposed unless jury unanimously answers

Page 25 of 126

027

first question [(first two questions if both aggravators submitted)] "yes" and mitigation question "no.") Therefore, even after a capital jury answers the continuing threat special issue "yes," its verdict authorizes only a life sentence under Texas law. Only if the jury makes an additional unanimous finding of "no" to the mitigation special issue does Texas law authorize the sentence of death. If the jury is unable to answer the mitigation special issue, the affirmative answer on the aggravating special issue still does not authorize the imposition of death.

## 3.
## Necessity for Independent Application
## of Burden of Proof to Unadjudicated Extraneous Offenses
## and Acts of Misconduct

The Court of Criminal Appeals has not ruled that the State has no burden at the punishment phase of a capital trial to prove beyond a reasonable doubt the defendant committed the unadjudicated offense or misconduct, but for some reason the Court has stoutly resisted the capital defendant's attempt to obtain a separate instruction applying that burden. The Court's language has suggested in the past that the burden of proof on continuing threat somehow "encompasses" the burden of

proving the unadjudicated extraneous offenses, finding that so long as the jury is properly instructed on that burden of proof "there is no unfairness" in not having a separate instruction concerning the burden of proof on unadjudicated extraneous offenses. See, e.g., *Ladd v. State, 3* S.W.3d 547, 574 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1070 (2000).

At best, the Court's language suggests that the jury seeing the burden of proof on the on the ultimate fact (continuing threat) will assume there also must be a burden of proof on the component facts (unadjudicated extraneous offenses). But the Court does not address the significance of the fact that unadjudicated extraneous offenses are admitted also as "anti-mitigation evidence, non-statutory aggravating evidence independent of their relevance to the continuing threat special issue, and that the mitigation issue carries no burden of proof that can `supply' the burden on the unadjudicated extraneous offenses. If the United States Supreme Court finds the State must bear the burden of proving the negative mitigation answer that is legally essential to imposing the death penalty, then perhaps the Texas Court's view of the matter would be more logical. However, as the

Scanned Aug 29, 2011

matter stands now, with no burden of proof on the mitigation special issue, the Court of Criminal Appeals' opinions do not satisfy the *Ring* requirement that the jury must find beyond a reasonable doubt the defendant committed any unadjudicated extraneous offenses or acts of misconduct when the prosecution offers those offenses as aggravating factors to secure death answers to both special issues: continuing threat and mitigation.

Without a separate instruction, there is certainly no assurance that the jury will recognize and apply the burden of proof to those alleged offenses.

Applicant however, claims that the recent opinion in Apprendi V. New Jersey, 530 U.s. 466, 120 S.ct. 2348, 147 L.ed.2d 435 (2000) would overrule prior case law and hold that: "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." See *U.S. v Doggett*, 230 F.3d 160 (5th Cir. 2000)

The Supreme Court requires a jury determination of mitigation based on the rational of *Ring v. Arizona*, ___ U.S. ___, 122 S.Ct. 2428, 153 L.Ed.2d 556 (June 24, 2002) in which

the United States Supreme Court held that any fact necessary to elevate a particular punishment – here, that there is sufficient mitigating circumstances to impose a life sentence, a fact that would be necessary to elevate the punishment from life imprisonment to the death if the jury decided in the negative – must be submitted to the jury (unless a jury is waived by the defense) and proven by the state beyond a reasonable doubt. While this principle had previously been applied in the context of non-capital sentencing, *see Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring* applied it in the context of capital sentencing, overruling the Supreme Court's earlier decision in Walton v. Arizona, 497 U.S. 639 (1990).

Applicant preserved his error in the trial court by pre-trial Motion to Hold Unconstitutional Art. 37.071, Sec. 2(e) & (f). (CR:I,158-162) Additionally, applicant filed a Motion to Set Aside the Indictment raising similar objections to the lack of burden of proof with regards to "nullification instruction on mitigation." (CR:I,219-21) Both motions were overruled by the trial court.

### CLAIM 11:
### FEDERAL CLAIM
**THE "NULLIFICATION INSTRUCTION" MANDATED IN ART. 37.071(e)**

Scanned Aug 29, 2011

TEX. CODE CRIM. PROC. DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL JURY AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS OF THE FIFTH, SIXTH, EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT IS A SENTENCING FACTOR WHICH FAILS TO GIVE FULL EFFECT AND CONSIDERATION TO MITIGATING CIRCUMSTANCES AND FAILS TO PROVIDE THE JURY WITH AN ADEQUATE VEHICLE FOR EXPRESSING A "REASONED RESPONSE" TO ALL OF APPLICANT'S EVIDENCE RELEVANT TO HIS CULPABILITY.

### CLAIMS 12:
#### STATE CLAIM

THE SENTENCING PROCEDURE MANDATED IN ART. 37.071(e) TEX. CODE CRIM. PROC. DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF ARTICLE I, SECTIONS 10, 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE IT IS A SENTENCING FACTOR WHICH FAILS TO GIVE FULL EFFECT AND CONSIDERATION TO MITIGATING CIRCUMSTANCES AND FAILS TO PROVIDE THE JURY WITH AN ADEQUATE VEHICLE FOR EXPRESSING A "REASONED RESPONSE" TO ALL OF APPLICANT'S EVIDENCE RELEVANT TO HIS CULPABILITY.

### CLAIM 13:
#### FEDERAL CLAIM

APPLICANT WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO A GRAND JURY DETERMINATION AND AN INDICTMENT THAT CHARGES THE "SPECIAL ISSUE ELEMENTS" OF THE DEATH PENALTY, AND FACTS RELIED UPON TO SUPPORT THE CHARGE THAT APPLICANT IS "GUILTY" OF THE SPECIAL ISSUES IN VIOLATION OF THE FIFTH, SIXTH, EIGHT, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE ART. 37.071(e) IS A SENTENCING FACTOR WHICH FAILS TO GIVE FULL EFFECT AND CONSIDERATION TO MITIGATING CIRCUMSTANCES AND FAILS TO PROVIDE THE JURY WITH AN ADEQUATE VEHICLE FOR EXPRESSING A "REASONED RESPONSE" TO ALL OF APPLICANT'S EVIDENCE RELEVANT TO HIS CULPABILITY.

### CLAIM 14:
#### STATE CLAIM

APPLICANT WAS DENIED HIS STATE CONSTITUTIONAL RIGHT TO A GRAND JURY DETERMINATION AND AN INDICTMENT THAT CHARGES THE "SPECIAL ISSUE ELEMENTS" OF THE DEATH PENALTY, AND FACTS RELIED UPON TO SUPPORT THE CHARGE THAT APPLICANT IS "GUILTY" OF THE SPECIAL

032

**ISSUES IN VIOLATION OF ARTICLE I, SECTIONS 3, 10, 19, 13 OF THE TEXAS CONSTITUTION BECAUSE ART. 37.071(e) IS A SENTENCING FACTOR WHICH FAILS TO GIVE FULL EFFECT AND CONSIDERATION TO MITIGATING CIRCUMSTANCES AND FAILS TO PROVIDE THE JURY WITH AN ADEQUATE VEHICLE FOR EXPRESSING A "REASONED RESPONSE" TO ALL OF APPLICANT'S EVIDENCE RELEVANT TO HIS CULPABILITY.**

### ARGUMENT AND AUTHORITIES

In the recent case of *Smith v. Texas*, 2004 U.S. LEXIS 7668; 73 U.S.L.W. 3294 (S.Ct. Nov. 15, 2004) the United States Supreme Court held that a similar nullification instruction was constitutionally inadequate under *Penry v. Johnson*, 532 U.S. 782 (2001).(*Penry II*) That opinion held: that the *Penry II* "nullification instruction" was constitutionally inadequate because it did not allow the jury to give "full consideration and full effect to mitigating circumstances" in choosing the defendant's appropriate sentence. The "nullification instruction" in *Smith* directed the jury to give effect to mitigation evidence, but allowed the jury to do only by negating what would otherwise be affirmative responses to two special issues relating to deliberateness and future dangerousness. Applicant argues that the mitigating instruction provided in his trial contains the same constitutional defects and those held unconstitutional in *Penry II* and *Smith*.

Page 31 of 126

The current Texas legislative scheme for the imposition of a death sentence was amended to be effective September 1, 2001. Those provisions are as follows:

Art 37.071.  Procedure in capital case

Sec. 1. If a defendant is found guilty in a capital felony case in which the state does not seek the death penalty, the judge shall sentence the defendant to life imprisonment.

Sec. 2. (a)(1) If a defendant is tried for a capital offense in which the state seeks the death penalty, on a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court and, except as provided by Article 44.29(c) of this code, before the trial jury as soon as practicable. In the proceeding, evidence may be presented by the state and the defendant or the defendant's counsel as to any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty. This subdivision shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas. The state and the defendant or the defendant's counsel shall be permitted to present argument for or against sentence of death. The court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on issues submitted under Subsection (c) or (e) of this article.

(2) Notwithstanding Subdivision (1), evidence may not be offered by the state to establish that the race or ethnicity of the defendant makes it likely that the defendant will engage in future criminal conduct.

(b) On conclusion of the presentation of the evidence, the

Page 32 of 126

court shall submit the following issues to the jury:

(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under *Sections 7.01 and 7.02, Penal Code*, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

(c) The state must prove each issue submitted under Subsection (b) of this article beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted under Subsection (b) of this Article.

(d) The court shall charge the jury that:

(1) in deliberating on the issues submitted under Subsection (b) of this article, it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty;

(2) it may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously and it may not answer any issue "no" unless 10 or more jurors agree; and

(3) members of the jury need not agree on what particular evidence supports a negative answer to any issue submitted under Subsection (b) of this article.

(e)(1) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

Page 33 of 126

035

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(2) The court, on the written request of the attorney representing the defendant, shall:

(A) instruct the jury that if the jury answers that a circumstance or circumstances warrant that a sentence of life imprisonment rather than a death sentence be imposed, the court will sentence the defendant to imprisonment in the institutional division of the Texas Department of Criminal Justice for life; and

(B) charge the jury in writing as follows:

"Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted."

(f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

(1) shall answer the issue "yes" or "no";

(2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree;

(3) need not agree on what particular evidence supports

an affirmative finding on the issue; and

(4) shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

(g) If the jury returns an affirmative finding on each issue submitted under Subsection (b) of this article and a negative finding on an issue submitted under Subsection (e) of this article, the court shall sentence the defendant to death. If the jury returns a negative finding on any issue submitted under Subsection (b) of this article or an affirmative finding on an issue submitted under Subsection (e) of this article or is unable to answer any issue submitted under Subsection (b) or (e) of this article, the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life.

(h) The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals.

(i) This article applies to the sentencing procedure in a capital case for an offense that is committed on or after September 1, 1991. For the purposes of this section, an offense is committed on or after September 1, 1991, if any element of that offense occurs on or after that date.

The jury charge submitted at applicant's punishment trial contained three special issues.(CR:II,296-304) The first issue the jury answered in the affirmative inquired from the jurors whether they found from the evidence beyond a reasonable doubt that there is a substantial probability that applicant would commit criminal acts of violence that would constitute a continuing threat to society.(CR:II,301) The

Page 35 of 126

037

Case 3:06-cv-02185-M  Document 107  Filed 07/06/15  Page 42 of 236  PageID 1580

second special issue also answered in the affirmative, inquires from the jury whether they found beyond a reasonable doubt that applicant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.(CR:II, 302)

The third special issue, which wad considered by the jury only after they unanimously answered special issues No.1 and 2 yes, was the "nullification instruction" pursuant to Art. 37.071(e)(1). The instruction for the juror's consider was whether they find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposted? (CR:II,303)

The jury was instructed that in deliberating on special issues No. 1 and No. 2 that the State has the burden of proving beyond a reasonable doubt that those issues should be answered yes.

Further, the jurors were instructed that they shall

038

consider all evidence admitted during the guilt or innocence stage and the punishment stage, including evidence fo the defendant's background or character or the circumstances of the offense that militate for or mitigates against the imposition of the death penalty.

In deliberation on their answers to special issue No. 3, the jurors were instructed that they may not answer special issue No. 3 "No" unless the jury agrees unanimously, and they may not answer "Yes" unless 10 or more jurors agree. The members of the jury need not agree on what particular evidence supports an affirmative answer to special issue No. 3. In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness. (CR:II,298)

The court's instructions did not define the term "mitigating evidence" beyond instructing the jury that such evidence to be that a juror might regard as reducing applicant's moral blameworthiness.

In *Tennard v. Dretke, 542 U.S. ___, 159 L. Ed. 2d 384, 124 S. Ct. 2562 (2004)*, the United States Supreme Court reversed the Fifth Circuit's refusal to grant a certificate of appealability (COA) to a defendant who was sentenced under the

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 44 of 236   PageID 1582

Texas capital sentencing scheme prior to the legislative revisions which took place in the aftermath of *Penry v. Lynaugh, 492 U.S. 302, 328, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989) (Penry I).* Tennard, relying upon *Penry I*, argued that Texas' two special issues -- deliberateness and future dangerousness -- did not allow the jury to give effect to his mitigation evidence and that the trial court's failure to issue a supplemental mitigation instruction that would allow the jury to give full effect to his evidence rendered his death sentence unconstitutional. The state court and the Fifth Circuit both held that the lack of an adequate mitigation instruction was irrelevant. The courts both determined that Tennard had failed to satisfy the Fifth Circuit's threshold standard for "constitutionally relevant" mitigating evidence, that is, evidence of a 'uniquely severe permanent handicap with which the defendant was burdened through no fault of his own," and evidence that "'the criminal act was attributable to this severe permanent condition." *542 U.S., at ___, 159 L. Ed. 2d 384, 124 S. Ct. 2562 (slip op., at 6)*

The Supreme Court's rejection of that threshold test was central to its decision to reverse in *Tennard*. They held that "the Fifth Circuit's test has no foundation in the decisions

049

of the Supreme Court. Neither *Penry I* nor its progeny screened mitigating evidence for "constitutional relevance" before considering whether the jury instructions comported with the *Eighth Amendment*." *Id., at ___, 159 L. Ed. 2d 384, 124 S.Ct. 2562 (slip op., at 9)*. Rather, they held that the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a "low threshold for relevance," which is satisfied by" evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id., at ___, 159 L. Ed. 2D 384, 124 S. Ct. 2562 (slip op., at 10)* (quoting *McKoy v. North Carolina, 494 U.S. 433, 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990)*).

The Texas Court of Criminal Appeals has demonstrated its awareness of the Texas Legislature's inadequate attempt to provide a constitutionally acceptable "nullification instruction." In *Ex Parte Smith*, 132 S.W. 3d. 407, 427, (Tex.Crim.App. 2004), Judge Hervey wrote in a concurring opinion that "the "nullification instruction" would as a matter of federal law, suffer from the same defects as the one in *Penry II* had applicant presented any mitigating evidence beyond "the effective reach of the sentencer" and that the

instruction given in *Ex Party Smith* , *may have been inadequate as a matter of federal law. Id. At 428.  Judge Holcomb, held the same concerns, writing that the "nullification instruction" provided to Smith's jury contained the same defects the Supreme Court identified in Penry II.  There, the jury was unconstitutionally precluded from considering and giving effect to Smiths mitigating evidence."*

While *Smith*, like *Penry II,* did not receive the benefit of the new statutory instruction "Art. 37.071(e)(1)." Instead, they were given very similar "nullification instructions" pursuant to supplemental instructions provided to the jury by the trial judge.

### SMITH'S INSTRUCTIONS

"You are instructed that you shall consider any evidence which, in your opinion, is mitigating. Mitigating evidence is evidence that reduces the Defendant's personal or moral culpability or blameworthiness, and may include, but is not limited to, any aspect of the Defendant's character, record, background, or circumstances of the offense for which you have found him guilty. Our law does not specify what may or may not be considered as mitigating evidence. Neither does our law provide a formula for determining how much weight, if any, a mitigating circumstance deserves. You may hear evidence which, in your judgment, has no relationship to any of the Special Issues, but if you find such evidence is mitigating under these instructions, you shall consider it in the following instructions of the Court. You, and each of you, are the sole judges of what evidence, if any, is mitigating and how much weight, if any, the mitigating

Page 40 of 126

042

circumstances, if any, including those which have no relationship to any of the Special Issues, deserves.

"In answering the Special Issues submitted to you herein, if you believe that the State has proved beyond a reasonable doubt that the answers to the Special Issues are "Yes," and you also believe from the mitigating evidence, if any, that the Defendant should not be sentenced to death, then you shall answer at least one of the Special Issues "No" in order to give effect to your belief that the death penalty should not be imposed due to the mitigating evidence presented to you. In this regard, you are further instructed that the State of Texas must prove beyond a reasonable doubt that the death sentence should be imposed despite the mitigating evidence, if any, admitted before you.

"You are instructed that you may deliberate as a body about mitigating circumstances, but you are not required to reach a unanimous verdict as to their existence or weight. When you vote about the Special Issues, each of you must decide for yourself whether mitigating circumstances exist and, if so, how much weight they deserve." *Ex.Parte Smith, 132 S. W. 3d, at 409.*

The statutory language of Art. 37.071, that was submitted in applicant's trial, contains some minor distinctions from the "nullification instructions" held unconstitutional in *Penry II*, and *Smith*. One of the main distinctions is the "nullification issue" was submitted as a separate special issue No. 3, and did not require the jury to negate an affirmative finding by inserting a "No" answer to either special issues No. 1 or 2. However, that change by itself did not cure the constitutional defects in the charge.

Page 41 of 126

In particular the Court instruction the jury;

## APPLICANT'S INSTRUCTIONS

"Three special issues, numbered one, two, and three, are included in this charge. You are instructed to answer the first two special issues either "Yes" or "No" in accordance with the instructions given in this charge. Special Issue No. 3 should be answered only if you have answered "Yes" to both Special Issue No. I and Special Issue No. 2. If you have not answered "Yes" to both Special Issue No. I and Special Issue No. 2, then you shall not proceed to answer Special Issue No. 3."

In deliberating on your answers to both Special Issue No. 1 and Special Issue No. 2, you are instructed that the State has the burden of proving beyond a reasonable doubt that Special Issue No. 1 and Special Issue No. 2 should be answered "Yes."

You shall consider all evidence admitted during the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You may not answer either Special Issue No. I or Special Issue No. 2 "Yes" unless the jury agrees unanimously, and you may not answer either Special Issue No. I or Special Issue No. 2 "No" unless 10 or more members of the jury agree. The members of the jury need not agree on what particular evidence supports a negative answer to either Special Issue No. 1 or Special Issue No. 2.

If you do not find and believe from the evidence beyond a reasonable doubt that the answer to either Special Issue No. 1 or Special Issue No. 2 should be "Yes," or if you have a reasonable doubt thereof, then you shall answer that special issue "No."

If you have answered either Special Issue No. I or Special Issue No. 2, or both, "No," then you shall cease

644

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 49 of 236   PageID 1587

your deliberations. If you have found beyond a reasonable doubt that the answers. to both Special Issue No. I and Special Issue No. 2 are "Yes," then you shall next consider Special Issue No. 3.

In deliberating on your answer to Special Issue No. 3, you are instructed that you may not answer Special Issue No. 3 "No" unless the jury agrees unanimously, and you may not answer Special Issue No. 3 "Yes" unless 10 or more members of the jury agree. The members of the jury need not agree on what particular evidence supports an affirmative answer to Special Issue No. 3. In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

You are further instructed that if the jury returns an affirmative finding on both Special Issue No. I and Special Issue No. 2 and a negative finding on Special Issue No. 3, the Court shall sentence the defendant to death. If the jury returns a negative finding on either Special Issue No. 1 or Special Issue No. 2 or an affirmative finding on Special Issue No. 3, the Court shall sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

If the jury's answers are unanimous to the special issues answered, then the Foreman may sign each special issue for the entire jury. If any answer or answers, are not unanimous, but agreed to by at least 10 members of the jury, as set out above, then the 10 or more jurors who agree shall individually sign the special issue.

You are instructed that, if there is any testimony before you in this case regarding the defendant having committed offenses or acts other than the offense alleged against him in the indictment, you cannot consider said testimony, unless you first find and believe beyond a reasonable doubt that the defendant committed such other offenses or acts, if any were committed; but if you do not so believe, or if you have a reasonable doubt thereof, you will not consider such testimony for any purpose.

645

You are instructed that if the jury answers that a circumstance or circumstances warrant that a sentence of life imprisonment rather than a death sentence be imposed, the court will sentence the defendant to imprisonment in the institutional division of the Texas Department of Criminal Justice for life.

Under the law applicable in this case, if the defendant is sentenced to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

You are instructed that the defendant may testify in his own behalf if he chooses to do so, but if he elects not to do so, that fact cannot be taken by you as a circumstance against him or prejudice him in any way. The defendant has elected not to testify, and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever.

Mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling should not play a part in your deliberations.

Your verdict must be by a unanimous vote of all members of the jury. In arriving at your verdict, it will not be proper to fix the same by lot, chance, or any other method than by a full, fair, and free exercise of the opinion of the individual jurors under the evidence admitted before you.

You are the exclusive judges of the facts proved, of the credibility of the witnesses, and of the weight to be. given to the testimony, but you are bound to receive the law from the Court, which is given you, nd be governed thereby. CR:II,296-300)

A comparison between the "nullification instruction" in applicant's trial and that of *Smith's* is helpful to understand that the "nullification instruction" as enacted by the Texas Legislature remains constitutionally infirm.

**SMITH'S INSTRUCTIONS**

You are instructed that you shall consider any evidence which, in your opinion, is mitigating. <u>Mitigating evidence is evidence that reduces the Defendant's personal or moral culpability or blameworthiness, and may include, but is not limited to, any aspect of the Defendant's character, record, background, or circumstances of the offense for which you have found him guilty. Our law does not specify what may or may not be considered as mitigating evidence. Neither does our law provide a formula for determining how much weight, if any, a mitigating circumstance deserves. You may hear evidence which, in</u>

**APPLICANT'S INSTRUCTIONS**

<u>You shall consider all evidence admitted during the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for</u> or mitigates against the imposition of the death penalty.

Page 45 of 126

647

<u>your judgment, has no relationship to any of the Special Issues, but if you find such evidence mitigating under these instructions, you shall consider it in the following instructions of the Court.</u> You, and each of you, are the sole judges of what evidence, if any, is mitigating and how much weight, if any, the mitigating circumstances, if any, including those which have no relationship to any of the Special Issues, deserves.

Page 46 of 126

U48

Scanned Aug 29, 2011

"In answering the Special Issues submitted to you herein, if you believe that the State has proved beyond a reasonable doubt that the answers to the Special Issues are "Yes," <u>and you also believe from the mitigating evidence, if any, that the Defendant should not be sentenced to death, then you shall answer at least one of the Special Issues "No" in order to give effect to your belief that the death penalty should not be imposed due to the mitigating evidence presented to you. In this regard, you are further instructed that the State of Texas must prove beyond a reasonable doubt that the death sentence should be imposed despite the mitigating evidence, if any, admitted before you.</u>

You may not answer either Special Issue No. I or Special Issue No. 2 "Yes" unless the jury agrees unanimously, and you may not answer either Special Issue No. I or Special Issue No. 2 "No" unless 10 or more members of the jury agree. The members of the jury need not agree on what particular evidence supports a negative answer to either Special Issue No. 1 or Special Issue No. 2.

If you do not find and believe from the evidence beyond a reasonable doubt that the answer to either Special Issue No. 1 or Special Issue No. 2 should be "Yes," or if you have a reasonable doubt thereof, then you shall answer that special issue "No."

If you have answered either Special Issue No. I or Special Issue No. 2, or both, "No," then you shall cease your deliberations. If you have found beyond a reasonable doubt that the answers. to both Special Issue No. I and Special Issue No. 2 are "Yes," then you shall next consider Special Issue No. 3.

649

"You are instructed that you may deliberate as a body about mitigating circumstances, but you are not required to reach a unanimous verdict as to their existence or weight. When you vote about the Special Issues, each of you must decide for yourself whether mitigating circumstances exist and, if so, how much weight they deserve."

In deliberating on your answer to Special Issue No. 3, you are instructed that you may not answer Special Issue No. 3 "No" unless the jury agrees unanimously, and you may not answer Special Issue No. 3 "Yes" unless 10 or more members of the jury agree. The members of the jury need not agree on what particular evidence supports an affirmative answer to Special Issue No. 3. In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

Page 48 of 126

A comparison of the pertinent sections of applicant's punishment charge with that submitted in *Smith* shows that the Smith charge actually provided more information to the jury to decide whether there was mitigating evidence to warrant a negative answer to either special issue No. 1 or 2. In the instruction given to applicant, the jury is informed that the evidence they consider may either mitigate for or against a death sentence. The Smith instruction clearly instructed the jury that if they find mitigating evidence, to only consider mitigating evidence in determining whether the defendant should be given a sentence less than death even though they have found evidence beyond a reasonable doubt that the special issue should be answered "Yes." A close comparison between the two instructions leads to no other conclusion other than that the legislative instruction mandated by Art. 37.071(e)(1) is even more constitutionally infirm that the one held unconstitutional in <u>Ex. Parte Smith</u>.

## MITIGATION EVIDENCE

Applicant's attorneys introduced much evidence before the jury to mitigate against a sentence of death.

Testimony was introduced by deposition of Virginia Anne

Nerone, who was related to applicant and knew him all his life showed: applicant had been borne out of wedlock; never had a father figure; as a child experienced neglect and abused by his mother and her family; was raised in a very improvised environment and unstable family; and most of his relatives refused to care for applicant, preferring to raise his siblings over applicant. As a child applicant was very close to his younger sister Arlene who developed spinal bone cancer at the age of eight years, became paralyzed and died a few years later in New York where she had gone to live with her father.

Applicant lived in various foster homes after the age of thirteen years after Child Protective Services removed applicant and his sister from the care of his alcoholic and drug addictive mother. Applicant's mother often left applicant alone and inflicted physical abuse resulting in visible bruising to applicant. (RR:Vol.55;7-15)

Elizabeth Venecia was a case worker for applicant's mother from Child Protective Services (CPS); and CPS became interactive with applicant since the time his mother and family moved back from New York in 1981, when applicant was approximately ten years old. The Child Protective Files were

introduced as evidence before the jury, which records consisted of 1,145 pages of reports and information. (RR:Vol.76;,DX-15).

Venecia testified that CPS entries in 1981 contained information that applicant's sister Arlene had cancer of the spine and had been abandoned by applicant's mother at a local hospital. It was noted that the mother was a heroin addict and had problems handling the situation. Arlene was in a wheel chair at that stage of her illness and could not dress herself. Applicant's mother was staying with her mother and at many different places since her return from New York to Texas, where she had lived for nine years in a common-law-marrige with Luis Negrone. (RR:Vol.54:10-12) CPS became involved around October 1981, when Arlene was left at a hospital for over two weeks and the mother could not be located. In March 1982 both applicant and Arlene were take to a children's shelter by police and Arlene's custody was given to CPS. Arlene was later taken to New York to live with her father and paternal grandmother in March of 1932. (RR:Vol.54;13-14)

After being removed from the shelter, applicant began to live with his maternal grandmother and was attending school. In September 1982, a counselor at Riverside Elementary

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 58 of 236   PageID 1596

contacted CPS to inform them that applicant was excessively absent from school. The counselor had attempted to contact applicant's mother who claimed she was staying with her sister and her mother. Applicant's mother was on probation for drug use. (RR:Vol.54;15-16)

In June 1986 a report was made to CPS that applicant been abandoned by his mother and that applicant told the investigator that his mother had been leaving him with various relatives since he was thirteen years old. He stayed with his grandmother, but he and his grandmother did not get along and he went to stay with an aunt. However, the aunt wanted applicant out of her house in June of 1986. Everyone seem fed up with applicant's problematic behavior, and he had no place to go but to the streets, because no one knew the whereabouts of his mother. Applicant was brought to the Bridge, an emergency shelter.

At the Bridge, applicant provide information that his mother took him to New York when he was very young and they lived there until he was ten years old. He grew up with his mother and stepfather who was Angel Negrone, but his biological father was Angel Luis Bermudes, but had never met his biological father. He claimed his legal father was Danny

Garcia, his mother's third husband, but they were separated. (RR;Vol.56;18)

Applicant's aunt, who was applicant's sister, told the case workers that applicant's mother was in and out of jail because of her heroin addiction. The aunt described applicant as hyperactive, short memory span, and did not like to abide to restrictions and that he badmouthed his grandmother. Basically, applicant was a good child, but had been hurt by his mother, and no relatives wanted to take applicant into their home. His mother had stolen for her relatives and no one wanted to deal with that situation. Applicant's sister had gone to live in New York with her father and died from cancer sometime around 1984. Joseph and Arlene had a great relationship applicant helped Arlene. Applicant carried a picture of Arlene after her death, and her death affected him. Applicant had fond memories of his sister and wondered why she had died and not him. Applicant expressed angry feelings toward his mother because his mother had taken away his sister's stuffed animals. (RR:Vol.56;35)

Applicant told the case worker, that his mother was hanging out with a boyfriend by the name of Papa Carlo, who had gone to prison for attempted murder, and that Carlo was

heavily involved with drugs. Applicant lived with them, but was left alone much of the time. Carlo and applicant's mother were involved in drugs and often squealed on each other causing each or the other to be placed into jail. Applicant's mother would use a belt on his buttocks. (RR:Vol.56:19-24)

A psychological report was completed on applicant in July 1986. Applicant had a full scale IQ of 93, which placed him in the average range of intelligence. However there was a large discrepancy between his verbal IQ score of 85 and his performance IQ score of 105 which favored his nonverbal skills. (RR;Vol.56;36)

Applicant remained in the state's custody until he ran away at the age of 17. He later joined the Coast Guard. (RR:Vol.56; 37-42)

Dr. Judge Stonedale, a physician specializing I psychiatry, interviewed applicant and members of his family, along with the CPS records. She found no distinct psychiatric abnormalcies, but found applicant had suffered from depression while incarcerated at TDCJ for a murder conviction in Bexar County. Prior to that conviction, applicant had no history of violence nor had he any disciplinary record while incarcerated. Dr. Stonedale expressed an opinion that

Page 54 of 126

applicant could be safely confined in the penitentiary if given a life sentence. (RR:Vol.55:59-72)

Debra Garza, the ex-wife of applicant, testified she married applicant in 1991. Applicant had graduated from high school in 1992 and joined the Coast Guard, but had suffered from chronic sea sickness and was discharged in 1993. He returned to San Antonio and worked at various jobs. Garza left applicant after he begin to sell drugs. (RR:Vol.55;137-71)

Glenda Kessner testified she was a clinical psychologist and her analysis of applicant was that he was one who avoided confrontation. That applicant's impetus for getting involved in the prison escape was hopelessness, loss of family relationships, and depression.(RR:Vol.56;10-37)

Within the framework of special issues No. 3, the jury could have considered a variety of mitigation evidence. The State argued against a life sentence based upon the facts of a prior murder conviction, an organized and well planned prison escape by seven individuals, who robbed an Oshman's Sporting Store in Dallas on Christmas Eve when Aubrey Hawkins, a police officer was shot multiple times by one or more of the other seven escapees.

"And when you get to Special Issue No. 3 and that question on mitigation where it talks and asks you to look at his character and background, what role did he play during the crime, the personal moral culpability of applicant, what type of person do you have here?  The crime itself, the circumstances around the offense, is there anything that is sufficiency mitigating to lessen his punishment form the death penalty?  And ut position is again today, if not even more so, is that the answer is no." (RR:56:77)

It  abundantly  clear  that  there  is  no  principled distinction, for *Eighth Amendment* purposes, between the instruction given to applicant's jury pursuant to Art. 37.071(e091), and the instruction in *Penry II* and *Smith*. Applicant's evidence was relevant mitigation evidence for the jury under *Tennard* and *Penry I*. The instructions provided by the trial court as enacted by the Texas Legislature failed to provide a vehicle to give full consideration and full effect to mitigating circumstances.

In *Penry II*, the Supreme Court reasoned "We generally presume that jurors follow their instructions. Here, however, it would have been both logically and ethically impossible for a juror to follow both sets of instructions. Because Penry's

mitigating evidence did not fit within the scope of the special issues, answering those issues in the manner prescribed on the verdict form necessarily meant ignoring the command of the supplemental instruction. And answering the special issues in the mode prescribed by the supplemental instruction necessarily meant ignoring the verdict form instructions. Indeed, jurors who wanted to answer one of the special issues falsely to give effect to the mitigating evidence would have had to violate their oath to render a "true verdict."

"The mechanism created by the supplemental instruction thus inserted "an element of capriciousness" into the sentencing decision, "making the jurors" power to avoid the death penalty dependent on their willingness' to elevate the supplemental instruction over the verdict form instructions. There is, at the very least, 'a reasonable likelihood that the jury . . . applied the challenged instruction in a way that prevented the consideration' of Penry's mental retardation and childhood abuse. The supplemental instruction therefore provided an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." *Id., 532 U.S. 782 at 799-800, 150 L. Ed. 2d 9, 121 S. Ct. 1910*"

The instructions incorporated in the amendments to Art. 37.071 contained the same elements of capriciousness into the sentencing decision. First the jurors are required to answer Special issues one and/or two before they consider the mitigation. Although, the amendments do not require the jurors to negated their answer by inserting a "No" answer instead of a "yes" answer as was the case in *Penry II* and *Smith*, the provisions of Art. 37.071(e) still require the jury to answer the mitigation issue after they have answered special issues one and two in the affirmative.

In answering special issue one and two, the jury was instructed that "In deliberating on the issues submitted under Subsection (b) of this article, it shall consider all evidence admitted at the guilty or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty. Art. 37.071(d)(1).

When the jury is required to consider the mitigation issue under Art. 37.0719e), the jury is instructed: "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and

background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."

In answering special issues one and two, the jury was already instructed to consider all the evidence introduced including evidence of a defendant's background or character that militates for or mitigates against the death penalty. In considering the mitigating issue, the jury has already determined that a death sentence is appropriate by answering special issues one and two "yes." In answering these issues, the jury has already considered mitigating circumstances. However, the jury is then instructed in answering the mitigating issue to again consider the same circumstances you have already rejected, but not determine that your rejection did not include the personal moral culpability of the defendant for which they determine there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment.

The amendment incorporated into Art. 37.071(e) "shackled and confined" the juror's consideration of applicant's relevant mitigating evidence admissible under *Penry II*,

*Tennard*, and Smith. While the instructions require the jury to consider special issues one and two allow the jury to consider mitigating circumstances before answering the issues "yes," the jury them must reverse their own answers if they are to answer special issue three, the mitigating issue, "yes." Such instruction can only confuse a jury, when instructed to find special issues "yes" by considering all the evidence to impose a death sentence, then return to consider the same evidence and negate your first findings. Such instructions truly incorporate elements of capriciousness for Eight Amendment purposes.

This court should therefore hold that the nullification instruction was constitutionally inadequate under *Penry II*, and *Smith*. and reversed the case and remanded for a new trial.

### CLAIM 15:
### FEDERAL CLAIM
**THE PARTY "CONSPIRACY" INSTRUCTION PURSUANT TO §7.02(b), TEX. PENAL CODE, AT THE GUILT/INNOCENSE PHASE, DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL JURY VERDICT AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS OF THE FIFTH, SIXTH, EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT ALLOWED A NON-UNANIMOUS VERDICT WHEN THE COURT SUBMITTED DISJUNCTIVE MEANS OF COMMITTING CAPITAL MURDER PURSUANT TO §19.03, TEX. PENAL CODE.**

### CLAIMS 16:
### STATE CLAIM
**THE PARTY "CONSPIRACY" INSTRUCTION PURSUANT TO §7.02(b), TEX. PENAL CODE, AT THE GUILT/INNOCENSE PHASE, DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL JURY VERDICT AND IMPOSED CRUEL AND**

662

UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS OF ARTICLE I, SECTIONS 10, 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE IT ALLOWED A NON-UNANIMOUS VERDICT WHEN THE COURT SUBMITTED DISJUNCTIVE MEANS OF COMMITTING CAPITAL MURDER PURSUANT TO §19.03, TEX. PENAL CODE.

## CLAIM 17:
### FEDERAL CLAIM
TRAIL COUNSEL'S FAILURE TO OBJECT TO THE PARTY "CONSPIRACY" INSTRUCTION PURSUANT TO PURSUANT TO §7.02(b), TEX. PENAL CODE, AT THE GUILT/INNOCENSE PHASE RENDERED APPLICANT INEFFECTIVE ASSISTANCE OF COUNSEL, DUE COURSE OF LAW, AN IMPARTIAL JURY VERDICT AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS OF THE FOURTH, FIFTH, SIXTH, EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT ALLOWED A NON-UNANIMOUS VERDICT WHEN THE COURT SUBMITTED DISJUNCTIVE MEANS OF COMMITTING CAPITAL MURDER PURSUANT TO §19.03, TEX. PENAL CODE.

## CLAIM 18:
### STATE CLAIM
TRAIL COUNSEL'S FAILURE TO OBJECT TO THE PARTY "CONSPIRACY" INSTRUCTION PURSUANT TO PURSUANT TO §7.02(b), TEX. PENAL CODE, AT THE GUILT/INNOCENSE PHASE RENDERED APPLICANT INEFFECTIVE ASSISTANCE OF COUNSEL, DUE COURSE OF LAW, AN IMPARTIAL JURY VERDICT AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS OF THE PROVISIONS OF ARTICLE I, SECTIONS 10, 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE IT ALLOWED A NON-UNANIMOUS VERDICT WHEN THE COURT SUBMITTED DISJUNCTIVE MEANS OF COMMITTING CAPITAL MURDER PURSUANT TO §19.03, TEX. PENAL CODE.

## CLAIM 19:
### FEDERAL CLAIM
THE PARTY "CONSPIRACY" INSTRUCTION PURSUANT TO §7.02(b), TEX. PENAL CODE, AT THE GUILT/INNOCENSE PHASE, DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL JURY VERDICT AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS OF THE FIFTH, SIXTH, EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT ALLOWED A LESSER BURDEN OF PROOF OF INTENT TO SECURE A CONVICTION FOR CAPITAL MURDER PURSUANT TO

§19.03, TEX. PENAL CODE.

## CLAIM 20:
### STATE CLAIM

THE PARTY "CONSPIRACY" INSTRUCTION PURSUANT TO §7.02(b), TEX. PENAL CODE, AT THE GUILT/INNOCENSE PHASE, DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL JURY VERDICT AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS ARTICLE I, SECTIONS 10, 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE IT ALLOWED A LESSER BURDEN OF PROOF OF INTENT TO SECURE A CONVICTION FOR CAPITAL MURDER PURSUANT TO §19.03, TEX. PENAL CODE.

## CLAIM 21:
### FEDERAL CLAIM

THE INCLUSION OF INFERRED INTENT INCLUDED WITHIN THE JURY CHARGE AS A DEFINITION OF CULPABLE MENTAL STATE AT THE GUILT/INNOCENSE PHASE, DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL JURY VERDICT AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS OF THE FIFTH, SIXTH, EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT ALLOWED A LESSER BURDEN OF PROOF OF INTENT TO SECURE A CONVICTION FOR CAPITAL MURDER PURSUANT TO §19.03, TEX. PENAL CODE.

## CLAIM 22:
### STATE CLAIM

THE INCLUSION OF INFERRED INTENT INCLUDED WITHIN THE JURY CHARGE AS A DEFINITION OF CULPABLE MENTAL STATE AT THE GUILT/INNOCENSE PHASE, DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL JURY VERDICT AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS OF ARTICLE I, SECTIONS 10, 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE IT ALLOWED A LESSER BURDEN OF PROOF OF INTENT TO SECURE A CONVICTION FOR CAPITAL MURDER PURSUANT TO §19.03, TEX. PENAL CODE.

### ARGUMENT AND AUTHORITIES

The indictment returned by a Dallas Grand Jury alleged the offense of capital murder in two separate paragraphs pursuant to §19.03(a)(1) "murder of a peace office in paragraph I" and §19.03.03(a)(2) "intentionally committing murder in the course of robbery in paragraph II." (CR:I;2)

Within the jury charge, the trial court instructed the jury that "intent may be inferred from the surrounding facts and circumstances including but not limited to acts done and words spoken." (CR:II,286)

The charge also contained an instruction that allowed the jury to consider criminal responsibility for conduct of another under a conspiracy theory pursuant to §7.02(b), Texas Penal Code. The instruction provided stated:

> "If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, then all conspirators are guilty of the felony actually committed, thought having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. Murder and robbery are felony offenses." (CR:II,287)

The application paragraphs permitted the jury to find applicant guilty of capital murder under six multiple manner and means and multiple means of culpability, individually and as a party.

## APPLICATION OF THE LAW AND FACTS

### CAPITAL MURDER

Now bearing in mind the foregoing instructions,

(1) If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, the defendant, Joseph C. Garcia, intentionally or knowingly caused the death of Aubrey Hawkins, an individual, by shooting Aubrey Hawkins with a firearm, a deadly weapon, and that Aubrey Hawkins was a peace officer, namely: a City of Irving police officer, acting in the lawful discharge of an official duty, and the defendant knew Aubrey Hawkins to be a peace officer, then you will find the defendant, Joseph C. Garcia, guilty of capital murder:

**OR**

(2) If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, George Rivas, Donald Keith Newbury, Michael Anthony Rodriguez, Randy Halprin, Patrick Murphy, or Larry Harper, hereinafter referred to as "the others," or any combination of the others, knowing Aubrey Hawkins was a peace officer, did intentionally or knowingly cause the death of Aubrey Hawkins, an individual and a peace officer, namely a City of Irving police officer, acting in the lawful discharge of an official duty, by shooting him with a firearm, a deadly weapon, and if you further find from the evidence beyond a reasonable doubt that the defendant, Joseph C. Garcia, acting as a party, as that term is here in before defined, did, with the intent to promote or assist the commission of the offense of murder, solicit, encourage, direct, aid, or attempt to aid the others, or any one or combination of the others, in intentionally or knowingly causing the death of Aubrey Hawkins, then you will find the defendant. Joseph C. Garcia, guilty of capital murder:

**OR**

(3) If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, the defendant, Joseph C. Garcia, entered into a conspiracy with one or more of the following

Page 64 of 126

persons: George Rivas, Donald Keith Newbury, Michael Anthony Rodriguez, Randy Halprin, Patrick Murphy, or Larry Harper, hereinafter referred to as "the others," to commit the felony offense of robbery, and that in the attempt to carry out the conspiracy, if any, one or more of the others, knowing Aubrey Hawkins was a peace officer, did intentionally or knowingly cause the death of Aubrey Hawkins, an individual and a peace officer, namely a City of Irving police officer, acting in the lawful discharge of an official duty, by shooting him with a firearm, a deadly weapon, and if you further find that intentionally or knowingly causing the death of Aubrey Hawkins was committed in furtherance of the unlawful purpose to commit robbery and should have been anticipated as a result of carrying out the conspiracy to commit robbery, whether or not the defendant, Joseph C. Garcia, had the intent to cause the death of Aubrey Hawkins, then you will find the defendant, Joseph C. Garcia, guilty of capital murder;

**OR**

(4) If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, the defendant, Joseph C. Garcia, intentionally caused the death of Aubrey Hawkins, an individual, by shooting Aubrey Hawkins with a firearm, a deadly weapon, while in the course of committing or attempting to commit teh offense of robbery of Wesley Ferris, then you find the defendant, Joseph Garcia, guilty of capital murder;

**OR**

(5) If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, George Rivas, Donald Keith Newbury, Michael Anthony Rodriguez, Randy Halprin, Patrick Murphy, or Larry Harper, hereinafter referred to as "the others," or any combination of the others, did intentionally cause the death of Aubrey Hawkins, an individual, by shooting him with a firearm, a deadly weapon, while in the course of committing or attempting to commit the offense of robbery of Wesley Ferris, and if you further find from the evidence beyond a reasonable doubt that the defendant, Joseph C.

Page 65 of 126

Garcia, acting as a party, as that term is here in before defined, did, with the intent to promote or assist the commission of the offense of murder, solicit, encourage, direct, aid, or attempt to aid the others, or any one or combination of the others, in intentionally causing the death of Aubrey Hawkins, in the course of the commission or attempted commission of the offense of robbery of Wesley Ferris, then you will find the defendant, Joseph C. Garcia, guilty of capital murder;

**OR**

(6) If you believe from the evidence beyond a reasonable doubt, that on or about December 24, 2000, in Dallas County, Texas, the defendant, Joseph C. Garcia, entered into a conspiracy with one of more of the following persons: George Rivas, Donald Keith Newbury, Michael Anthony Rodriguez, Randy Halprin, Patrick Murphy, or Larry Harper, hereinafter referred to as "the others," to commit the felony offense of robbery of Wesley Ferris, and that in the attempt to carry out this conspiracy, if any, one or more of the others did intentionally cause the death of Aubrey Hawkins by shooting Aubrey Hawkins with a firearm, a deadly weapon, and if you further find that intentionally causing the death of Aubrey Hawkins was committed in furtherance of the unlawful purpose to commit the robbery of Wesley Ferris, and that intentionally causing the death of Aubrey Hawkins was an offense that should have been anticipated as a result of carrying out the conspiracy to commit robbery, whether or not the defendant had the intent to cause the death of Aubrey Hawkins, then you will find the defendant Joseph C. Garcia, guilty of capital murder.

Reviewing the aggravating factors set out in $ 19.03(a)(1-8)$, leads to a conclusion that the legislature's inclusion of the elements of $ 19.02(b)(1)$ in the capital-murder statute by reference was an expression of the legislature's desire to limit capital murder to intentional and knowing murders that are committed in circumstances that

Page 66 of 126

663

the legislature found particularly egregious.  In *Patrick v. State, 906 S.W.2d 481 (Tex. Crim. App. 1995)*, this Court discussed the elements that the state is required to prove in a prosecution for capital murder:  In proving capital murder, the State must prove that the accused intentionally or knowingly caused the death of an individual and also that the accused engaged in other criminal conduct (i.e., kidnaping, robbery, aggravated sexual assault, escape from a penal institution) or had knowledge of certain circumstances (i.e., that the victim was a peace officer). We have therefore recognized that capital murder is a result of conduct offense which also includes nature of circumstances and/or nature of conduct elements depending upon the underlying conduct which elevates the intentional murder to capital murder. *Patrick, 906 S.W.2d at 491, citing Hughes v. State, 897 S.W.2d 285 (Tex.Crim.App.1994)*. Thus, under our case law, the aggravating "nature of circumstances and/or nature of conduct elements" are elements of the offense of capital murder. See *Rodriguez v. State*, 146 S.W.3d 674 (Tex. Crim. App. 2004).

Clearly, to be found guilty of the offense of capital murder under this provision an accused must have

specifically intended the death of his victim. *Gardner v. State*, 730 S.W.2d 675; (Tex. Crim. App. 1987).

The application paragraphs submitted to the jury authorized the jury to find applicant guilty in one of six manner and means. The first three manner and means of committing capital murder were given pursuant to §19.03(a)(1). The jury was instructed that if they believe beyond a reasonable doubt that applicant either shot Aubrey Hawkins himself; that one of the other co-defendants shot Aubrey Hawkins and applicant acted as a party by promoting or assisting in the commission of the offense of murder; or that applicant entered into a conspiracy with the other co-defendants to commit a robbery and in the attempt to carry out the conspiracy of robbery one or more of the coconspirators knew Hawkins was a peace officer and murdered Hawkins in furtherance of the conspiracy and applicant should have anticipated the murder, whether or not applicant had the intent to cause the death of Hawkins, the jury could find applicant guilty of capital murder.

The other three manner and means of capital murder submitted to the jury were given pursuant to §19.03(a)(20. Those instructions authorized the jury to find applicant

guilty if they believed beyond a reasonable doubt; applicant intentionally caused the death of Hawkins while in the course of committing robbery; or if one of the co-defendants intentionally caused the death of Hawkins while in the course of committing robbery and applicant acted as a party with intend to promote or assist in the intentionally death of Hawkins; or if applicant entered into a conspiracy with one or more of the co-defendants to commit robbery and during that conspiracy one of the co-defendants intentionally caused the death of Hawkins and that the intentional death of Hawkins was an offense that should have been anticipated by applicant whether or not he had the intent to cause the death of Hawkins.

An unanimous jury verdict ensures that the jury agrees on the factual elements underlying an offense - it is more than mere agreement on a violation of a statute. *United States v. Holley*, 942 F.2d 916 (5th Cir. 1991) citing *McKoy v. North Carolina, 494 U.S. 433, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990)* (Blackmun, J., concurring).

While the courts have distinguished the submission of jury charges between multiple offenses from submission of multiple manner and means of a single offense, the

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 76 of 236   PageID 1614

submission in applicant's trial was equivalent to a submission of two offense because there were two distinct ways of committing the capital murder of Hawkins. The first manner and means is pursuant to §19.03(a)(1), the murder of a peace officer which does not require an intentional murder pursuant to §19.02(b)(1). That is, the murder made be committed with the lesser "mens rea" of knowingly causing the death. The second manner and means is pursuant the §19.03(a)(2) which specifically requires a "mens rea" of intentionally causing the death pursuant to §19.02(b)(1). Our courts have recently recognized that capital murder is a result of conduct offense which also includes nature of circumstances and/or nature of conduct elements depending upon the underlying conduct which elevates the intentional murder to capital murder. *Patrick v. State, 906 S.W.2d 481, 491 (Tex. Crim. App. 1995), citing Hughes v. State, 897 S.W.2d 285 (Tex.Crim.App.1994).* Thus, under our case law, the aggravating "nature of circumstances and/or nature of conduct elements" are elements of the offense of capital murder. *Rodriguez v. State, 146 S.W.3d 674;* (Tex. Crim. App. 2004); *Reyes v. State,* 84 S.W.3d 633, 636 (Tex. Crim. App. 2002).

Applicant argues that while only one capital murder was alleged within the indictment, the manner and means equivalently alleged two distinct offenses of capital murder for the reason that the murder of Hawkins as a peace officer did not require the intentional murder while the murder of Hawkins in the furtherance of a robbery did require an intentional murder.

It has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. *Kitchens v. State, 823 S.W.2d 256 (Tex. Crim. App. 1991)* In Schad v. Arizona, 501 U.S. 624, 115 L. Ed. 2d 555, 111 S. Ct. 2491 (1991) where the plurality concluded that a conviction under a jury instruction, which did not require agreement on whether the defendant was guilty of felony murder or premeditated murder, was not unconstitutional. Justice Scalia stated in his concurrence, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict. When a woman's charred body has been found in a burned house, and

Page 71 of 126

there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her (and caused the fire accidently in his hasty escape), while six others believe he left her unconscious and set fire to kill her. While that seems perfectly obvious, it is also true as the plurality points out, that one can conceive of novel "umbrella" crimes (a felony consisting of either robbery or a failure to file a tax return) where permitting a 6-to-6 verdict would seem contrary to due process. *Schad, 501 U.S. at 649-50* (Scalia, J., concurring) Justice Scalia further observed that "we would not permit . . . an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday, despite the 'moral equivalence' of those two acts." *Id. at 651* (Scalia, J., concurring).

The plurality in *Schad* also discussed the "umbrella" crimes stating, "nothing in our history suggests that the Due Process Clause would permit a State to convict  anyone under a charge of 'Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction." Id. at 633.

The Fifth Circuit distinguished *Schad* from the issue raised in *United States v. Holley, 942 F.2d 916 (5th Cir. 1991)*. In *Holley*, the defendant was charged with two counts of perjury, and each count alleged multiple statements. At trial, the defendant objected to the jury instructions because the court failed to instruct the jury that it must be unanimous as to one particular statement in each count to find the defendant guilty. His objection was overruled. See Holley, 942 F.2d at 920-22. The Fifth Circuit first examined the importance of an unanimous jury verdict. An unanimous jury verdict ensures that the jury agrees on the factual elements underlying an offense - it is more than mere agreement on a violation of a statute. *See id. at 925* (citing *McKoy v. North Carolina, 494 U.S. 433, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990)* (Blackmun, J., concurring)). The unanimity requirement is undercut when a jury risks convicting the defendant on different acts, instead of agreeing on the same act for a conviction. *See id.* Looking at the *Schad* opinion, the *Holley* court noted that the two cases entertained different factual scenarios. In *Schad*, one single killing occurred. But in *Holley*, a single count encompassed two or more separate offenses. Because the

Page 73 of 126

075

jury instruction did not require jurors to agree on the falsity of one particular statement, the court concluded that "there was a reasonable possibility that the jury was not unanimous with respect to at least one statement in each count. *Holley, 942 F.2d at 929.*

In *Francis v. State*, 36 S.W.3d 121, (Tex. Crim. App 2000). The Court of Criminal Appeals applied the *Holley* reasoning to a jury charge one a single count of indecency with a child where the evidence showed four distinct acts over four different days. The jury charge alleged two of those acts in the disjunctive and counsel requested the state to elect which act the state sought a conviction on. In Francis, the court found the breast-touching and the genital-touching were two different offenses, and therefore, should not have been charged in the disjunctive. By doing so, it is possible that six members of the jury convicted appellant on the breast-touching offense (while the other six believed he was innocent of the breast-touching) and six members convicted appellant on the genital-touching offense (while the other six believed he was innocent of the genital-touching). Appellant was entitled to an unanimous jury verdict. *See Brown v. State, 508 S.W.2d 91 (Tex. Crim. App. 1974).* Hence,

Page 74 of 126

the trial court erred by charging appellant in the disjunctive.

While in this case, there was only one offense, the disjunctive allegations in the application paragraphs gave rise to an equivalent "umbrella" crime because the crimes were two distinct crimes, one of murder in the course of robbery and one the murder of a police officer. The proof of each crime is completely distinct, one requires an intentional murder in the furtherance of a robbery, while the other requires a murder knowing the victim is a police officer acting in this official duties.

The inclusion of the intent instruction, to which trial counsel objected, added more confusion to the duties of the jurors to arrive at a unanimous verdict. (RR:Vol. 50;3-4) The intent instruction could well be considered as a comment on the weight of the evidence by the court.

Further confusion was injected into the jury charge by the inclusion of a party charge pursuant to §7.02(b) which essentially lessens the burden of proof on the intent to commit an intentional murder in the course of a robbery. Anticipation does not equate to intending to cause the death of an individual. Furthermore, conspiracy is an inchoate

Page 75 of 126

crime and under §15.01, Tex. Penal Code, the commission of criminal conspiracy with intent that a felony be committed is punished one category lower than the most serious felony. Murder is one category lower than capital murder.

The six application paragraphs submitted to the jury in applicant's trial offended the due course of law provisions of the Untied States and Texas Constitution rendering a jury verdict that lack a fair and impartial verdict because the verdict was lacking in unanimity.

### CLAIM NO. 22
### FEDERAL CLAIM

**APPLICANT'S TRIAL COUNSEL'S FAILURE TO OBJECT TO THE RACIAL COMPOSITION OF THE VENIRE WAIVED HIS RIGHT TO HABEAS REVIEW OF THIS ISSUE DENYING APPLICANT THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION.**

### CLAIM NO. 23
### STATE CLAIM

**APPLICANT'S TRIAL COUNSEL'S FAILURE TO OBJECT TO THE RACIAL COMPOSITION OF THE VENIRE WAIVED HIS RIGHT TO HABEAS REVIEW OF THIS ISSUE DENYING APPLICANT THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER ARTICLE I, SECTION 10, OF THE TEXAS CONSTITUTION.**

## ARGUMENTS AND AUTHORITIES

In *Taylor v. Louisiana*, 419 U.S. 522, 537 (1975), the Supreme Court embraced "the view that the Sixth Amendment [applicable to the states through the Fourteenth Amendment] affords the defendant in a criminal trial the opportunity to

Case 3:06-cv-02185-M  Document 107  Filed 07/06/15  Page 83 of 236  PageID 1621

have the jury drawn from venires representative of the community[.]" This does not mean that criminal defendants are "entitled to a jury of any particular composition, . . . but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* at 538 (citation omitted). A few years later the Supreme Court fashioned a three part test for determining a *prima facie* violation of this Sixth Amendment right, *viz*:

> "the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Once the defendant has made a prima facie showing of an

679

infringement of his constitutional right to a jury drawn from a fair cross section of the community,' the burden shifts to the State to 'justify[] this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest.'" TED M. EADS, *Revisiting the Jury System in Texas: A Study of the Jury Pool in Dallas County*, 54 SMU L. REV. 1813, 1821 (2001), *quoting Duren v. Missouri*, supra, at 368.

*(1) Distinctive Class:*

There is no question that persons of Hispanic origin constitute a distinctive group in the community. *See Castandea v. Partida*, 430 U.S. 482, 495 (1977) ("it is no longer open to dispute that Mexican-Americans are a clearly identifiable class[,]" *citing Hernandez v. Texas*, 347 U.S. 475, 479-80 (1954), in which the Supreme Court held that "[t]he petitioner's initial burden in substantiating his charge of group discrimination was to prove that persons of Mexican descent constitute a separate class in Jackson County, distinct from '"whites."' . . . it must be concluded that petitioner succeeded in his proof."). *See also Aldrich v. State*, 928 S.W.2d 558 (Tex. Crim. App. 1996) ("Hispanics are a distinct group in any community. . . .");

*United States v. Weaver*, 267 F.3d 231 (3rd Cir., 2001) (Hispanics are a "distinctive" group for purposes of fair cross-section analysis); *United States v. Lara*, 181 F.3d 183, 192 (1st Cir., 1999) ("Hispanics comprise a distinctive groups that meets the cognizability requirement.").

(2) *Under-Representation of Hispanics in Dallas County Venires:*

The degree of under-representation of Hispanics is not unique to Applicant's case. An analysis of the jury pool in Dallas County, was done by The Dallas Morning News and a Southern Methodist University Law Review based on juror summonses for the week of March 6, 2000. The sum and substance of the study - as it is applicable to the case-at-bar - established that in the March, 6, 2000, time frame, which is approximately three years prior to the start of the jury selection in the case at bar, there was, among other things, a substantial under-representation in the venire of Hispanic Americans and young adults. *Id.* at 1815.

In particular the study found that "Hispanic Americans represent 23% of the population in Dallas County, but only 9% of the venire[,]" and that "[t]hirty-seven percent of Dallas adults are between the ages of 18 and 34, but only 8%

Page 79 of 126

081

Case 3:06-cv-02185-M Document 107 Filed 07/06/15 Page 86 of 236 PageID 1624

of the prospective jurors are in that age group."

The study concluded that "[t]he Dallas County jury system is primed for a constitutional challenge. Although the intent of the officials operating the jury wheel may not be to discriminate, the reality is that at least two distinct groups are being excluded from the weekly venire." *Id*. at 1826. (**Appendix No. 3**). There can be no doubt that during the time period between March of 2000 and July of 2001, if not more, the venires in Dallas County from which juries were actually chosen did not include a fair representation of either Hispanics or young adults, and that the problem was not the result of happenstance, but of an inherent flaw in the jury selection system.

*(3) Systematic Exclusion:*

The effect of the failure of Dallas County officials to enforce jury summonses is "an exemption for every individual who wants to shirk jury duty, an option which is most often exercised by the poor and hence a disproportionate number of Hispanic people [and those between the ages of 18-34 years of age]. . . . In *Duren*, an explicit exemption for a discrete class of individuals resulted in the under representation of that class. In Dallas County, an implicit

Page 80 of 126

082

Case 3:06-cv-02185-M Document 107 Filed 07/06/15 Page 87 of 236 PageID 1625

exemption for all prospective jurors, as a practical matter, results in the under representation of the members of a discrete class on the jury pools. In principle, there is little that distinguishes the system successfully challenged in *Duren* and the system currently in place in Dallas County." MICK MICKELSEN, *A Jury of Your Peers?*, VOICE FOR THE DEFENSE 24, 25 (March 2001).

As the SMU study concluded:

"An examination of the weekly venire will show that juries in Dallas County are not drawn from a cross-section of the community. Something in the system is inherently wrong, and is excluding distinct groups from the venire. The rules in Texas, such as paying jurors only $6 per day, make it so financially onerous that low income people [a disproportionate number of whom are Hispanic] cannot afford to fulfill their civic duty."

Hispanics are demonstrably under-represented in Dallas County juries, as least for the significant period of time between March of 2000, when the SMU study was conducted, and February 2003, when Applicant's jury was selected. As long as Dallas County persists in its failure to rectify this problem by either raising juror compensation, or enforcing summonses even for those prospective jurors who cannot afford to (and would not otherwise) comply, or both, the systematic deficiency will remain.

Case 3:06-cv-02185-M  Document 107  Filed 07/06/15  Page 88 of 236  PageID 1626

At issue for purposes of the Sixth Amendment *Duren* test, is whether the under-representation of Hispanics "is due to systematic exclusion of the group in the jury-selection process." *Duren*, supra, at 364. There *is* systematic exclusion, the direct cause of which is directly attributable to the State of Texas and the County of Dallas. Dallas County officials are under a duty to ensure that everyone is entitled to a jury drawn from a cross-section of society, yet the design of the system inherently causes large numbers of people, disproportionately Hispanics and those between the ages of 18-34 years of age, to stay home rather than report for jury service. And Dallas County has taken no steps to rectify the disparity.

Ordinarily, even claims of federal constitutional dimension are not cognizable in a post-conviction habeas context unless preserved by a timely trial objection. *Ex parte Crispen*, 777 S.W.2d 103 (Tex. Crim. App. 1989). That rule is subject to certain exceptions not applicable in the present case. *Id*. at 105-06 ("novel" federal constitutional claim may be raised for first time in state post-conviction proceeding). But the contemporaneous objection rule itself, applicable on direct appeal and in habeas proceedings alike,

Page 82 of 126

084

is not immune from exception, based upon the purpose that the rule serves. *E.g.*, *Ex parte Chambers*, 688 S.W.2d 483, 486 (Tex. Crim. App. 1984) (Campbell, J., concurring, with five judges joining) (claim based upon a right not recognized at the time of trial could be raised for first time in post-conviction writ application despite apparent procedural default at trial).

Under Rule 33.1 (a) (1) of the Texas Rules of Appellate Procedure, any claim of error in the trial court must be predicated upon "a timely request, objection, or motion" asking for certain relief. After all, a criminal defendant may not "lie behind the log" and allow trial error to occur when he is aware of it (or *should* be aware of it), and knows that the trial court can take corrective measures if he calls it to the court's attention in a timely manner. Some errors of constitutional dimension, however, do not manifest themselves in such a way as to be susceptible of an ordinary trial objection, and application of the rule would be simply too draconian. Even though the law may be in place, the facts to support the claim may be, for reasons beyond the defendant's control, inaccessible to him. In such instances, the writ of habeas corpus may serve as the first

realistic opportunity to raise the claim. *E.g.*, *Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997) (claims which call for development of evidence that is extrinsic to the appellate record, such as ineffectiveness of trial counsel, may be raised for the first time in post-conviction habeas proceedings)

Should the Court find Applicant's trial counsel somehow *should have known* to raise a *Duren* claim of under-representation of Hispanics and young adults, then the Court should also find that his trial counsel provided ineffective assistance of counsel.

Applicant's jury consisted of twelve White or Black jurors and two alternates, both white Caucasians. Hispanic jurors were completed excluded from the jury itself. The fifteen peremptory strikes by defense were all Caucasians or Blacks, as were the six peremptory strikes by the State.

### CLAIM 24:
### FEDERAL CLAIM

**THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BY DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE MEMBER AMA HELFENBEIN BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HER FROM BEING IMPARTIAL.**

Page 84 of 126

(RR:VOL.8;91-165)

### CLAIM 25:
#### STATE CLAIM

THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF ART. §§10, 15, 15a OF THE TEXAS CONSTITUTION BY DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE MEMBER AMA HELFENBEIN BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HER FROM BEING IMPARTIAL. (RR:VOL.8;91-165)

### CLAIM 26:
#### FEDERAL CLAIM

THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BY DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE MEMBER THOMAS TUCKER BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HIM FROM BEING IMPARTIAL. (RR:VOL.9;42-110)

### CLAIM 27:
#### STATE CLAIM

THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF ART. §§10, 15, 15a OF THE TEXAS CONSTITUTION BY DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE MEMBER THOMAS TUCKER BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HIM FROM BEING IMPARTIAL. (RR:VOL.9;42-110)

### CLAIM 28:
#### FEDERAL CLAIM

THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BY DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE MEMBER LARRY CARROLL BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD

087

A BIAS THAT PREVENTED HIM FROM BEING IMPARTIAL. (RR:VOL.12;44-112)

### CLAIM 29:
#### STATE CLAIM
THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF ART. §§10, 15, 15a OF THE TEXAS CONSTITUTION BY DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE MEMBER LARRY CARROLL BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HIM FROM BEING IMPARTIAL. (RR:VOL.12;44-112)

### CLAIM 30:
#### FEDERAL CLAIM
THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BY DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE MEMBER GREGORY BABINEAU BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HIM FROM BEING IMPARTIAL. (RR:VOL.14;49-96)

### CLAIM 31:
#### STATE CLAIM
THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF ART. §§10, 15, 15a OF THE TEXAS CONSTITUTION BY DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE MEMBER GREGORY BABINEAU BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HIM FROM BEING IMPARTIAL. (RR:VOL.14;49-96)

### CLAIM 32:
#### FEDERAL CLAIM
THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BY DENYING APPLICANT'S

Page 86 of 126

038

CHALLENGE FOR CAUSE AS TO VENIRE MEMBER LILLIAN LYLES
BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS
TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HER
FROM BEING IMPARTIAL. (RR:VOL.22-85)

### CLAIM 33:
#### STATE CLAIM
THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE
EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN
VIOLATION OF ART. §§10, 15, 15a OF THE TEXAS CONSTITUTION BY
DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE
MEMBER LILLIAN LYLES BECAUSE THIS PROSPECTIVE JUROR HAD
FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS
THAT PREVENTED HER FROM BEING IMPARTIAL. (RR:VOL.25;22-
85)

### CLAIM 34:
#### FEDERAL CLAIM
THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE
EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN
VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE
UNITED STATES CONSTITUTION BY DENYING APPLICANT'S
CHALLENGE FOR CAUSE AS TO VENIRE MEMBER ALAN LUCIEN
BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS
TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HIM
FROM BEING IMPARTIAL. (RR:VOL.36;108-171)

### CLAIM 35:
#### STATE CLAIM
THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE
EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN
VIOLATION OF ART. §§10, 15, 15a OF THE TEXAS CONSTITUTION BY
DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE
MEMBER ALAN LUCIEN BECAUSE THIS PROSPECTIVE JUROR HAD
FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS
THAT PREVENTED HIM FROM BEING IMPARTIAL. (RR:VOL.36;108-
171)

### CLAIM 36:
#### FEDERAL CLAIM
THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE

069

EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BY DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE MEMBER ROBIN TUCKER BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HER FROM BEING IMPARTIAL. (RR:VOL.37;15-118)

CLAIM 37:
STATE CLAIM

THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF ART. §§10, 15, 15a OF THE TEXAS CONSTITUTION BY DENYING APPLICANT'S CHALLENGE FOR CAUSE AS TO VENIRE MEMBER ROBIN TUCKER BECAUSE THIS PROSPECTIVE JUROR HAD FORMED AN OPINION AS TO APPLICANT'S GUILT AND HAD A BIAS THAT PREVENTED HER FROM BEING IMPARTIAL. (RR:VOL.37;15-118)

FACTUAL SUMMATION

OBJECTIONABLE JURORS

AMA HELFENBEIN

Ms. Helfenbein expressed considerable Bias concerning the range of punishment for the lesser-included offense of murder. She told the defense that she doubted she could assess a five (5) year sentence for murder. Her opinion was that the minimum for murder should be thirty (30) years confinement.(RR;Vol.8;147-9) Neither the State nor the Court questioned Ms. Helfenbein concerning her ability to assess a five year sentence for the offense of murder. Ms. Helfenbein also expressed a bias in regards to her

Page 88 of 126

answers to Special Issue #2[7]. Helfenbein informed the defense that if there's more than one person involved in the offense and at least one person is armed. the non-armed individuals would always anticipate that a human life would be taken and she would answer Special Issue #2 "yes.(RR:Vol.8;151). She also told the defense that "if they go in there with gun in hand, there's always an anticipation that somebody will get shot." If the State were able to prove that one or more of the participants in a conspiracy or a joint enterprise were armed. she would always answer Special Issue #2 "yes." (RR:Vol.8; 152-3). During the prosecution's questioning of Ms. Helfenbein she did not give conflicting responses. The Court gave no clarifying instructions and asked no clarifying questions following the defense's questioning of Ms. Helfenbein. (RR:Vol.8;153-4).

Following the questioning of Ms. Helfenbein, the appellant asserted a clear and specific challenge for cause. She was challenged for her inability to consider the minimum of five (5) years confinement for the offense

---

[7] The "anti- parties"special issue from Texas Code of Criminal Procedure. Article 37.071. Section 2(b)(2) will be referred to throughout this brief as Special Issue #2.

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 96 of 236   PageID 1634

of murder and for her position that if the State proved
that any participant in the offense was armed it had
satisfied its burden to prove that the appellant should
have anticipated that a life would be taken in the
commission of the offense and answer Special Issue #2
"yes." The appellant was entitled under law to a juror who
could consider and assess a five (5) year sentence for
murder in the proper case and a juror who would not
automatically answer Special Issue #2 "yes" if the State
proved that the appellant had entered into an offense. at
least one of the participants was armed, and a human life
had been taken. (RR:Vol.8;154-5). The Court erroneously
denied the appellant's challenge for cause.

### THOMAS TUCKER

Venireperson Thomas Tucker was examined by the State,
the defense and the Court concerning Special Issue #1[8].
Mr. Tucker told the State that if he believed that a
defendant had committed one murder, he was predisposed to
believing that the defendant was willing to do it again.
(RR:Vol.9;130) He told the State that he honestly didn't
know if he court start with a "no" answer to Special Issue

---

[8] The "future dangerousness" issue of Texas Code of Criminal Procedure. Article 37.071. Section 2(c) will be
referred to throughout this brief as Special Issue #1.

Page 90 of 126

u92

#1 and make the State prove beyond a reasonable doubt that the answer was "yes" before he answering it "yes." Even if the defendant was now a paraplegic, if he had committed one murder there was a probability that he would still commit criminal acts that would be a threat to society. (RR:Vol.9;133). He told the defense that if he had found a defendant guilty of capital murder then the answer to Special Issue #1 would be "yes." (RR:Vol.9;147-50). However, Mr. Tucker told the Court that he would presume the answer to Special Issue #1 to be "no" and would require the State to prove beyond a reasonable doubt that the answer was "yes" before he would answer it "yes." (RR:Vol9:169-70).

Following the questioning of Mr. Tucker, trial counsel  asserted a clear and specific challenge for cause. Tucker was challenged for his inability to presume the answer to Special Issue #1 to be "no," his belief that a defendant who had committed a murder would always be a continuing threat to society as contemplated by Special Issue #1, thereby relieving the State of its burden of proof of beyond a reasonable doubt on that issue. The Court erroneously denied the appellant's challenge for

cause.

## LARRY CARROLL

Venireperson Carroll was questioned by the State, the defense, and the Court. He gave conflicting answers on several issues. He indicated during the State's questioning that he could presume the answer to Special Issue #1 to be "no" and require the state to prove beyond a reasonable doubt that the answer was "yes'' before he would answer it "yes." (RR:Vol.12; 64). He agreed that mere presence alone does not make one a party or co-conspirator to an offense. (RR:Vol.12;75). However, Mr. Carroll told the defense that a person guilty of capital murder would always be a continuing threat to society.(RR:Vol.12;91-2). He also stated that if a defendant agreed to participate in a robbery and it went further than he had thought it would, the defendant should be found guilty and Special Issue #1 should be answered "yes." (RR:12;94-5). Concerning Special Issue #1 and #2, the Court instructed Mr. Carroll that the answer was presumed to be "no" until the state proved beyond a reasonable doubt that the answer was "yes." Mr. Carroll stated to the Court that he could follow that law.

Page 92 of 126

(RR:12;104-5).

Following the questioning of Mr. Carroll, the appellant asserted a clear and specific challenge for cause. Mr. Carroll was challenged for his inability to presume the answer to Special Issue # 1 to be "no," his belief that a defendant who had committed a capital murder would always be a continuing threat to society as contemplated by Special Issue #1, thereby relieving the State of its burden of proof of beyond a reasonable on that issue. He was further challenged for cause based upon his belief that mere presence alone made one a party to the offense. The Court erroneously denied the appellant's challenge for cause.

### *GREGORY BARBINEAU*

Venireperson Babineau gave conflicting answers to many of the questions propounded to him by the State, defense, and Court. During questioning by the State he indicated he could consider the entire range of punishment for murder. (RR:Vol.14; 21-2)  He expressed no problem with the idea that mere presence alone did not make one a party to an offense. (RR:Vol.14;26). He indicated there was no problem with the State having to prove everything

in the indictment. (RR:Vol.14;28) He could abide by an instruction that an indictment was no evidence of guilt and could presume the defendant to be not guilty. (RR:Vol.14; 29). He stated that he could assess five (5) years for murder if he thought that was the right thing to do. (RR:Vol.14;32) He indicated that he could presume the answers to Special Issues #1 and #2 to be "no" and would require the State to prove beyond a reasonable doubt that they should be answered "yes" before he did so. (RR:Vol.14;38-44).

During questioning by the defense Mr. Babineau said that he would find a defendant guilty even though the State had not proven beyond a reasonable doubt the manner and means of death alleged in the indictment. (RR:Vol.14;60-2). He further held the position that he could not consider a five (5) sentence for the offense of murder. (RR:Vol.14;64-6). Barbomeai would believe a police officer over a lay witness just because he was a police officer. (RR:Vol.14;67). He said that he would always answer Special Issue #1 "yes" and that he took the defendant's indictment to mean he must have done something illegal. (RR:Vol.14;71-3).

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 101 of 236   PageID 1639

Mr. Babineau stated that the burden of proof would be on the defendant to prove that he wasn't a party or conspirator and had no knowledge. (RR:Vol.14;73-4). He also stated there was no evidence that could cause him to find mitigating circumstances resulting in a "yes" answer to Special Issue #3[9]. (RR:Vol.14;77-8).

The Court questioned Mr. Babineau in an attempt to clarify his positions. He told the Court that he would require the State to prove all elements in the indictment and would acquit if they didn't, although he was not comfortable with it. (RR:Vol.14;79-80). He further stated to the Court that he could considered a five (5) year sentence for murder, would not believe a police officer over other witnesses, and would answer Special Issue #1 "no" if the State did not carry its burden of proof. (RR:Vol.14;80-1). He also told the Court that he would not make the defendant prove any issue in the case and that mere presence alone would be no indication of guilty. He also stated that he could answer Special Issue #3 "yes" or "no" depending on the evidence and could answer it "yes"

---

[9] 'The "mitigation" issue of Texas Code of Criminal Procedure. Article 37.071 will be referred to throughout this brief as Special Issue #3.

knowing that it would result in a life sentence.
(RR:Vol.14;81-2).

Following the questioning of Mr. Babineau, the
appellant asserted a clear and specific challenge for
cause. Mr. Babineau was challenged for his inability to
assess a five (5) year sentence for the offense of murder,
his inability to find a defendant not guilty if the State
did not prove each and every element of the indictment
beyond a reasonable doubt, for the reason that he would
give police officers more credibility under oath than an
average citizen, for the reason that he would always
answer Special Issue #1 "yes" for someone convicted of
capital murder, for his inability to presume the defendant
to be not guilty. for his placing of a burden of proof on
the defendant concerning Special Issue #2, and for the
reason that he could never find sufficient mitigating
circumstances and would always answer Special Issue #3
"no." The Court erroneously denied the appellant's
challenge for cause.

### LILLIAN LYLES

During questioning by the defense, Ms. Lyles
indicated that she would always find that the defendant

had anticipated that a life would be taken and answer Special Issue #2 "yes" if the State showed that the defendant had participated in any way in an offense in which a weapon was used. (RR:Vol.25;66). Concerning Special Issue #3 she told the defense that she could never see herself finding sufficient mitigating circumstances to justify a life sentence for a defendant who had committed capital murder. (RR:Vol.25;66-7). She also told the defense that she could not consider and assess a five (5) year sentence for the offense of murder. (RR:Vol.25;68-9). She gave contrary answers concerning these issues during questioning by the State and the Court. (RR:Vol.25:41-2,51,75-7).

Following the questioning of Ms. Lyles, the appellant asserted a clear and specific challenge for cause. Ms. Lyles was challenged because she would always answer Special Issue #2 "yes" if the defendant had been involved in the offense and a weapon had been use; for her inability to assess a five (5) year sentence for the offense of murder; and for the reason that she could never find sufficient mitigating circumstances and would always answer Special Issue #3 "no." The Court erroneously denied

the appellant's challenge for cause.

### ALAN LUCEIN

During questioning by the defense, venireperson Lucien said that he would always find there was an anticipation that a human life would be taken and answer "yes" to Special Issue #2 if it was shown that the defendant agreed to participate in the offense and weapons were involved. (RR:Vol.36;160). He indicated that he could not consider and assess a five (5) year sentence for murder and held the opinion that the minimum sentence for murder should be forty (40) to fifty (50) years. (RR:Vol.36;165-6). He gave contrary answers when questioned by the State and the Court on these issues. (RR:Vol.36;13,138. 143,167-8).

Following the questioning of Mr. Lucien. the appellant asserted a clear and specific challenge for cause. Mr. Lucien was challenged for his inability to assess a five (5) year sentence for the offense of murder and because he would always answer Special Issue #2 "yes" if the defendant had been involved in the offense and a weapon had been used. The Court erroneously denied the appellant s challenge for cause. The Court erroneously

Page 98 of 126

100

denied the appellant's challenge for cause.

## ROBIN TUCKER

During questioning by the defense concerning Special Issue #3, venireperson R. Tucker said that she would require the defendant to bring evidence showing that he was worthy of life instead of death. (RR:Vol.37;86). Concerning Special Issue #1 she said that someone who had committed a capital murder would probably be a violent person in the future. (RR:Vol.37; 89-90). She also said that she could not assess a five (5) year sentence for the offense of murder. (RR:Vol.37; 98-100). She gave contrary responses when questioned on these issues by the State and the Court. (RR:Vol.37;71-2,75-6,81, 100-2).

Following the questioning of Ms. Tucker the appellant asserted a clear and specific challenge for cause. Ms. Tucker was challenged for her placing of a burden of proof on the defendant concerning Special Issue #3, her inability to assess a five (5) year sentence for the offense of murder, and because her position that a defendant who had committed a capital murder would be violent in the future would cause her to always answer Special Issue #1 "yes." (RR:Vol.37; 103-5). The Court

Page 99 of 126

Case 3:06-cv-02185-M  Document 107  Filed 07/06/15  Page 106 of 236  PageID 1644

erroneously denied the appellant's challenge for cause.

## PRESERVATION OF ERROR

Applicant exhausted his 15 peremptory challenges and was twice denied any additional peremptory challenges by the Court. (RR:Vol.42;83-5). Challenges for cause being denied (RR:Vol.37;103-5,180-1;RR:Vol.42;78-83) and having no more peremptory challenges, two objectionable jurors. R. Tucker (Juror 11) and S. Hutchison (Juror 12) sat on the jury. Error was properly preserved for review.

Appellant's rights to an impartial jury under the Fifth. Sixth, and Fourteenth Amendments to the U. S. Constitution were violated, as well as, his rights to a juror free of any bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely under Texas Code of Criminal Procedure, Article 35.16 (c)(2).

## FEDERAL CONSTITUTIONAL CLAIMS

The erroneous exclusion of even one potential juror mandates reversal of a death sentence. See *Gray v. Mississippi, 481 U.S. 648, 657-68, 95 L. Ed. 2d 622, 107 S. Ct. 2045 (1987)* (erroneous exclusion of one potential juror based on her views on the death penalty was

Page 100 of 126

1ᴜ2

reversible constitutional error); see also *O'Bryan v. Estelle, 714 F.2d 365, 371 (5th Cir. 1983)* ("The courts have required a death sentence to be set aside even if only one potential juror has been excluded for opposing the death penalty on grounds broader than those set forth in Witherspoon.") (citing Davis v. Georgia, 429 U.S. 122, 97 S. Ct. 399, 50 L. Ed. 2d 339 (1976).

The Supreme Court has expressly warned against oversimplifying the inquiry as to whether jurors can perform their duty notwithstanding their views on the death penalty. "Determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Wainwright v. Witt, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 105 S. Ct. 844 (1985).The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. *Moore v. Gibson, 195 F.3d 1152, 1168 (10th Cir. 1999)* ("In making such a determination, the trial judge must assess the credibility of the prospective juror, a task an appellate court cannot

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 108 of 236   PageID 1646

easily do based upon a record."); See *Darden v. Wainwright,*
*767 F.2d 752, 761 (11th Cir. 1985)* (Clark, J.,dissenting)
("A conscientious trial judge must be bent upon
determining if a prospective juror has such a mind set
that he or she would refuse to vote for the death penalty
regardless of the evidence in the case. That is fact-
finding."). Moreover, because the jurors are vested with
greater discretion in capital cases, the examination of
prospective jurors must be more careful than in non-
capital cases. See, Turner v. Murray, 476 U.S. 28, 35-36,
90 L. Ed. 2d 27, 106 S. Ct. 1683 (1986).

In *Spivey v. Head*, 207 F.3d 1263, 1275 (11th Cir.
2000), that court held "The assessments of jurors' states
of mind are based upon determinations of demeanor and
credibility that are peculiarly within a trial judge's
province and are therefore entitled to deference on habeas
review."). See *Mann v. Scott*, 41 F.3d 968, 982 (5th Cir.
1994) ("Such credibility determinations are more
appropriately resolved under the watchful eye of the trial
judge than by an appellate court staring at a cold record,
which is precisely why they are accorded a presumption of
correctness under § 2254(d)."); *Maynard v. Dixon, 943*

Page 102 of 126

*F.2d 407, 415 (4th Cir. 1991)* ("The Court has held that the question of juror bias is to be resolved by the trial judge's assessment of demeanor and credibility.").

The Sixth Amendment guarantees an impartial jury. A jury composed "by excluding veniremen for cause simply because they expressed general objections to the death penalty or voiced conscientious or religious scruples against its infliction" violates the Sixth Amendment guarantee of an impartial jury. See *Witherspoon v. Illinois, 391 U.S. 510, 518-23, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968); Wainwright v. Witt, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 105 S. Ct. 844 (1985)* A juror may be properly excluded for cause based on his death penalty views only if those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt, 469 U.S. at 424.* The burden of proving bias rests on the party seeking to excuse the venire member for cause. See *id. at 423.*

"If a prospective juror's emotional opposition is so severe that it compels them to ignore the law or disables them from answering the statutory questions without

**Page 103 of 126**

conscious distortion or bias, exclusion for cause is proper." *Mann, 41 F.3d at 981* (citing *Adams v. Texas, 448 U.S. 38, 50, 65 L. Ed. 2d 581, 100 S. Ct. 2521 (1980)*). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." Dutton v. Brown, 788 F.2d 669, 675 (10th Cir. 1986).

A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness. *Jones v. Butler*, 864 F.2d 348, 362 (5th Cir. 1988). A reading the record leads to a conclusion that each objectionable venireperson held a strong *personal* preference for the death penalty as a punishment for those convicted of capital murder. While each changed their answers to satisfy the questions by the court or the prosecutor, their corrected answers were not the result of their feelings but were the result of compliance with the court's or prosecutor's authority to be a good citizen and abide with the system. For example, the Texas Court of Criminal Appeals has repeatedly recognized that a venireperson who cannot distinguish between intentional and deliberate conduct is impaired in

his ability to consider the first special issue, and is challengeable for cause. *Green v. Johnson, 160 F.3d 1029, 1037 (5th Cir. 1998)* (quoting *Soria v. State, 933 S.W.2d 46, 60-61 (Tex. Crim. App. 1996)*) Each of the challenged jurors continued to harbor a bias against a portion of the law that applicant had a right to have unbiased views.

## STATE CONSTITUTIONAL CLAIM

A venireperson may be excluded for cause consistent with the Sixth Amendment to the United States Constitution when his views on capital punishment are such that they would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Clark v. State, 929 S.W.2d 5, 6-7 (Tex. Crim. App. 1996), cert. denied, 520 U.S. 1116, 137 L. Ed. 2d 328, 117 S. Ct. 1246 (1997); Vuong v. State, 830 S.W.2d 929, 942 (Tex. Crim. App.), cert. denied, 506 U.S. 997, 121 L. Ed. 2d 533, 113 S. Ct. 595 (1992); Moody v. State, 827 S.W.2d 875, 888 (Tex. Crim. App.), cert. denied, 506 U.S. 839, 121 L. Ed. 2d 75, 113 S. Ct. 119 (1992).* Prospective jurors may not be excused merely because their beliefs about the death penalty might influence the decision-making process. However, if their personal views

prevent them from being fair and impartial regardless of their conformity with the requisite answers they believe will satisfy the needs of the prosecutor, then the venireperson does not satisfy the constitutional requirements for a juror to be fair and impartial.

Before a veniremember can be properly challenged for cause, the law must be explained to her and she must be asked whether she can follow that law regardless of her personal views. *See* Jones v. State*, 982 S.W.2d 386 at 390.* Where a venireman continues to harbor views on capital punishment thre were such that they would have prevented or substantially impaired the performance of their duties as a juror in accordance with her instructions and her oath, then the court must grant a challenge for cause. *Colburn v. State*, 966 S.W.2d 511, 518 (Tex. Crim. App. 1998)

## CLAIM 38:

**TEXAS CODE OF CRIMINAL PROCEDURE ART. 44.251(A), WHEN INTERPRETED IN CONJUNCTION WITH TEXAS CODE OF CRIMINAL PROCEDURE ART. 37.071 § 2(E), IS FACIALLY UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

## STATEMENT OF FACTS

The jury that sentenced Applicant to death was confused on the role of determining the mitigating issues at punishment. Applicant contends that the jury did not have the proper guidance in weighing mitigating versus aggravating circumstances.

## ARGUMENT AND AUTHORITIES

In Texas the special issues of the punishment phase do not specify the types of mitigating (or aggravating factors) relevant to a capital sentencing jury's deliberations during the punishment phase. The jury is simply asked whether there are "sufficient mitigating circumstance or circumstances" to warrant a life sentence rather than a death sentence. TEX.CRIM.PROC.CODE ANN. Art.37.071, §2 (e). The _Penry_ special issue requires Texas juries to perform the same functions that other states' post-_Furman_ capital sentencing juries perform: 1) the threshold findings of particular aggravating and mitigating circumstances; and 2) the balancing process whereby jurors determine whether the mitigating factors outweigh aggravating factors. _Gregg v. Georgia_, 428 U.S. 153, 98 S.Ct. 2909, 49 L.Ed.2d 859(1976) (discussing Georgia's post-_Furman_ statute).

Page 107 of 126

Applicant contends that Texas' unstructured sentencing scheme is unconstitutional because it does not permit meaningful appellate review, which is not only required by Texas statute but is also a prerequisite to a constitutionally implemented capital sentencing scheme. Because the <u>Penry</u> statutory special issue in open-ended -- not enumerating a list of mitigating and aggravating factors and not requiring jurors to make specific findings in this regard -- the Court of Criminal Appeals has no way of knowing which aggravating and mitigating factors jurors considered. The Court, therefore, has no way of knowing whether the sentencer considered all of the constitutionally relevant mitigating evidence offered at trial, making meaningful appellate impossible.

The U.S. Supreme Court has recognized that an appellate court is in a virtually impossible position to review a jury's consideration of mitigating and aggravating evidence without knowing which factors were considered. <u>Sawyer v. Whitley</u>, 505 U.S. 303, 112 S.Ct.2514, 120 L.Ed.2d 269 (1992) (noting how difficult a task a reviewing court faces in assessing how jurors reacted to mitigating and aggravating evidence,

particularly considering the breath of those factors that a jury must be allowed to consider without knowing how jurors actually considered the totality of the evidence). The point in <u>Sawyer</u> and in Applicant's case is that without actually knowing whether and how a particular jury considered evidence during a capital sentencing phase, it is difficult to assess the jury's decision-making.

### CLAIM 39:

**THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION REQUIRES THIS COURT TO ENGAGE IN PROPORTIONATELY REVIEW IN DEATH PENALTY CASES.**

#### ARGUMENT AND AUTHORITIES

Applicant urges that the Court of Criminal Appeals, based on statutory language of the <u>Penry</u>[10] special issue, at least upon request, should engage in some type of meaningful proportionality review of death penalty verdicts to consider the "death worthiness" of a particular defendant in view of the totality of mitigating and aggravating evidence in a given case. Under the former capital sentencing scheme, the Court of Criminal Appeals has refused to do so. <u>Hughes v. State</u>, 897 S.W. 2d. 285,

_____

[10]<u>Penry v. Lynaugh</u>, 492 U.S. 302, S. Ct. 2934, 106 L. Ed. 2d 256 (1989)

294 (Tex. Crim. App. 1994). The review should consider whether Applicant's death sentence is "excessive" or "disproportionate" as compared to "sentences imposed in similar capital cases" in Texas, at least post-<u>Furman</u>. Applicant recognizes that the United States Supreme Court has held that the Eighth Amendment does not require a "comparative proportionality review." <u>Pulley v. Harris</u>, 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984). In <u>Hughes</u> <u>supra</u>, the Court of Criminal Appeals has likewise rejected such an argument.

In spite of the above United States Supreme Court and Texas decisions, Applicant urges that his Fourteenth Amendment Due Process right requires such an appellate review. It is ironic that due process requires that courts engage in a proportionality review in civil cases, e.g. <u>Honda Motor Co., Ltd v. Oberg</u>, 512 U.S. 415, 114 S. Ct. 2331, 129 L. Ed. 2d 336 (1994), while not in death penalty cases. "It is inconceivable that a punitive verdict of death is not entitled to the same due process as applies to dollar-amount verdicts." <u>State v. Pinnell</u>, 877 P. 2d 635, 310 Ore. 438 (Oregon 1994); <u>State v. Cunningham</u>, 880 P. 2d 431, 320, Ore. 47, 74-82 (Oregon 1994) (Fadeley, J.

Page 110 of 126

112

dissenting). Applicant contends that due process requires proportionality review in death penalty cases to determine whether a particular death sentence is "excessive" or "disproportionate," and urges that his sentence of death is excessive and disproportionate.

**CLAIM 40:**

**THE TEXAS CAPITAL SENTENCING STATUTE'S DEFINITION OF "MITIGATING EVIDENCE" IS UNCONSTITUTIONAL BECAUSE IT LIMITS THE EIGHTH AMENDMENT CONCEPT OF "MITIGATION" TO FACTORS THAT RENDER A CAPITAL DEFENDANT LESS MORALLY "BLAMEWORTHY" FOR COMMISSION OF THE CAPITAL MURDER.**

## STATEMENT OF FACTS

At the punishment phase the trial court instructed the jury, pursuant to TEX.CRIM.PROC.CODE ANN. Article 37.071, §2(f)(4) (Vernon Supp. 1996): "mitigating evidence is evidence that a juror might regard as reducing the defendant's blameworthiness,"

**ARGUMENT AND AUTHORITIES**

As presently written, the Texas Capital sentencing statute defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX.CRIM.PROC.CODE ANN. Article 37.071, §2 (f) (4) and 37.0711, §§ 3 (f) (3) (Vernon Supp. 1997). Applicant contends that the statutory definition is

Page 111 of 126

Seanned Aug 29, 2011

unconstitutionally narrow under the Eighth and Fourteenth Amendments to the United States Constitution. The United States Supreme Court has held that constitutionally relevant mitigating evidence is not simply that type of mitigating evidence that relates tc a capital defendant's moral culpability or blameworthiness for the crime, but also includes any mitigating evidence relevant to a defendant's character, history, or circumstances of the crime that militates in favor of a life sentence. <u>Skipper v. South Carolina</u>, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986). "The fundamental respect for humanity underlying the Eight Amendment, [mandates the].......consideration of the character and record of the individual offender and the circumstances of the particular offense as a constituticnally indispensable part of the process of inflicting the penalty of death. <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978); <u>Roberts (Harry) v. Louisiana</u>, 431 U.S. 633 (1977); <u>Roberts (Stanislaus) v. Louisiana</u>, 428 U.S. 325 (1976). Evidence about a defendant's background and character is relevant because of the belief, held by this society, that defendants who commit criminal acts that are attributable to a

disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. California v. Brown, 479 U.S. at 545 (J. O'Connor concurring, 1987). This is accomplished only through a process which requires the sentencer to consider in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of mankind. Woodson v. North Carolina, 428 U.S. 280, 304 (1976). The Lockett principle "is the product of considerable history reflecting the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual. California v. Brown, 479 U.S. at 562 (1987). The underlying principle in Lockett and Eddings is that punishment should be directly related to the personal culpability of the criminal defendant. Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989). Thus, jury instructions must be sufficient to provide the jury "with a vehicle for expressing its reasoned moral response to that evidence in rendering its decision." Penry v. Lynaugh. Id. at 38. Furthermore, an individual juror must be free to consider

Page 113 of 126

115

a mitigating factor, regardless of whether other members of the jury agree as to its existence. <u>Mills v. Maryland</u>, 486 U.S. 367 (1988); <u>McKoy v. North Carolina</u>, 494 U.S. 433 (1990) (each juror must be permitted to consider and give effect to mitigating evidence). In other words, it is not enough "simply to allow the defendant to present mitigating evidence to the sentencer, rather there must not be any impediment through evidentiary rules, jury instructions or prosecutorial argument to the sentencer's full consideration and ability to give effect to mitigating evidence." <u>Penry v. Lynaugh</u>, 492 U.S. 302 at 327, S. Ct. 2934, 106 L. Ed. 2d 259 (1989).

Numerous types of constitutionally relevant mitigating evidence thus have nothing to do with a capital defendant's moral culpability or blameworthiness- - such as a history of positive character traits, kindness shown toward children, or artistic talent. Although the statutory <u>Penry</u> special issue speaks of "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," Article 37.071, § 2 (e), the statute's limited definition of "mitigating evidence," violates the Eighth and

Page 114 of 126

116

Fourteenth Amendments to the United States Constitution.

### CLAIM 41

**THE STATUTORY "<u>PENRY</u>" SPECIAL ISSUE IS FACIALLY UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT PERMITS THE VERY TYPE OF OPEN-ENDED DISCRETION CONDEMNED BY THE UNITED STATES SUPREME COURT IN <u>FURMAN V. GEORGIA</u>.**

### ARGUMENT AND AUTHORITIES

In <u>Furman</u>, the United States Supreme court struck down the death penalty as it was then being administered. Their chief complaint was that of arbitrariness. In particular, the Court condemned the open-ended, unstructured discretion that was given to capital sentencing juries. <u>Furman v. Georgia</u>, 408 U. S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972); <u>See also Gregg v. Georgia</u>, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); <u>Spaziano v. Florida</u>, 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984).

Pursuant to <u>Penry v. Lynaugh</u>, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), the Texas Legislature enacted a new capital sentencing scheme that sought to cure the constitutional defect in the former capital sentencing scheme identified by the United States Supreme

court in _Penry_. The present statutory "_Penry_" special issue contained in TEX. CRIM. PROC. CODE ANN. Articles 37.071 and 37.0711 (Vernon 1994), states:

> "Whether, taking into consideration all of the evidence, including the circumstances of the offense, including the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."

Open-ended, unstructured capital sentencing instructions- - such as Texas' _Penry_ special issue- - have been condemned by the United States Supreme Court because they violate the Eighth and Fourteenth Amendments to the United States Constitution. _Penry v. Lynaugh_, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (Scalia, J., dissenting, joined by Rehnquist, C.J., White, J., and Kennedy, J.) ("In holding that the jury had to be free to deem Penry's mental retardation and sad childhood for whatever purpose it wished, the Court has come full circle, not only permitting but requiring what _Furman_ once

condemned."); <u>Graham v. Collins</u>, 506 U.S. 461, 113 S. Ct. 892, 122 L. Ed. 2d 260 (1993) (Thomas, J., concurring) ("<u>Penry</u>" reintroduces the very risks that we had sought to eliminate through the simple directive that states in all events provide rational standards for capital sentencing.") In <u>dicta</u>, Justice Thomas has explicitly suggested that the type of sentencing scheme in operation at Applicant's trial violates <u>Furman</u>; <u>See also Staley v. State</u>, 887 S.W. 2d 885 (Tex. Crim. App. 1994) (Baird, J., concurring, joined by Maloney and Overstreet, JJ.) ("Although I do not agree with Justice Thomas that <u>Penry</u> should be overruled, I can sympathize with Justice Thomas.")

The Eighth Amendment requires submission of a charge that adequately structures the jury's sentencing discretion regarding mitigating and aggravating factors. <u>Gregg v. Georgia</u>, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (discussing Georgia's post-<u>Furman</u> Capital sentencing statute). Applicant contends that his Eighth and Fourteenth Amendment rights were violated.

### CLAIM 42

**THE STATUTORY "<u>PENRY</u>" SPECIAL ISSUE IN THE TEXAS CODE OF CRIMINAL PROCEDURE ART. 37.071 IS UNCONSTITUTIONAL BECAUSE**

**IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE. IT THERFORE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

## ARGUMENT AND AUTHORITIES

The Eighth Amendment to the United States Constitution requires the State to prove the existence of aggravating factors during the capital punishment phase. Walton v. Arizona, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (State's "method of allocating the burdens of proof" during capital sentencing phase cannot "lessen the State's burden... to prove the existence of aggravating factors"). Walton applies to the Texas Penry special issue because the issue is a conduit for aggravating as well as mitigating factors. By asking jurors to determine whether there are sufficient mitigating circumstances, the statutory special issue in effect tells jurors to consider any possible aggravating factor that may outweigh the mitigating factors present in the case. Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute. Johnson v. Texas, 509 U.S. 350, 113 S. Ct. 3658, 125 L.Ed. 2d 2658 (1993). Because the statute is silent on whether the State

or the defense has the burden of proof on aggravating factors, and, moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances is on Applicant, the statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

### CLAIM 43
**THE TEXAS DEATH PENALTY IS CRUEL AND UNUSUAL PUNISHMENT UNDER ART. 1, §13 TEXAS CONSTITUTION.**

### CLAIM 44

**THE DEATH PENALTY AS ADMINISTERED IN TEXAS IS CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

### ARGUMENT AND AUTHORITIES

Justice Harry Blackmun, in his dissent in <u>Callenis v. Collins,</u> 114 S.Ct. 1127 (1994), and who dissented in <u>Furman</u> and who voted in the majority in the 1976 cases affirming various states' post-<u>Furman</u> death penalty statutes, see <u>Jurek v. Texas,</u> 428 U.S. 262, 90 S.Ct. 2950, 49 L. Ed. 2d 929 (1976), did not condemn capital punishment in the abstract as cruel and unusual punishment that offends "evolving standards of decency." <u>Gregg v. Georgia,</u> 428 U.S. 153 (1976) (Brennan and Marshall JJ., dissenting). Justice Blackmun contended that capital sentencing procedures employed in the post-Furman era are per se unconstitutional because they are the

Page 119 of 126

product of paradoxical constitutional commands: on the one hand, jurors must be free to consider any and all types of constitutionally relevant mitigating evidence, while, on the other hand, there must be "structured discretion in sentencing, as required by Furman." The Texas "Penry" special issue is unconstitutional because it permits the very type of open-ended discretion condemned by the United States Supreme Court in Furman. Applicant contends that his Eighth and Fourteenth Amendment rights to the United States Constitution were violated.

### CLAIM 45:

**ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE IS UNCONSTITUTIONAL BECAUSE ITS 12-10 RULE MAY ARBITRARILY FORCE THE JURY TO CONTINUE DELIBERATING AFTER A JUROR VOTED TO ANSWER A SPECIAL ISSUE IN FAVOR OF APPLICANT. THE SENTENCING STATUTE'S FAILURE TO INFORM THE JURY THAT A SINGLE HOLDOUT JUROR ON ANY SPECIAL ISSUE WOULD RESULT IN AN AUTOMATIC LIFE SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

### ARGUMENT AND AUTHORITIES

Article 37.071 does not allow the trial judge to inform the jurors that a failure to agree on the special issues will force the trial judge to sentence a defendant to life in prison. Article 37.071 allows an instruction that merely states that a life sentence will be imposed if ten or more jurors vote for special issue number two. Counsel is prohibited from informing the jurors that a deadlocked jury will result in a life sentence. Draughton v. State, 831 S.W. 2d 331 (Tex. Crim. App. 1991). It is arbitrary

and capricious, however, to prevent jurors from sentencing a defendant to life in prison if each juror believes that a different mitigating circumstance made the death penalty inappropriate. <u>Mckoy v. North Carolina</u>, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 369 (1990); Mills v. Maryland 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988).

Because jurors are instructed that they are not required to agree on the evidence that supports their answers to the special issues, the 12-10 rule is unconstitutional since it may still arbitrarily force the jury to continue deliberating after one juror voted to answer special issue two in favor of Applicant. Applicant's jury was not instructed about Texas' "one holdout juror" rule.

Article 37.071, §2 (a), violates the Eighth and Fourteenth Amendments to the United States Constitution. <u>Andres v. United States</u> 33 U.S. 740, 752, 68 S. Ct. 880, 92 L. Ed. 2d 1055 (1948). <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 105 S. Ct. 2633, 80 L. Ed. 2d 231 (1985) (Eighth Amendment violation if capital sentencing jury not informed of relevant state sentencing law); <u>Dugger v. Adams</u>, 489 U.S. 401, 109 S. Ct. 1211, 103 L. Ed. 435 (1989) ("To establish a Caldwell violation the defendant must necessarily show that the instructions to the jury improperly described local law.").

## PRAYER

**WHEREFORE,** Applicant prays this Court: (1) issue a writ of habeas corpus to have Applicant brought before this Court, returnable to the Court of Criminal Appeals, so that Applicant may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death; (2) conduct a hearing at which argument may be offered concerning the allegations of this application; (3) permit Applicant, due to his indigence, to proceed without prepayment of costs and fees; (4) continue the appointment of counsel because of Applicant's indigence, to represent Applicant during state habeas corpus proceedings and grant Applicant continued sufficient funds to secure expert and lay testimony necessary to prove the facts as alleged in this Application; (5) grant Applicant the authority to obtain subpoenas in forma pauperis for witnesses and discovery of documents and other information necessary to prove the facts as alleged in this Application; (6) grant Applicant an evidentiary hearing at which Applicant be allowed to present evidence on these claims and on all affirmative defenses raised by the State in their response; (7) enter

124

findings of fact and conclusions of law returnable to the Court of Criminal Appeals in Austin, Texas, recommending that Applicant's conviction and sentence of death be vacated and his case remanded for a new trial; and (8) grant such other relief as may be necessary and appropriate.

Respectfully submitted,

LAW OFFICES OF
RICHARD E. LANGLOIS
217 ARDEN GROVE
San Antonio, Texas  78215
TEL:(210) 225-0341
FAX:(210) 225-0345
richardl@stic.net

BY:_____
RICHARD E. LANGLOIS
State Bar No. 11922500
ATTORNEY FOR APPLICANT

125

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 130 of 236   PageID 1668

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing Writ of Habeas Corpus, was mailed to Bill Hill, District Attorney Dallas County, Appellate Section, Frank Crowley Courts Building, 133 North Industrial, 11th Floor, Dallas Texas and to the Office of The Attorney General, P. O. Box 12548, Austin, Texas 78711 and to Applicant Joseph C. Garcia, TDCJ#999441, Polunsky Unit, Livingston, Texas 77351 on this the 10th day of December, 2004.

_____
RICHARD E. LANGLOIS

## VERIFICATION BY PETITIONER

STATE OF TEXAS
COUNTY OF BEXAR:

BEFORE ME, the undersigned authority, personally appeared, **Richard E. Langlois**, Attorney at Law for Applicant Joseph C. Garcia, who, being by me first duly sworn did depose and state upon his oath as follows:

I am the attorney for Joseph C. Garcia, Applicant in this Writ of Habeas Corpus filed pursuant to Article 11.071, Texas Code of Criminal Procedure, and I have prepared and reviewed all of the Claims for Review contained within the above Writ of Habeas Corpus and the information contained therein are true and correct to the best of my knowledge.

_____
RICHARD E. LANGLOIS

SUBSCRIBED AND SWORN TO BEFORE ME, on this <u>10h</u> day of <u>December</u>, 2004, which witness my hand and official seal of office.

ELENA O. MORENO
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
MARCH 2, 2008

_____
NOTARY PUBLIC In and For
The State of Texas

Page 125 of 125

127

# TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

BAIL STATUS:

No. W01–00325–T(A)

FORM 511 REV

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| | | | DEC 14 2004 |
| EX PARTE: JOSEPH C. GARCIA | LAW OFFICES OF : RICHARD E. LANGLOIS 217 ARDEN GROVE SAN ANTONIO, TX 78215 SBN 11922500 TEL 210–225–0341 FAX 210–225–0345 | CAP MUR PO | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| DEC 14 2004 | POST CONVICTION WRIT OF HABEAS CORPUS FILED; APPLICANT NOTIFIED; COPY OF WRIT TO D.A. |

Scanned Aug 29, 2011

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 133 of 236   PageID 1671

CAUSE NO. W01-00325-T(A)

FILED

JUN 10 2005

JIM HAMLIN
DIST. CLERK, DALLAS CO., TEXAS
_____ DEPUTY

# IN THE 283RD JUDICIAL DISTRICT COURT
## OF DALLAS COUNTY, TEXAS
### Trial Court Cause No. F01-00325-T

## EX PARTE JOSEPH C. GARCIA

### STATE'S ORIGINAL ANSWER
### TO APPLICATION FOR WRIT OF HABEAS CORPUS
### IN DEATH PENALTY CASE

*Counsel of Record:*

BILL HILL
*CRIMINAL DISTRICT ATTORNEY*
DALLAS COUNTY, TEXAS

LISA SMITH
*ASSISTANT DISTRICT ATTORNEY*

JOHANNA H. KUBALAK
*ASSISTANT DISTRICT ATTORNEY*
STATE BAR NO. 24014297
FRANK CROWLEY COURTS BLDG.
133 N. INDUSTRIAL BLVD., LB-19
DALLAS, TEXAS 75207-4399
(214) 653-3629
(214) 653-3643 *fax*

*ATTORNEYS FOR THE STATE OF TEXAS*

# TABLE OF CONTENTS

PROCEDURAL HISTORY .................................................................................. 7

FACTUAL SUMMARY .................................................................................... 7

RESPONSES ................................................................................................... 8

RESPONSE TO GROUNDS 1 – 6:  TRIAL COUNSEL'S ALLEGED FAILURE TO
REQUEST A JURY INSTRUCTION ON THE LESSER-INCLUDED OFFENSE OF
FELONY MURDER .......................................................................................... 8

*Applicant's Claims Should Be Denied as Procedurally Barred* ............................ 9

*Alternatively, Applicant's Claims Should Be Denied on Their Merits* ................. 10

*The record does not support the factual allegations underlying applicant's
claims.* ..................................................................................................... 10

*This Court did not err in refusing to instruct the jury on felony murder.* ......... 11

RESPONSE TO GROUNDS 7 – 8:  BURDEN OF PROVING THE ABSENCE OF
SUFFICIENT MITIGATING CIRCUMSTANCES ................................................. 15

*FEDERAL CONSTITUTIONAL CLAIMS* ............................................................ 15

*Applicant's Claims Should Be Denied as Procedurally Barred* ........................... 15

*Alternatively, Applicant's Claims Should Be Denied on Their Merits* ................. 16

*STATE CONSTITUTIONAL CLAIMS* ................................................................. 18

RESPONSE TO GROUNDS 9 – 10:  ALLEGING "SPECIAL ISSUE ELEMENTS" IN
CAPITAL MURDER INDICTMENTS ................................................................. 19

*FEDERAL CONSTITUTIONAL CLAIMS* ............................................................ 19

*Applicant's Claims Should Be Denied as Procedurally Barred* ........................... 20

*Alternatively, Applicant's Claims Should Be Denied on Their Merits* ................. 20

*STATE CONSTITUTIONAL CLAIMS* ................................................................. 20

RESPONSE TO GROUNDS 11 – 14:  THE STATUTORY MITIGATION SPECIAL
ISSUE AS AN ADEQUATE VEHICLE FOR GIVING EFFECT TO MITIGATING
EVIDENCE .............................................................................................. 21

FEDERAL CONSTITUTIONAL CLAIMS ...................................................... 21

   Applicant's Claims Should Be Denied as Procedurally Barred............................ 22

   Alternatively, Applicant's Claims Should Be Denied on Their Merits................. 23

STATE CONSTITUTIONAL CLAIMS .............................................................. 29

RESPONSE TO GROUNDS 15 – 18:  UNANIMITY OF VERDICT...................... 30

   Applicant's Claims Should Be Denied as Procedurally Barred............................ 30

   Alternatively, Applicant's Claims Should Be Denied on Their Merits................. 31

     The jury charge did not allow for a non-unanimous verdict............................ 31

     Error, if any, in the jury charge did cause applicant egregious harm.............. 36

     Counsel was not ineffective for failing to make a meritless objection. ............. 37

RESPONSE TO GROUNDS 19 – 20:  CONSPIRACY INSTRUCTION................... 39

   Applicant's Claims Should Be Denied as Procedurally Barred............................ 39

   Alternatively, Applicant's Claims Should Be Denied on Their Merits................. 39

RESPONSE TO GROUNDS 21 – 22:  INFERRED-INTENT INSTRUCTION .......... 41

   Applicant's Claims Should Be Denied as Procedurally Barred............................ 41

   Alternatively, Applicant's Claims Should Be Denied on Their Merits................. 41

RESPONSE TO GROUNDS 23 – 24:  "FAIR CROSS SECTION" CHALLENGE ................. 42

   Applicant's Claims Should Be Denied as Procedurally Barred............................ 42

   Alternatively, Applicant's Claims Should Be Denied on Their Merits................. 42

     While Hispanics are a distinctive group in the community, eighteen- to thirty-
     four-year-olds are not...................................................................................... 43

2

*Applicant has not shown that Hispanics and persons 18–34 years of age are underrepresented on venires.* ........................................................................... 44

*Applicant has not shown that Hispanics and persons 18-34 years of age are systematically excluded from the jury-selection process.* ................................... 46

*Counsel was not ineffective for failing to make a meritless objection.* ............. 49

RESPONSE TO GROUNDS 25 – 38: DENIAL OF CHALLENGES FOR CAUSE ................. 50

*Applicant's Claims Are Not Cognizable* ................................................................. 50

*Applicant's Claims Should Be Denied as Procedurally Barred* ........................... 52

*Alternatively, Applicant's Claims Should Be Denied on Their Merits* ................. 52

*This Court did not err in denying applicant's challenge for cause to prospective juror Ama Helfenbein.* .............................................................................................. 53

    Helfenbein did not have a bias against the law concerning the anti-parties special issue. ........................................................................................................ 53

    Helfenbein did not have a bias against the law concerning the minimum punishment for murder. ...................................................................................... 59

*This Court did not err in denying applicant's challenge for cause to prospective juror Thomas Tucker.* ........................................................................................... 61

*This Court did not err in denying applicant's challenge for cause to prospective juror Larry Carroll.* ............................................................................................. 64

    Carroll did not have a bias against the law concerning the future-dangerousness special issue. ........................................................................... 64

    Carroll did not have a bias against the law of parties ................................... 66

*This Court did not err in denying applicant's challenge for cause to prospective juror Gregory Babineau.* ..................................................................................... 68

    Babineau did not have a bias against the law concerning the State's burden of proof. .............................................................................................................. 68

    Babineau did not have a bias against the law concerning the presumption of innocence. ........................................................................................................... 72

3

132

Babineau did not have a bias against the law concerning the minimum punishment for murder. ........................................................................... 73

Babineau did not have a bias against the law concerning the future-dangerousness special issue. ...................................................................... 74

Babineau did not have a bias against the law concerning the mitigation special issue. ............................................................................................. 77

Babineau did not have a bias against applicant. ........................................... 78

*This Court did not err in denying applicant's challenge for cause to prospective juror Lillian Lyles.* ............................................................................ 80

Lyles did not have a bias against the law concerning the anti-parties special issue. ...................................................................................................... 80

Lyles did not have a bias against the law concerning the mitigation special issue. ...................................................................................................... 83

Lyles did not have a bias against the law concerning the minimum punishment for murder. ........................................................................... 84

*This Court did not err in denying applicant's challenge for cause to prospective juror Alan Lucien.* ............................................................................. 85

Lucien did not have a bias against the law concerning the anti-parties special issue. ...................................................................................................... 85

Lucien did not have a bias against the law concerning the minimum punishment for murder. ........................................................................... 88

*This Court did not err in denying applicant's challenge for cause to prospective juror Robin Tucker.* .............................................................................. 89

Tucker did not have a bias against the law concerning the future-dangerousness special issue. ...................................................................... 90

Tucker did not have a bias against the law concerning the mitigation special issue. ...................................................................................................... 90

4

Tucker did not have a bias against the law concerning the minimum punishment for murder. .................................................................................. 91

RESPONSE TO GROUND 39:  APPELLATE REVIEW OF THE JURY'S ANSWER TO THE MITIGATION SPECIAL ISSUE ............................................................. 92

Applicant's Claim Should Be Denied as Procedurally Barred ............................ 92

Alternatively, Applicant's Claim Should Be Denied on Its Merits ...................... 92

RESPONSE TO GROUND 40:  PROPORTIONALITY REVIEW........................................... 93

Applicant's Claim Should Be Denied as Procedurally Barred ............................ 93

Alternatively, Applicant's Claim Should Be Denied on Its Merits ...................... 93

RESPONSE TO GROUND 41:  DEFINING "MITIGATING EVIDENCE" ............................ 94

Applicant's Claim Should Be Denied as Procedurally Barred ............................ 94

Alternatively, Applicant's Claim Should Be Denied on Its Merits ...................... 94

RESPONSE TO GROUND 42:  JURY'S SENTENCING DISCRETION ................................ 95

Applicant's Claim Should Be Denied as Procedurally Barred ............................ 95

Alternatively, Applicant's Claim Should Be Denied on Its Merits ...................... 95

RESPONSE TO GROUND 43:    BURDEN OF PROVING AGGRAVATING CIRCUMSTANCES ....................................................................................... 95

Applicant's Claim Should Be Denied as Procedurally Barred ............................ 96

Alternatively, Applicant's Claim Should Be Denied on Its Merits ...................... 96

RESPONSE TO GROUNDS 44 – 45:  INDIVIDUALIZED SENTENCING............................ 96

FEDERAL CONSTITUTIONAL CLAIM................................................................................. 96

Applicant's Claim Should Be Denied as Procedurally Barred ............................ 97

Alternatively, Applicant's Claim Should Be Denied on Its Merits ...................... 97

STATE CONSTITUTIONAL CLAIM..................................................................................... 97

Applicant's Claim Should Be Denied as Procedurally Barred ............................ 98

134

*Alternatively, Applicant's Claim Should Be Denied on Its Merits* ........................ 98

RESPONSE TO GROUND 46:  THE "12/10" RULE AND THE PROHIBITION
AGAINST INFORMING THE JURY OF THE EFFECT OF A DEADLOCK ............................ 98

*Applicant's Claim Should Be Denied as Procedurally Barred* ............................ 99

*Alternatively, Applicant's Claim Should Be Denied on Its Merits* ........................ 99

REPLY TO APPLICANT'S REQUEST FOR A HEARING ........................................ 101

CERTIFICATE OF SERVICE ........................................................................ 102

135

TO THE HONORABLE COURT:

Respondent, the State of Texas, by and through the Criminal District Attorney of Dallas County files this, its original answer to applicant Joseph C. Garcia's application for writ of habeas corpus, pursuant to the requirements of article 11.071 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 11.071 (Vernon 2005).

## PROCEDURAL HISTORY

Applicant is confined pursuant to the judgment and sentence of this Court in cause number F01-00325-T. On February 6, 2003, a jury convicted applicant of the December 24, 2000 capital murder of Irving Police Officer Aubrey Hawkins. (CR 2: 295; RR 50: 56). On February 13, 2003, in accordance with the jury's answers to the special issues submitted under article 37.071 of the Texas Code of Criminal Procedure, this Court assessed applicant's punishment at death. (CR 2: 301-03, 308). TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b), (e)(1) (Vernon Supp. 2004-05). The Court of Criminal Appeals affirmed applicant's conviction on direct appeal. *See Garcia v. State*, No. AP-74,692 (Tex. Crim. App. Feb. 16, 2005) (not designated for publication).

## FACTUAL SUMMARY

On December 13, 2000, applicant and six other inmates escaped from a Texas prison. (RR 48: 23-25, 27). Eleven days later, in Irving, Texas, armed with firearms they had stolen during the escape, they entered an Oshman's sporting-goods store at closing time, held the employees at gunpoint, and stole a host of additional firearms and a large

7

amount of cash. (RR 45: 42-43, 52, 61-81, 99-100, 196, 221-23; RR 48: 23-24; RR 49: 187).

Officer Hawkins, responding to a report of suspicious activity, drove up behind the store just as the escapees were preparing to leave. (RR 45: 84-85, 147, 150, 175-76, 229; RR 46: 14, 16, 23; RR 47: 53, 60). Before Officer Hawkins could even get out of his patrol car, the escapees opened fire, striking him eleven times. (RR 45: 84-85, 147, 150, 175-76, 229; RR 46: 14, 16, 23; RR 47: 53, 60, 119-20, 131, 139-40). They then pulled his lifeless body out of his car and took his service revolver. (RR 47: 26-27, 98-99). Before driving away, the escapees ran over the officer, dragging his body underneath their car for several feet. (RR 47: 26-27, 29-30, 40).

After murdering Officer Hawkins, the escapees fled to Colorado and, posing as traveling missionaries, took up residence in an RV park, where they remained until law enforcement authorities finally caught up to them in late January 2001. (RR 48: 28-29, 33-34, 36, 49-52, 57-58, 60-61, 63; RR 49: 32-34, 44-45, 59, 74-75). One of the escapees committed suicide before he could be taken into custody. (RR 49: 39, 40-41). The remaining six, including applicant, were successfully apprehended. (RR 49: 36-37, 39, 41-42, 54-55, 61, 65-66, 68, 75-76, 190).

## RESPONSES

### RESPONSE TO GROUNDS 1 – 6: TRIAL COUNSEL'S ALLEGED FAILURE TO REQUEST A JURY INSTRUCTION ON THE LESSER-INCLUDED OFFENSE OF FELONY MURDER

Applicant's first six grounds for relief are premised on his contention that trial counsel failed to request a jury charge on felony murder as a lesser-included offense of

8

137

capital murder. Applicant maintains that this alleged failure on the part of counsel deprived him of his rights to due process, trial by an impartial jury, and effective assistance of counsel under the federal and state constitutions and the Texas Code of Criminal Procedure.

### Applicant's Claims Should Be Denied as Procedurally Barred

Habeas corpus is not a substitute for an appeal. *Ex parte Ramos*, 977 S.W.2d 616, 617 (Tex. Crim. App. 1998). It may not, therefore, be used to litigate matters that could have been raised on direct appeal. *Ex parte Boyd*, 58 S.W.3d 134, 136 (Tex. Crim. App. 2001). Even constitutional claims are procedurally barred from consideration on habeas review if they could have been raised on appeal. *Ex parte Townsend*, 137 S.W.3d 79, 81 (Tex. Crim. App. 2004).

Applicant's complaints concerning counsel's alleged failure to request a jury instruction on felony murder could have been, but were not, raised on direct appeal. Applicant has not submitted any new evidence derived from the habeas process to substantiate his allegations of deficient performance. Instead, he relies exclusively on information contained in the trial record, which was available to him on direct appeal. An applicant is barred from challenging the effectiveness of trial counsel for the first time on habeas review when, as here, he has failed to utilize the habeas process to develop additional evidence to support his claim. *See Ex parte Nailor*, 149 S.W.3d 125, 131-32 (Tex. Crim. App. 2004); *cf. Ex parte White*, 160 S.W.3d 46, 49 n.1, 51-55 (Tex. Crim. App. 2004) (addressing defendant's ineffective-assistance claim, although it was not

9

raised on direct appeal, where new evidence, developed through the habeas process, was submitted to support the claim).

Because applicant has based his ineffective-assistance claims on matters contained solely within the trial record, these claims, like the other claims asserted in his first six grounds for relief, could have been raised on direct appeal. They are, therefore, procedurally barred from consideration on habeas review. Grounds for relief one through six should be summarily denied.

### *Alternatively, Applicant's Claims Should Be Denied on Their Merits*

*The record does not support the factual allegations underlying applicant's claims.*

As previously stated, applicant's first six grounds for relief are based on his complaint that trial counsel failed to request a jury instruction on felony murder as a lesser-included offense of capital murder. Indeed, applicant contends that counsel failed to "ask for a charge on any lesser included offenses other than aggravated robbery." (Writ Application, p. 8). This is simply incorrect. The record of the charge conference shows that counsel actually did request several lesser-included-offense instructions, *including an instruction on felony murder*:

> I'll start off, your Honor, by requesting many lesser includeds. *The defense would [request] that the lesser included offense of felony murder or murder in the first degree be included,* the offense of attempted capital murder be included, the offense of attempted murder be included, the offense of aggravated assault with a deadly weapon be included, the offense of aggravated assault on a police officer be included, as the evidence shows each of those issues were raised during the course of the trial.

(RR 50: 3). [Emphasis added.] This Court denied counsel's requested instructions. (RR 50: 3).

10

A habeas applicant must prove his factual allegations by a preponderance of the evidence. *Ex parte Morrow*, 952 S.W.2d 530, 534 (Tex. Crim. App. 1997). Here, the record plainly refutes applicant's allegation that trial counsel failed to request a jury instruction on felony murder. Accordingly, applicant's first six grounds for relief — based, as they are, on an obvious misstatement of the record — should be denied. *See, e.g., Salinas v. State*, No. AP-74,524, 2005 Tex. Crim. App. LEXIS 741, at *12-13 (May 18, 2005) (rejecting defendant's ineffective-assistance claim where the record showed that counsel did everything defendant said he should have).

> *This Court did not err in refusing to instruct the jury on felony murder.*

To the extent applicant means to complain that this Court erred in denying counsel's requested instruction on felony murder, this complaint is also without merit.[1] The evidence in this case does not support felony murder as a valid, rational alternative to capital murder. *See Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000).

An offense is a lesser-included offense if:

> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

---

[1] Of course, such a claim could have been raised on direct appeal and would, therefore, be procedurally barred from consideration on habeas review. *See Ramos*, 977 S.W.2d at 617. For the sake of argument, however, the State will briefly address the merits.

11

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (Vernon 1981). A lesser-included-offense instruction should be given if there is some evidence that would permit the jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *See Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). In other words, there must be some evidence from which a rational jury could acquit the defendant of the greater offense while still convicting him of the lesser-included offense. *Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004).

The indictment in this case charged applicant with the capital murder of Officer Hawkins under two different theories: (1) the intentional or knowing murder of a peace officer who was acting in the lawful discharge of an official duty; or (2) an intentional murder committed in the course of committing or attempting to commit a robbery. (CR 1: 2). *See* TEX. PENAL CODE ANN. § 19.03(a)(1)-(2) (Vernon Supp. 2004-05). It is well-settled that felony murder is a lesser-included offense of capital murder committed in the course of a robbery. *See Threadgill*, 146 S.W.3d at 665; *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999); *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993). The two offenses differ only in the culpable mental state of the offender: capital murder requires the existence of an intentional cause of death, while in felony murder, the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying felony. *Rousseau*, 855 S.W.2d at 673 (citing *Rodriquez v. State*, 548 S.W.2d 26, 29 (Tex. Crim. App. 1977)).

12

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 146 of 236   PageID 1684

That felony murder is a lesser-included offense under one of the theories of capital murder charged in this case does not, however, end the inquiry. The jury returned a general verdict of guilty after being instructed on both theories of capital murder alleged in the indictment. (CR 2: 295). When an indictment alleges alternative theories of capital murder, "the defendant is entitled to a requested lesser-included offense charge if a rational jury could convict him only on the lesser-included offense after considering each of the alternative theories of commission." *Feldman v. State*, 71 S.W.3d 738, 752 (Tex. Crim. App. 2002) (op. on reh'g) (citing *Arevalo v. State*, 970 S.W.2d 547, 548-49 (Tex. Crim. App. 1998)). In other words, there must be some evidence negating the defendant's guilt under each theory of capital murder alleged in the indictment.

Thus, applicant's contention that he was entitled to a jury instruction on felony murder if there was evidence that neither he nor his codefendants intended to kill Officer Hawkins is not entirely accurate. Under the indictment in this case, the jury could still convict applicant of capital murder if it found that he, either as a principal or a party, *knowingly* killed the officer. (CR 2: 289-90). Accordingly, applicant was not entitled to a jury instruction on felony murder unless there was some evidence that he and the other escapees did not act at least knowingly in causing Officer Hawkins's death.

Applicant does not point to a single piece of evidence in the record showing that he and his cohorts were not at least aware that by unleashing a hail of gunfire on Officer Hawkins as he sat, relatively defenseless, in his patrol car, they were reasonably certain to cause his death. *See* TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003) (defining "knowingly"). Indeed, the evidence shows nothing less than an intentional murder: the

13

142

escapees ambushed the officer, shooting him eleven times with several different guns. (RR 47: 98-99, 119-20, 131, 139-40). No rational juror could conclude that at the moment they started shooting, it was not the escapees' conscious objective and desire to kill Officer Hawkins. *See* TEX. PENAL CODE ANN. § 6.03(a) (defining "intentionally"); *Salinas*, 2005 Tex. Crim. App. LEXIS 741, at *15-16 (holding that the evidence did not raise any issue of felony murder when it showed that the defendant dragged the victim from the car and shot him in the head at close range with a shotgun); *Threadgill*, 146 S.W.3d at 665-66 (holding that there was no evidence that would permit a jury to rationally find that the defendant did not intend to cause the victim's death when he leaned into the car in which the victim was sitting and fired two shots); *Fuentes*, 991 S.W.2d at 273 (holding that there was no evidence that the defendant lacked intent to kill when he ran up to the victim, shot him twice in the chest, and fled as the victim fell into a ditch and died). Thus, this Court properly denied applicant's request for a jury instruction on felony murder. *See Feldman*, 71 S.W.3d at 752-73 (holding that the defendant was not entitled to an instruction on the lesser-included offense of murder because the evidence did not negate both alternative theories of capital murder alleged in the indictment). To the extent applicant's first six grounds for relief complain of this Court's ruling on his requested instruction, they should be denied.

14

### RESPONSE TO GROUNDS 7 – 8: BURDEN OF PROVING THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES

#### *FEDERAL CONSTITUTIONAL CLAIMS*

In his seventh ground for relief, applicant argues that because it does not assign a burden of proof to the mitigation special issue, Texas's death-penalty scheme denies a capital defendant due process of law and trial by an impartial jury, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and inflicts cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution. He maintains that pursuant to the decisions of the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); and *Blakely v. Washington*, 124 S. Ct. 2531 (2004), the absence of sufficient mitigating circumstances is a fact legally essential to imposition of the death penalty that must be proved by the State beyond a reasonable doubt.

#### *Applicant's Claims Should Be Denied as Procedurally Barred*

Claims that were raised and rejected on direct appeal may not be relitigated through habeas corpus. *Ramos*, 977 S.W.2d at 617; *Ex parte Drake*, 883 S.W.2d 213, 215-16 (Tex. Crim. App. 1994). In his ninth point of error on direct appeal, applicant, relying on *Apprendi* and its progeny, argued that article 37.071 of the Texas Code of Criminal Procedure violated the Due Process Clause of the United States Constitution because it did not require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt. *See Garcia*, slip op. at 9-10. The Court of Criminal Appeals rejected applicant's argument. *Id.* Applicant is procedurally barred

15

from raising his due process claim again on habeas review. Accordingly, his seventh ground for relief, to the extent it relies on federal due process protections, is procedurally barred.

Additionally, applicant's remaining federal constitutional claims under this ground could have been asserted on direct appeal, but were not. Habeas corpus will not lie as a substitute for appeal. *Ramos*, 977 S.W.2d at 617. Applicant's seventh ground for relief is therefore procedurally barred in its entirety and should be summarily denied.

### *Alternatively, Applicant's Claims Should Be Denied on Their Merits*

In *Apprendi* and *Ring*, the Supreme Court held that any fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Ring*, 536 U.S. at 600; *Apprendi*, 530 U.S. at 490. The Court of Criminal Appeals has repeatedly rejected the argument that the holdings in *Apprendi* and *Ring* apply to Texas's mitigation special issue, reasoning that a jury's finding on the mitigation issue cannot increase the penalty for capital murder beyond the prescribed statutory maximum of death. *See, e.g., Rayford v. State*, 125 S.W.3d 521, 533-34 (Tex. Crim. App. 2003), *cert. denied*, 125 S. Ct. 39 (2004); *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003), *cert. denied*, 125 S. Ct. 297 (2004). On the contrary, the mitigation issue is designed to allow for the imposition of life imprisonment — a sentence *less* than the statutory maximum. *See Rayford*, 125 S.W.3d at 534.

While acknowledging these prior holdings, applicant maintains that the Supreme Court's more recent decision in *Blakely* calls them into question. (Writ Application, p.

16

145

24). In *Blakely*, the Supreme Court held that the statutory maximum sentence for *Apprendi* purposes is "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." 124 S. Ct. at 2537. Applicant argues that absent a negative finding on the mitigation special issue, the maximum sentence that may be imposed for capital murder is life imprisonment. (Writ Application, p. 26).

The Court of Criminal Appeals has already rejected the suggestion that *Blakely* undercuts its prior decisions regarding the applicability of *Apprendi* to Texas's mitigation special issue. *See Perry v. State*, 158 S.W.3d 438, 446-48 (Tex. Crim. App. 2004); *Woods v. State*, 152 S.W.3d 105, 120-21 (Tex. Crim. App. 2004), *cert. denied*, 2005 U.S. LEXIS 4223 (2005). In *Perry*, the Court stressed the distinction, recognized in *Apprendi* and *Ring*, between "facts in aggravation of punishment and facts in mitigation," noting that the requirement of proof beyond a reasonable doubt applies only to the former. *Perry*, 158 S.W.3d at 448 (citing *Ring*, 536 U.S. at 609; *Apprendi*, 530 U.S. at 490 n.16). The Court held that "what a jury is asked to decide in the mitigation special issue is not a '[fact] legally essential to the punishment.' . . . By the time the jury reaches the mitigation special issue, the prosecution has proven all aggravating 'facts legally essential to the punishment.'" *Perry*, 158 S.W.3d at 448 (alteration in original) (quoting *Blakely*, 124 S. Ct. at 2531).

Article 37.071 requires the State to prove beyond a reasonable doubt — and the jury to find — every fact legally necessary for imposition of the death penalty. This is all that *Apprendi* and its progeny require. Once a death sentence is authorized by the jury's

17

affirmative findings on the future-dangerousness and, if applicable, the anti-parties special issues, the mitigation special issue exists to give the jury an opportunity to reduce the defendant's sentence to life imprisonment. Applicant's seventh ground for relief is without merit and should be denied.

### STATE CONSTITUTIONAL CLAIMS

In his eighth ground for relief, applicant contends that the absence of a burden of proof for the mitigation special issue denies a capital defendant due course of law and trial by an impartial jury, in violation of Article I, sections 10 and 19 of the Texas Constitution, and inflicts cruel and unusual punishment, in violation of Article I, section 13 of the Texas Constitution. Although he presents them as a separate ground for relief, applicant argues his state constitutional claims together with the federal constitutional claims asserted in the previous ground. He does not contend that the two constitutions offer different levels of protection.

The proponent of a state constitutional claim must provide the reviewing court with some basis for the application of a constitutional test beyond that required for the federal constitutional analysis. *See Ex parte Anderson*, 902 S.W.2d 695, 701 (Tex. App.—Austin 1995, pet. ref'd) (citing *Muniz v. State*, 851 S.W.2d 238, 251-52 (Tex. Crim. App. 1993)). Accordingly, the Court of Criminal Appeals has repeatedly instructed that state and federal constitutional claims should be argued separately, and the proponent should explain why the state constitution affords him more protection in a particular area of the law than the federal constitution. *See, e.g., Lawton v. State*, 913

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 152 of 236   PageID 1690

S.W.2d 542, 558 (Tex. Crim. App. 1995); *Muniz*, 851 S.W.2d at 251; *Heitman v. State*, 815 S.W.2d 681, 690 n.22 (Tex. Crim. App. 1991).

Applicant has failed to properly present and argue his claims under the Texas Constitution. Accordingly, these claims have been procedurally defaulted, and applicant's eighth ground for relief should be denied. *See Emery v. State*, 881 S.W.2d 702, 707 n.8 (Tex. Crim. App. 1994) (holding that the defendant had failed to preserve his state constitutional claim for review because he presented no argument or authority as to why the Texas Constitution afforded him greater protection than the United States Constitution).

Moreover, applicant could have raised his state constitutional claims on direct appeal, but chose instead to rely solely on the federal constitution. Habeas corpus may not be used to litigate claims that could have been brought on direct appeal. *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004). For this additional reason, applicant's eighth ground for relief is procedurally barred.

### RESPONSE TO GROUNDS 9 – 10: ALLEGING "SPECIAL ISSUE ELEMENTS" IN CAPITAL MURDER INDICTMENTS

#### *FEDERAL CONSTITUTIONAL CLAIMS*

Relying again on *Apprendi*, applicant contends in his ninth ground for relief that he was denied his right to have the statutory special issues passed upon by a grand jury and alleged in the indictment, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

148

### *Applicant's Claims Should Be Denied as Procedurally Barred*

Applicant could have raised his federal constitutional claims on direct appeal. By failing to do so, he has forfeited these claims. *See Townsend*, 137 S.W.3d at 81. Applicant's ninth ground for relief is procedurally barred.

### *Alternatively, Applicant's Claims Should Be Denied on Their Merits*

The Court of Criminal Appeals has rejected the argument that *Apprendi* requires the statutory special issues to be pleaded in the indictment. *See Threadgill*, 146 S.W.3d at 672; *Rayford*, 125 S.W.3d at 533. "A defendant indicted for capital murder is effectively put on notice that the special issues under Article 37.071 will be raised, so such procedural provisions need not be alleged in the indictment." *Moore v. State*, 969 S.W.2d 4, 13 (Tex. Crim. App. 1998). Applicant's ninth ground for relief is therefore without merit and should be denied.

### STATE CONSTITUTIONAL CLAIMS

In his tenth ground for relief, applicant asserts that the Texas Constitution — specifically, Article I, sections 3, 10, 13, and 19 — entitles him to an indictment charging the "special issue elements" of article 37.071. Once again, however, although he designates them as a separate ground for relief, applicant fails to provide any meaningful analysis distinguishing his state constitutional claims from the federal constitutional claims raised in his ninth ground. And he fails to offer any reason for construing the Texas Constitution as conferring greater protection in this area of the law than the federal constitution. Consequently, applicant's state constitutional claims have been

procedurally defaulted and should not be addressed. *See Black v. State*, 26 S.W.3d 895, 896 n.4 (Tex. Crim. App. 2000).

In addition, as with his federal claims, applicant could have brought his state constitutional claims on direct appeal. Applicant may not use a writ of habeas corpus to litigate matters that he could have raised on direct appeal. *See Ex parte Goodman*, 816 S.W.2d 383, 385 (Tex. Crim. App. 1991). Applicant's tenth ground for relief is procedurally barred.

### RESPONSE TO GROUNDS 11 – 14: THE STATUTORY MITIGATION SPECIAL ISSUE AS AN ADEQUATE VEHICLE FOR GIVING EFFECT TO MITIGATING EVIDENCE

#### *FEDERAL CONSTITUTIONAL CLAIMS*

In his eleventh and thirteenth grounds for relief, applicant contends that the mitigation special issue under article 37.071, section 2(e) denies capital defendants due process of law and trial by an impartial jury and subjects them to cruel and unusual punishment, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, "because it is a sentencing factor that fails to give full effect and consideration to mitigating circumstances and fails to provide the jury with an adequate vehicle for expressing a 'reasoned response' to all of applicant's evidence relevant to his culpability."[2] He specifically argues that the statutory mitigation

---

[2] Applicant's eleventh ground for relief states:

> THE "NULLIFICATION INSTRUCTION" MANDATED IN ART. 37.071(e) TEX. CODE CRIM. PROC. DENIED APPLICANT DUE COURSE OF LAW, AN IMPARTIAL JURY AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT BY VIOLATING THE PROVISIONS OF THE FIFTH, SIXTH, EIGHT[H] AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT IS A SENTENCING FACTOR WHICH FAILS TO GIVE FULL

21

instruction given to the jury at the punishment phase of his trial contains the same defects as the "nullification instructions" found to be unconstitutional in *Smith v. Texas*, 125 S. Ct. 400 (2004), and *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*").

### *Applicant's Claims Should Be Denied as Procedurally Barred*

Although he could have, applicant did not raise these federal constitutional claims on direct appeal. Habeas corpus will not lie as a substitute for appeal. *Ramos*, 977 S.W.2d at 616. Applicant's eleventh and thirteenth grounds for relief are procedurally barred and should be denied without consideration of their merits.

---

EFFECT AND CONSIDERATION TO MITIGATING CIRCUMSTANCES AND FAILS TO PROVIDE THE JURY WITH AN ADEQUATE VEHICLE FOR EXPRESSING A "REASONED RESPONSE" TO ALL OF APPLICANT'S EVIDENCE RELEVANT TO HIS CULPABILITY.

(Writ Application, pp. 29-30). His thirteenth ground for relief states:

*APPLICANT WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO A GRAND JURY DETERMINATION AND AN INDICTMENT THAT CHARGES THE "SPECIAL ISSUE ELEMENTS" OF THE DEATH PENALTY, AND FACTS RELIED UPON TO SUPPORT THE CHARGE THAT APPLICANT IS "GUILTY" OF THE SPECIAL ISSUES IN VIOLATION OF THE FIFTH, SIXTH, EIGHT[H], AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE ART. 37.071(e) IS A SENTENCING FACTOR WHICH FAILS TO GIVE FULL EFFECT AND CONSIDERATION TO MITIGATING CIRCUMSTANCES AND FAILS TO PROVIDE THE JURY WITH AN ADEQUATE VEHICLE FOR EXPRESSING A "REASONED RESPONSE" TO ALL OF APPLICANT'S EVIDENCE RELEVANT TO HIS CULPABILITY.*

(Writ Application, p. 30). [Emphasis added.] The portion of ground thirteen italicized above is a repeat of the claim raised in ground nine, discussed on pages 17-18 of the State's response. (Writ Application, pp. 12-13). The latter portion is a repeat of the claim raised in applicant's eleventh ground. (Writ Application, pp. 29-30).

Applicant does not explain — and the State has been unable to determine — what the failure of the indictment to allege the special issues has to do with whether the mitigation special issue is an adequate vehicle for giving effect to mitigating evidence. Indeed, applicant does not even mention the indictment issue in his discussion of grounds eleven and thirteen. Accordingly, the State refers this Court to the State's response to applicant's ninth ground for a discussion of applicant's claim concerning the indictment. And the State will otherwise treat grounds eleven and thirteen as raising identical claims.

22

### *Alternatively, Applicant's Claims Should Be Denied on Their Merits*

In *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) ("*Penry I*"), the Supreme Court held that the version of article 37.071 then in effect was unconstitutional as applied because it failed to provide the jury with a means to give effect to mitigating evidence.[3] In 1991, in order to comply with *Penry I*, the Texas Legislature revised article 37.071 to require that juries be instructed to "take[] into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant" in determining whether "there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." Act of May 17, 1991, 72nd Leg., R.S., ch. 838, § 1, art. 37.071(e) (amended 1999) (current version at TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(1) (Vernon Supp. 2004-05)). This current version of article 37.071 applies to capital offenses committed on or after September 1, 1991. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(i) (Vernon Supp. 2004-05).

---

[3] At the time, article 37.071(b) required that the following three special issues be submitted to the jury in a capital case:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Act of May 28, 1973, 63rd Leg., R.S., ch. 426, art. 3, § 1, 1973 Tex. Gen. Laws 1122, 1125 (amended 1991) (current version at TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b) (Vernon Supp. 2004-05)). This version of article 37.071 is now codified under article 37.0711 and applies to the sentencing procedure for a capital offense committed before September 1, 1991. TEX. CODE CRIM. PROC. ANN. art. 37.0711, § 3(b) (Vernon Supp. 2004-05).

Applicant's jury was given the mitigation instruction contained in the current version of article 37.071.[4] This instruction has been upheld by the Court of Criminal Appeals as complying with the requirement of *Penry I* that capital juries be given a vehicle for expressing a "reasoned moral response" to mitigating evidence. *Penry I*, 492 U.S. at 328; *see Massey v. State*, 933 S.W.2d 141, 156 (Tex. Crim. App. 1996); *McFarland v. State*, 928 S.W.2d 482, 521 (Tex. Crim. App. 1996).

Still, applicant claims that the current statutory mitigation instruction is indistinguishable from the constitutionally-defective "nullification" instructions given to capital juries in the immediate wake of *Penry I*. The 1989 *Penry I* decision created a dilemma for Texas trial courts in capital cases: these courts "could not craft entirely new jury interrogatories, as the precise questions had been written by the state legislature. Nor could they suspend trials in anticipation of legislative remediation, as the legislature would not meet again until 1991 and its reaction was unknown." *Robertson v. Cockrell*, 325 F.3d 243, 248 (5th Cir. 2003); *see also Ex parte Staley*, 160 S.W.3d 56, 58 (Tex. Crim. App. 2005). Thus, the courts attempted to conduct trials that complied with *Penry I* by drafting extra-statutory jury instructions or supplemental special issues. *Staley*, 160 S.W.3d at 58.

---

[4] Specifically, the jury was instructed that if it had answered the first two special issues in the affirmative, it should proceed to answer the following special issue:

> Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

24

One of these judicially-crafted, supplemental instructions was given to the sentencing jury at Penry's retrial. That instruction told the jury that it could consider mitigating circumstances in deliberating on the three statutory special issues and that if it determined that a life sentence, rather than a death sentence, was an appropriate response to Penry's "personal culpability," it should answer one of the special issues "no."[5] *Penry II*, 532 U.S. at 790.

Once again, the Supreme Court reversed Penry's death sentence, holding that the supplemental instruction provided "an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." *Id.* at 800. The Court reasoned that, depending on how it was interpreted, the instruction either (1) "shackled and confined" Penry's mitigating evidence within the scope of the three statutory special issues, none of which was broad enough to provide a vehicle for the jury to give effect to this evidence; or (2) operated as a "nullification instruction," making the jury charge as a whole "internally inconsistent" and placing "law-abiding jurors in an impossible situation." *Id.* at 798-99. The Court explained that it would have been both "logically and ethically impossible" for the jury to answer the special issues in the manner prescribed on the

---

(CR 2: 303).

[5] This methodology was intended to ensure that both *Penry I* and Texas statutory law were followed. *See Staley*, 160 S.W.3d at 60 n.7. Under then-existing Texas law, whether the defendant was sentenced to life imprisonment or death depended solely on the jury's answers to the three, statutorily-required special issues: if the jury answered all three special issues in the affirmative, then the trial judge was required to sentence the defendant to death. *See* Act of May 28, 1973, 63rd Leg., R.S., ch. 426, art. 3, § 1, art. 37.071(e), 1973 Tex. Gen. Laws 1122, 1126 (amended 1981).

25

154

verdict form while at the same time obeying the command of the supplemental instruction. *Id.* at 799-800.

Thus, the Court held, the supplemental instruction "inserted 'an element of capriciousness' into the sentencing decision, 'making the jurors' power to avoid the death penalty dependent on their willingness' to elevate the supplemental instruction over the verdict form instructions." *Id.* at 800 (citations omitted). The Court observed, however, that a "clearly drafted catchall instruction on mitigating evidence . . . might have complied with *Penry I*" and pointed to Texas's newly-enacted statutory instruction as providing "a helpful frame of reference." *Id.* at 803. Noting its "brevity and clarity," the Court called the new statutory instruction an "adequate alternative[]" to the supplemental instruction given to Penry's jury. *Id.*

The Supreme Court has recently confronted another extra-statutory supplemental instruction given to a Texas capital sentencing jury in the period of time between *Penry I* and the enactment of a statutory mitigation issue. *See Smith*, 125 S. Ct. at 401-07. The instruction in *Smith* told the jury that it could consider any evidence that it deemed mitigating, even if the evidence had no relationship to any of the statutory special issues. *Id.* at 402. If the jury believed that the death penalty was inappropriate due to the mitigating evidence, it was instructed to answer one of the special issues "no" in order to give effect to this belief. *Id.* at 402-03.

While acknowledging that this instruction was not identical to the one at issue in *Penry II*, the *Smith* Court held that the distinctions between the two instructions were "constitutionally insignificant." *Id.* at 406. The Court explained that the instruction

26

given to Smith's jury did not resolve the ethical problem identified in *Penry II*: the jury was still "essentially instructed to return a false answer to a special issue in order to avoid a death sentence." *Id.* at 407 (citing *Penry II*, 532 U.S. at 801).

Applicant contends there is no principled distinction, for Eighth Amendment purposes, between the statutory mitigation instruction given to the jury in his case and the instructions found to be constitutionally defective in *Penry II* and *Smith*. Specifically, he argues that the statutory instruction inserts the same "element of capriciousness" into the sentencing decision because the jury has already been instructed to consider mitigating evidence in deliberating on the future-dangerousness and anti-parties special issues, and, by answering these two special issues in the affirmative, has already determined that a death sentence is appropriate before even reaching the mitigation special issue. Thus, he reasons, the jurors must effectively reverse their answers to the first two special issues if they are to answer the mitigation special issue "yes." (Writ Application, p. 59). Applicant's arguments reflect a misunderstanding of the *Penry II* and *Smith* decisions.

In *Penry II*, the Court noted that "the key under *Penry I* is that the jury be able to 'consider and give effect to [a defendant's mitigating] evidence in imposing sentence.'" *Penry II*, 532 U.S. at 797 (quoting *Penry I*, 492 U.S. at 319). The instructions in *Penry II* and *Smith* were constitutionally infirm because the only way the jury could give effect to mitigating evidence was through its answers to the statutory special issues, none of which were broad enough to encompass all of evidence relevant to the defendant's culpability. *Smith*, 125 S. Ct. at 406; *Penry II*, 532 U.S. at 796. Thus, in order to give effect to mitigating evidence that did not fit within the scope of the special issues, jurors would

27

have to ignore the verdict-form instructions and answer one of the special issues falsely, thereby violating their oath. *See Smith*, 125 S. Ct. at 406-07; *Penry II*, 532 U.S. at 799.

In contrast, the statutory mitigation instruction given in this case permitted applicant's jury "to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant." *Perry*, 158 S.W.3d at 448-49. As part of its verdict, the jury was required to make a determination, separate and apart from its answers to the first two special issues, of whether there were sufficient mitigating circumstances to warrant a life sentence instead of the death penalty. Thus, the jury was able to give effect to any evidence that had mitigating relevance beyond the scope of the first two special issues. And contrary to applicant's contentions, the jury was not required to effectively negate its answers to the first two special issues in order to give mitigating effect to such evidence. The jury could still, even after having answered the first two special issues in the affirmative, determine that the death penalty was inappropriate because there was sufficient evidence mitigating applicant's personal moral culpability.

The Court of Criminal Appeals has specifically held that Texas's statutory mitigation special issue satisfies the constitutional requirement that a capital sentencing jury be provided with an adequate vehicle for expressing a reasoned moral response to all of the evidence relevant to the defendant's culpability. *See Woods*, 152 S.W.3d at 121; *Hall v. State*, 67 S.W.3d 870, 877 (Tex. Crim. App. 2002), *vacated on other grounds by Hall v. Texas*, 537 U.S. 802 (2002). Nothing in either *Penry II* or *Smith* has altered this conclusion, especially in view of the language in *Penry II* giving tacit approval to the

28

statutory instruction. Applicant's eleventh and thirteenth grounds for relief should be denied.

## STATE CONSTITUTIONAL CLAIMS

In his twelfth and fourteenth grounds for relief, applicant contends that the statutory mitigation issue denies capital defendants due course of law and trial by an impartial jury and subjects them to cruel and unusual punishment, in violation of Article I, sections 10, 13, and 19 of the Texas Constitution, for the same reasons asserted in support of his federal constitutional claims in grounds eleven and thirteen.[6] Applicant relies solely on federal constitutional authority and does not argue that the state constitution provides a greater level of protection than the federal constitution in this area. Applicant's state constitutional claims have therefore been procedurally defaulted and should be summarily denied. *See Black*, 26 S.W.3d at 896 n.4.

Moreover, as with his federal claims, applicant could have raised his state constitutional claims on direct appeal. By failing to do so, he has forfeited those claims. *See Townsend*, 137 S.W.3d at 81. For this additional reason, applicant's twelfth and fourteenth grounds for relief are procedurally barred.

---

[6] Like his thirteenth ground, applicant's fourteenth ground also makes an assertion about the indictment that appears to have no connection to his complaint concerning the mitigation special issue. (Writ Application, pp. 30-31). Applicant raised his state constitutional claim regarding the indictment in his tenth ground for relief, discussed by the State on pages 18-19 of this response. (Writ Application, p. 13). Accordingly, as it did with ground thirteen, the State refers this Court to its previous discussion of the indictment issue and will otherwise treat grounds twelve and fourteen as raising identical claims.

## RESPONSE TO GROUNDS 15 – 18:  UNANIMITY OF VERDICT

Applicant contends in his fifteenth and sixteenth grounds for relief that this Court "allowed a non-unanimous verdict when [it] submitted disjunctive means of committing capital murder" and thereby violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, sections 10, 13, and 19 of the Texas Constitution.  In his seventeenth and eighteenth grounds for relief, applicant contends that trial counsel's failure to object to the jury charge on this basis constituted ineffective assistance of counsel under both the federal and state constitutions.[7]

### *Applicant's Claims Should Be Denied as Procedurally Barred*

Applicant did not raise any of these claims on direct appeal, although nothing prevented him from doing so.  He does not rely on any new evidence or law that was not available to him on direct appeal.  Habeas corpus may not be used to litigate matters that could have been raised on appeal.  *See Boyd*, 58 S.W.3d at 136.  Applicant's fifteenth

---

[7] Grounds fifteen through eighteen refer to the "party 'conspiracy' instruction" under Penal Code section 7.02(b) as permitting a non-unanimous verdict.  (Writ Application, pp. 60-61).  Once again, there seems to be discrepancy between what applicant lists as his grounds for relief and what he actually argues.  Applicant does not specifically discuss the relationship, if any, between the conspiracy instruction and the unanimity of the jury's verdict.  Instead, what he appears to be arguing is that there was a potential for a non-unanimous verdict because two theories of capital murder were submitted to the jury:  murder of a peace officer and murder committed in the course of a robbery.  (CR 2: 282-83; Writ Application, pp. 70-71, 75).  *See* TEX. PENAL CODE ANN. § 19.03(a)(1)-(2).  For instance, he maintains that "the disjunctive allegations in the application paragraphs gave rise to an equivalent 'umbrella' crime because the crimes were two distinct crimes, one of murder in the course of robbery and one the murder of a police officer." (Writ Application, p. 75).  Thus, the State has interpreted grounds for relief fifteen through eighteen as a challenge to the submission of alternative theories of capital murder under section 19.03 and not as a challenge to the submission of alternative theories of parties liability under section 7.02.

30

through eighteenth grounds for relief are procedurally barred and should be summarily denied.

### *Alternatively, Applicant's Claims Should Be Denied on Their Merits*
#### *The jury charge did not allow for a non-unanimous verdict.*

As discussed previously, the indictment in this case alleged that applicant committed the offense of capital murder by (1) knowingly and intentionally causing the death of Aubrey Hawkins, a peace officer acting in the lawful discharge of an official duty, by shooting him with a firearm; and (2) intentionally causing the death of Aubrey Hawkins by shooting him with a firearm while applicant was in the course of committing and attempting to commit the offense of robbery. (CR 1: 2). *See* TEX. PENAL CODE ANN. § 19.03(a)(1)-(2). The charge authorized the jury to find applicant guilty of capital murder if it concluded beyond a reasonable doubt that he — as a principal, a party, or a co-conspirator — caused Officer Hawkins's death under either of the two theories alleged in the indictment.[8]  (CR 2: 289-92). The jury was not instructed that it had to

---

[8] Thus, the jury charge contained six separate application paragraphs, instructing the jury to find applicant guilty of capital murder if it believed that he

(1) intentionally or knowingly caused the death of Aubrey Hawkins, a peace officer;

(2) with the intent to promote or assist the commission of the offense of murder, solicited, encouraged, directed, aided, or attempted to aid any one or combination of the other six escapees in intentionally or knowingly causing the death of Aubrey Hawkins, a peace officer;

(3) entered into a conspiracy with one or more of the other six escapees to commit the offense of robbery, and in the attempt to carry out this conspiracy, one or more of the other escapees intentionally or knowingly caused the death of Aubrey Hawkins, a peace officer, and intentionally or knowingly causing the death of Aubrey Hawkins was committed in furtherance of the unlawful purpose to commit robbery and should have been anticipated as a result of carrying out the conspiracy to commit robbery, whether or not applicant intended to cause the death of Aubrey Hawkins;

31

160

unanimously agree on any one particular theory. The jury returned a general verdict, finding applicant guilty of capital murder "as charged in the indictment." (CR 2: 295).

A jury must be unanimous as to what specific statutory criminal act the defendant has committed. *See Ngo v. State*, No. PD-0504-04, 2005 Tex. Crim. App. LEXIS 457, at *14-15 (Mar. 16, 2005). The jury need not, however, agree on the preliminary factual issues that underlie its verdict. *See id.* at *16; *Kitchens v. State*, 823 S.W.2d 256, 257-58 (Tex. Crim. App. 1991) (citing *Schad v. Arizona*, 501 U.S. 624, 632 (1991)). In other words, the jury must unanimously agree on *what* criminal act the defendant committed, but not on *how* the defendant committed that act. "The crucial distinction is thus between a fact that is a specific *actus reus* element of the crime and one that is 'but the means' to the commission of a specific actus reus element." *Ngo*, 2005 Tex. Crim. App. LEXIS 457, at *18 (citing *Richardson v. United States*, 526 U.S. 813, 817 (1999)).

Accordingly, when an indictment charges the defendant with committing separate criminal acts — even if those acts constitute violations of the same statutory provision —

---

(4) intentionally caused the death of Aubrey Hawkins while in the course of committing or attempting to commit the offense of robbery;

(5) with the intent to promote or assist the commission of the offense of murder, solicited, encouraged, directed, aided, or attempted to aid any one or combination of the other six escapees in intentionally causing the death of Aubrey Hawkins in the course of the commission or attempted commission of the offense of robbery; or

(6) entered into a conspiracy with one or more of the other six escapees to commit the felony offense of robbery, and in the attempt to carry out this conspiracy, one or more of the other escapees intentionally caused the death of Aubrey Hawkins, and intentionally causing the death of Aubrey Hawkins was committed in furtherance of the unlawful purpose to commit robbery and should have been anticipated as a result of carrying out the conspiracy to commit robbery, whether or not applicant intended to cause the death of Aubrey Hawkins.

(CR: 2: 289-91).

32

the jury must be instructed that it cannot return a guilty verdict unless it unanimously agrees upon the commission of any one of these criminal acts. *Ngo*, 2005 Tex. Crim. App. LEXIS 457, at *11. The trial court does not err simply by submitting the separate offenses to the jury in the disjunctive, however; error lies "in failing to instruct the jury that it must be unanimous in deciding which one (or more) of the . . . disjunctively submitted offenses it found [the defendant] committed." *Id.* at *24. Nor does the trial court necessarily err by allowing the jury to return a general verdict in this situation: "it does not matter which criminal act . . . the jury found [the defendant] had committed as long as each juror agreed on the same criminal act." *Id.* at *25.

In addressing a complaint that a disjunctive jury charge permitted a non-unanimous verdict, the reviewing court should first determine whether the separate application paragraphs contain different criminal acts or whether they merely instruct as to different means of committing the same criminal act. *See Holford v. State*, No. 01-04-00195-CR, 2005 Tex. App. LEXIS 3602, at *14 (Houston [1st Dist.] May 12, 2005, no pet. h.) (citing *Ngo*, 2005 Tex. Crim. App. LEXIS 457, at *15-16). In making this determination, "[a] handy, though not definitive, rule of thumb is to look to the statutory verb defining the criminal act. That verb . . . is generally the criminal act upon which all jurors must unanimously agree." *Ngo*, 2005 Tex. Crim. App. LEXIS 457, at *15 n.24.

Here, applicant was charged with committing a single criminal act: the murder of Aubrey Hawkins. In order to convict, therefore, the jury had to unanimously agree that applicant was criminally responsible for causing Officer Hawkins's death. The jury did not, however, have to agree on which of the two aggravating factors alleged in the

33

indictment — that Officer Hawkins was a peace officer or that he was intentionally killed in the course of a robbery — elevated the act of causing Officer Hawkins's death to a capital murder. The Court of Criminal Appeals has held that when an indictment charges different theories under which a defendant committed a single capital murder, the jury need not agree on which theory has been proven. *See Kitchens*, 823 S.W.2d at 258; *see also Hathorn v. State*, 848 S.W.2d 101, 113 (Tex. Crim. App. 1992) (holding that an indictment charging the defendant with committing a single capital murder under different subsections of section 19.03 alleged only one offense); *Bethany v. State*, 152 S.W.2d 660, 669 (Tex. App.—Texarkana 2004, pet. ref'd) (holding that the jury was not required to agree on whether the defendant killed the victim for remuneration or in the course of committing a robbery in order to convict him of capital murder); *cf. Graham v. State*, 19 S.W.3d 851, 854 (Tex. Crim. App. 2000) (holding that a capital murder indictment charging the defendant with murdering victims A and B during the same criminal transaction, murdering victim A during the course of a robbery, and murdering victim C during the course of a robbery alleged two distinct capital murder offenses, not simply three alternative theories for one offense).

Accordingly, because applicant was charged with committing a single criminal act, this Court did not err in submitting the different theories of capital murder in the disjunctive and not requiring the jury to unanimously agree on one specific theory. *See, e.g., Schad*, 501 U.S. at 632 (holding that the jury was not required to agree on whether the defendant murdered the victim "with premeditation or in the course of committing a robbery"); *Aguirre v. State*, 732 S.W.2d 320, 324-27 (Tex. Crim. App. 1987) (op. on

34

reh'g) (holding that where the indictment charged the defendant with intentionally causing the victim's death and with causing the victim's death during the course of committing a felony, intentional murder and felony murder were not different offenses, but merely different ways of committing the same murder); *cf. Ngo*, 2005 Tex. Crim. App. LEXIS 457, at *25 (holding that where the defendant was charged with three separate acts of credit-card abuse in a single indictment, the jury was required to unanimously agree on which of these three acts the defendant committed); *Francis v. State*, 36 S.W.3d 121, 123-25 (Tex. Crim. App. 2000) (holding that where the defendant was charged with two distinct acts of indecency with a child, which occurred at different times and dates, the jury was required to agree on the same act for conviction). Even if half the jury found applicant guilty of the murder of a peace officer while the other half found him guilty of murder in the course of robbery, the jury still unanimously convicted applicant of the same, single, specific criminal act — the capital murder of Officer Hawkins. Capital murder is not, as applicant contends, an "umbrella" crime, under which any one of several distinct criminal acts would suffice for conviction. *Schad*, 501 U.S. at 650 (Scalia, J., concurring). The actus reus of capital murder is murder, regardless of how the offense is alleged to have been committed.

The jury charge in this case did not, therefore, deprive applicant of his constitutional right to a unanimous verdict. His fifteenth and sixteenth grounds for relief should be denied.

35

164

*Error, if any, in the jury charge did cause applicant egregious harm.*

Moreover, even if the jury charge was erroneous for failing to require unanimity as to which of the two theories of capital murder the jury found from the evidence, applicant was not egregiously harmed by this error and, therefore, is not entitled to relief. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

Errors that result in egregious harm are those that affect "the very basis of the case," "deprive the defendant of a valuable right," or "vitally affect a defensive theory." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). In the instant case, it was not contested that Officer Hawkins was intentionally killed during the course of a robbery and while he was in the lawful discharge of his official duties as a peace officer. (RR 50: 19-39). The only issue contested at trial was the degree of applicant's involvement in, and responsibility for, the officer's murder. (RR 50: 26-27, 32-39). *Cf. Ngo*, 2005 Tex. Crim. App. LEXIS 457, at *33-34 (holding that the defendant was egregiously harmed by the trial court's failure to instruct the jury that it must be unanimous in deciding which one of the three disjunctively-submitted offenses it found the defendant had committed, where the defendant testified and denied committing any of the three offenses and where two of the offenses were mutually exclusive). Thus, a juror could not have believed that applicant was guilty of committing a murder in the course of a robbery, but was not guilty of murdering a peace officer, or vice versa. There was, therefore, no real possibility of a non-unanimous verdict in this case.

Accordingly, to the extent this Court erred in not requiring unanimity as to which type of capital murder applicant committed, such error did not cause applicant egregious harm. For this additional reason, grounds for relief fifteen and sixteen should be denied.

*Counsel was not ineffective for failing to make a meritless objection.*

To establish ineffective assistance of counsel, applicant must demonstrate that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness and (2) a probability sufficient to undermine confidence in the outcome exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). To show that counsel was ineffective for failing to object to the jury charge, applicant must show that this Court would have erred in overruling the objection. *See White*, 160 S.W.3d at 53 (citing *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996)). Thus, the success of applicant's ineffective-assistance complaint is contingent on the merits of his challenge to the jury charge.

For the reasons discussed in response to grounds fifteen and sixteen, applicant's contention that the jury charge allowed for a non-unanimous verdict on guilt is without merit. Accordingly, any objection to the charge on this basis would have been properly overruled by this Court. Counsel cannot be labeled ineffective for failing to lodge a meritless objection. *See, e.g., Ladd*, 3 S.W.3d at 565 (holding that counsel did not render ineffective assistance when he failed to object to the definition of "conspiracy" contained in the jury charge because that definition was not erroneous).

37

Moreover, absent any evidence of the rationale behind counsel's failure to object, applicant cannot defeat the strong presumption that counsel's actions fell within the wide range of reasonable, professional assistance. *See Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). To defeat this presumption, applicant must prove that there was, in fact, no plausible, professional reason for the failure to object. *See Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Here, however, the trial record is silent as to why counsel did not object to the charge. And applicant has not provided this Court with any extrinsic evidence of counsel's reasoning. The Court of Criminal Appeals has made it clear that trial counsel should ordinarily be accorded an opportunity to explain his actions before his performance is scrutinized for constitutional competence. *See id.*; *Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003).

Furthermore, even if the jury charge should have required the jurors to agree on one of the theories of capital murder alleged, applicant has not shown that trial counsel's decision not to object to the charge on this basis prejudiced his defense. As discussed previously, it is highly unlikely that, given the evidence in this case, the jury was divided on whether Officer Hawkins was killed in the lawful discharge of his official duties as a peace officer or whether he was killed during a robbery. Thus, applicant has not shown there to be a reasonable probability that had unanimity been required as to the specific manner and means of committing the offense, he would not have been convicted of the capital murder of Officer Hawkins. *See Strickland*, 466 U.S. at 694; *Thompson*, 9 S.W.3d at 812.

Applicant has not met his burden of establishing ineffective assistance of counsel. His seventeenth and eighteenth grounds for relief should be denied.

### RESPONSE TO GROUNDS 19 – 20:  CONSPIRACY INSTRUCTION

In grounds for relief nineteen and twenty, applicant contends that this Court erred in instructing the jury on co-conspirator liability pursuant to section 7.02(b) of the Texas Penal Code.[9] (CR 2: 287).  He argues that this instruction "allowed a lesser burden of proof of intent to secure a conviction for capital murder" and thereby violated his federal and state constitutional rights to due process of law, to trial by an impartial jury, and to be free from cruel and unusual punishment.

### *Applicant's Claims Should Be Denied as Procedurally Barred*

Applicant has forfeited his challenge to the conspiracy instruction by failing to raise this issue on direct appeal.  *See Townsend*, 137 S.W.3d at 81.  Habeas corpus may not be used as a substitute for appeal.  *See Nelson*, 137 S.W.3d at 667.  Grounds for relief nineteen through twenty are procedurally barred.

### *Alternatively, Applicant's Claims Should Be Denied on Their Merits*

Although section 7.02(b) allows a defendant to be held criminally responsibility for the conduct of another, thereby eliminating the necessity for proving intent to commit

---

[9] This statute provides:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02(b) (Vernon 2003).

the felony actually committed, it does not excuse the State altogether from proving a culpable mental state. *Gravis v. State*, 982 S.W.2d 933, 938 (Tex. App.—Austin 1998, pet. ref'd). In fact, the statute requires the State to prove that the defendant had both the mens rea to engage in a conspiracy and the culpable mental state to commit the underlying felony. *Id.* The mental state required for the underlying felony supplies the mens rea for the felony that resulted from the conspiracy. *Id.*; *accord Cienfuegos v. State*, 113 S.W.3d 481, 493-94 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). This "transference of the mental element establishing criminal responsibility for the original act to the resulting act conforms to and preserves the traditional mens rea requirement of the criminal law." *Rodriquez*, 548 S.W.2d at 29.

Furthermore, the submission of a section 7.02(b) instruction in a capital murder case does not subject the defendant to cruel and unusual punishment. The Court of Criminal Appeals has held that Texas's capital-punishment scheme does not unconstitutionally allow an individual to be put to death for merely being a party to a murder. *See Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992). When a jury was permitted to find the defendant guilty of capital murder as a party under section 7.02, the death penalty may be assessed only if the jury determines that the defendant "actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(2). This ensures that a capital defendant convicted as a party or co-conspirator will not be sentenced to death

unless he is found to bear personal moral culpability for the victim's death. *See Prystash v. State*, 3 S.W.3d 522, 540 (Tex. Crim. App. 1999).

This Court did not err in instructing the jury pursuant to section 7.02(b). Applicant's nineteenth and twentieth grounds for relief should be denied.

### RESPONSE TO GROUNDS 21 – 22: INFERRED-INTENT INSTRUCTION

Applicant contends in grounds for relief twenty-one and twenty-two that this Court erred in instructing the jury at the guilt phase of his trial that "[i]ntent may be inferred from the surrounding facts and circumstances including but not limited to acts done and words spoken." (CR 2: 286). He argues that this instruction constituted an improper comment on the weight of the evidence, in violation of the federal and state constitutions.

#### *Applicant's Claims Should Be Denied as Procedurally Barred.*

Applicant could have raised these complaints about the jury charge on direct appeal, but did not. Habeas corpus may not be used to litigate claims that could have been raised on appeal. *See Nelson*, 137 S.W.3d at 667. Grounds twenty-one and twenty-two are procedurally barred.

#### *Alternatively, Applicant's Claims Should Be Denied on Their Merits*

The Court of Criminal Appeals has held that a trial court's instructing the jury that it may infer intent from acts done and words spoken "marginally falls on the wrong side of the 'improper-judicial-comment' scale because it is simply unnecessary and fails to clarify the law for the jury." *Brown v. State*, 122 S.W.3d 794, 802 (Tex. Crim. App. 2003). The Court has also held, however, that such an instruction is "mild, neutral, and

41

an obvious common-sense proposition" and is "not, in any sense, harmful under *Almanza.*" *Id.* at 803-04.

Thus, even if this Court erred in including an inferred-intent instruction in the jury charge, applicant has not shown that he suffered any harm. His twenty-first and twenty-second grounds for relief are therefore without merit and should be denied.

### RESPONSE TO GROUNDS 23 – 24: "FAIR CROSS SECTION" CHALLENGE[10]

In his twenty-third and twenty-fourth grounds for relief, applicant contends that trial counsel rendered ineffective assistance under both the federal and state constitutions by failing to challenge the composition of the venire. Applicant maintains that Hispanics and persons eighteen to thirty-four years of age are demonstrably underrepresented on jury panels in Dallas County.

#### *Applicant's Claims Should Be Denied as Procedurally Barred*

Applicant relies exclusively on the trial record to substantiate his complaints about trial counsel's performance. Thus, applicant could have raised these complaints on direct appeal. *See Nailor,* 149 S.W.3d at 131-32. By failing to do so, he has forfeited his claims. *See Townsend,* 137 S.W.3d at 81. Applicant's twenty-third and twenty-fourth grounds for relief are procedurally barred.

#### *Alternatively, Applicant's Claims Should Be Denied on Their Merits*

The Sixth Amendment to the United States Constitution guarantees the right of an accused to a "speedy and public trial, by an impartial jury of the State and district

---

[10] The remainder of applicant's grounds for relief are misnumbered in his writ application. The State's response will refer to these grounds in their correct sequence.

42

wherein the crime shall have been committed." U.S. CONST. amend. VI. An essential component of this Sixth Amendment guarantee is the requirement that the venire from which a petit jury is selected represent a "fair cross-section" of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528-29 (1975). In order to establish a prima facie violation of this fair-cross-section requirement, a defendant must show that (1) the group allegedly excluded is a "distinctive group" within the community; (2) the group is not fairly represented on venires from which juries are selected; and (3) this underrepresentation results from systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). A habeas applicant has the burden of proving his factual allegations by a preponderance of the evidence. *Ex parte Adams*, 768 S.W.2d 281, 287-88 (Tex. Crim. App. 1989).

*While Hispanics are a distinctive group in the community, eighteen- to thirty-four-year-olds are not.*

The State does not dispute that Hispanics are a distinctive group in Dallas County. *See Aldrich v. State*, 928 S.W.2d 558, 560 (Tex. Crim. App. 1996). The State does, however, challenge applicant's characterization of persons eighteen to thirty-four years of age as a distinctive group in the community. Applicant has not cited, and the State has not found, any authority for the proposition that a particular age group may be a distinctive group for *Duren* purposes. Indeed, courts have consistently refused to classify age groups as "distinctive" under *Duren*. *See Johnson v. McCaughtry*, 92 F.3d 585, 592-93 (7th Cir. 1996) (rejecting ages 18-25 as a distinctive group and noting that age-based claims under *Duren* "have been rejected in every circuit that has considered them");

43

*Brewer v. Nix*, 963 F.2d 1111, 1113 (8th Cir. 1992) (rejecting ages 65 and older as a distinctive group); *Wysinger v. Davis*, 886 F.2d 295, 296 (11th Cir. 1989) (rejecting ages 18-25 as a distinctive group); *Ford v. Seabold*, 841 F.2d 677, 682 (6th Cir. 1988) (rejecting ages 18-29 as a distinctive group); *Barber v. Ponte*, 772 F.2d 982, 998 (1st Cir. 1985) (op. on reh'g en banc) (rejecting ages 18-34 as a distinctive group); *Weaver v. State*, 823 S.W.2d 371, 373 (Tex. Crim. App. 1992) (rejecting ages 65 and older as a distinctive group).

Furthermore, applicant has not provided any evidence to suggest that eighteen- to thirty-four-year-olds, in particular, share similar attitudes, values, ideas, and experiences that make them distinct from other age groups. *See Barber*, 772 F.2d at 998; *see also Weaver*, 823 S.W.2d at 373 (rejecting *Duren* claim with respect to persons over 65 years of age where the defendant had "offered no evidence to suggest that some common thread of shared experience or political, social, or religious viewpoint binds this group together to make it distinct from any other age group").

Applicant has not demonstrated that persons eighteen to thirty-four years of age comprise a distinctive group in the community. Accordingly, with respect to this age group, applicant has failed to meet the first prong of the *Duren* test.

> *Applicant has not shown that Hispanics and persons 18–34 years of age are underrepresented on venires.*

The second prong of *Duren* requires applicant to show that the number of Hispanics and persons eighteen to thirty-four years of age on Dallas County venires is not fair and reasonable in relation to the number of those individuals in Dallas County who

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 178 of 236   PageID 1716

are qualified for the jury-selection process. *See Pondexter v. State*, 942 S.W.2d 577, 580-81 (Tex. Crim. App. 1996). In *Pondexter*, the defendant claimed that the trial court had violated the Sixth Amendment by refusing to dismiss the array after he presented undisputed evidence that African-Americans made up twenty-two percent of the county's population but less than ten percent of the panel of prospective jurors. 942 S.W.2d at 580. In response, the Court of Criminal Appeals noted that, on its face, the difference between the number of African-Americans in the county and the number on the venire might arguably raise an inference of unfairness or unreasonableness. *Id.* The Court overruled the defendant's complaint, however, because he had not shown that the percentage of African-Americans who *qualified* for the jury-selection process was the same as or similar to the total percentage of African-Americans in the population. *Id.* at 580-81; *accord United States v. Brummitt*, 665 F.2d 521, 529 (5th Cir. 1981) ("[T]o establish the prima facie case of a denial of a fair cross-section, the disparity between the proportion of members of an identifiable class on a jury list must be based not on total population but, instead, on those of the identifiable class who are eligible to serve as jurors.").

Applicant has the same problem proving his fair-cross-section claim as did the defendant in *Pondexter*. Applicant claims to rely on statistics extracted from a 2000 *Dallas Morning News* article comparing the percentage of Hispanics and persons eighteen to thirty-four years of age in the population as a whole to the percentage of these groups in the Dallas County jury pool. As an initial matter, the mere citation of a newspaper article to this Court does not suffice to introduce into evidence the truth of the

45

174

hearsay or so-called scientific conclusions contained within the article. *See Ramdass v. Angelone*, 530 U.S. 156, 172 (2000). Additionally, even if this Court were to assume the accuracy of applicant's statistics, he has presented no evidence showing what percentage of Hispanics and eighteen- to thirty-four-year-olds are actually *qualified* to participate in the jury-selection process. Thus, applicant cannot show that the representation of these two groups on Dallas County venires is not fairly and reasonably related to the number of such persons in the community who are qualified to sit on a jury.

Applicant has not demonstrated that Hispanics and people between the ages of eighteen and thirty-four are unfairly represented on jury panels in Dallas County. He has therefore failed to satisfy the second prong of the *Duren* test.

> *Applicant has not shown that Hispanics and persons 18-34 years of age are systematically excluded from the jury-selection process.*

The third prong of *Duren* requires applicant to show that the alleged underrepresentation of these groups on jury panels is inherent in the jury-selection process used in Dallas County. *Duren*, 439 U.S. at 366. Specifically, applicant must identify a particular systematic defect or operational deficiency that accounts for the alleged underrepresentation. *See United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994). Because some people are simply less available than others to serve as jurors, a true cross-section is practically unobtainable. *Barber*, 772 F.2d at 997. Thus, the Supreme Court has never required that a venire be, statistically, a substantially true mirror of the community. *Id.* "[C]ourts have tended to allow a fair degree of leeway in designating

46

175

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 180 of 236   PageID 1718

jurors so long as the state or community does not *actively* prevent people from serving or actively discriminate, and so long as the system is reasonably open to all." *Id.*

Affirmative barriers to selection for jury service or different selection standards for different groups are hallmarks of a Sixth Amendment violation. In *Taylor*, for example, the Supreme Court held that a Louisiana statute that prevented a woman from being selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service violated the fair-cross-section requirement. 419 U.S. at 523, 531. And in *Lacy v. State*, the Tyler Court of Appeals suggested that systematic exclusion could be established by showing that distinctive groups "were not included in the computer base from which the panel was selected." 899 S.W.2d 284, 288 (Tex. App.—Tyler 1995, no pet.).

In Texas, the names on the jury wheel in each county are selected from the names of all persons on the current voter-registration lists and the names of all citizens who have a valid Texas driver's license or identification card. *See* TEX. GOV'T CODE ANN. § 62.001 (Vernon Supp. 2004-05). There is nothing inherently exclusive about this method of selection, which has been repeatedly upheld against Sixth Amendment attack. *See, e.g., United States v. James*, 528 F.2d 999, 1022 (5th Cir. 1976) (upholding the use of voter registration lists as the *sole* source of potential jurors). No person, by reason of their membership in either of the distinctive groups at issue here, is prevented by law from registering to vote or from obtaining a driver's license or state identification card. Moreover, the failure of individual group members to avail themselves of these privileges "in the same proportion as was their share in the overall population" does not constitute

47

systematic exclusion under *Duren.* *United States v. Cecil*, 836 F.2d 1431, 1448 (4th Cir. 1988); *see also Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir. 2000) ("[T]he fact that an identifiable minority group votes in a proportion lower than the rest of the population and is therefore underrepresented on jury panels presents no constitutional issue.").

Applicant has failed to produce any evidence that Dallas County's jury-selection process systematically excludes Hispanics and persons eighteen to thirty-four years of age. In fact, his real complaint is directed toward what happens *after* summonses are mailed to potential jurors. Applicant claims that a disproportionate number of Hispanics and people between the ages of eighteen and thirty-four ignore jury summonses. He blames this failure to obey jury summonses on Dallas County policies, suggesting that the low pay for jury service, coupled with the failure of Dallas County officials to enforce jury summonses, results, as a practical matter, in the underrepresentation of Hispanics and eighteen- to thirty-four-year-olds in the jury pool.

Applicant's assertion that low juror pay in Dallas County and the failure to enforce summonses cause Hispanics and young adults to shirk jury duty in disproportionate numbers is pure speculation. Apart from referencing newspaper and law review articles, applicant does not point to any evidence that the amount of pay or the lack of consequences for failing to report are the reasons why these groups do not report. There could be any number of personal reasons, wholly unrelated to county policies, for the failure to report.

More importantly, any discrepancies resulting from such private-sector influences do not violate the fair-cross-section requirement. Everyone summoned for jury duty in

48

the criminal courts of Dallas County, regardless of age or ethnicity, receives the same pay and suffers the same consequences for failing to report. The system is, therefore, "reasonably open to all." *Barber*, 772 F.2d at 997. The personal decision of a particular individual to ignore a jury summons cannot be attributed to a constitutional defect in the jury-selection process itself.

Applicant has failed to satisfy the third prong of the *Duren* test by demonstrating that the allegedly distinctive and underrepresented groups are systematically excluded from the jury-selection process in Dallas County. Accordingly, applicant has not established a prima facie violation of the Sixth Amendment's fair-cross-section requirement.

*Counsel was not ineffective for failing to make a meritless objection.*

As discussed previously, when a defendant claims that counsel was ineffective for failing to object or to preserve error on some issue, the defendant must show that the underlying issue has merit. *See White*, 160 S.W.3d at 53. Here, in order to succeed on the ineffective-assistance-of-counsel claims he makes in his twenty-third and twenty-fourth grounds for relief, applicant had to demonstrate that this Court would have erred in overruling a *Duren* objection to the composition of the venire. Applicant has failed in this burden because, as discussed above, he has not shown that the venire in his case did not represent a fair cross-section of the community. *See Luckette v. State*, 906 S.W.2d 663, 667 (Tex. App.—Amarillo 1995, pet. ref'd). Counsel was not ineffective for failing to make a meritless objection. *See Vaughn*, 931 S.W.2d at 566-67.

49

178

Additionally, applicant has not presented any evidence of counsel's reasons for not raising a fair-cross-section challenge to the venire. He cannot, therefore, defeat the strong presumption that counsel's actions fell within the wide range of reasonable, professional assistance. *See Mallett*, 65 S.W.3d at 63; *Tong*, 25 S.W.3d at 712. Grounds for relief twenty-three and twenty-four should be denied.

### RESPONSE TO GROUNDS 25 – 38: DENIAL OF CHALLENGES FOR CAUSE

In grounds for relief twenty-five through thirty-eight, applicant contends that this Court erred in denying his challenges for cause to prospective jurors Ama Helfenbein, Thomas Tucker, Larry Carroll, Gregory Babineau, Lillian Lyles, Alan Lucien, and Robin Tucker. He argues that each of these prospective jurors possessed some bias against the law that prevented them from being fair and impartial. *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(c)(2) (Vernon Supp. 2004-05). He maintains that the erroneous denial of his challenges for cause violated his rights to due process of law and effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, section 10 of the Texas Constitution.

### *Applicant's Claims Are Not Cognizable*

A writ of habeas corpus is available only for relief from jurisdictional defects and violations of constitutional or fundamental rights. *Ex parte McCain*, 67 S.W.3d 204, 207 (Tex. Crim. App. 2002). Procedural errors or statutory violations may be reversible error on direct appeal, but they are not "fundamental" or "constitutional" errors that require relief on a writ of habeas corpus. *Id.* at 209-10; *see also Ex parte Sanchez*, 918 S.W.2d 526, 527 (Tex. Crim. App. 1996) (holding that the violation of a state statute in general is

50

not a cognizable claim on habeas corpus); *Ex parte Graves*, 70 S.W.3d 103, 109 (Tex. Crim. App. 2002) (holding that "[v]iolations of statutes, rules, or other non-constitutional doctrines are not recognized" on habeas corpus).

The erroneous denial of a challenge for cause under article 35.16 of the Texas Code of Criminal Procedure is statutory — not constitutional — error.[11] *See Johnson v. State*, 43 S.W.3d 1, 2, 4 (Tex. Crim. App. 2001); *Jones v. State*, 982 S.W.2d 386, 391-92 (Tex. Crim. App. 1998). The right at issue is the defendant's statutory right to "an unbridled use of the number of peremptory challenges given." *Johnson*, 43 S.W.3d at 8 (Keller, P.J., concurring); *see* TEX. CODE CRIM. PROC. ANN. art. 35.14 (Vernon 1989), art. 35.15 (Vernon Supp. 2004-05); *see also Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) ("We have long recognized that peremptory challenges are not of constitutional dimension."). This unbridled right is violated when the defendant is forced to use a peremptory challenge on a prospective juror who should have been removed for cause and, as a result, is required to accept a different juror who is objectionable to him. *Johnson*, 43 S.W.3d at 8.

Applicant has alleged nothing more than statutory violations with respect to the denial of his challenges for cause. These claimed statutory violations did not deprive this Court of jurisdiction or deny applicant any fundamental or constitutional rights and are

---

[11] In support of his argument that the erroneous denial of his challenges for cause violated his constitutional rights, applicant relies on caselaw concerning the improper exclusion — through the granting of a prosecution challenge for cause — of a prospective juror who expresses opposition to the death penalty. (Writ Application, pp. 100-26). *See, e.g., Witherspoon v. Illinois*, 391 U.S. 510 (1968). The State fails to see the relevance of such caselaw to applicant's claims, none of which allege that a prospective juror was erroneously removed for cause by the prosecution.

51

not, therefore, proper grounds for habeas relief. *See Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989) (op. on reh'g) (holding contention that trial court erred in granting challenge for cause to prospective juror because of bias under article 35.16 was not a cognizable claim on habeas corpus). Grounds for relief twenty-five through thirty-eight are not cognizable and should be summarily denied.

### Applicant's Claims Should Be Denied as Procedurally Barred

Applicant complained on direct appeal about this Court's denial of his challenges for cause to these same seven prospective jurors. *See Garcia*, slip op. at 2-7. The Court of Criminal Appeals rejected applicant complaints, holding that this Court did not abuse its discretion in denying applicant's challenges. *Id.*, slip op. at 7. Applicant does not raise any new or different arguments to contest this Court's rulings. Instead, he merely reasserts, usually verbatim, the arguments he made in his brief on direct appeal. Claims that have already been raised and rejected on direct appeal may not be relitigated through habeas corpus. *Ramos*, 977 S.W.2d at 617. Grounds twenty-five through thirty-eight are procedurally barred and should be summarily denied.

### Alternatively, Applicant's Claims Should Be Denied on Their Merits

The defense may challenge for cause a prospective juror who has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely. TEX. CODE CRIM. PROC. ANN. art. 35.16(c)(2). A "bias against the law" is a refusal to consider or apply the relevant law. *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998). Bias exists when certain beliefs or opinions would prevent or substantially impair a prospective juror from carrying out the duties of a juror in

52

181

Case 3:06-cv-02185-M Document 107 Filed 07/06/15 Page 186 of 236 PageID 1724

accordance with the law. *Id.* A challenge for cause may also be made to a prospective juror who exhibits a bias or prejudice against the defendant. TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(9).

A trial court's ruling on a challenge for cause is reviewed under an abuse-of-discretion standard. *Blue*, 125 S.W.3d at 497. The ruling is given "considerable deference" because the trial court was in the best position to evaluate the prospective juror's demeanor and responses during voir dire. *Blue*, 125 S.W.3d at 497. Particular deference is given to a trial court's ruling on a challenge for cause to a prospective juror whose answers were vacillating, unclear, or contradictory. *Feldman*, 71 S.W.3d at 744.

*This Court did not err in denying applicant's challenge for cause to prospective juror Ama Helfenbein.*

In grounds for relief twenty-five and twenty-six, applicant contends that prospective juror Ama Helfenbein should have been struck for cause because she (1) would answer the anti-parties special issue "yes" if the State proved that applicant conspired to commit an offense, knowing that one or more of his co-conspirators would be armed; and (2) could not consider the five-year minimum sentence for the lesser-included offense of murder. (RR 8: 154-55).

Helfenbein did not have a bias against the law concerning the anti-parties special issue.

Under examination by the State, Helfenbein said she would answer the anti-parties special issue according to what the evidence revealed about applicant's involvement in the murder. (RR 8: 106-09, 114). She agreed to "[k]eep [her] mind open" and listen to all the evidence. (RR 8: 126). Later, defense counsel questioned Helfenbein concerning

Case 3:06-cv-02185-M  Document 107  Filed 07/06/15  Page 187 of 236  PageID 1725

her understanding of actual anticipation under the second special issue by posing several

hypothetical scenarios:

Q. [DEFENSE COUNSEL]     Let me ask you another question regarding Special Issue No. 2. You see down there that it says that one of the ways you can get death is if you anticipate that a human life would be taken. [The prosecutor] talked to you about the people going in the bank vault. Two people go in, two people come out, and there's a bunch of dead bodies. That situation could be pretty cut and dried to some people.

But it could be kind of a conundrum for other people, because you don't know what went on in the bank vault, except that the people died, you know. And his example, you don't know who killed them. You don't know if one guy says, hey, quit shooting, you know, don't kill these people. I'm not, you know, I didn't buy into this, you know, please quit. You know, they may have attacked each other or whatever. So you don't know, other than the fact that two go in and none of the victims come out.

Do you still think that it would be that easy to decide life or death in that situation?

A. [PROSPECTIVE JUROR]     I didn't say it would be easy. But the chances are, if two people go in and a room full of people are killed, one could have done something to stop part of that.

Q.     Well, in [the prosecutor's] example, there's only one pistol.

A.     Uh-huh.

Q.     And attacking somebody with a pistol when you can see that he's killing people may not be something that would lead to your longevity, either, as you can well imagine. The other thing is, it says anticipated that a human life would be taken.

What if you and I drive to this store and you know that I'm going to go in and rob it. And you say, look, don't hurt anybody. Just go in and bring back the money and we'll split it up. But don't hurt anybody. Is that anticipating that a human life would be taken?

A.     They are going to go in and carry out a robbery with a gun in hand?

Q.   No.  But I'm talking about you sitting in the car and you say, look, don't hurt anybody.

A.   I'd have to be some kind of stupid.

Q.   Well, we're not—but all I'm asking you is, would that be enough to show that you anticipated that a human life could be taken?  Because see, what you're doing is, you're telling the person who commits the murder definitely not to do that.  However, you can see that by your very act of saying, don't hurt anybody, that you may be anticipating that a human life would be taken.  See where I'm coming from?

A.   I see where you are coming from, but that's almost like telling a young child don't do it.  So you have got to have some type of anticipating in that situation.

Q.   Could there never be, in your mind, could there never be a way that you wouldn't anticipate that a human life would be taken if you participated in some sort of criminal activity where somebody was armed with a firearm?

A.   I rarely say never because you have to leave yourself some margin.

Q.   I understand that.  But in your way of thinking, if, going back to [the prosecutor's] example, or any other example, if there's more than one person and one person is armed, would the other people always be in some anticipation that a human life would be taken?

A.   Yes.

Q.   Okay.  Simply because they were aware that that one person was armed and could, would, always have the potential to kill someone?

A.   Yes, because the potential would exist.

Q.   And so that in and of itself would answer that part of Special Issue No. 2, in your mind, yes; is that correct?

A.   Yes.

Q.   In other words, that would always be a situation where the person should have anticipated that would happen?

55

A.    Yes.

. . . .

Q.    Well, let's take another aspect of that. I doubt you thought you would come down here for a criminal law course. A conspiracy is— let's go back to the bank robbery or whatever.

Conspiracy is where two people agree to produce a certain crime, to rob the bank. And going back to the example of the bank vault. They agreed to drive up there and to rob the bank. That's their conspiracy. And then something else happens, i.e., the murder, while they're conspiring to rob the bank.

Would that—would you always find in that situation that they should have anticipated that event to have occurred?

A.    If they go in with a gun in hand, there's always an anticipation that somebody will get shot.

Q.    So if the State were able to prove that one or more of the participants in a conspiracy or a joint enterprise were armed, Special Issue No. 2 would be answered yes in your mind?

A.    Yes.

(RR 8: 149-153).

As a threshold matter, applicant's complaint that this Court should have removed Helfenbein for cause because she would answer the anti-parties special issue "yes" based on evidence that applicant participated in an offense involving weapons has been procedurally defaulted. Applicant did not challenge Helfenbein on this basis at trial. (RR 8: 154-55). He has therefore forfeited this complaint. *See Ex parte Pena*, 71 S.W.3d 336, 337 (Tex. Crim. App. 2002) (holding that the rules regarding preservation of error apply on habeas review); *see also Mooney v. State*, 817 S.W.2d 693, 703 (Tex. Crim. App. 1991) (holding that a defendant could not contend on appeal that a juror was

56

185

unqualified because he had been exposed to outside information about the case, where the challenge for cause at trial was limited to the juror's testimony concerning the definitions of the terms "intentional" and "deliberate").

Moreover, even if applicant had presented such a complaint, this Court would not have abused its discretion in rejecting it. As the Court of Criminal Appeals noted in its opinion on direct appeal, "[t]he record does not indicate that any distinction was made between the law of party liability in the guilt phase of trial and the law governing the anti-parties issue at punishment." *Garcia*, slip op. at 5. While in some cases, a jury's finding of guilt will be the functional equivalent of an affirmative answer to the anti-parties special issue, this is not always so. A defendant may be found guilty of capital murder under a parties theory without meeting the requirements for an affirmative anser to the anti-parties punishment issue. *Id.*, slip op. at 5-6 (citing *Valle v. State*, 109 S.W.3d 500, 503-04 (Tex. Crim. App. 2003)). Applicant has not met his burden of showing that Helfenbein understood the requirements of the law, but could not overcome her prejudice well enough to follow it. *Id.*, slip op. at 6.

Furthermore, applicant has not shown that Helfenbein's views would have substantially impaired her ability to carry out her oath and instructions in accordance with the law. Applicant cites no authority for the proposition that a prospective juror is challengeable for cause because she would infer actual anticipation under the anti-parties special issue from the defendant's involvement in an armed criminal endeavor. Applicant's dissatisfaction with the way in which Helfenbein defined proof beyond a reasonable doubt of actual anticipation did not require Helfenbein's removal for cause.

*See Castillo v. State*, 913 S.W.2d 529, 534 (Tex. Crim. App. 1995) ("This Court has repeatedly held the fact that a person is armed when entering the area of a crime or while committing a crime is itself of probative value in proving deliberate conduct.").

To the extent applicant's complaint is that Helfenbein should have been struck for cause because she would "automatically" answer the anti-parties special issue "yes," it is likewise without merit. The defense may challenge for cause a prospective juror who would automatically answer the first or second special issue "yes" after finding the defendant guilty. *See Feldman*, 71 S.W.3d at 745. In other words, a prospective juror who professes an inability to reconsider guilt evidence in the particular context of the special issues has demonstrated a bias against the law. *See Gardner v. State*, 730 S.W.2d 675, 680 (Tex. Crim. App. 1987). The critical determination to be made is whether the challenged juror would answer the special issues based on the evidence presented, rather than merely relying on the earlier finding of guilt. *Pierce v. State*, 777 S.W.2d 399, 404 (Tex. Crim. App. 1989).

Here, Helfenbein never said she would automatically answer the anti-parties issue "yes" after finding applicant guilty. To the contrary, her responses indicated that she could reconsider the evidence of guilt within the context of the second special issue's requirement of actual anticipation. *See id.* at 412 (holding that the trial court did not err in denying a challenge for cause to a prospective juror whose answers indicated that she would base her answer to the future-dangerousness special issue on an examination of the evidence, even though neither the prosecution nor defense counsel could provide a

58

hypothetical situation in which she would answer the future-dangerousness special issue "no").

Furthermore, even if Helfenbein's remarks to defense counsel suggested that she would automatically answer the anti-parties special issue "yes," they conflicted with her initial assurances to the State that she would first consider all the evidence. (RR 8: 114, 126). Given these conflicting responses, this Court was well within its discretion in determining that Helfenbein could follow the law. *See Feldman*, 71 S.W.3d at 744; *see also Wolfe v. State*, 917 S.W.2d 270, 276 (Tex. Crim. App. 1996) (holding that an appellate court must defer to the trial court's ruling on a challenge for cause when the record supports both the ability and inability of the prospective juror to follow the law); *Banda v. State*, 890 S.W.2d 42, 58 (Tex. Crim. App. 1994) (holding that the trial court did not abuse its discretion in denying a challenge for cause where, although some of the prospective juror's testimony indicated that he would presume "yes" answers to the special issues, the record contained sufficient evidence to the contrary to support the trial court's ruling).

<u>Helfenbein did not have a bias against the law concerning the minimum punishment for murder.</u>

This Court was also well within its discretion in determining that Helfenbein would give fair consideration to the entire range of punishment for the lesser-included offense of murder. When questioned by the State, Helfenbein said she could keep an open mind and make a punishment decision based on the evidence. (RR 8: 124). To the defense, however, Helfenbein said she "doubt[ed]" she could assess a five-year sentence

after having found someone guilty of murder. (RR 8: 147-48). She also said that, if she were the "queen of Texas," the minimum sentence for murder would be thirty years' imprisonment. (RR 8: 148-49).

A prospective juror who is unable to consider the full punishment range for any offense of which the defendant may be convicted possesses a bias against the law. *Ladd*, 3 S.W.3d at 559. But a prospective juror is not biased simply because she cannot immediately envision a scenario in which the minimum punishment would be appropriate. *Id*. The crucial consideration is whether the prospective juror could keep an open mind until she has heard all the evidence. *Johnson v. State*, 982 S.W.2d 403, 405-06 (Tex. Crim. App. 1998).

Here, this Court could have reasonably interpreted Helfenbein's statement that she "doubt[ed]" she could assess a five-year sentence to mean that she simply could not, at that moment, envision a situation in which she might find the minimum punishment appropriate. That Helfenbein could not imagine such a situation during voir dire, however, does not necessarily mean that she could not assess the minimum punishment if an appropriate scenario presented itself at trial. *See Ladd*, 3 S.W.3d at 559.

Additionally, there is a distinction between a prospective juror who has a bias or prejudice against the law and one who is merely entertaining an opinion. *Penry v. State*, 903 S.W.2d 715, 728 (Tex. Crim. App. 1995). Thus, Helfenbein's personal belief that the minimum punishment for murder should be much higher does not automatically translate into an inability or unwillingness to follow the law as it currently stands.

As the Court of Criminal Appeals held on direct appeal, applicant has failed to carry his burden of showing that Helfenbein's views on the statutory minimum punishment for murder would substantially impair her ability to carry out her oath and instructions in accordance with the law. *See Garcia*, slip op. at 5. Accordingly, this Court did not abuse its discretion in denying applicant's challenge for cause. (RR 8: 124). *See Williams v. State*, 773 S.W.2d 525, 537 (Tex. Crim. App. 1988) (holding that the trial court did not err in denying a challenge for cause based on an inability to consider five years for the lesser-included offense of murder, where the prospective juror only said that he did not "think" he could consider five years). Applicant's twenty-fifth and twenty-sixth grounds for relief should be denied.

*This Court did not err in denying applicant's challenge for cause to prospective juror Thomas Tucker.*

In grounds for relief twenty-seven and twenty-eight, applicant contends that prospective juror Thomas Tucker should have been struck for cause because he believed that a person who had already committed one murder would always be a continuing threat to society, thereby relieving the State of its burden to prove future dangerousness beyond a reasonable doubt.

Under questioning by the State, Tucker said he would follow this Court's instructions and the law and would answer each of the special issues according to the evidence. (RR 9: 111-12). He said he understood it was the State's burden to prove that the future-dangerousness special issue should be answered "yes" and he could answer this issue either "yes" or "no" depending on the evidence. (RR 9: 128-30). He also said

61

that he "may be predisposed" toward believing that somebody guilty of capital murder

would be "willing to do it again":

> If I have found the individual to be guilty, in my mind, that tells me that
> there will always be a probability, regardless if you were run over by a bus
> and you are now a quadriplegic. In my mind there's still a probability that
> you may at some time in the future be capable of committing another
> criminal act that might constitute a threat to society.

(RR 9: 130, 133).

Further questioning by the State revealed that Tucker was equating a "probability"

under the future-dangerousness special issue with a "possibility." (RR 9: 133). After the

prosecutor explained that a "probability" meant more than a mere "possibility" or

"chance," Tucker said he could follow the law and listen to the evidence before deciding

the future-dangerousness issue. (RR 9: 133-35).

During his examination by the defense, Tucker confirmed that "[d]eep down," he

believed that a convicted capital murderer would probably commit violent criminal acts

in the future. (RR 9: 147-48). Still, he maintained that while he may be inclined to think

such a probability existed, he would not automatically answer the future-dangerousness

special issue "yes." (RR 9: 148-49). Additionally, upon questioning by this Court,

Tucker said he would hold the State to its burden of proof on this issue. (RR 9: 170).

The Court of Criminal Appeals held on direct appeal that this Court did not abuse

its discretion in denying the challenge for cause to Tucker because applicant had failed to

show that Tucker's views would have substantially impaired his ability to carry out his

oath and instructions in accordance with the law. *Garcia*, slip op. at 7. Once a

prospective juror demonstrates he can set aside his personal feelings and follow the trial

Case 3:06-cv-02185-M Document 107 Filed 07/06/15 Page 196 of 236 PageID 1734

court's instructions, he is not disqualified as a matter of law. *Kemp v. State*, 846 S.W.2d 289, 298 (Tex. Crim. App. 1992). Here, Tucker repeatedly assured both the State and this Court that despite his personal beliefs about the likelihood of a capital murderer's being violent in the future, he would follow the law and require the State to prove beyond a reasonable doubt that the answer to the future-dangerousness special issue should be "yes." (RR 9: 111-12, 129-30, 134-35, 170). Moreover, to the extent Tucker vacillated on his ability to follow the law, this Court was in the best position to determine whether he was indeed biased. *See Feldman*, 71 S.W.3d at 744; *see also Teague v. State*, 864 S.W.2d 505, 514 (Tex. Crim. App. 1993) (holding that the trial court did not err in denying a challenge for cause where the prospective juror initially indicated to defense counsel that he "felt" he would automatically answer the special issues "yes," but his later answers to the prosecutor indicated that he would follow the law and answer the special issues based on the evidence presented), *overruled on other grounds by Robertson v. State*, 871 S.W.2d 701 (Tex. Crim. App. 1993); *Cooks v. State*, 844 S.W.2d 697, 713 (Tex. Crim. App. 1992) (upholding the denial of a challenge for cause where some of the prospective juror's responses to defense questioning indicated that she would automatically answer the special issues on a finding of guilt, but the trial court specifically questioned juror on the matter and elicited contrary responses, as did the State). Applicant's twenty-seventh and twenty-eighth grounds for relief should be denied.

*This Court did not err in denying applicant's challenge for cause to prospective juror Larry Carroll.*

In grounds for relief twenty-nine and thirty, applicant contends that prospective juror Larry Carroll should have been struck for cause because he (1) would always answer the future-dangerousness special issue "yes" and (2) believed that mere presence alone makes one a party to an offense. (RR 12: 106).

<u>Carroll did not have a bias against the law concerning the future-dangerousness special issue.</u>

During questioning by the State, Carroll agreed he could hold the State to its burden of proof on the future-dangerousness special issue and could answer it "yes" or "no" according to the evidence. (RR 12: 64-68). He acknowledged there might be situations in which someone who had been convicted of capital murder would not pose a continuing threat to society. (RR 12: 67-68). Under defense examination, Carroll was questioned about his "feelings" regarding the future-dangerousness special issue:

> Q. [DEFENSE COUNSEL]    That is what the law is. Now, a lot of jurors, frankly, have problems with that concept. Because this is what they tell us. Well, if the State has already proven to me right here in court that the person on trial is a person who is engaged in a robbery, first of all, and then during the course of that robbery intentionally killed a police officer when he knew he was a police officer, well, that is the type of person who to me is always going to be a continuing threat. Okay?

> A. [PROSPECTIVE JUROR]    Okay.

> Q.    So many jurors tell us that by the time they have heard the evidence which convinced them the defendant was guilty, they don't need to hear anything else in regards to Special Issue Number 1, that has already been answered for them. Okay? And so that they say, well, my answer is always going to be yes, if the State has proven to me that the person here on trial is an intentional murderer and did so under one of those aggravating factors that are listed there in front of you. How do you feel about that?

64

    A.    I agree with it.

    Q.    Now, you understand, Mr. Carroll, that that is not what the law says again, and I'm going back over that. The law says that a jury has to presume that the answer to the question is no. Okay? Even though they have found somebody guilty of capital murder, an intentional murder with one of those aggravating factors. Okay? But many jurors just like yourself have told us that that you feel, and we don't have any quarrel with them feeling that way, it is just something we need to know right now.

    A.    Uh-huh.

    Q.    And is that, Mr. Carroll, the way you feel?

    A.    Yeah.

(RR 12: 91-92). Later, in response to this Court's inquiries, Carroll returned to the position he had taken with the State and assured this Court that he would presume the answer to the future-dangerousness special issue to be "no" and require the State to prove beyond a reasonable doubt that it should be "yes." (RR 12: 105).

An isolated statement will not require a prospective juror's removal for cause if his voir dire responses, considered as a whole, demonstrate he can follow the law. *Cooks*, 844 S.W.2d at 711. Here, Carroll repeatedly said he would follow the law and require the State to meet its burden of proof on the future-dangerousness special issue. (RR 12: 64-65, 105). Additionally, he said several times that he would wait to hear all the facts before determining whether applicant would pose a future danger. (RR 12: 65-68). He agreed, therefore, that a guilty verdict should not dictate his answers to the special issues. (RR 12: 67). Considering the voir dire examination as a whole, this Court did not abuse its discretion in concluding that Carroll could follow the law with respect to the future-dangerousness special issue. *See Ladd*, 3 S.W.3d at 558-59 (holding that the

trial court did not err in denying a challenge for cause where the court could have reasonably concluded that the prospective juror would follow the law with respect to the burden of proof on the special issues and would answer those issues honestly, based on the evidence presented).

As the Court of Criminal Appeals noted on direct appeal, Carroll "was at best a vacillating veniremember" with respect to his ability to answer the future-dangerousness special issue "no." *Garcia*, slip op. at 7. This Court was therefore in the best position to resolve Carroll's qualifications as a juror. *See Banda*, 890 S.W.2d at 55 ("It is not error on the part of the trial court to deny a challenge for cause to a veniremember who gives equivocal answers on whether or not he would automatically say 'yes' to one of the special issues.")

<u>Carroll did not have a bias against the law of parties.</u>

This Court was also in the best position to determine whether Carroll was biased against the rule that mere presence alone does not make one a party to an offense. *See Porter v. State*, 634 S.W.2d 846, 849 (Tex. Crim. App. 1982). During his examination by the State, Carroll said he agreed with this rule. (RR 12: 75). To the defense, however, Carroll intimated that as long as applicant was *present* during the commission of the offense, he would find him guilty as a party. (RR 12: 95).

Before a prospective juror may be struck for having a bias against the law, the relevant law must be explained to him and he must be asked whether he can follow the law despite his personal views. *Sells v. State*, 121 S.W.3d 748, 759 (Tex. Crim. App.), *cert. denied*, 124 S. Ct. 511 (2003). Here, Carroll's responses to the State's questions

66

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 200 of 236   PageID 1738

showed he understood and could apply the law regarding party liability. (RR 12: 74-75).

Nevertheless, applicant contends that the following exchange demonstrates Carroll's bias:

> Q. [DEFENSE COUNSEL]    . . . Some people have, frankly, told us that, well, I understand what those requirements are, I see what you're saying. But my belief is that if a person went into it, was in any way participated with the robbery and if a person happened, even if they didn't think it through that far, that that is going to be enough for me and I'm going to find—I'm going to find him guilty, number one, and I'm going to find the answer to Special Issue Number 2 to be yes. As long as the State has got to show they were there and they were present, but that is really all they're going to have to show me. How do you feel about that?
>
> A. [PROSPECTIVE JUROR]     That's right.

(RR 12: 95). While this exchange may reveal something about Carroll's personal feelings or beliefs, it does not establish that he would be unable to abide by the law that mere presence alone does not make one a party to an offense. It does not, in other words, show that Carroll's personal views would prevent him from following the law. *See id.* (holding that the proponent of a challenge for cause must show that the prospective juror understands the law and cannot overcome his prejudice well enough to follow it).

This Court could have reasonably found, based on Carroll's earlier assurances to the State, that he did not have a bias against the law. *See Rachal v. State*, 917 S.W.2d 799, 814 (Tex. Crim. App. 1996) (holding that the trial court did not abuse its discretion in denying a challenge for cause where the prospective juror was never directly asked if he could follow the law, and never clearly stated that he could not do so). Moreover, as the Court of Criminal Appeals held on direct appeal, to the extent Carroll made contradictory statements, this Court's implicit determination that Carroll would follow

67

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 201 of 236   PageID 1739

the law is entitled to deference. *See Garcia*, slip op. at 7; *see also Swearingen v. State*, 101 S.W.3d 89, 99 (Tex. Crim. App. 2003).

Applicant has failed to meet his burden to show that prospective juror Carroll was challengeable for cause. *See Garcia*, slip op. at 7. This Court did not err in denying applicant's challenge. Grounds twenty-nine and thirty should be denied.

*This Court did not err in denying applicant's challenge for cause to prospective juror Gregory Babineau.*

In thirty-first and thirty-second grounds for relief, applicant contends that prospective juror Gregory Babineau should have been struck for cause because he (1) would return a guilty verdict even if the State failed to prove the manner and means of death as alleged in the indictment, (2) believed an indictment was some evidence of guilt, (3) could never consider a five-year sentence for the lesser-included offense of murder, (4) would always answer the future-dangerousness special issue "yes," (5) would require applicant to prove that the anti-parties special issue should be answered "no," and (6) could never find sufficient mitigating circumstances to warrant a "yes" answer to the mitigation special issue. (RR 14: 82-85). Applicant also maintains that Babineau exhibited a bias against him by saying he would always believe a police officer's testimony over that of a lay witness. (RR 14: 83).

<u>Babineau did not have a bias against the law concerning the State's burden of proof.</u>

Babineau assured the State that he would require the prosecution to prove beyond a reasonable doubt each and every element of the charged offense. (RR 14: 27-28).

Later, defense counsel quizzed him on his ability to return a not-guilty verdict if the

State's proof failed on a "technicality":

> Q. [DEFENSE COUNSEL]      . . . [I]t always comes down to a
> situation in which you know in your heart of hearts that the person on trial
> is guilty. You know, it's not like there's some questions in your mind as to
> whether they identified him. . . . [W]e could put it on videotape. . . . And
> you could look at the film and say that's the guy that is sitting over there in
> the defendant's chair and, yeah, that's the clerk in the store that got shot
> and you can be convinced because not only are you hearing testimony, but
> you can see it on the screen. But then when you get down there, there's
> something that they left out. . . . You see the guy go in and he shoots the
> clerk three or four times. And then on the video you see him lean over the
> clerk, make some motion and then he leaves the store. And they allege that
> . . . the defendant took the life of so and so by shooting him with a firearm.
> You look at the video and you see him walk in and he's got a gun in his
> hand and you see him shoot and you see the clerk fall and you see him
> leave.
>
> A. [PROSPECTIVE JUROR]      Okay.
>
> Q.      Medical examiner comes in here and says, yeah, I examined
> the body of the clerk and he was shot five times at close range, nine
> millimeter. What killed him, though, was somebody stabbed him in the
> heart. The gunshot wounds didn't kill him at all. That explains, then, at
> that point in time what the guy was doing when he was leaning over the
> clerk. And it's the same person you can see on the video.
>
> A.      Uh-huh.
>
> Q.      Some people say, look, if that's the law, I don't want to have
> any part of it. Go find you some other jurors, because I couldn't go home
> and go to my work and I couldn't go home and face my wife and kids and
> tell them that I had let somebody off because some dumb prosecutor
> couldn't get the county right or some prosecutor didn't talk to the medical
> examiner and find out what killed somebody. What do you think about
> that?
>
>      . . . .
>
> A.      Would it bother me? No. To make the right decision.

Q.    Would you find him guilty anyway?

A.    I would find him guilty, yes.

. . . .

Q.    [T]he defendant is the person who brought about his death, but because of the State's failure of evidence, the law, or the Court's charge, would require that you find the defendant not guilty.

I'm just thinking that talking to you, seeing you answered the questions both from the State and myself, that that would be about as offensive to your conscience as anything we can dream of?

A.    We would have to prove [sic] him not guilty because of that one little technicality because he died of a knife stab wound, instead of gunshot wound, even though you saw him get shot?

Q.    That's correct?

A.    That sucks.

. . . .

Q.    But, you know, they just—somebody was asleep at the switch and they didn't figure out, hey, it happened somewhere else. So once again, it would be a mistake on their part, no question in your mind, I take it you couldn't, you couldn't find that, right?

A.    Correct.

(RR 14: 58-62). Upon further questioning by this Court, Babineau said that while he was

not "comfortable" acquitting a defendant because the State failed to prove an element

such as manner and means, he could follow the law. (RR 14: 78-80).

By applicant's own admission, Babineau was at best a vacillating veniremember

with respect to his ability to follow the law concerning the State's burden of proof. (Writ

Application, p. 93). As the Court of Criminal Appeals recognized on direct appeal, this

70

Court was in the best position to determine whether Babineau held a bias against the law. *See Garcia*, slip op. at 7.

Moreover, a prospective juror need not agree with the law so long as his personal views do not substantially impair his ability to abide by his oath as a juror. *Rayford v. State*, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003). Initially, Babineau said he would require the State to prove beyond a reasonable doubt each and every element of the offense as alleged in the indictment. (RR 14: 27-28). Later, when confronted with a troubling scenario in which he would be forced to acquit an ostensibly guilty defendant due to the State's failure to allege and prove the proper manner and means, Babineau understandably found such a prospect disagreeable. (RR 14: 61). Ultimately, however, after this Court reiterated the law, Babineau said that despite his discomfort and "[b]ecause that's the law," he could find applicant not guilty if the State failed to prove even a relatively trivial averment in the indictment. (RR 14: 79-80). He thus recognized the distinction between his personal scruples and his responsibilities as a juror. Consequently, this Court could have been reasonably satisfied that Babineau's personal views would not impair his obligation to follow the law. *See Cantu v. State*, 842 S.W.2d 667, 683 (Tex. Crim. App. 1992) (upholding the denial of a challenge for cause where the record showed that the prospective juror was confused when he indicated he might find the defendant guilty even if the State failed to prove all the elements of the offense as alleged in the indictment; upon further questioning by the trial court, he said he could follow the law and hold the State to its burden of proof); *Lane v. State*, 822 S.W.2d 35, 47-48 (Tex. Crim. App. 1991) (holding that the trial court did not err in denying a

71

200

challenge for cause to a prospective juror who said he would find the defendant guilty even if the State failed to prove "some technical thing" in the indictment such as the location of the offense, where, after the law was clarified, he stated without hesitation that he could follow the law and the judge's instructions).

<u>Babineau did not have a bias against the law concerning the presumption of innocence.</u>

This Court could have reached a similar conclusion regarding Babineau's ability to abide by the presumption of innocence. Babineau first told the State that he agreed with the presumption of innocence and that he would not consider the indictment as any evidence of applicant's guilt. (RR 14: 28-29). To the defense, however, Babineau said that he suspected applicant "must have done something," or, as defense counsel put it, "if there's this much smoke down here, there has to be a fire somewhere." (RR 14: 72-73). When asked whether applicant's current incarceration sufficed for him to presume applicant guilty, Babineau replied that he "would like to hear evidence and all that." (RR 14: 73). Still, he said he was fairly certain that applicant had done "something." (RR 14: 73).

A reviewing court must defer to the trial court's decision on a challenge for cause when the record supports both the ability and the inability of the prospective juror to follow the law. *Wolfe*, 917 S.W.2d at 276. Accordingly, even if Babineau's remarks to defense counsel could be construed as showing a bias against the presumption of innocence in general, this Court could have reasonably denied the challenge for cause because of Babineau's repeated assurances that he could keep an open mind and hold the State to its burden of proof. (RR 14: 28-29). *See Ladd*, 3 S.W.3d at 560 (holding that the

72

trial court did not abuse its discretion in denying a challenge for cause to a prospective juror who told defense counsel that he thought the defendant's arrest and indictment "suggest[ed]" guilt; that "where there's smoke, there's fire"; and that "if someone is one trial, there's at least some reason for them to have been brought in before the court" where, upon questioning by the State and the trial court, the prospective juror repeatedly said he could hold the State to its burden of proof).

### Babineau did not have a bias against the law concerning the minimum punishment for murder.

Similarly, this Court could have been satisfied by Babineau's repeated assurances that he could consider a five-year sentence for murder. In response to questioning by the State, Babineau said that if he found applicant guilty of the lesser-included offense of murder, he could keep an open mind with respect to punishment and could even impose a five-year sentence if he thought it was the "right thing to do." (RR 14: 32). Later, when defense counsel asked whether he would ever be able to assess a five-year sentence for murder, Babineau replied, "No, I don't think so." (RR 14: 64). Ultimately, however, Babineau assured this Court that he could contemplate a five-year sentence where appropriate. (RR 14: 80).

Once again, given these vacillating responses, this Court was in the best position to ascertain Babineau's qualifications as a juror. *See Garcia*, slip op. at 7; *see also Feldman*, 71 S.W.3d at 744. Considering Babineau's many assurances that he could remain open-minded to the possibility that five years might be an appropriate punishment under some circumstances, this Court did not abuse its discretion in concluding that he

would comply with the law. (RR 14: 32, 80). *See Cooks*, 844 S.W.2d at 709-10 (holding that the trial court did not err in denying challenges for cause to prospective jurors who initially expressed reservations about assessing the minimum punishment for the lesser-included offense, but ultimately said they could follow the law and remain open-minded).

<u>Babineau did not have a bias against the law concerning the future-dangerousness special issue.</u>

Additionally, the record supports this Court's implicit finding that Babineau would give proper consideration to the future-dangerousness special issue. Initially, Babineau told the State that he could answer this issue "yes" or "no" depending on whether the State met its burden of proof. (RR 14: 37-39, 41-43). Later, defense counsel questioned Babineau concerning what evidence he would look to in answering the future-dangerousness issue:

> Q. [DEFENSE COUNSEL]     . . . Let's say that you find the defendant guilty beyond a reasonable doubt of committing a capital murder. At that point in time the State may present other evidence to you or they may not present other evidence. In other words, they may show that you have been in prison ever since he turned adult or they may not show anything. They may not have anything else to put on.
>
> So when you get to question No. 1, you are asked is he going to be a continuing danger to society because he committed criminal acts of violence, a lot of people say, look, I was convinced beyond a reasonable doubt that the person I was dealing with is the type of person that would and did commit capital murder, the answer to question No. 1 is pretty easy. Sure he's going to be a continuing threat to society. He's already gone out and robbed and killed somebody or robbed and raped somebody, whatever the crime he's charged with?
>
> A. [PROSPECTIVE JUROR]     Uh-huh.
>
> Q.     What do you think about that, Mr. Babineau?

74

Scanned Aug 29, 2011

A.      They have to show evidence to prove it, right?

Q.      If they have got any.  There may not be any, but some people say, look, what evidence do I need?  I've already found that he not only committed an intentional murder, but he committed an intentional robbery or intentional rape or an intentional burglary or I could check off the list.  And, you know, I don't need any more proof, other than the crime itself to answer question No. 1.

What do you think?  Would you have to look to something else or would the facts of the case itself answer that for you?

A.      The facts should answer that for me.

Q.      I'm sorry?

A.      The facts I think—I'm not sure.

Q.      Well, it's a hard question.  All I'm asking you is, is you understand what at this point—before you get to Special Issue No. 1, see, we have to project ahead of time and pretend that things have happened or not.  But we have to—we have to put you in a position to where—and eleven other people have heard evidence in the courtroom that's convinced all twelve of you beyond a reasonable doubt that the person on trial is not only a murderer, a murder that you thought the only logical punishment would be—would be life or death, but they have proven not only is the person a murderer, but he's a capital murderer.  Somebody that not only murdered intentionally, but did something that would aggravate it.

And then, like I say, may be more evidence there; may be no more evidence.  But I'm kind of getting the impression, and if I'm wrong, correct me, but I kind of get the impression that when you get to Special Issue No. 1, that you probably automatically answer that that should be yes, that the person would be a continuing threat to society because they are going to be violent in the future.  Is that the way—

A.      Yes.

Q.      So let me get this—let me see if I'm hearing you correctly.  If you get to Special Issue No. 1, if you found the person guilty in your mind, the answer to Special Issue No. 1 would always be yes.  Is that a correct statement?

75

294

A.      Most likely, yes, it would.

(RR 14: 69-71).

At the close of the voir dire examination, this Court again explained the law with respect to the future-dangerousness special issue and then specifically asked Babineau whether he could return a "no" answer if the State failed to meet its burden of proof. (RR 14: 80-81). Babineau said he could indeed answer "no" under those circumstances. (RR 14: 81).

Applicant has not shown that Babineau was biased against the law concerning the future-dangerousness special issue. Although Babineau did say that he "probably" or "[m]ost likely" would answer the future-dangerousness special issue "yes," he also recognized that it was the State's burden to prove future dangerousness. The totality of Babineau's voir dire responses indicates that his answer to the future-dangerousness issue would not be dictated by the guilty verdict, but would, rather, be determined by an examination of all the evidence, including the facts of the offense. *See Cooks*, 844 S.W.2d at 713 ("[T]he facts and circumstances of a capital offense alone, if particularly heinous in nature, can be sufficient to support an affirmative response to the anti-parties special issue.").

In any event, Babineau was at best a vacillating veniremember, and this Court was in the best position to resolve his conflicting responses. *See Garcia*, slip op. at 7; *see also Mooney*, 817 S.W.2d at 701. This Court could have reasonably found Babineau to be qualified with respect to the future-dangerousness special issue because of his specific, repeated assurances that he would abide by the law. (RR 14: 38-39, 41-43, 81). *See*

76

*Feldman*, 71 S.W.3d at 748 (upholding the denial of a challenge for cause where, depending on who asked the question, the prospective juror vacillated on whether she would automatically return a "yes" answer to the future dangerousness issue).

<u>Babineau did not have a bias against the law concerning the mitigation special issue.</u>

Likewise, this Court could have reasonably found Babineau to be qualified with respect to the mitigation special issue. Babineau assured the State that even after having answered the first two special issues "yes," he could answer the mitigation issue "yes" or "no" according to the evidence. (RR 14: 46-47). Though he admitted he could not immediately think of anything he would regard as mitigating evidence, he agreed to give the issue "the fair weight it deserves." (RR 14: 47). Babineau equivocated, however, under defense questioning: at first, he told defense counsel he could be persuaded to answer the mitigation special issue "yes"; later, he said he could never find sufficient mitigating circumstances to warrant a life sentence. (RR 14: 76-78). Ultimately, Babineau told this Court that he could answer the mitigation special issue "yes" or "no" depending on the evidence. (RR 14: 81-82). Additionally, Babineau specifically assured this Court that he could answer this issue "yes" even though applicant would then receive a life sentence. (RR 14: 82).

Considering Babineau's voir dire responses as a whole, this Court had ample evidence to support its denying applicant's challenge for cause. This Court could have reasonably regarded any hesitation on Babineau's part as simply due to his confessed inability to readily envision the kind of evidence he might consider mitigating. (RR 14: 47). A juror need not, however, regard any particular evidence as mitigating. *Allridge v.*

77

*State*, 850 S.W.2d 471, 481-82 (Tex. Crim. App. 1991). The law requires only that jurors consider all the evidence in determining whether the defendant's "moral blameworthiness" should be reduced. TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(f)(4); *Maldonado v. State*, 998 S.W.2d 239, 250 (Tex. Crim. App. 1999).

Here, Babineau specifically acknowledged that there "could be some evidence out there" to warrant a "yes" answer to the mitigation special issue and agreed to keep an open mind to such evidence. (RR 14: 46-47, 76-77). Given these assurances, this Court acted well within its discretion in concluding that he Babineau qualified with respect to this issue. *See Coleman v. State*, 881 S.W.2d 344, 352 (Tex. Crim. App. 1994) (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to all the evidence with an open mind). Furthermore, to the extent Babineau equivocated, this Court's decision should be given deference. *See Garcia*, slip op. at 7.

<u>Babineau did not have a bias against applicant.</u>

Finally, applicant contends Babineau should have been struck for cause because he could not impartially judge the credibility of witnesses. Specifically, he claims that Babineau would always find a police officer more credible than a lay witness.

A defendant may insist on jurors who will impartially judge the credibility of witnesses. *Hernandez v. State*, 563 S.W.2d 947, 950 (Tex. Crim. App. 1978). A prospective juror who believes that a police officer would never lie under oath has an impermissible bias against the defendant under article 35.16(a)(9). TEX. CODE CRIM. PROC. ANN. art. 35.16 (a)(9); *Lane*, 822 S.W.2d at 42.

The record shows that Babineau gave vacillating responses to the question whether he would always believe the testimony of a police officer over that of a lay witness. He first assured the State that in the event of a conflict, he could disbelieve a police officer's testimony if he found the lay witness more credible. (RR 14: 47-48). Later, however, he told the defense that he would always believe the police officer "simply because he was a police officer and for no other reason." (RR 14: 66-67). Still later, in response to questioning by this Court, Babineau said he would *not* always believe a police officer's testimony. (RR 14: 80).

Here again, this Court was best equipped to resolve the prospective juror's contradictory responses. *See Garcia*, slip op. at 7; *see also Feldman*, 71 S.W.3d at 744. Given Babineau's assurances that he could follow the law and not automatically believe a police officer's testimony, this Court could have reasonably concluded that Babineau was not biased against applicant. (RR 14: 47-48, 80). *See Lane*, 822 S.W.2d at 45 (holding that the trial court did not abuse its discretion in denying a challenge for cause where, although the prospective juror gave some responses indicating that she was predisposed to always believe police officers, she also said she would evaluate a police officer's credibility as she would any other witness's).

This Court did not abuse its discretion in denying applicant's challenge for cause to prospective juror Babineau. Applicant's thirty-first and thirty-second grounds for relief should be denied.

*This Court did not err in denying applicant's challenge for cause to prospective juror Lillian Lyles.*

In grounds for relief thirty-three and thirty-four, applicant contends that prospective juror Lillian Lyles should have been struck for cause because she (1) would answer the anti-parties special issue "yes" if she found that applicant had participated in an offense in which weapons were used, (2) would automatically answer the mitigation special issue "no," and (3) could never assess a five-year sentence for murder. (RR 25: 76-77).

<u>Lyles did not have a bias against the law concerning the anti-parties special issue.</u>

Lyles told the State that she would consider all the evidence before answering the anti-parties special issue and would require the State to prove beyond a reasonable doubt that the answer should be "yes." (RR 25: 42). She further assured the State that she would "keep [her] mind open" throughout the entire trial and would not "automatically answer anything" before hearing all the evidence. (RR 25: 51).

Lyles told defense counsel that there is "always a chance" during an armed robbery that "somebody will get hurt." (RR 25: 59-60). She agreed, however, that there might be a distinction in punishment as between the party who actually shot and killed the victim and the party who participated in the robbery, but did not take an active role in the killing. (RR 25: 59). She also said that, in determining the proper punishment for the non-shooter, she would look to the evidence and what it revealed about "how much that person knew about what was going on." (RR 25: 63-64). But when defense counsel pressed her further, Lyles's responses became more ambiguous:

Q. [DEFENSE COUNSEL]     . . . [The prosecution] ha[s] to prove to you that the defendant anticipated that a human life would be taken. Does that mean more than it's just possible out there that it could happen?

A. [PROSPECTIVE JUROR]     Yes. If you, a person goes into a situation where there are weapons being used, I mean there's that likelihood that something could happen, something bad.

Q.     What I understand then, you're saying if an individual goes in with a weapon that that answer would always be that you would anticipate a human life would be taken?

A.     Could be. It could be. A human life could be taken, not that it will be, but it could be.

Q.     Okay. So, if, in fact, you found the defendant did, in fact, participate where there where weapons involved, is it fair to say that you would always find that he anticipated that a human life would be taken? Is that fair?

A.     Yes, uh-huh.

(RR 25: 64-65).

Lyles later assured this Court that she would make the State prove beyond a reasonable doubt that the anti-parties special issue should be answered "yes." (RR 25: 74).

In challenging Lyles for cause, applicant argued that she had "unequivocally stated that she would always find the answer to Special Issue No. 2 to be yes, if she found the defendant guilty as a party in a capital murder case, and if weapons were used, which necessarily is going to be the case in a murder case." (RR 25: 76). Indeed, Lyles did say she would always find in such a scenario that applicant anticipated a human life *would* be taken. (RR 25: 65). Immediately before this statement, however, she had taken pains to

81

point out that she would only find that applicant anticipated a human life *could* be taken. (RR 25: 65). Lyles may have misunderstood defense counsel's questions; she may have also misunderstood the relevant law. Regardless, considering the voir dire examination in its entirety, including Lyles's repeated assurances that she would hold the State to its burden of proof on the anti-parties special issue, this Court could have justifiably concluded that applicant had not shown Lyles to be biased against the law. (RR 25: 42, 74). *See Garcia*, slip op. at 7; *see also Feldman*, 71 S.W.3d at 747 (holding that the proponent has the burden of establishing the propriety of a challenge for cause); *Rachal*, 917 S.W.2d at 815 ("When the record is confused, and without a clearly objectionable declaration by the venireman, we cannot second guess the trial court, and we must defer to the trial court's understanding of what actually occurred."); *Curry v. State*, 910 S.W.2d 490, 494 (Tex. Crim. App. 1995) (holding that the trial court did not err in denying a challenge for cause to a prospective juror who acknowledged that there were some instances in which the death penalty would not be appropriate and answered affirmatively when directly asked if she could follow the law that compels the answers to the special issues to be "no" unless proven beyond a reasonable doubt by the State to be "yes").

Additionally, as previously discussed with respect to Helfenbein, Lyles was not challengeable for cause simply because she would infer actual anticipation from applicant's participation in an armed offense. Lyles's responses indicate that she would base her answer to the anti-parties special issue on the evidence. The fact that Lyles would require less or different evidence than applicant would have liked to be convinced beyond a reasonable doubt of actual anticipation does not mean that she was biased

82

211

against the law. *Cf. Howard v. State*, 941 S.W.2d 102, 127 (Tex. Crim. App. 1996) (holding that it was the State's burden, as the challenging party, to show that the prospective juror's refusal to answer the future-dangerousness issue in the affirmative without evidence that the accused had committed a prior murder was predicated on something other than her personal threshold of reasonable doubt).

<u>Lyles did not have a bias against the law concerning the mitigation special issue.</u>

Under questioning by the State, Lyles acknowledged that a defendant's youth or "how [he was] brought up" might be a mitigating circumstance. (RR 25: 44-45). She said she could "keep [her] mind open" to potentially mitigating evidence and could answer the mitigation special issue "yes," knowing that applicant would receive a life sentence. (RR 25: 45-46). Yet, Lyles later told defense counsel that she could never "see that there is anything mitigating to give a person a life sentence." (RR 25: 65-66). Ultimately, however, Lyles assured this Court that if presented with sufficient evidence, she could return a "yes" answer to the mitigation special issue. (RR 25: 74).

Defense counsel's questions required Lyles to immediately envision a situation in which she would answer the mitigation special issue "yes." (RR 25: 65-66). Her inability to do so did not require her removal for cause, given that she had already assured the State and this Court that she would keep an open mind and would base her answer on the evidence. (RR 25: 45-46, 74). *See Maldonado*, 998 S.W.2d at 251 (deferring to the trial court's decision to deny a challenge for cause where the prospective juror vacillated, but ultimately expressed his willingness to consider character and background evidence in answering the mitigation special issue); *McCoy v. State*, 713

83

S.W.2d 940, 951 (Tex. Crim. App. 1986) (holding that a prospective juror's inability to envision a situation in which he would respond "yes" or "no" to a special issue is not automatically grounds for reversing a trial court's ruling denying a challenge for cause).

Furthermore, to the extent Lyles vacillated on her ability give proper consideration to the mitigation special issue, this Court was in the best position to determine whether she had a bias against the law. *See Garcia*, slip op. at 7.

### Lyles did not have a bias against the law concerning the minimum punishment for murder.

Additionally, this Court did not abuse its discretion in concluding that Lyles could consider the full range of punishment for murder. Lyles assured both the State and this Court that she could remain open-minded to the full range of punishment and that she could assess as little as five years' imprisonment in an appropriate case. (RR 25: 49-50, 75-76). She told the defense, on the other hand, that she could never assess a five-year sentence for murder. (RR 25: 66-68).

Here again, this Court was faced with a vacillating prospective juror. Because Lyles ultimately said she could consider the full range of punishment, this Court acted within its discretion in denying applicant's challenge for cause. (RR 25: 75-76). *See Garcia*, slip op. at 7; *see also Rosales v. State*, 4 S.W.3d 228, 233 (Tex. Crim. App. 1999) (holding that the trial court did not err in denying a challenge for cause where the prospective juror equivocated regarding his ability to consider a five-year sentence for murder, but ultimately assured the trial court that he could consider the full range of punishment).

84

213

Applicant has not met his burden to show that prospective juror Lyles was challengeable for cause. As the Court of Criminal Appeals noted on direct appeal, Lyles was at best a vacillating veniremember. *Garcia*, slip op. at 7. Accordingly, this Court was well within its discretion in finding that Lyles did not have a bias against the law. Applicant's thirty-third and thirty-fourth grounds for relief are without merit and should be denied.

*This Court did not err in denying applicant's challenge for cause to prospective juror Alan Lucien.*

In his thirty-fifth and thirty-sixth grounds for relief, applicant contends that prospective juror Alan Lucien should have been struck for cause because he (1) would answer the anti-parties special issue "yes" if the evidence showed that applicant agreed to participate in an offense in which weapons would be used and (2) could never assess a five-year sentence for murder. (RR 36: 169).

<u>Lucien did not have a bias against the law concerning the anti-parties special issue.</u>

Lucien told the State that he could consider all the evidence in answering the anti-parties special issue. (RR 36: 129, 132-33). As with prospective juror Lyles, however, defense counsel's questioning on this subject yielded ambiguous responses. (RR 36: 157-160). Again, there may have been some confusion regarding the difference between anticipating that a human life *would* be taken and anticipating that a human life *could* be taken:

> Q. [DEFENSE COUNSEL]   How would you ever be able to tell that I was anticipating that somebody else other than myself was about to kill someone?

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 219 of 236   PageID 1757

A. [PROSPECTIVE JUROR]      Well, I would have to think that you'd have to look at the intention going into committing the crime, of that individual, was going to anticipate that somebody *could possibly* be killed before they went, before they ever went in to commit that crime.

. . . .

Q.      Let's say that myself and Mr. Lucas decide to go rob a bank. We're kind of a low budget operation, we've only got one gun. So, he's got a car, I've got a gun, we go down there, and I get out of the car, and he says, don't hurt anybody. I don't want, you know, I've already brought you down here and I'm not going to go in, but I don't want you to hurt anybody. Would that be anticipating that a human life would be taken?

A.      Yes, it would.

Q.      Even though his intent in saying that is to prevent a human life from being taken, right?

A.      Yes, sir. But to me that's anticipating that it *could* happen. It's a *possibility* whenever they go in and commit that crime, even though they're not planning on killing anybody, there's a possibility that someone *could* be killed. To me that's an anticipation of the consequences that *could* happen once that crime was committed.

Q.      Okay. Let me ask you this. If we have a situation where people band together to do a certain crime.

A.      Yes, sir.

Q.      There's weapons involved.   Would you always find that because of that they were anticipating that a human life would be taken?

A.      There's always that *possibility*, and I think you always have to anticipate that that is the consequences that *could* occur under those circumstances.

Q.      As far as you're concerned, if the State shows that people agreed to do the offense and there were weapons involved. . . . One or more, you know. . . . Just something that could cause someone's death. . . . That all the people would then, the answer to Special No. 2, Special Issue No. 2 would always be yes, that they anticipated that a human life would be taken?

86

215

A.     They anticipate, yes, sir.

(RR 36: 158-60).   [Emphasis added.]   Later, this Court attempted to clarify Lucien's

position:

> THE COURT: . . . If you'll look at Special Issue No. 2, that last line anticipated that a human life would be taken. . . . From time to time in some of your remarks you said if someone took guns to a situation that they would anticipate that a life could be taken?
>
> PROSPECTIVE JUROR: Could be taken.
>
> THE COURT: Do you see the difference between would and could?
>
> PROSPECTIVE JUROR:   Could be taken is it might happen. Would be taken, it's going to happen.   And so they're anticipating when they're going in they're going to kill somebody.
>
> THE COURT: Okay.   Would you make the State of Texas prove the answer to Special Issue No. 2 is yes beyond a reasonable doubt?
>
> PROSPECTIVE JUROR: Yes.

(RR 36: 166-67).

To the extent his responses during defense examination suggested that he would

automatically answer the anti-parties special issue "yes" if he found applicant guilty as a

party, Lucien's failure to appreciate the difference between "would" and "could" calls the

certainty of those responses into doubt.   (RR 36: 159-60).   Once this Court pointed out

this distinction, Lucien said he would hold the State to its burden of proof on the anti-

parties special issue.   (RR 36: 166-67).   This corresponds with his earlier assurances to

the State that he would look at all the evidence and that he would return a "yes" answer

only if the State had met its burden of proving that applicant actually anticipated that a

human life would be taken.   (RR 36: 129, 132-33).   Looking at the voir dire examination

87

216

as a whole, this Court could have reasonably found that Lucien would not automatically answer the anti-parties special issue "yes." *See Cockrum v. State*, 758 S.W.2d 577, 586-87 (Tex. Crim. App. 1988) (upholding the denial of a challenge for cause where the record revealed that the prospective juror was initially confused by counsel's questions and unfamiliar with the law, but ultimately said she could follow the law).

In addition, as previously discussed, Lucien was not challengeable for cause simply because he would find that applicant anticipated that a human life would be taken based on the fact that applicant participated in a crime involving weapons. The above exchange with defense counsel reveals how Lucien would weigh evidence that applicant took part in an armed crime in answering the anti-parties special issue. That Lucien would find such evidence sufficient to prove actual anticipation does not demonstrate a bias against the law; it merely shows Lucien's personal understanding of proof beyond a reasonable doubt on this issue. *See Castillo*, 913 S.W.2d at 534.

<u>Lucien did not have a bias against the law concerning the minimum punishment for murder.</u>

Additionally, this Court could have reasonably found that Lucien would contemplate the entire range of punishment if he found applicant guilty of the lesser-included offense of murder. Indeed, Lucien assured the State and this Court that he could consider the full punishment range for murder and that he could assess a five-year sentence "[i]f the facts and circumstances warranted." (RR 36: 142-43, 168). Nevertheless, applicant contends that Lucien should have been struck for cause because

he told defense counsel that he "[p]robably" could not consider a five-year sentence. (RR 36: 165).

The Court of Criminal Appeals has upheld the denial of a challenge for cause under similar facts. *See Rosales*, 4 S.W.3d at 233 (holding that the trial court did not err in denying a challenge for cause to a prospective juror who told defense counsel he "probably" could not consider the five-year minimum sentence for murder, but, on questioning by the trial court, confirmed that he could consider the full punishment range). Given Lucien's repeated assurances that he could consider the entire range of punishment for murder, this Court did not abuse its discretion in denying applicant's challenge for cause. (RR 36: 142-43, 168).

Applicant has failed to establish that prospective juror Lucien had a bias against the law that rendered him challengeable for cause. At most, Lucien vacillated on his ability to follow the law. *See Garcia*, slip op. at 7. This Court was able to observe Lucien's demeanor during voir dire and, therefore, was in the best position to evaluate his responses. Applicant's thirty-fifth and thirty-sixth grounds for relief should be denied.

*This Court did not err in denying applicant's challenge for cause to prospective juror Robin Tucker.*

In grounds for relief thirty-seven and thirty-eight, applicant contends that prospective juror Robin Tucker should have been struck for cause because she (1) would always answer the future-dangerousness special issue "yes," (2) would expect the defense to bring forth mitigating evidence to justify imposing a life sentence, and (3) could never assess a five-year sentence for murder. (RR 37: 103-04).

### Tucker did not have a bias against the law concerning the future-dangerousness special issue.

Tucker told the State that she could presume the answer to the future-dangerousness special issue to be "no" and require the State to prove that the answer should be "yes." (RR 37: 72-73). Later, in response to defense questioning, Tucker said that someone who had been convicted of capital murder would probably be a violent person in the future. (RR 37: 90). She also indicated, however, that she would have to consider the evidence in answering this question. (RR 37: 89). Ultimately, she told this Court she could answer the future-dangerousness special issue "yes" or "no" depending on the evidence. (RR 37: 101).

Tucker assured both the State and this Court that she could answer the future-dangerousness special issue based on the evidence presented. (RR 37: 72-73, 101). Thus, the record supports this Court's implicit determination that Tucker could follow the law in this respect. *See Ladd*, 3 S.W.3d at 558-59 (holding that the trial court did not err in denying a challenge for cause where the prospective juror said he was inclined to answer the special issues in such a way that the death penalty would be assessed, but repeatedly assured the State and the trial court that he would answer the special issues based on the evidence).

### Tucker did not have a bias against the law concerning the mitigation special issue.

Similarly, the record supports this Court's determination that Tucker could follow the law with respect to the mitigation special issue. Under questioning by the State, Tucker said she could keep her mind open to possible mitigating evidence. While she

Case 3:06-cv-02185-M  Document 107  Filed 07/06/15  Page 224 of 236  PageID 1762

later told defense counsel that she expected such mitigating evidence to be presented by the defense, this remark did not evince a bias against the law. (RR 37: 86-87). Because the law does not assign the burden of proof on the mitigation special issue to the State, a prospective juror is not subject to a challenge for cause simply because she would place the burden of proving the existence of mitigating circumstances on the defense. *See Ladd*, 3 S.W.3d at 559.

<u>Tucker did not have a bias against the law concerning the minimum punishment for murder.</u>

Finally, this Court did not err in finding that Tucker could consider the full range of punishment for murder. Although she told the defense that she could never assess a five-year sentence for murder, she told the State and this Court that she could remain open to the entire punishment range and could give a five-year sentence in an appropriate case. (RR 37: 81, 99-100, 101-02). This Court resolution of Tucker's conflicting responses is entitled to deference. *See Ladd*, 3 S.W.3d at 559 ("If a venireman vacillated or equivocated with respect to his ability to follow the law, the appellate court must defer to the trial court's judgment.").

Applicant has not established that Tucker should have been struck for having a bias against the law. To the extent Tucker vacillated regarding her ability to follow the law, this Court was in the best position to resolve her qualifications as a juror. *See Garcia*, slip op. at 7. This Court did not abuse its discretion in denying applicant's challenge for cause. Grounds for relief thirty-seven and thirty-eight should be denied.

220

### RESPONSE TO GROUND 39:  APPELLATE REVIEW OF THE JURY'S ANSWER TO THE MITIGATION SPECIAL ISSUE

In his thirty-ninth ground for relief, applicant claims that Texas's death-penalty scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not permit "meaningful appellate review" of the jury's answer to the mitigation special issue.    He argues that the Court of Criminal Appeals has a constitutional and statutory duty to review the sufficiency of the evidence to support the jury's negative answer the mitigation special issue.  *See* TEX. CODE CRIM. PROC. ANN. art. 44.251(a) (Vernon Supp. 2004-05) ("The court of criminal appeals shall reform a sentence of death to a sentence of confinement . . . for life if the court finds that there is insufficient evidence to support . . . a negative answer to an issue submitted to a jury under Section 2(e), Article 37.071 . . . of this code.")

### *Applicant's Claim Should Be Denied as Procedurally Barred*

Applicant could have raised this complaint on direct appeal, but did not.  The purpose of habeas corpus is to determine the lawfulness of confinement, not to litigate claims that applicant neglected to raise on direct appeal.  *See Ex parte McGowen*, 645 S.W.2d 286, 288 (Tex. Crim. App. 1983).  Applicant's thirty-ninth ground for relief is procedurally barred.

### *Alternatively, Applicant's Claim Should Be Denied on Its Merits*

The Court of Criminal Appeals has already addressed and rejected the claim that article 37.071 is infirm as a matter of federal constitutional law because it precludes a meaningful review of the sufficiency of mitigating evidence.  *See McFarland*, 928

92

Scanned Aug 29, 2011

S.W.2d at 498-99; *see also Tong*, 25 S.W.3d at 715; *Ladd*, 3 S.W.3d at 573. The Court held that the constitutionality of article 37.071 is not contingent on appellate review of the mitigation issue: "So long as the jury is not precluded from hearing and effectuating mitigating evidence, we have never regarded appellate review of mitigating evidence to be an essential component of a constitutionally acceptable capital punishment scheme." *McFarland*, 928 S.W.2d at 499. Indeed, the Court noted, such review would be a practical impossibility. *Id.* Applicant's thirty-ninth ground for relief should be denied.

### RESPONSE TO GROUND 40: PROPORTIONALITY REVIEW

In his fortieth ground for relief, applicant contends that the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that the Court of Criminal Appeals conduct a proportionality review in death-penalty cases.

#### *Applicant's Claim Should Be Denied as Procedurally Barred*

Applicant could have argued on direct appeal that he had a constitutional right to a proportionality review of his death sentence. By failing to do so, he has forfeited this claim. *See Townsend*, 137 S.W.3d at 81. Applicant's fortieth ground for relief is procedurally barred.

#### *Alternatively, Applicant's Claim Should Be Denied on Its Merits*

The Court of Criminal Appeals has previously rejected the contention that the Due Process Clause requires it to conduct proportionality reviews in death-penalty cases. *See King v. State*, 953 S.W.2d 266, 273 (Tex. Crim. App. 1997); *Hughes v. State*, 897 S.W.2d 285, 294 (Tex. Crim. App. 1994). Accordingly, applicant's fortieth ground for relief is without merit and should be denied.

222

### RESPONSE TO GROUND 41: DEFINING "MITIGATING EVIDENCE"

In his forty-first ground for relief, applicant contends that Texas's death-penalty scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it limits the concept of mitigation to factors that make the capital defendant less morally blameworthy for his crime.

#### *Applicant's Claim Should Be Denied as Procedurally Barred*

Applicant's claim that the statutory definition of mitigating evidence is unconstitutionally narrow is one that could have been brought on direct appeal. Applicant may not use habeas corpus to litigate a claim that he could have raised on appeal. *See Boyd*, 58 S.W.3d at 136. His forty-first ground for relief is therefore procedurally barred.

#### *Alternatively, Applicant's Claim Should Be Denied on Its Merits*

Article 37.071 defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(f)(4). The Court of Criminal Appeals has held that "[b]ecause the consideration and weighing of mitigating evidence is an open-ended, subjective determination engaged in by each individual juror," the statute "does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness," as applicant contends. *Raby v. State*, 970 S.W.2d 1, 9 (Tex. Crim. App. 1998); *Cantu v. State*, 939 S.W.2d 627, 649 (Tex. Crim. App. 1996). Accordingly, applicant's forty-first ground for relief is without merit and should be denied.

### RESPONSE TO GROUND 42: JURY'S SENTENCING DISCRETION

Applicant contends in his forty-second ground for relief that the statutory mitigation special issue violates the Eighth and Fourteenth Amendments to the United States Constitution because it permits the very type of open-ended discretion condemned by the Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972).

#### *Applicant's Claim Should Be Denied as Procedurally Barred*

Applicant could have raised his *Furman* claim on direct appeal. By failing to do so, he has forfeited this claim. *See Townsend*, 137 S.W.3d at 81. His forty-second ground for relief is procedurally barred.

#### *Alternatively, Applicant's Claim Should Be Denied on Its Merits*

The Court of Criminal Appeals has rejected the contention that Texas's statutory mitigation issue allows the type of open-ended discretion condemned in *Furman*. *See Moore v. State*, 999 S.W.2d 385, 408 (Tex. Crim. App. 1999); *Pondexter*, 942 S.W.2d at 587. The Court in *Furman* was concerned with the open-ended discretion permitted by statutes that failed to narrow the class of death-eligible defendants. *Pondexter*, 942 S.W.2d at 587. "There is no prohibition against allowing juries to decide what evidence is mitigating, and how much weight they are going to give it." *Id.* Applicant's forty-second ground for relief fails on its merits and should be denied.

### RESPONSE TO GROUND 43: BURDEN OF PROVING AGGRAVATING CIRCUMSTANCES

In his forty-third ground for relief, applicant contends that the statutory mitigation special issue violates the Eighth and Fourteenth Amendments to the United States

Constitution because it fails to place the burden of proving aggravating circumstances on the State.

### *Applicant's Claim Should Be Denied as Procedurally Barred*

Applicant could have raised on direct appeal this challenge to the mitigation special issue, but he did not. Habeas corpus does not exist to provide an applicant with a second opportunity to raise appellate claims. *See McGowen*, 645 S.W.2d at 288. Applicant's forty-third ground for relief is procedurally barred.

### *Alternatively, Applicant's Claim Should Be Denied on Its Merits*

The Court of Criminal Appeals has repeatedly rejected the argument that the mitigation special issue is unconstitutional because it does not place on the State the burden of proof regarding aggravating evidence. *See Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004), *cert. denied*, 2005 U.S. LEXIS 2828 (Mar. 28, 2005); *Moore*, 999 S.W.2d at 408; *Williams v. State*, 937 S.W.2d 479, 491 (Tex. Crim. App. 1996). Because Texas law imposes on the State the burden of proving certain prescribed aggravating circumstances, a burden of proof need not be prescribed for aggravating circumstances that might be considered in connection with the open-ended mitigation issue. *Williams*, 937 S.W.2d at 491. Applicant's forty-third ground for relief is without merit and should be denied.

### RESPONSE TO GROUNDS 44 – 45: INDIVIDUALIZED SENTENCING
### *FEDERAL CONSTITUTIONAL CLAIM*

In his forty-fifth ground for relief, applicant contends that the death penalty, as it is administered in Texas, constitutes cruel and unusual punishment under the United States

Constitution because of the impossibility of restricting the jury's discretion to impose the death penalty while at the same time giving the jury unlimited discretion to consider mitigating evidence. In support of this contention, applicant relies on Justice Blackmun's dissent in *Callins v. Collins*, 510 U.S. 1141 (1994).

### *Applicant's Claim Should Be Denied as Procedurally Barred*

The Court of Criminal Appeals overruled applicant's federal constitutional complaint when he raised it in his twelfth point of error on direct appeal. *See Garcia*, slip op. at 10. Claims raised and rejected on direct appeal are procedurally barred from reconsideration on habeas review. *See Ramos*, 977 S.W.2d at 617. Applicant's forty-fifth ground for relief should be denied.

### *Alternatively, Applicant's Claim Should Be Denied on Its Merits*

The Court of Criminal Appeals has repeatedly rejected the argument that Texas's death-penalty scheme violates the federal constitution because it fails to appropriately channel the jury's discretion. *See Rayford*, 125 S.W.3d at 532; *Cannady v. State*, 11 S.W.3d 205, 214 (Tex. Crim. App. 2000) (citing *Raby*, 970 S.W.2d at 7; *Lawton*, 913 S.W.2d at 558). Applicant's forty-fifth ground for relief is therefore without merit and should be denied.

### STATE CONSTITUTIONAL CLAIM

In his forty-fourth ground for relief, applicant contends that the death penalty constitutes cruel and unusual punishment under the Texas Constitution.

97

226

### *Applicant's Claim Should Be Denied as Procedurally Barred*

Although he did not, applicant could have raised his state constitutional claim on direct appeal. The writ of habeas corpus may not be used to advance claims that should have been brought on appeal. *See Nelson*, 137 S.W.3d at 667.

Moreover, applicant has procedurally defaulted his state constitutional claim by failing to support it with separate argument and authority. Specifically, applicant does not explain why the Texas Constitution provides or should provide any different or greater protection against cruel and unusual punishment than the protection afforded under the United States Constitution. Applicant's state constitutional arguments will not be made for him. *See Muniz v. State*, 851 S.W.2d 238, 251 (Tex. Crim. App. 1993). The relief requested in ground forty-four should be denied.

### *Alternatively, Applicant's Claim Should Be Denied on Its Merits*

In *Cannady*, the Court of Criminal Appeals rejected a claim that Texas's death-penalty scheme violates Article I, section 13 of the state constitution due to the impossibility of reconciling the competing constitutional requirements of consistency and fairness. 11 S.W.3d at 214. Thus, applicant's forty-fourth ground for relief is without merit.

### RESPONSE TO GROUND 46: THE "12/10" RULE AND THE PROHIBITION AGAINST INFORMING THE JURY OF THE EFFECT OF A DEADLOCK

In his forty-sixth ground for relief, applicant contends that Texas's death-penalty scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because the rule that the first two special issues may not be answered "yes," and the third

227

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 232 of 236   PageID 1770

special issue may not be answered "no," unless at least ten jurors agree "may arbitrarily force the jury to continue deliberating" if it fails to garner the requisite number of votes to answer one of the special issues. He argues that the jury should be informed that a deadlock on any of the special issues will result in a life sentence for the defendant.

### *Applicant's Claim Should Be Denied as Procedurally Barred*

Applicant raised this exact complaint in his eleventh point of error on direct appeal, and the Court of Criminal Appeals rejected it. *See Garcia*, slip op. at 10. Claims that have already been raised and rejected on direct appeal will not be considered on habeas corpus. *Ramos*, 977 S.W.2d at 617. Applicant's forty-sixth ground for relief is procedurally barred.

### *Alternatively, Applicant's Claim Should Be Denied on Its Merits*

The Court of Criminal Appeals has repeatedly rejected identical attacks on the constitutionality of Texas's "12/10" rule. *Rayford*, 125 S.W.3d at 532 (citing *Turner v. State*, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002); *Jackson v. State*, 33 S.W.3d 828, 841 (Tex. Crim. App. 2000); *McFarland*, 928 S.W.2d at 519). The instructions on answering the special issues do not mislead the jury into thinking that the death penalty will be imposed unless ten or more jurors agree to answer the special issues in favor of a life sentence. *See Prystash*, 3 S.W.3d at 536. "Any juror who wishes to vote life contrary to the votes of the majority is 'given an avenue to accommodate the complained-of potential disagreements,' for 'every juror knows that capital punishment cannot be imposed without the unanimous agreement of the jury on all three special issues.'" *Id.* (quoting

228

Scanned Aug 29, 2011

*McFarland*, 928 S.W.2d at 519; *Lawton*, 913 S.W.2d at 559). Applicant's forty-sixth ground for relief should be denied.

## REPLY TO APPLICANT'S REQUEST FOR A HEARING

An evidentiary hearing is not necessary for the disposition of this application. Applicant raises no question of law or fact that cannot be resolved by this Court and the Court of Criminal Appeals upon review of the trial testimony, the applicable law, the official court records, and any affidavits or exhibits tendered with the application and this response. Moreover, applicant has failed to prove by a preponderance of the evidence that "controverted, previously unresolved factual issues material to the legality of [his] confinement" exist that necessitate an evidentiary hearing. TEX. CODE CRIM. PROC. ANN. art. 11.071, § 9(a). Accordingly, this Court should deny applicant's request for an evidentiary hearing on his claims.

Respectfully submitted,

BILL HILL
*CRIMINAL DISTRICT ATTORNEY*
DALLAS COUNTY, TEXAS

JOHANNA H. KUBALAK
*ASSISTANT DISTRICT ATTORNEY*
STATE BAR NO. 24014297
FRANK CROWLEY COURTS BLDG.
133 N. INDUSTRIAL BLVD., LB-19
DALLAS, TEXAS 75207-4399
(214) 653-3629
(214) 653-3643 *fax*

230

Case 3:06-cv-02185-M   Document 107   Filed 07/06/15   Page 235 of 236   PageID 1773

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing State's answer has been served on Richard E. Langlois, attorney for applicant, 217 Arden Grove, San Antonio, Texas 78215, by depositing same in the United States Mail, postage prepaid, on June 10, 2005.

JOHANNA H. KUBALAK

231

# CLERK'S CERTIFICATION

THE STATE OF TEXAS           §
                             §
COUNTY OF DALLAS             §

I, JIM HAMLIN, CLERK OF THE DISTRICT COURTS WITHIN AND FOR THE

STATE AND COUNTY AFORESAID, DO HEREBY CERTIFY THAT THE RECORD ON

THE APPLICATION FOR WRIT OF HABEAS CORPUS TO THE COURT OF CRIMINAL

APPEALS OF TEXAS, AUSTIN, TEXAS IN WRIT NO. **W01-00325-T(A)**

**JOSEPH C. GARCIA  v  THE STATE OF TEXAS.**

AS SHOWN IN **VOLUME 1 of 2,  Pages 1 - 231,** INCLUSIVE, TO WHICH THIS

CERTIFICATION IS ATTACHED THERETO AND MADE A PART THEREOF, CONTAINS

A TRUE AND CORRECT TRANSCRIPT OF ALL THE MATTERS AND PROCEEDINGS

HAD AND DONE IN SAID CAUSE

GIVEN UNDER MY HAND AND SEAL OF OFFICE IN DALLAS COUNTY,

TEXAS, THIS 19th DAY OF **April, 2006.**

JIM HAMLIN
CLERK OF THE DISTRICT COURTS
DALLAS COUNTY, TEXAS

BY: _____
DEPUTY/Gary Nimtz

231A